ORIGINAL

UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR - 5 2004
U.S. COURT OF FEDERAL CLAIMS

*****************************

ACE CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant.

*****************************

No. 04 - 299C

Judge ________________

## COMPLAINT

## JURISDICTION

Jurisdiction of this Court is founded upon the Contract Disputes Act of 1978, 41 U.S.C. 601 et seq.

## STATEMENT OF FACTS

1. On September 27, 2000, Contract No. DACA 63-00-C-0025 (the "Contract") was awarded by the U.S. Army Corps of Engineers (the "Corps"), Ft. Worth District to ACE Constructors, Inc. ("ACE"), Post Office Box 357490, Gainesville, Florida 32635-7490, for the Ammo Hot-Load Area Project No. 44921 at Fort Bliss, Texas.

2. The Contract awarded to ACE was based on ACE's unit price bid in the total amount of $8,616,840.00.

3. The Contract contained standard clauses governing Disputes (52-233-1), Differing Site Conditions (52-236-2), and Changes (52.243-4). The Corps further had a

common law duty to cooperate with the Appellant in the performance of the Contract, as well as an obligation not to unreasonably delay or hinder Contract performance.

4. The Corps breached its obligations to ACE by, inter alia, (a) providing inaccurate and misleading topographical survey information, and (b) providing inaccurate, misleading and conflicting contract drawings and specifications.

5. On November 4, 2002, ACE submitted a claim for $580,485.00 and a 53 calendar day time extension in accordance with the contract dispute clause and the Contract Disputes Act. A copy of the November 4, 2002 claim is attached as exhibit 1.

6. On August 6, 2003, ACE submitted a claim for $1,781,318.00 and a 120 calendar day time extension in accordance with the contract dispute clause and the Contract Disputes Act. A copy of the August 6, 2003 claim is attached as exhibit 2.

7. By letter dated March 7, 2003, the contracting officer issued a final decision denying the November 4, 2002 claim. A copy of the contracting officer's final decision is attached as exhibit 3.

8. By letter dated February 12, 2004, the contracting officer issued a final decision denying the August 6, 2003 claim. A copy of the contracting officer's final decision is attached as exhibit 4.

**COUNT ONE**

9. ACE hereby incorporates by reference the allegations contained in Paragraphs 1 through 8 of this Complaint as though fully set forth herein.

10. The contract documents upon which ACE based its bid included a topographical survey showing that the excavation required for the Project would generate surplus soil so that importation of borrow material would not be required for construction of the taxiway and pads required by the contract. Upon performance of the excavation

work, ACE discovered that the excavated material would not be sufficient to construct the taxiway and pads. ACE timely notified the Contracting Officer Engineer of the defect in the plans.

11. As a result of the defective topographical survey, ACE performed additional work for which it is entitled to additional compensation and contract time.

**COUNT TWO**

12. ACE incorporates by reference the allegations contained in Paragraphs 1 through 8 of this Complaint as though fully set forth herein.

13. As a result of the inaccurate contract drawings and specifications, the grading elevations required by the contract could not be constructed to the discreet elevation points required by the typical sections. In order to construct the Project, ACE was required to perform additional grading and other work for which it is entitled to additional compensation and contract time.

WHEREFORE, ACE is entitled to additional compensation and an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

Respectfully submitted,

Dated: March 4th, 2004

W. Robert Vezina III

W. Robert Vezina, III
Florida Bar No. 0329401
Vezina, Lawrence & Piscitelli, P.A.
318 North Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Telefacsimile: (850) 224-1353

ACE
CONSTRUCTORS, INC.

*Your Challenge*
*is our Challenge*

November 4, 2002

U.S. Army Corps of Engineers
8380 Morgan Avenue, Suite B
Fort Bliss, Texas 79906

**Attn.:** **David L. Wise, P.E.**

**Re:** **ACE Constructors, Inc. Certified Claim on the Ammo Hot-Load Area, Project No. 44921, Contract DACA63-00-C-0025**

Dear Mr. Wise:

ACE Constructors, Inc. ("ACE") hereby submits a Contracting Officer's Final Decision on this certified claim ("the Claim") on the Ammo Hot-Load Area, Project No. 44921 ("the Project"), Contract DACA63-00-C-0025 ("the Contract") for the sum certain of $580,485 along with a 53 calendar-day extension to the contract time. ACE continues to be willing to resolve this matter by meeting with the U.S. Army Corps of Engineers ("COE") at a mutually agreeable time and place, or by submitting to a mutually agreeable dispute resolution procedure.

In accordance with FAR 33.207(c), I certify the Claim as follows:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

ACE initiates this Claim through section 52.233-1, "Disputes," of the Contract, as well as the Contract Disputes Act of 1978, as amended.

**Basis of Claim**

The basis of the Claim is set forth in the narrative time line of events attached hereto as Exhibit 1. By way of brief summary, ACE reasonably determined from the topographical survey contained in the bid documents that the Project would generate surplus soil and no importation of borrow material would be required. Stated differently, the bid documents reflected that the material excavated during construction of the ditches would be more than sufficient to construct the taxiway and pads. An independent consultant retained during the bidding stage confirmed our view (Attachment 1). ACE bid the Project accordingly.

EXHIBIT
tabbies
1

P.O. Box 357490 • Gainesville, Fl (352) 384-0272 • (352) 384-0282 FAX

## Notice to COR

As set forth in Exhibit 1, ACE gave notice to COE's on-site Quality Assurance Representative of the defective topographical information upon discovery of such in the field. Specifically, COE was told that the preliminary survey information commissioned by ACE revealed that there would not be enough excavated fill for the Project. In response to a second notice, COE's on-site representative directed ACE to complete the topographical survey to fully substantiate the design bust before COE would provide a directive on how to proceed to complete the work.

Promptly upon completion of the new topographical survey, ACE met with COE's on-site representative to seek direction. ACE submitted Requests for Information and discussions with COE continued, with ACE providing COE with a projected date of when the supply of on-site dirt from the area to be excavated would be exhausted.

ACE was able to demonstrate that the actual elevation of the Project was two feet lower than indicated on the Contract plans upon which ACE based its bid. ACE calculated; and so informed COE, that an additional 125,000 cubic yards of fill was required to complete the Project.

## The Solution

To mitigate potential adverse impact to cost and schedule, ACE took a proactive approach in an attempt to mitigate adverse impacts to the Contract and schedule, and worked cooperatively with COE to implement the most expedient and cost effective fix available. ACE identified a potential source of additional dirt from a nearby project and obtained a directive from the COE Resident Engineer to import available fill from that project site. The Resident Engineer also gave directives to widen the ditches on the Project and to double the size of on-site ponds to generate additional borrow material.

There should be no dispute that the "fix" employed was the best and least expensive approach to remedy the significant shortfall of material needed to complete the Project. Construction was not halted and the integrity of other key aspects of project design (e.g. drainage, utilities, etc.) was maintained.

Regardless of the characterization of the claim (e.g., design bust or differing condition) or the date of implementation, the additional dirt had to be generated from or imported to the site in order to complete the Project. ACE and COE found and implemented the best way to do this at the least cost to the government.

## Cost Impact

ACE originally scheduled eight weeks to complete the grading work; it actually took 15 weeks. The amount of dirt moved approximately doubled from what had been represented by COE in the Contract Documents. As such the last seven weeks of grading work was additional to the Contract and the costs therefore are set forth in the Claim.

We have included the costs incurred by ACE as a direct result of COE's constructive acceleration (i.e., overtime premium) of the Project, resulting from its refusal to grant a time extension as a result of the additional work required to complete the fill to the contract grades. Also, as part of the acceleration component, we have quantified the decreased productivity suffered due to the longer workweeks required to make up lost time. We rely on proven industry standards to document these impacts. A detailed description of the cost impact is attached hereto as Exhibit 2.

The total cost for the Claim is $580,485 along with a 53 calendar-day extension to the contract time.

**Miscellaneous Items**

Under the Equal Access to Justice Act, 5 U.S.C.A. s.504, ACE seeks recovery from the government for fees and other expenses incurred by it in connection with the prosecution of this claim.

ACE makes this submission with the express reservation of its rights to submit a claim for itself and on behalf of its subcontractor, Cambro Construction, Inc., under the referenced contract for separate and distinct items from those presented herein.

Sincerely,

ACE CONSTRUCTORS, INC.

John R. Fulkerson
President
(Executed as Required by FAR 33.207(e))

ACE
CONSTRUCTORS, INC.

*Your Challenge is our Challenge*

August 6, 2003

U.S. Army Corps of Engineers
8380 Morgan Avenue, Suite B
Fort Bliss, Texas 79906

**Attn.:** **David L. Wise, P.E.**

**Re:** **ACE Constructors, Inc. Request for Equitable Adjustment on the Ammo Hot-Load Area, Project No. 44921, Contract DACA63-00-C-0025**

Dear Mr. Wise:

ACE Constructors, Inc. ("ACE") hereby submits a Request for Equitable Adjustment ("the Request") on the Ammo Hot-Load Area, Project No. 44921 ("the Project"), Contract DACA63-00-C-0025 ("the Contract") for the sum certain of $1,781,318 along with a 120 calendar-day extension to the contract time. ACE continues to be willing to resolve this matter by meeting with the U.S. Army Corps of Engineers ("COE") at a mutually agreeable time and place, or by submitting to a mutually agreeable dispute resolution procedure.

In accordance with FAR 33.207(c), I certify the Request as follows:

> I certify that the Request is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the request on behalf of the contractor.

ACE initiates this Request through section 52.233-1, "Disputes," of the Contract, as well as the Contract Disputes Act of 1978, as amended.

**Basis of Request**

The Request is based upon ACE's and Cambro's belief that the Contract Documents were defective in three different but related areas. The first defect consisted of conflicting plans that were incorporated into the Contract Documents. Typical sections shown on drawing sequences 59 through 62 showed the subgrade, drainage layer rock and concrete being finished at consistent grades ranging from 0.5% to 2%. ACE bid the Project accordingly. During construction, ACE attempted to grade the subgrade and drainage layer at the slopes specified in the typical sections. Finish grading of these components at the grades shown in the typical sections did not meet the survey elevations shown in the project plans. After investigation and analysis by ACE and our surveyors, it was determined that the discrete elevations shown on the plans did not yield the consistent grades shown on the typical sections.

EXHIBIT
tabbies
2

The second defect in the Specifications was the requirement included in Section 02753 Part 3.5.5.1.b to use three-meter long steel forms for the concrete paving. As described in Cambro's Request, the grade contours resulting from the specified grade elevation points had grade breaks at random locations. These grade breaks made it impossible for three-meter long rigid forms to conform to the surface of the drainage layer. This defect is more fully described in Cambro's narrative.

The third defect was the requirement included in Specification Section 02753 Part 1.3.7 that profilograph testing to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length. As described in Cambro's Request, the profilograph machine is designed to test roadway sections much longer than the sixty-meter minimum employed on this project. The machine design was not applicable to the subject project due to the short test runs and the test results were statistically inaccurate. This defect is more fully described in Cambro's narrative.

**Notice to COR**

ACE and Cambro complained vigorously to COE on numerous occasions about these issues starting in September 2001. The COE formally agreed in November 2001 to eliminate the profilograph testing requirement for areas of the project.

**The Solution**

To mitigate potential adverse impact to cost and schedule, ACE and Cambro took a proactive approach in an attempt to mitigate adverse impacts to the Contract and schedule, and worked cooperatively with COE to determine and implement the most expedient and cost effective fix available.

ACE solved the grading problems caused by the first defect described above by employing additional labor and equipment to hand measure and grade the slopes between each of the elevation locations identified on the project plans. Since the slopes could not be finished at the grades shown on the typical sections, ACE demobilized the laser system that had been purchased and mounted on the motor grader specifically for the purpose of this finish grading. The hand grading allowed ACE to conform to the distinct grade points specified in the plans.

In response to the problems created by the second defect described above, ACE provided Cambro with additional labor to perform hand grading of each of the concrete lanes prior to forming and with surveyors to shoot grades full-time while Cambro set the forms. Cambro performed hand grading under the three-meter forms to attempt to achieve a level surface upon which to set the forms.

ACE and Cambro agreed to resume pouring concrete on the pallet storage pad after COE agreed to eliminate the profilograph requirement for this portion of the work. Our project team continued to struggle with this requirement throughout the remainder of the project and eventually hired a concrete surfacing contractor to finish the concrete so that it would pass the profilograph tests.

There should be no dispute that the "fix" employed was the best and least expensive approach to remedy the conflicts and defects in the plans and specifications. Construction was not halted after COE modified the profilograph testing requirements and the integrity of other key aspects of project design (e.g. drainage, utilities, etc.) was maintained.

After careful analyses, ACE and Cambro determined and implemented the best way to do the work at the least cost to the Government.

**Cost Impact**

The grading of the subgrade took ACE an additional three weeks of work because of the failure of the laser system on the motor grader and the additional complexity created by the irregular geometry of the surface. The irregular surface caused ACE to string line the subgrade in order to meet the grades shown on the plans.

ACE incurred additional costs to finish the drainage layer rock due to same irregular surface geometry. As with the subgrade, ACE was forced to string line the entire surface of the drainage layer to meet the plan grades. This additional work added two weeks to the time required finishing the drainage layer rock.

ACE incurred delay costs during the period of time from September 24, 2001 through October 6, 2001 when Cambro was forced by the Government's adherence to the defective profilograph specification to stop work on the project. During this delay period, drainage layer rock that had been ready to pave became covered with sand. When the Government agreed to abandon the profilograph specification for work on the pallet storage pad and Cambro returned to work on the project on October 6, ACE spent the next two weeks removing and refinishing the rock that had been ready to pave on September 24.

The irregular surface forced ACE to provide full time support in the form of labor and surveying services to Cambro while the forms were set. ACE directed our surveying subcontractor to shoot the elevation of each end of every form prior to and after setting in order to ensure that the top of the concrete met the elevations specified in the plans. In order to place the concrete at the specified thickness, ACE was forced to string line every paving lane at close intervals and hand finished inside the forms after they had been installed and prior to paving.

The total cost for the Claim is $1,781,318 along with a 120 calendar-day extension to the contract time.

**Miscellaneous Items**

Under the Equal Access to Justice Act, 5 U.S.C.A. s.504, ACE seeks recovery from the Government for fees and other expenses incurred by it in connection with the prosecution of this claim.

ACE makes this submission with the express reservation of its rights to submit a claim for itself and on behalf of its subcontractor, Cambro Construction, Inc., under the referenced contract for separate and distinct items from those presented herein.

Sincerely,

**ACE CONSTRUCTORS, INC.**

John R. Fulkerson
President

(Executed as Required by FAR 33.207(e))

**REQUEST FOR EQUITABLE ADJUSTMENT**
**COST SUMMARY**

| | | | TOTAL DIRECT COST |
|---|---|---|---|
| Additional grading: | | | |
| Subgrade | | | $67,217 |
| Drainage layer | | | $34,884 |
| Concrete forming support | | | $199,616 |
| Profilograph | | | $85,613 |
| Cambro cost | | | $935,131 |
| TOTAL DIRECT COST | | | $1,322,461 |
| Field Overhead | Direct cost | 10% | $132,246 |
| TOTAL FIELD COST | | | $1,454,707 |
| Home office overhead | Field cost | 10% | $145,471 |
| TOTAL COST | | | $1,600,178 |
| Profit | Total cost | 10% | $160,018 |
| SUB-TOTAL | | | $1,760,196 |
| Bond cost | Sub-total | 1.2% | $21,122 |
| TOTAL REQUEST FOR EQUITABLE ADJUSTMENT | | | $1,781,318 |

CERTIFIED - RETURN RECEIPT REQUESTED

**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P. O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO ATTENTION OF:

March 7, 2003

Office of Counsel

SUBJECT: Differing Site Condition Claim from ACE Constructors, Inc., under Contract No. DACA63-00-C-0025, Ammo Hot Load Area, Fort Bliss, Texas

Mr. John R. Fulkerson
President
ACE Constructors, Inc.
Post Office Box 357490
Gainesville, Florida 32635-7490

Dear Mr. Fulkerson:

The claim, which you submitted through your letter dated November 4, 2002, has been received and reviewed. ACE Constructors, Inc. (ACE), requests additional compensations in the amount of $580,485.00 as the result of allegedly incurring a differing site condition.

ACE asserts that the topographical information contained in the contract drawings indicated that excavation at the site would generate sufficient fill wherein it would not be necessary to import fill material from off-site locations. ACE alleges that the elevations indicated on the contract drawings contained errors, necessitating the importation of approximately 125,000 cubic yards of fill. ACE seeks recovery under the Differing Site Conditions and Disputes clauses of the contract.

The Differing Site Conditions clause of the contract is found under General Clause 52.236-2. Under subparagraph (a) of the clause the contractor is required to promptly and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature,

EXHIBIT
tabbies
3

which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. The claim which you submitted would fall under category (1), latent physical conditions at the site that differ materially from those indicated in the contract.

Under the Differing Site Conditions clause, the Contracting Officer is required to investigate the site conditions promptly after receiving the notice. If the conditions do materially differ from those indicated in the contract causing an increase or decrease in the contractor's costs, or the time required for performing any part of the work under this contract an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

However, the Differing Site Conditions clause contains a caveat in subparagraph (c) that "no request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the contractor has given the written notice required; provided, that the time prescribed in (a) above for given written notice may be extended by the Contracting Officer."

A notice requirement is also found under Section 01720 of the contract, entitled, Survey, Layout, and Other Data. Section 01720 requires the contractor during initial site layout and before existing conditions are disturbed to:

> ...verify, in writing, the basic survey data provided on the contract drawings. Verification shall be initiated from the point shown on the contract drawings or from the contract drawing reference point designated by the Contracting Officer's Authorized Representative and shall include, as a minimum benchmark elevations,

> horizontal control points, and sufficient spot checks of critical elevations to ensure that the survey data adequately reflects existing conditions. The Contractor shall not proceed with construction until survey verification is provided to the Contracting Officer's Authorized Representative.

After a review of the documents submitted with your claim and after a review of documents contained in the contract files, I must conclude that ACE has failed to comply with the notice requirements of the Differing Site Conditions clause and failed to perform the verification required under Section 01720 of the Technical Provisions.

ACE claims in its August 15, 2001 letter, that the Government was provided notice of the differing site condition as early as January 29, 2001, during an alleged conversation between ACE representatives and the Government's Quality Assurance Representative, Mr. Menchaca. The alleged conversation did not occur since Mr. Menchaca was on leave on that date. Neither the Government Quality Assurance Report (QAR) nor the contractor's Quality Control Report (QCR) corroborate ACE's allegation. ACE also alleges that it advised Mr. Menchaca on February 6, 2001, that the existing grade was lower than that shown on the contract drawings. Mr. Menchaca denies that these allegations were made to him. Neither the QAR nor the QCR corroborate that this issue was discussed with the Government's representative.

ACE alleges that Mr. Menchaca and the Project Engineer, Mr. Fuentes, were advised on March 16, 2001, of the differing site conditions. Mr. Fuentes does not recall a meeting on March 16, 2001, with ACE. Mr. Menchaca and Mr. Wagner, the Southwest Area Office Mechanical Engineer, met with ACE to discuss tracer wire on water pipe. Neither the QAR nor QCR reflected that the alleged differing site conditions were discussed on March 16, 2001.

ACE further alleges that the differing site condition was discussed with David Wise, the Resident Engineer at Fort Bliss on March 23, 2001. Mr. Wise is alleged to have instructed ACE to obtain fill material by widening the ditches, to import fill material from Dan William's project, and to submit a request for equitable adjustment. Subsequently, Mr. Wise is alleged to have limited the extent of widening the ditches and obtain fill from the retention ponds. Mr. Wise denies these allegations. Mr. Wise indicated that he did advise ACE that a claim could be submitted under the Disputes clause of the contract and that a claim would be evaluated.

I find no evidence that ACE advised the Government of the existence of the differing site condition until its April 27, 2001 letter. The notice provided in the April 27, 2001 letter was not in compliance with either the notice requirement of the Differing Site Conditions clause of the contract or Section 01720 of the Technical Provisions. By the time the notice was provided, the site had been cleared and grubbed, the ditches excavated, and fill placed on the areas which served as pads for the loading and storage areas. Therefore, the contractor's failure to provide notice deprived the Government of an opportunity to investigate the alleged differing site condition prior to the conditions being disturbed. Even if ACE's position was accepted that Mr. Wise was provided notice of the differing site conditions on March 3, 2001, the clearing and grubbing had been completed at that time and the excavation of the trenches had started. Therefore, it would have been impossible on March 23, 2001, to verify the conditions that existed prior to ACE starting to work. I find no evidence to collaborate ACE's allegations that notice in late January, February, or on March 16, of the differing site conditions was provided to Government representatives.

I find that the failure to provide notice of the alleged differing site conditions prejudiced the

Government. Each of the grading plans describes the contours as "PROPOSED CONTOURS." If the Government had been provided notice of the alleged differing site condition, and if the differing site conditions actually existed, the Government could have adjusted the contours in order to mitigate damages. ACE's failure to provide timely notice, as required by the contract, deprived the Government of that opportunity. Additionally, ACE has presented no surveys or other documents establishing that a differing site condition was encountered. The only evidence ACE has submitted in support of its claim are marked-up copies of the contract drawings containing cross sections. These marked-up drawings contain elevations and other notations. However, no survey data is provided to establish the correctness of the elevations. Therefore, I do not find them persuasive.

This letter constitutes the final decision of the Contracting Officer denying your claim for additional compensation. The parenthetical references within the enclosed Findings of Fact refer to correspondence and other documents which substantiate this decision and which will be furnished to you in the event you wish to appeal this decision.

This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof should be furnished to the Contracting Officer from whose decision the appeal was taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number.

In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring action directly in the U.S. Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Joan O. LoRe
Contracting Officer

Enclosure

# FINDINGS OF FACT

Subject: Claim by ACE Constructors, Inc., Differing Site Conditions

Contract No. Contract No. DACA63-00-C-0025, Ammo Hot Load Facility, Fort Bliss, TX

## A. Introduction

ACE Constructors, Inc. (ACE), has submitted a claim in the amount of $580,485.00 alleging they encountered a differing site condition while performing the contract for the construction of the Ammo Hot Load Facility at Fort Bliss, TX. ACE asserts that the topographical information contained in the contract drawings indicated that excavation at the site would generate sufficient fill wherein it would not be necessary to import fill material from off-site locations. ACE alleges that the elevations indicated on the contract drawings contained errors, necessitating the importation of 125,000 cubic yards of fill. ACE seeks recovery under the Differing Site Conditions and Disputes clauses of the contract.

## B. Pertinent Contract Provisions

1. The contract, a Standard Form 1442 construction contract, was awarded to ACE on September 27, 2000, in the amount of $8,616,840.00. (Tab 3) The contract required the construction of roads, drainage ditches and drainage structures areas, a loading pad and shelter and a taxiway for an ammunition loading area at Biggs Army Airfield.

2. The contract, a Standard Form 1442 construction contract, included the standard provisions of general application required by the Federal Acquisition Regulations (FAR). These include the contract clauses entitled Disputes (FAR 52.233-1) and Differing Site Conditions (FAR 52.236-2)

3. General Clause 52.236-2, Differing Site Conditions, provides:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of

(1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or

(2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the contractor has given the written notice required; provided, that the time prescribed in (a) above for given written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment of this contract. (Tab 3)

4. Section 01720 (Tab 4) of the contract is entitled "Survey, Layout and Other Data." This section provides in part:

During initial site layout and before existing conditions are disturbed the Contractor shall verify, in writing, the basic survey data provided on the contract drawings. Verification shall be initiated from the point shown on the contract drawings or from the contract drawing reference point designated by the Contracting Officer's Authorized Representative and shall include, as a minimum benchmark elevations, horizontal control points, and sufficient spot checks

of critical elevations to ensure that the survey data adequately reflects existing conditions. The Contractor shall not proceed with construction until survey verification is provided to the Contracting Officer's Authorized Representative.

5. Drawing Sequence No. 1 (Tab 5) provides the elevations control points. Elevation control point No. 1 is located to the southeast of the project site. It has an elevation of 1195.892 meters (M). Elevation control point No. 2 is located north or the project site and has an elevation of 1195.802 M.

6. Drawing Sequence Nos. 2 and 3 (Tabs 6 and 7) indicate that the contract consisted of the construction of a taxiway (Tabs 59 and 60), an Ammo Hot Load Apron (Tab 59), a pallet storage shelter (Tab 58), a sentry station, retention ponds (Tabs 52, 55 and 56) and access roads and drainage ditches (Tabs 50, 51, 53 and 54).

7. Drawing Sequence Nos. 24 through 29 (Tabs 8 through 13) contains the grading plan. Each plan depicts existing contours by means of a dashed line. Many of the existing contours have elevations ascribed to them. Solid darkened lines representing the final elevations are labeled "PROPOSED CONTOURS."

8. Drawing Sequence No. 24 (Tab 8) provides a grading plan for the southern segment of the taxiway, where it intersects with the existing runway (See the photograph at Tab 60). The grading for this area is shown to have a built-up area for the taxiway with ditches 8.61 M wide cut on each side of the taxiway. Finished contours on this drawing are denoted as "PROPOSED CONTOURS."

9. Drawing Sequence No. 25 (Tab 9) provides a grading plan for the northern segment of the taxiway, the ammo-loading apron and the pallet storage shelter (See the photographs at Tabs 58 and 59). The grading plans show the taxiway, the ammo loading apron and the slab for the storage shelter to be built-up areas. Ditches, 8.61 M wide are shown on either side of the taxiway, the loading apron and the shelter slab. Finished contours on this drawing are denoted as "PROPOSED CONTOURS."

10. Drawings Sequence No. 26 (Tab 10) provides the grading plan for the area north of the ammo loading apron and the storage shelter. The ditches are shown to join and drain to the west. The grading plan for the southern segment of the

access road is also shown on this drawing. Finished contours on this drawing are denoted as "PROPOSED CONTOURS."

11. Drawing Sequence Nos. 27, 28 and 29 (Tabs 11 through 13) provide the grading plans for the access road. Finished contours on these drawings are denoted as "PROPOSED CONTOURS." Drawing Sequence No. 28 shows the locations of the retention pond. The retention pond is the shaded area at the bottom of the drawing labeled "DETENTION AREA." (See photographs found at Tabs 52, 55 and 56)

12. Cross sections of the final grades for the roadways, the taxiway and the apron are shown on Drawing Sequence Nos. 66 through 88 (Tabs 14 through 36). The existing elevations are shown on the cross sections by a dashed line. The cross sections indicate the amount of cut (excavations) and fill required to achieve the final grade. The locations of the retention ponds are shown on Drawing Sequence No. 88 in the top profile. The retention ponds are shown to be 60 M wide on one side of the road and 20 M wide on the other side of the road.

13. Ace started clearing and grubbing (removal of vegetation and roots) activities started on January 9, 2001 (Tab 37, p. 00158). Clearing and grubbing activities continued through January 29, 2001 (Tab 37, p. 00162-00233).

14. ACE subcontracted the survey work to SLI Engineering (SLI). SLI worked on setting the clearing limits or the grade limits stakes from January 7, 2001 (Tab 37, p. 00150) through January 15, 2001 (Tab 37. p. 00179). SLI then worked to create a topography grid from January 16 until January 30, 2001 (Tab 37, p. 00184-00237).

15. ACE started stripping of topsoil and leveling the loading pad on February 2, 2001 (Tab 38, p. 00249). Excavation and fill activities started on February 5, 2001 and continued throughout February 2001 (Tab 38, p. 00257-00343).

16. During February 2001, SLI was setting grade stakes. (Tab 38)

17. In March 2001, ACE continued its excavation and fill activities. The Contractor's Daily Quality Control Report (QCR) dated March 2, 2001 (Tab 39, p. 00351), under paragraph 5 indicates "We are in need of more dirt."

18. The Government's Quality Assurance Report (QAR) dated March 5, 2001 (Tab 39, p. 00357) reflects: "The amount of cut does not balance with the amount of fill needed to finish the job. Ideas talked about today were lessening the slope on road and lowering job. Also discussed was widening the trenches." "Will discuss further." The QAR dated March 5, 2001, reflects "Talked about dirt shortage and alternate plan." (Tab 39, p. 00360)

19. The QAR dated March 6, 2001 (Tab 39, p. 00362), indicates "cut and fill do not balance."

20. The daily QAR dated March 8, 2001 (Tab 39, p. 00370), indicates: "Along with Roland Ray and Telo Fuentes the conference call held with AE on bal [balance] and fill and cut, he said he was never asked to design a balance job." The report also indicates "The contractor waiting on answer for dirt is his delay and not a delay of the Gov't." The Quality Control Report (QCR) dated March 8, 2001 (Tab 39, p. 00373), reflects "Danny said discussion on dirt will be made very soon...Still waiting on discussion for dirt."

21. The contractor in its QCR dated March 10, 2001 (Tab 39, p. 00377), indicates "We will be out of dirt to move on pads by Wed, March 14 if decision is not made." The QCR for March 10, 2001 (Tab 39, p. 00380), reflects "Getting close to no dirt to move. Subseqluently on March 12, 2001 (Tab 39, p. 0000389), the contractor in its QCR indicates "We are cutting the last of the dirt out of the ditches."

22. The QCR dated Wednesday March 14, 2001 (Tab 39, p. 00398), indicates "We are going to be out of dirt Thursday." On March 15, 2001, the contractor in its QCR report (Tab 39, p. 00402) indicates "We are scraping the last of the dirt."

23. RFI No. 4 (Tab 47) was received by the Corps of Engineers (COE) on March 13, 2001. The RFI stated:

> Dirt-We are going to be out of dirt by Wed, 3-07-01. The amount of fill to go on the taxiway loading pad and pallet shed will require about 125,000 cu. yds. of dirt. We will need another place to get dirt from. As a suggestion we could widen the ditches.

The COE responded to the RFI on March 14, 2001 (Tab 42). ACE was advised "Earth fill is a contractor responsibility. Please submit any suggestion in writing to Govt. for review."

24. The contractor indicated in its QCR dated March 16, 2001 (Tab 39, p. 00406): "The dirt resolution has not been solved. If we do not get a resolution by Friday March 3, this will change complete schedule." The QCR for March 17, 2001 (Tab 39, p. 00409), indicates the contractor was excavating dirt from the detention pond.

25. The contractor continued to excavate fill material from the detention ponds on March 19, 23, 24, and 26 through 31, 2001 (Tab 39, p. 00417, 00434, 00438, 000446-00467). The contractor excavated fill material from the ditches on March 20, 21, 22, 23, and 24, 2001 (Tab 39, p. 00422, 00426, 00430, 00434, and 00438).

26. The QAR dated March 22, 2001, reflects "In meeting with Dave Wise over quantities it was agreed that ACE would provide quantities showing original topo." (Tab 39, p. 00428)

27. The QCR dated March 24, 2001 (Tab 39, p. 00439), indicates, "We have been slowed because of rock dirt but we are continuing. On March 25, 2001, the QCR (Tab 39, p. 00443) indicates "We will start to import dirt Monday from Dan Williams job site."

28. On March 26, 2001, ACE received 60 loads of dirt from Dan Williams's jobsite. (Tab 39, p. 00447) Dirt was received from the Dan Williams jobsite on March 27 through March 31 (Tab 39, p. 00445, 00455, 00459, 00463).

29. The QAR dated April 2, 2001 (Tab 40, p. 00473), indicates:

> In a meeting with Jerry and Del (ACE) along with Dave Wise it was agreed to allow ACE to widen ditches. It was also agreed that quantities would be made available to the CORPS. Ditches would be widened away from the pads. Also detention ponds would also be made wider...Dave Wise has agreed to let ACE widen ditches and ponding areas for remaining fill needed.

30. The QCR for April 2, 6, 7, 9, 10, 13, 16, and 30, 2001 (Tab 40, p. 00475, 00492, 00496, 00504, 00509, 00521, 00529, 00588), indicates that ACE was excavating fill from the detention pond. Fill was excavated from the detention pond and the ditches on April 3, 2001 (Tab 39, p. 00480). Fill was excavated from the ditches on April 4, 5, 11, 12, 17, 18, 19, 20, 21, 23, 24, 25 through 28, 2001 (Tab 40, p. 00484, 00488,

00513, 00517, 005534, 00538, 00543, 005547, 00551, 00559, 00563, 00568, 00572, 00576, 00580). Fill was obtained from the west end of the runway on April 5, 6, 7, 11, 12, 13, 16, 19, 20, and 21, 2001 (Tab 40, p. 00488, 00492, 00496, 00509, 00513, 00521, 00529, 00543, 00547, 00551).

31. The QCR dated April 4, 2001 (Tab 40, p. 00485), indicates "We are to widen ditches to get balance of dirt for our fill." The QAR for April 16, 2001, indicates "ACE now widening out ponding areas." (Tab 40, p. 00527)

32. The QCR dated May 1, 2002 (Tab 41, p. 00594), reflects:

> Telo said we would be receiving a progress deficiency letter as required. The response to this is because of the topole [sic topo] being off we have had to move more dirt than the plans call for.

33. Fill was excavated from the detention pond on May 1, 2, 3, 4, 7, 8, 9, 10, and 11, 2001 (Tab 41, p. 00593, 00597, 00601, 00605, 00613, 00618, 00622, 00626, 00630).

34. ACE's initially approved schedule (Tab 48) was submitted for approval on February 20, 2001 and approved on March 6, 2001. The schedule had two earthwork activities. Road earthwork was scheduled to start in late April 2001 and continue until mid-June 2001. Apron and taxiway earthwork was scheduled to start in February 2001 and continue until mid-March 2001.

35. ACE in a letter dated April 27, 2001 (Tab 42), submitted to the COE a request for equitable adjustment for additional embankment placement as a result of purported errors in the contract documents. ACE alleged that the existing elevations shown on the project plans were erroneous. ACE asserted that its bid take-off indicated only a nominal quantity of excess fill would be required. The excess fill would be available from the ditch and pond cuts. ACE asserted that it had a topographic survey prepared by a professional surveyor. The topographical survey allegedly indicated that the existing elevations ranged from one to two feet lower than the elevations shown on the contract documents requiring more fill to attain the final grade.

ACE asserted that three estimates were prepared indicating that between 116,000 and 125,000 cubic yards of additional material would be required to achieve the finish elevations shown on the drawings. Applying a shrinkage factor and

averaging the estimates, ACE asserted that an additional 129,000 cubic yards of fill was required, which doubled its original estimated quantity. Additional fill was obtained from the Dan Williams project, enlarging the retention ponds, and widening the ditches. ACE alleged that obtaining fill from these sources resulted in the contractor incurring higher unit costs for construction of the embankment.

36. The request for equitable adjustment was quantified by ACE in a letter dated May 29, 2001 (Tab 43). The May 29, 2001 letter substantially repeated the allegations contained in the April 27, 2001 letter. A cost breakdown in the amount of $567,126.00 was provided in the May letter.

37. The Contracting Officer's Representative, David Wise advised ACE in a letter dated July 13, 2001 (Tab 44), that due to ACE's failure to comply with the provisions of Section 01720 of the contract, to verify existing conditions before disturbing those conditions and due to ACE's failure to provide timely notice under the Differing Site Conditions clause of the contract, the COE was denied the opportunity to verify the existence of the alleged differing site condition. ACE was advised that their daily QCR dated March 5, 2001, was the first notice to the COE that the cut and fill was not balanced. The first allegation by ACE that they had incurred a differing site condition was in their letter dated April 27, 2001. ACE was advised that the disturbance of the natural elevations at the site though clearing and grubbing in January 2001, and cut and fill activities in February 2001, made it impossible for the COE to investigate or address the alleged differing site condition. ACE was advised that due to lack of notification the Government's position was prejudiced and the Government was not provided the opportunity to mitigate damages.

38. ACE in a letter dated August 15, 2001 (Tab 45), repeated their allegations that the contract drawings contained inaccurate elevations and ACE was required to import fill to the site. ACE asserted that the contract drawings indicated that there was approximately 20,000 cubic yards of excess dirt on the site. ACE alleged that on February 6, 2001, Danny Menchaca, the Government's Quality Assurance Representative, was advised that the COE provided elevations appeared to be in error and significantly overstated the amount of fill available on site. ACE alleged that a Mr. Fletcher and Mr. Hyland advised Mr. Menchaca that the surveyors were indicating that the existing grade was lower than shown on the contract documents.

Mr. Menchaca is alleged to have advised ACE to complete the topo survey to substantiate that the plans were defective.

ACE asserts that on March 2, 2001, RFI No. 4 was delivered to Mr. Menchaca, which clearly stated that there was not a sufficient amount of dirt available to complete the embankment work. Mr. Menchaca is alleged to have refused to formally accept the RFI and indicated that until ACE had the topo fully complete and could substantiate that the elevations were in error, the COE would not accept an RFI on the problem. On March 16, 2001, Mr. Menchaca and Mr. Fuentes, the Project Engineer, are alleged to have met with ACE and were informed that approximately 125,000 cubic yards of additional fill was needed. ACE asserts that on March 20, 2001, it submitted RFI No. 4-01 to Mr. Menchaca, which repeated what was said in RFI No. 4.

On March 23, 2001 Messrs. Fukerson, Fletcher and Hyland from ACE met with Mr. Wise, the Resident Engineer for the Fort Bliss Resident Office and Mr. Menchaca. During this meeting Mr. Wise is alleged to have instructed ACE to widen the ditches and utilize fill from Dan Williams project. ACE alleges it considered these instructions as an authorization to take necessary steps to complete the work. Mr. Wise is also alleged to have instructed ACE to submit a request for equitable adjustment. Subsequently Mr. Wise is alleged to have restricted the bottom of the trenches to a width of 100' and told ACE to double the size of the retention ponds.

40. Mr. Wise rebutted the allegations made by ACE in their August 15, 2001 letter in a letter dated September 17, 2001 (Tab 47). ACE was advised:

- The alleged conversation with Mr. Menchaca did not occur on January 29, 2001, since he was on leave on that date. Neither the QAR nor the QCR collaborate ACE's allegations. [See Tab 37, p. 00231-00234]
- Mr. Menchaca did not refuse to accept RFI No. 4. Mr. Menchaca advised ACE that the RFI system was being misused for providing notifications of preparatory meetings, requests for outages and other uses.
- Neither Mr. Fuentes nor Mr. Menchaca recalled a meeting on March 16, 2001, with ACE. Neither the QAR nor QCR reflected that such a meeting occurred. [See Tab 39, p. 00403-00406]
- Mr. Wise denied that he instructed ACE to widen the ditches, use fill material from Dan Williams's project,

submit a request for equitable adjustment, limit the extent of widening the ditches, or obtain fill from the ditches. Mr. Wise indicated that he did advise ACE that a claim could be submitted under the Disputes clause of the contract and that the claim would be evaluated.

41. ACE submitted its claim (Tab 49) in a letter dated November 4, 2002. The letter contained the certification required by the Disputes Act of 1978. ACE's claim of differing site conditions is premised on the following factual allegations:

- All clearing operations were performed behind the survey crew so that the survey crew would have undisturbed terrain to work on.
- After being informed that the existing elevations were lower than the elevations provided on the drawings, ACE instructed the surveyors to survey to a line 100 feet outside of the construction limits to insure that ACE would have survey points outside the area that would be disturbed by the week. The COE representative, Danny Menchaca, was on site during this week and inquired why the surveyors were working outside of the construction limits. Mr. Menchaca was allegedly advised of the surveyor's initial findings and the surveyors were continuing the topo outside of the construction limits because this information indicated that there would not be enough excavated fill for the project.
- ACE advised the COE Quality Assurance Representative that the elevations in the contract documents were defective. The Quality Assurance Representative informed ACE's superintendent that ACE should complete the topo in order to substantiate that the plans were defective before the COE would make any judgment on the subject.
- On February 9, 2001, ACE discussed several questions including the problem with the survey and lack of dirt with the COE's Quality Assurance Representative.
- SLI finished the fieldwork for the topo survey on February 20, 2001.
- On March 1, 2001, ACE was directed not to use RFIs except for issues involving money.
- ACE delivered RFI No. 4 to the COE on March 2, 2001, stating that there was not a sufficient quantity of fill to complete the embankment work. ACE advised the COE that the plans were defective and that the COE needed to come up with additional dirt. ACE advised the COE that

representative of Dan Williams Company had contacted ACE about removing excess dirt from their runway project and that Dan Williams Company had a similar problem with their project. ACE alleged that on the Williams job the elevations were higher than indicated on the drawing creating a problem with excess dirt. The COE representative is alleged to have refused to accept the RFI saying that it was incomplete and that RFIs were only to be used if money was involved. ACE asserts that the COE representative indicated that until the topo was fully completed and could substantiate that the elevations in the plans were wrong, the COE would not accept an RFI on this issue.

- On March 8 the COE informed ACE that a decision on the dirt issue would be made soon. Subsequently on March 9, and 11, 2001, ACE advised the COE that fill available from the ditch excavation would run out by March 14, 2001.
- Engineering work for the topo survey was completed on March 10, 2001. Jerry Fletcher, ACE's project superintendent allegedly met with Danny Menchaca and Telo Fuentes on March 16, 2001, to discuss the shortage of dirt to use for fill. He is alleged to have advised the COE representatives that based on the new survey, ACE had calculated that it would need approximately 125,000 cubic yards of additional fill. ACE advised the COE that they were out of fill and needed direction by March 23, 2001.
- ACE submitted RFI No. 4-01 on March 21, 2001, repeating what was stated in RFI No. 4. ACE indicated that the Dan Williams project was a potential source of additional fill.
- On March 22, 2001 ACE's representatives met with David Wise and Danny Menchaca. ACE presented the new topo showing discrepancies with the contract drawings. Mr. Wise is alleged to have acknowledged that there was a dirt shortage, but said he had not been informed that there was an accuracy problem with the contract drawings. ACE is alleged to have indicated that they were within a couple of days of being out of dirt and needed direction to avoid a shut down of the project. Mr. Wise is alleged to have instructed ACE to widen the ditches and use Dan Williams' extra dirt. ACE was allegedly instructed to submit a request for an equitable adjustment.
- ACE began hauling fill from Dan Williams' jobsite on March 26, 2001.
- On April 2, 2001, ACE alleges it met with Mr. Wise to discuss the quantity of dirt necessary to complete the embankment project. ACE was directed on April 4, 2001, to

obtain the balance of fill necessary for the embankment from the ditches. The surveyors advised ACE that the ditches would need to be 262 feet wide to get the required quantity of fill. After advising Mr. Wise of this fact, ACE was allegedly directed to widen the ditches to 100 feet at the bottom and to double the size of the ponds.

- ACE allegedly met with Mr. Fuentes on April 11, 2001, to discuss enlarging the ponds to obtain additional fill.
- A request for equitable adjustment was submitted by ACE in a letter dated April 27, 2001.
- The issue of the differing site condition was discussed between representatives of ACE and the COE on May 17, 2001. Representative of the COE are alleged to have stated ACE could have additional time for delays caused by the differing site condition. The COE representatives are alleged to have indicated that additional compensations would be an issue because ACE had not advised the COE of the problem early enough to allow the COE to explore potential solution. The ACE representatives are alleged to have responded that the COE had been informed as soon as ACE received an indication that there was a potential problem.
- In a meeting on May 18 between representatives of ACE and the COE, ACE reiterated its allegations that the Quality Assurance Representative and the Project Engineer had been informed there was a dirt shortage caused by defective specifications. Additionally, ACE is alleged to have discussed the rejection of RFI No. 4. When RFI No 4 was presented ACE could not provide a completed survey to document the discrepancy and could not calculate additional costs because at the time ACE had not received direction on how to proceed. The COE's Mr. Wise and Mr. Adkins are alleged to have agreed with ACE's definition of an RFI and are alleged to have indicated that they would inform the Quality Assurances Representative that RFIs were for information purposes and not necessarily cost issues.

C. <u>Findings of the Contracting Officer</u>:

The Contracting Officer herein determines that the facts in relations to this claim and the position of the parties are as set forth in this Findings of Fact.

Joan O. LoRe

JOAN O. LoRE
Contracting Officer

**APPEAL RECORD INDEX**

| | |
|---|---|
| **TAB 1** | Notice of Appeal. |
| **TAB 2** | Final Decision of the Contracting Officer with return receipt. |
| **TAB 3** | Standard Form 1442, Solicitation, Offer, and Award of Contract No. DACA63-00-C-0025, to Ace Constructors, Inc., with contract clauses. |
| **TAB 4** | Special Provisions, Section 01720, Survey, Layout, and Other Data. |
| **TAB 5** | Contract Drawing Sequence No. 1. |
| **TAB 6** | Contract Drawing Sequence No. 2. |
| **TAB 7** | Contract Drawing Sequence No. 3. |
| **TAB 8** | Contract Drawing Sequence No. 24. |
| **TAB 9** | Contract Drawing Sequence No. 25. |
| **TAB 10** | Contract Drawing Sequence No. 26. |
| **TAB 11** | Contract Drawing Sequence No. 27. |
| **TAB 12** | Contract Drawing Sequence No. 28. |
| **TAB 13** | Contract Drawing Sequence No. 29. |
| **TAB 14** | Contract Drawing Sequence No. 66. |
| **TAB 15** | Contract Drawing Sequence No. 67. |
| **TAB 16** | Contract Drawing Sequence No. 68. |
| **TAB 17** | Contract Drawing Sequence No. 69. |
| **TAB 18** | Contract Drawing Sequence No. 70. |
| **TAB 19** | Contract Drawing Sequence No. 71. |
| **TAB 20** | Contract Drawing Sequence No. 72. |
| **TAB 21** | Contract Drawing Sequence No. 73. |

| | |
|---|---|
| **TAB 22** | Contract Drawing Sequence No. 74. |
| **TAB 23** | Contract Drawing Sequence No. 75. |
| **TAB 24** | Contract Drawing Sequence No. 76. |
| **TAB 25** | Contract Drawing Sequence No. 77. |
| **TAB 26** | Contract Drawing Sequence No. 78. |
| **TAB 27** | Contract Drawing Sequence No. 79. |
| **TAB 28** | Contract Drawing Sequence No. 80. |
| **TAB 29** | Contract Drawing Sequence No. 81. |
| **TAB 30** | Contract Drawing Sequence No. 82. |
| **TAB 31** | Contract Drawing Sequence No. 83. |
| **TAB 32** | Contract Drawing Sequence No. 84. |
| **TAB 33** | Contract Drawing Sequence No. 85. |
| **TAB 34** | Contract Drawing Sequence No. 86. |
| **TAB 35** | Contract Drawing Sequence No. 87. |
| **TAB 36** | Contract Drawing Sequence No. 88. |
| **TAB 37** | Quality Assurance/Quality Control Logs for the month of January 2001. |
| **TAB 38** | Quality Assurance/Quality Control Logs for the month of February 2001. |
| **TAB 39** | Quality Assurance/Quality Control Logs for the month of March 2001. |
| **TAB 40** | Quality Assurance/Quality Control Logs for the month of April 2001. |
| **TAB 41** | Quality Assurance/Quality Control Logs for the month of May 2001. |

**TAB 42** Quality Assurance Log dated May 17, 2001, with attached letter dated April 27, 2001, from Ace Constructors, Inc., to the Corps of Engineers.

**TAB 43** Letter dated May 29, 2001, from Ace Constructors, Inc., to the Corps of Engineers.

**TAB 44** Letter dated July 13, 2001, from the Corps of Engineers to Ace Constructors, Inc.

**TAB 45** Letter dated August 15, 2001, from Ace Constructors, Inc., to the Corps of Engineers.

**TAB 46** Letter dated September 17, 2001, from the Corps of Engineers to Ace Constructors, Inc.

**TAB 47** RFI No. 4.

**TAB 48** Letter dated March 6, 2001, from the Corps of Engineers to Ace Constructors, Inc.

**TAB 49** Letter dated November 4, 2002, from ACE Constructors, Inc., to the Corps of Engineers.

**TAB 50** Photograph - Access Road Looking North.

**TAB 51** Photograph - Ditch Along Access Road.

**TAB 52** Photograph - Retention Pond.

**TAB 53** Photograph - Access Road and Ditch.

**TAB 54** Photograph - Access Road and Ditch.

**TAB 55** Photograph - Looking South From Detention Pond.

**TAB 56** Photograph - Detention Pond.

**TAB 57** Photograph - Access Road and Ditch.

**TAB 58** Photograph - Pallet Storage Building.

**TAB 59** Photograph - Taxiway Looking North To Loading Pad and Storage Building.

**TAB 60** Photograph - Taxiway Looking South Towards Runway.

CERTIFIED - RETURN RECEIPT REQUESTED

DEPARTMENT OF THE ARMY
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF:

February 12, 2004

Office of Counsel

SUBJECT: Differing Site Condition Claim from ACE Constructors, Inc., under Contract No. DACA63-00-C-0025, Ammo Hot Load Area, Fort Bliss, TX

Mr. John R. Fulkerson
President
Ace Constructors, Inc.
P.O. Box 357490
Gainesville, FL 32635-7490

Dear Mr. Fulkerson:

The claim that you submitted through your letter dated August 6, 2003, has been received and reviewed. ACE Constructors, Inc. (ACE), requests additional compensations in the amount of $1,781,318.00 and a 120-day extension for problems incurred in the placement of concrete pavement. The claim is being sponsored, in part, on behalf of the paving subcontractor, Cambro Construction Company, Inc. (Cambro).

**Contractor's Claim**

ACE submitted their claim dated August 6, 2003, under the Disputes Clause of the contract. ACE requested an additional $1,781,318.00 and a 120-calendar day time extension. ACE claimed that the contract specifications were defective in three related areas. First, ACE alleged that Drawing Sequence Nos. 59 through 62 indicated that the subgrade, drainage layer rock and concrete would be finished at consistent grades ranging from 0.5% to 2.0%. ACE allegedly attempted to grade the subgrade and drainage layer at the slopes specified in the typical sections. Finish grading of these components at the grades shown did not meet the survey elevations shown in the project plans. It was determined that

EXHIBIT
4

the discrete elevations shown on the plans did not yield the consistent grades shown in the typical sections. ACE allegedly solved the grading problem by employing additional labor and equipment to hand measure and grade the slopes between each of the elevation locations. Since the slopes could not be finished at the grades shown on the typical sections, ACE demobilized the laser system that had been mounted on the motor grader for finish grading.

The second alleged defect in the specifications was the requirement under Technical Provision 02753, paragraph 3.5.5.1.b, to use three-meter long steel forms for the concrete paving. The grade contours resulting from the specified grade elevations points had grade breaks at random locations. The grade breaks allegedly made it impossible for the three-meter rigid forms to conform to the surface of the drainage layer. This problem was solved by ACE providing Cambro additional labor to perform hand grading for each of the concrete lanes prior to forming and having the surveyor shoot the grades while Cambro set the forms.

The third alleged defect was the requirement under Technical Provision 02753, paragraph 1.3.7, to use profilograph testing as the basis of acceptance of concrete smoothness for runs over 60 meters in length. ACE asserted that the profilograph was not applicable to the subject project due to the short test runs. ACE alleged that Cambro agreed to resume placing concrete on the pallet storage pad after the COE agreed to eliminate the profilograph requirement for this portion of the work. ACE asserted that their project team continued to struggle with the profilograph requirement hiring a concrete surfacing contractor to finish the concrete so that it would pass the profilograph tests.

The claim contained a narrative prepared by Cambro. The narrative alleged that the project was delayed from September 23, 2001 to November 23, 2001,

before the owner determined that the profilograph was not acceptable for measuring the smoothness of concrete.

Cambro alleged that the site was graded in accordance with the specified grade. Cambro claimed that the grading of the site would not produce the discrete elevation points specified and that grading to the discrete points would not produce a 1% slope. The contractor resorted to laborious string lining of the grades and hand grading to match the discrete points. The resulting dirt surface had significant variation over distance of less then 3 meters and would not allow 3-meter metal forms to be set without hand digging of the trenches to accommodate the below grade portions of the forms.

Cambro alleged that forms for four lanes of concrete were set and placed. All four lanes allegedly failed the profilograph test. Cambro alleged that on November 19, 2002 [sic 2001], the owner agreed that the standard method for accepting concrete slabs of this size, the straight edge method would be used. This allegedly caused work to resume under adverse weather conditions. Cambro alleged that the problems with the data points and 3-meter long forms continued, Cambro overcame these deficiencies through grinding concrete surfaces.

**Analysis**

My review of the contract daily Quality Control and Assurance Reports and the contract correspondence does not verify the allegations contained in your claim. I find no evidence to support your allegation that the grades shown on the typical sections failed to meet the survey elevations shown in the project plans. Neither the contract daily Quality Assurance or Control Reports nor the contemporaneous contract correspondence address this issue. The contemporaneous documents which do address the issue of grades, attributes the incorrect grades and

elevations to survey errors. Cambro complained to ACE regarding incorrect grade and elevations in a letter dated September 7, 2001. These allegations were repeated to the Fort Bliss Resident Office in a letter dated September 19, 2001. Cambro asserted that the concrete forms had to be reset due to incorrect grades being furnished by ACE. Cambro, in part, attributed the problem with grades to ACE's surveyor not having a metric linker rod resulting in conversion errors when converting English measurement to Metric.

Your allegations that Technical Provision 02753, paragraph 3.5.5.1.b, which specified a form of not less than 3 meters in length was defective has no factual support. During the performance of the contract ACE disputed Cambro's allegations that the specified minimum length of form was causing problems with obtaining the required grade. ACE attributed Cambro's difficulty to the use of one length (3 meters) of form. ACE advised Cambro in a letter dated September 26, 2001, that Cambro should use different lengths of form so that when the subgrade slope changes at the hubs, the forms can change slope.

The allegations that the specified profilograph test caused problems with obtaining the contractually specified smoothness of the concrete are not supportable. The COE will concede that the profilograph test is not the standard testing technique for short concrete runs such as the pallet storage area or the Ammo Hot Load Apron. However, when Cambro was placing concrete in the pallet storage area or the apron, employing proper quality control techniques, the smoothness of the concrete slabs passed the profilograph. The problem with obtaining the specified smoothness resulted not from the requirement to use the profilograph test, but rather the lack of quality control procedures followed by ACE and Cambro. ACE, in its September 26, 2001 letter terminating Cambro for default, advised Cambro that the problem with concrete finishing resulted not from the grade or thickness of the concrete, but

construction techniques employed by Cambro. Cambro was advised that the concrete was placed in large piles in front of the paving machine and when the machine hit the pile of concrete, it rode up over the pile leaving knots and valleys on the surface of the concrete resulting in the failure of the profilograph test. ACE had earlier on August 30, 2001, advised Cambro that they were in default of their contractual obligations. ACE's quality control representative recorded on September 21, 2001, "[r]emoval of subcontractor [Cambro] due to non compliance to his contract. Behind, no over time to catch-up, not enough men to complete work on time, poor workmanship." The COE quality assurance representative in his daily logs expressed concerns with too many stops by the paving machine in the placement of concrete. Based on the contemporaneous record, I must conclude that the problems with the smoothness of the concrete resulted not from specifying an improper testing technique, but rather from the lack of quality control employed by ACE and Cambro.

Cambro alleges they left the project and the paving was delayed from September 23, 2001 to November 23, 2001, due to problems caused by the specified profilograph testing. Cambro advised ACE in its September 24, 2001 letter that they were leaving the job due to non-payment. ACE in pay request No. 9 for the pay period ending August 30, 2001, did not request any payment for concrete pavement even though much of the pallet storage area had been placed during August 2001. Since Cambro's stated reason for leaving the project was lack of payment by ACE, I cannot give any credibility to the allegation in the claim that they left the project due to the profilograph testing. At the time Cambro left the project in September, a substantial portion of the pallet storage area remained to be placed. The COE had waived the use of the profilograph in the pallet storage area in August 2001. Since concrete remained to be placed in the pallet storage area where the profilograph testing was

not being required, I find additional support for my determination that the profilograph testing was not the reason they abandoned the project.

Cambro alleges that the profilograph testing was waived in the apron area on November 19, 2001. This allegation has no factual support. Profilograph testing was waived in the apron area on October 18, 2001. Despite, the fact that the use of the profilograph was waived in October, Cambro delayed until November 19, 2001, in resuming concrete placement in the apron area.

Cambro alleges that the site was graded in accordance with the specified grade. Cambro's allegations in its claim are contradicted by contemporaneous documents wherein it complained to both ACE and the COE that the site had not been graded by ACE in accordance with the specified grade. Cambro alleged that the grade was incorrect due to survey errors. Since the contemporaneous documents do not support the allegations contained in Cambro's claim, I find no support for those allegations.

Cambro refers to four lanes of concrete failing the profilograph test. Cambro has not identified the lanes in question or addressed where the lanes were located. As noted earlier in this decision, where Cambro employed correct quality control procedures, the concrete placements met the smoothness requirements of the contract using the profilograph test. Cambro also reasserts its allegations that the owner did not authorize the use of the straight edge for measuring smoothness until November 2001. None of Cambro's allegations have any factual support; therefore, they are not afforded any credibility.

I have determined that your claim is without merit and therefore, is denied. This letter constitutes the final decision of the Contracting Officer denying your claim for additional compensation. The parenthetical references within the Findings of Fact

refer to correspondence and other documents which substantiate this decision and which will be furnished to you in the event you wish to appeal this decision.

This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof should be furnished to the Contracting Officer from whose decision the appeal was taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring action directly in the U.S. Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

John H. Rodgers
Contracting Officer

Enclosure

## APPEAL RECORD INDEX

| | |
|---|---|
| **TAB 1** | Notice of appeal. |
| **TAB 2** | Final Decision of the Contracting Officer with Findings of Fact and return receipt. |
| **TAB 3** | Standard Form 1442, Solicitation, Offer and Award of Contract No. DACA63-00-C-0025 with General Contract Clauses. |
| **TAB 4** | Technical Provisions, Section 02753, Concrete Pavement for Airfields and Other Heavy-Duty Pavements. |
| **TAB 5** | Drawing Sequence No. 2. |
| **TAB 6** | Drawing Sequence No. 45. |
| **TAB 7** | Drawing Sequence No. 46. |
| **TAB 8** | Drawing Sequence No. 47. |
| **TAB 9** | Drawing Sequence No. 48. |
| **TAB 10** | Drawing Sequence No. 54. |
| **TAB 11** | Drawing Sequence No. 55. |
| **TAB 12** | Drawing Sequence No. 59. |
| **TAB 13** | Drawing Sequence No. 60. |
| **TAB 14** | Drawing Sequence No. 61. |
| **TAB 15** | Drawing Sequence No. 62. |
| **TAB 16** | Drawing Sequence No. 66. |
| **TAB 17** | Drawing Sequence No. 67. |
| **TAB 18** | Drawing Sequence No. 68. |
| **TAB 19** | Drawing Sequence No. 69. |
| **TAB 20** | Drawing Sequence No. 70. |
| **TAB 21** | Drawing Sequence No. 71. |

**TAB 22** Daily Reports for May 2001.

**TAB 23** Daily Reports for June 2001.

**TAB 24** Daily Reports for July 2001.

**TAB 25** Daily Reports for August 2001.

**TAB 26** Payment Estimate No. 0009.

**TAB 27** Daily Reports for September 2001.

**TAB 28** Payment Estimate No. 0010.

**TAB 29** Daily Reports for October 2001.

**TAB 30** Daily Reports for November 2001.

**TAB 31** Letter dated August 30, 2001, from the US Army Corps of Engineers, Fort Worth District (USACE) to ACE Constructors, Inc.

**TAB 32** Letter dated August 30, 2001, from ACE Constructors, Inc., to USACE.

**TAB 33** Letter dated September 4, 2001, from USACE to ACE Constructors, Inc.

**TAB 34** Letter dated September 7, 2001, from Cambro Construction, Inc., to ACE Constructors, Inc.

**TAB 35** Letter dated September 19, 2001, from Cambro Construction, Inc., to USACE.

**TAB 36** Letter dated September 30, 2001, from USACE to ACE Constructors, Inc.

**TAB 37** Letter dated September 21, 2001, from Jobe Concrete Products, Inc., to ACE Constructors, Inc.

**TAB 38** Letter dated September 24, 2001, from Cambro Construction, Inc., to ACE Constructors, Inc.

**TAB 39** Letter dated September 24, 2001, from ACE Constructors, Inc., to USACE.

**TAB 40** Letter dated September 26, 2001, from ACE Constructors, Inc., to Cambro Construction, Inc.

**TAB 41** Letter dated September 27, 2001, from ACE Constructors, Inc., to USACE.

**TAB 42** Letter dated October 4, 2001, from USACE to ACE Constructors, Inc.

**TAB 43** Email from Dan Boyer to Telo Fuentes, Terry Sherman and Gene Gutierrez.

**TAB 44** Email from David Wise to Telo Fuentes.

**TAB 45** Letter dated October 26, 2001, from USACE to ACE Constructors, Inc.

**TAB 46** Letter dated November 15, 2001, from USACE to ACE Constructors, Inc.

**TAB 47** Letter dated November 21, 2001, from ACE Constructors, Inc., to USACE.

**TAB 48** Letter dated November 23, 2001, from ACE Constructors, Inc., to USACE.

**TAB 49** Letter dated November 23, 2001, from ACE Constructors, Inc., to USACE.

**TAB 50** Letter dated December 5, 2001, from USACE to ACE Constructors, Inc.

**TAB 51** Letter dated December 18, 2001, from ACE Constructors, Inc., to USACE.

**TAB 52** Letter dated January 3, 2002, from USACE to ACE Constructors, Inc.

**TAB 53** Letter dated March 8, 2002, from USACE to ACE Constructors, Inc.

**TAB 54** Letter dated March 14, 2002, from USACE to ACE Constructors, Inc.

**TAB 55** Letter dated March 18, 2002, from ACE Constructors, Inc., to USACE.

**TAB 56** Letter dated April 4, 2002, from ACE Constructors, Inc., to USACE.

**TAB 57** Undated letter from ACE Constructors, Inc., to Cambro Construction, Inc.

**TAB 58** Letter dated April 17, 2002, from Cambro Construction, Inc., to Jobe Concrete Products, Inc.

**TAB 59** Letter dated April 25, 2002, from USACE to ACE Constructors, Inc.

**TAB 60** Letter dated August 6, 2003, from ACE Constructors, Inc., to USACE.

**TAB 61** Letter dated February 5, 2002, from USACE to ACE Constructors, Inc.

**TAB 62** Photograph.

**TAB 63** Photograph.

**TAB 64** Photographs.

**TAB 65** Photograph.

**TAB 66** Photograph.

**TAB 67** Photographs.

**TAB 68** Photographs.

**TAB 69** Marked-up drawing showing dates of lane placement.

# FINDINGS OF FACT

Subject: Claim by Ace Constructors, Inc., Differing Site Conditions

Contract No. Contract No. DACA63-00-C-0025, Ammo Hot Load Facility, Fort Bliss, TX

## A. Introduction

ACE Constructors, Inc. (ACE), has submitted a claim in the amount of $1,781,318.00 requesting a 120-calendar day time extension. ACE bases its claim on three alleged defects in the contract specifications. These are:

- Alleged defects on Drawing Sequence Nos. 59-62 regarding the grading of the subgrade, drainage layer rock and concrete;
- The requirement for the use of three-meter long steel forms for the concrete paving; and
- The requirement that profilograph testing be used as the basis of the acceptance of concrete smoothness.

## B. Pertinent Contract Provisions

1. The contract, a Standard Form 1442 construction contract, was awarded to ACE on September 27, 2000, in the amount of $8,616,840.00. *Tab 3.* The contract required the construction of roads, drainage ditches and drainage structures areas, a loading pad and shelter and a taxiway for an ammunition loading area at Biggs Army Airfield.

2. The contract, a Standard Form 1442 construction contract, included the standard provisions of general application required by the Federal Acquisition Regulations (FAR). These include the contract clauses entitled Disputes (FAR 52.233-1) and Changes (FAR 52.243-4). *Tab 3.*

3. Paragraph 1.3.7 of Section 02753 of the Technical Provisions (Tab 4) provides that for testing surface smoothness "[t]he profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 m in length and at the ends where the straightedge shall be used."

4. Paragraph 1.3.7.1.b of Section 02753 of the Technical Provisions in Table 2 specifies the profilograph surface smoothness requirements for taxiway longitudinal and all other airfield areas, both longitudinal and transverse directions as 140 maximum specified profile index mm per km. *Tab 4.*

5. Paragraph 1.3.7.3.b of Section 02753 provides:

> Profilograph Testing: Location and data from all profilograph measurements shall be recorded, When the Profile Index of a lot exceeds the tolerance specified in paragraph 'Smoothness Requirements' above by 16 mm per km but less than 32 mm per km, after any reduction of high spots or removal and replacement, the computed percent payment based on surface smoothness will be 95 percent. When the Profile Index exceeds the tolerance by 32 mm per km but less than 47 mm per km, the computed percent payment will be 90 percent. When the Profile Index exceeds the tolerance by 47 km but less than 63 mm per km, the computed percentage payment will be 75 percent. When the Profile Index exceeds tolerance by 63 mm per km or more, the lot shall be removed and replaced at no additional costs to the Government. Regardless of the above, any small individual areas with surface deviation which exceeds the tolerance given above by more than 79 mm per km shall be corrected by grinding to meet the specification requirements above or shall be removed and replaced at no additional costs to the Government.

*Tab 4.*

6. Section 02753 of the contract Technical Provisions allowed the placement of concrete pavement utilizing either fixed form paving (¶ 3.5.5) or slip form paving (¶ 3.5.6). Rigid form concrete paving involves the installation of fixed or rigid forms over which a paving machine travels. In slip form paving a form is pulled or raised in a continual process as the paving machine places concrete. ACE elected to utilize the rigid form method of paving. *Tab 4.*

7. Paragraph 3.5.5.1.b of Section 02753 of the contract Technical Provisions provides that steel forms "shall be furnished in section not less than 3 m in length..." *Tab 4.*

8. Drawing Sequence No. 2 (Tab 5) indicates that the project consists of the construction of a concrete pallet storage area with a pallet storage shelter, a concrete Ammo Hot Load Apron, a taxiway connecting the apron to the runway and an access road.

9. Drawing Sequence No. 45 (Tab 6)shows the joint and lane pattern at the southern end of the taxiway where it intersects with the runway. Drawing Sequence No. 46 (Tab 7) shows the joint and lane pattern from just south of the Ammo Hot Load Apron to just north of the intersection of the taxiway with the runway.

10. Drawing Sequence No. 47 (Tab 8) shows the joint and lane pattern for the southern portion of the Ammo Hot Load Apron and the northern segment of the taxiway. Drawing Sequence No. 48 (Tab 9) shows the joint and lane pattern for the northern segment of the Ammo Hot Load Apron and the pallet storage area.

11. Drawing Sequence Nos. 54 and 55 (Tabs 10 and 11) contains profiles of the taxiway, the Ammo Hot Load Apron, and the pallet storage area. The profiles show elevations at specific stations and slopes between various stations.

12. Drawing Sequence No. 59 (Tab 12) shows Typical Sections for the runway/taxiway transition, the taxiway, the taxiway/apron/shoulder and sub-drain. The taxiway section indicates that the slopes of the taxiway varies from 1.5% to 2.0%

13. Drawing Sequence No. 60 (Tab 13) shows Typical Sections at the Ammo Hot Load Apron, and the Ammo Hot-Load Apron Pallet Storage Area Connector. The cross sections indicate that the slopes on the Ammo Hot-Load Apron vary from 1.0% to 2.0%. The cross sections indicate that the slopes on the Ammo Hot-Load Apron Pallet Storage Area Connector vary from 1.5% to 2.0%.

14. Drawing Sequence No. 61 (Tab 14) shows Typical Details for the Pallet Storage Area. The detail for the East-West Pallet Storage Area Section indicates that the

slope of the slab varies from 1.0% to 2.0%. The detail for the North-South Section Pallet Storage Area indicates that the slopes shown in the detail vary from 0.5% to 2.0%

15. Drawing Sequence No. 62 (Tab 15) provides Typical Sections for the access roadway and drainage ditch. The slopes of the paved areas on the roadway sections vary from m 2.0% to 2.10%.

16. Drawing Sequence Nos. 66-68 (Tabs 16-18) contains the cross sections for the taxiway. Each cross section contains information relative to the elevations of the taxiway and its slope. The cross sections indicate that the slope of the taxiway varies from a minimum of 0.1% at Station 0 + 200 to a maximum of 2% at various stations.

17. Drawing Sequence Nos. 69 and 70 (Tabs 19 and 20) contains the cross sections for the Ammo Hot Load Apron (through Station 0 + 820 on Sequence 70). Each cross section contains information relative to the elevations of the apron and its slope. The cross sections indicate that the slope of the apron varies from a minimum of 1% in the center of the apron to 2% on the sides of the apron.

18. Drawing Sequence No. 70 (Tab 20), beginning at Station 0 + 860, and Drawing Sequence No. 71 (Tab 21) contain the cross sections for the pallet storage area. Each cross section contains information relative to the elevations of the pallet storage area slope. The cross sections indicate that the slope of the pallet storage area varies from a minimum of 1% in the center of the apron to 2% on the sides.

**C. Chronology**

1. ACE subcontracted the paving work to Cambro Construction, Inc. (Cambro). Cambro began preparing their paving machine for concrete pavement on June 27, 2001. *Tab 23.* ACE, using a motor grader, and points set by their surveyor initially graded the rock drainage layer for the areas to receive concrete pavement. *Tab 62, Photo P001617.* Cambro would then set the rigid forms for the paving lanes. *Tab 63, Photo DCP0017.* Cambro would pave alternate paving lanes. *Tab 64, Photo P001724.* The concrete placement would start with a conveyor placing the concrete between the forms. *Tab 65, Photo P001612.* A concrete placer would auger the concrete from the pile left by the conveyor,

distributing the concrete between the forms. *Tab 66, Photo P001611.* After the concrete had been spread in place, a concrete paving machine would pass over the concrete, finishing the surface of the concrete. *Tab 67, Photos P001613, P001614.* Final finishing of the concrete was done manually with bull floats. *Tab 68, Photos P001615, P001616.*

2. On July 10 and 11, 2001, Cambro set forms for the fixed form concrete paving in the pallet storage area. A question arose as to the grade of the base material at the pallet storage area on July 12, 2001. Due to problems with the grade, Cambro removed forms on July 11 and 12 at the pallet storage area. On July 14 and 16, and 17, 2001, the pallet storage area was graded to blue tops to correct the problem with the grade. The contractor's Quality Control Report (QCR) for July 16 reflects that "Cambro refused to set forms until Corp clarifies specs-and they get form[s] to meet specs." *Tab 24.*

3. The Government daily Quality Assurance Report (QAR) for July 19, 2001, reflects that ACE's surveyor was asked how the elevations were set for the forms on the test strip. The surveyor replied that the "elevations in question were taken as topo errors and elevations were set to make center panels with no crown as interpreted by us. The fact is that the surveyor agrees and set elevations as previously discussed with USACE and that there is no crown but flat panels at the center line." *Tab 24.*

4. Cambro set forms for the pallet storage pad on July 17 through 24, 2001. The QAR dated July 24, 2001, states "observed that Cambro had re-set forms to level the elevation at the center for STA 0+932. Cambro placed a test strip (Lane P-1) in the pallet storage area on July 25, 2001. Profilograph test were run on the test strip on July 26, 2001 with the first two runs of the profilograph being within the specified tolerance. However the QAR dated July 30, 2001 indicates that the profilograph results on the pallet pad test section indicated that the pad as a whole was out of tolerance." *Tab 24.*

5. Between August 1 and 27, 2001, Cambro was primarily drilling, installing rebar, and placing concrete in the drilled piers, and was setting forms and placing concrete on paving lanes P-2, P-4, P-5, P-6, P-7, P-9, P-10 at the pallet storage pad. *Tab 25.*

6. The QAR dated August 7, 2001, noted concerns regarding too many stops by the paving machine in the placement of concrete pavement and late delivery of concrete causing delays in the concrete placement. The QAR dated August 8, 2001, reflects that the profilograph readings on lane P-2 were 131.1 on the left pass, 154.1 on the center pass, and 164.5 on the right pass. The QCR dated August 15, 2001, reflects that ACE was advised by the Government's project engineer, Telo Fuentes, that lane P-9 would have to be removed. The QCR for August 16, 2001, reflects that ACE's quality control representative discussed lane P-9 smoothness and straight edge readings. The quality control representative indicated that he was waiting for conformation from another profilograph test. The QAR for August 16, 2001, reflects that profilograph test on P-9 "might need to be rerun. Straight edge show no gaps or sunlight." The QAR dated August 23, 2001, indicates, "straightedge in lieu of profilograph will be allowed because of grade change occurring at pallet area only." Cambro was advised by ACE that panels 12 and 13 on lane P-2 and panel 10 on lane 7 had to be removed. *Tab 25.*

7. Cambro began setting forms on lane L-1 for the Hot Ammo Loading Apron on August 27, 2001. Installation of forms for lane L-1 continued on August 28, 2001, with some forms on the far west lane being removed due to the drainage layer being too thin. The setting of forms on lane L-1 continued on August 29. Forms were set for lane L-2 on August 31, 2001. On September 4, 2001, Cambro continued setting forms on lane L-2 and readjusted forms on L-1 due to the grade. *Tab 25.*

8. Pay Estimate No. 0009 was submitted to the USACE by ACE on August 30, 2001. The pay estimate covered the period starting on August 1, 2001 and ending on August 31, 2001. The pay request was in the amount of $362,193.00. Line Items Nos. 0001, 0002, and 0003 on the pay request were for concrete pavement. Although concrete in many of the paving lanes in the pallet storage area had been placed during the period covered by the pay estimate, ACE did not request any reimbursement for concrete pavement. *Tab 26.*

9. Concrete was placed in lane L-1 on September 5, 2001. The forming of lane L-2 was completed on September 6, 2001, and concrete was placed in lane L-2 on September 11, 2001. Cambro set forms on lane L-3 on September 10, 11 and 12, 2003. Forms were set in lane L-4

on September 12, 13 and 14, 2001. On September 14, 2001, Cambro changed forms and worked on the grade. The QCR noted on that date that the profilograph issue had not been resolved. *Tab 27.*

10. The QCR for September 17, 2001, indicates that Cambro was working the forms of lane L-4 and that Cambro cancelled a concrete placement scheduled for the following Tuesday. The QCR reflects that the profilograph was discussed "and what we need to do to get a good ride. Elevation change to match profilograph." Cambro did not work on form setting on September 18, 2001. The QCR for September 18, notes that the surveyor had supplied wrong elevations. Cambro concentrated on drilling dowel holes. On September 19, 2001, forms were placed on lanes L-3 and L-4. The QCR for that date notes that Cambro was ready "to pour concrete after a week of arguing about grade." Concrete was placed in lane L-3 on September 20, 2001, and in lane L-4 on September 21, 2001. The QAR for September 21, indicates that lane L-3 passed the profilograph testing. The Government's quality assurance representative noted that he told the contractor's quality control representative that lane L-3 passing the profilograph proves that the contractually specified smoothness can be obtained. Profilograph tests were conducted on lane L-4 on September 22, 2001. *Tab 27.*

11. The QCR dated September 24, 2001, reflects that Cambro started removing equipment from the job site. The QCR for September 25, 2001, states "[r]emoval of subcontractor due to non compliance to his contract. Behind, no overtime to catch-up, not enough men to complete work on time, poor workmanship. The QCR for September 27, 2001, indicates all of lane L-2 was to be removed, 15 panels on L-4 were to be removed and 2 panels on L-1 were to be removed." *Tab 27.*

12. Pay Estimate No. 0010 was submitted by ACE on October 2, 2001. The pay estimate covered the period starting on September 1, 2001, and ending on September 30, 2001. The pay request was in the amount of $409,624.00. Line Items Nos. 0001, 0002, and 0003 on the pay request were for concrete pavement. ACE requested payment under line item No. 0002, 368 mm concrete pavement of $58,328.00 and under line item No. 0003, 178 mm concrete pavement of $78,796.00. These were the first request for payment for concrete pavement submitted by ACE. *Tab 28.*

13. Cambro retuned to work at the site on October 9, 2001. During the remainder of October 2001 and through November 9, 2001, Cambro set forms in the pallet storage area for lane L-17 and drilled and installed dowel holes in the lanes that had already been placed, formed and placed concrete for edge light boxes and prepared and placed concrete in the foundation for the blast fence. *Tabs 29, 30.* The QAR dated October 22, 2001, reflects that the Government quality assurance representative physically demonstrated to ACE's representatives how the straight edge test would be performed. *Tab 29.* Cambro resumed concrete paving on November 12, 2002, when lane P-14 in the pallet storage area was placed. Cambro continued to place concrete pavement in the pallet storage area on November 13, 14 and 16. Concrete placement did not resume on the Hot Ammo Loading Apron until November 19, 2001, when concrete was placed in lane L-17, followed on November 20, 2001, with the placement of Lane L-5. *Tab 30.* The last concrete placement on the apron was on January 17, 2002. *Tab 69.*

14. David Wise, the Contracting Officers Representative, advised ACE in a letter dated August 30, 2001 (Tab 31), that their current schedule indicated that the project was 60 days behind schedule.

15. ACE advised Cambro that they were in default of their subcontract obligations in a letter dated August 30, 2001. *Tab* . Cambro was directed to provide sufficient resources to correct the deficiencies that had caused the default. *Tab 32.*

16. Mr. Wise, in a letter dated September 4, 2001 (Tab 33), advised ACE of deficiencies in their quality control organization. ACE was advised that sufficient notice was not being given prior to concrete placement and that the ACE's quality control representative was not present during concrete placements to monitor the work in progress. ACE was advised that two piers had to be demolished due to unacceptable quality problems.

17. Cambro disputed ACE's allegations that the subcontractor was in default of their contractual obligations in a letter dated September 7, 2001 (Tab 34). Cambro acknowledged problems with the drilling of dowel holes, but asserted that as of September 5, 2001, they had submitted a solution to the problem. Cambro alleged that

the biggest problem they faced on the project was the subgrade being out of tolerance. Cambro complained of having to reset their forms that had been set to the elevations established by ACE's surveyor causing additional labor and material. Cambro also complained of incorrect finish elevations furnished by ACE. Cambro requested that the elevations furnished by ACE's surveyor be corrected and that the subgrade graded and compacted correctly to enable Cambro to set their forms, lock them together and place concrete. ACE was advised that they needed to fulfill their responsibility under the contract in providing properly graded subgrades. ACE was advised that Cambro would seek reimbursement for added costs due to the subgrade not meeting the requirements of the contract.

18. Cambro advised the USACE in a letter dated September 19, 2001 (Tab 35), that the grades furnished Cambro by ACE were incorrect resulting in Cambro being required to reset the forms. Cambro indicated that this problem had caused "huge delays" to the project. Cambro indicated that they were considering abandoning the project. Cambro attributed the problems with the elevations and subgrade to ACE's surveyors not having a metric linker rod resulting in conversion errors when converting measurements from English to Metric. Cambro also stated that a profilograph was not the correct way to measure for smoothness for the loading pad.

19. Ace was advised by Mr. Wise, in a letter dated September 20, 2001 (Tab 36), that ACE had not responded to his August 30, 2001 letter regarding unsatisfactory progress towards completion of the project. Mr. Wise indicated that the USACE had been advised that the concrete paving subcontractor had been placed in default, and that the USACE had received a copy of ACE's letter demanding that the subcontractor remedy the default.

20. Jobe Concrete Products, Inc (Jobe), in a letter dated September 21, 2001 (Tab 37), advised ACE that they had not received payment from any of ACE's subcontractors. Jobe advised ACE that future deliveries must be paid for on a "cash in advance basis."

21. Cambro advised ACE that it could not afford to finance the project through paying "cash in advance" to Jobe for concrete, in a letter dated September 24, 2001 (Tab 38). Cambro complained that they had not been paid in

full on any of their pay requests. Cambro stated that they were vacating the project until they had been paid.

22. Ace advised the USACE, in a letter dated September 24, 2001 (Tab 39), that they disagreed with Mr. Wise's September 14, 2001 letter regarding contractor quality control. ACE attributed the problems with the piers to "means and methods" employed by Cambro. ACE indicated that it had advised its subcontractor on the proper and most efficient method to complete their work.

23. ACE advised Cambro in a letter dated September 26, 2001 (Tab 40), that there had been only one instance where the subgrade was out of tolerance. ACE attributed the canceling of concrete placements from August 15-17 and September 11-17, to a concrete placer being removed from the project and the paving machine screed bottom not being set up properly. Cambro was advised that they had been burdened by having to excavate to set forms which were ten feet (three meters) long. ACE indicated that the length of form did not allow the form to match the break points in the grade. ACE had advised Cambro to acquire different lengths of forms so that when the subgrade slope changes at the hubs the forms can change slope. ACE stated that when only a ten-foot form was used and a hub was located in the middle of the form, there was no way to adapt a rigid form to the change in slope. ACE acknowledged a elevation bust by their surveyor on September 4, 2001. The surveyor agreed to reimburse Cambro for repairs to the areas. ACE had agreed to remove the concrete at no cost to Cambro. Cambro was advised that Cambro's improper finishing of the concrete caused the 5% penalty due to an out of specification concrete elevation. The mistake in elevation was allegedly addressed by ACE when it occurred, but Cambro did not make the appropriate repairs. Cambro was advised that the overarching problem on the project resulted from the concrete finishing, not the grade or thickness of the concrete. The concrete was allegedly placed in large piles in front of the paving machine. When the paving machine hits the pile of concrete it rides up over the pile and comes off of the forms leaving knots and valleys on the surface of the concrete resulting in the failure of the profilograph test.

24. ACE acknowledged that the project was approximately 60 days behind schedule in a letter dated September 27, 2001 (Tab 41). ACE attributed the delay to

the "need to perform unplanned work in the hauling in of dirt from outside sources as a result of defective contract documents provided by the USACOE of Engineers...". ACE also indicated that it would "recover some time lost during Cambro Construction, Inc.'s (Cambro) non-performance by using a subcontractor who will place the concrete faster than planned by Cambro and shown in ACE's original schedule." ACE acknowledged delays and quality problems attributable to the performance of Cambro. ACE indicated that Cambro's right to proceed on the project was terminated by letter dated September 25, 2001.

25. The USACE, in a letter dated October 4, 2001 (Tab 42), insisted that ACE provide a revised and updated schedule illustrating how ACE planned on regaining satisfactory progress and completing the project by the contract completion date. Mr. Wise also disagreed with ACE's statements regarding the quality control issues.

26. In an e-mail dated October 11, 2001 (Tab 43), Mr. Fuentes was advised by Mr. Boyer with the USACE Transportation Systems Center that a straight edge could be used on the apron for determining smoothness rather than the profilograph. In a e-mail from Mr. Fuentes to Mr. Wise, Mr. Wise was advised that the profilograph was not recommended for the pallet storage area because the area was meant for vehicular traffic. The profilograph did not apply to the apron because of the dome shape. Mr. Boyer had recommenced that a straight edge be used on the pallet storage area and the loading apron for determining payment, and the profilograph be used for the taxiway. *Tab 44*

27. Mr. Wise, in a letter dated October 26, 2001 (Tab 45), questioned ACE's failure to commence concrete paving, failure to submit an acceptable progress schedule, and failure to submit an updated complete submittal register. ACE was advised that their progress on the contract was significantly behind schedule.

28. The Contracting Officer noted in a letter dated November 15, 2001, that ACE recently resumed concrete paving operations. *Tab 46.*

29. ACE submitted a revised schedule in a letter dated November 21, 2001. *Tab.* ACE also submitted a schedule indicating when work would be performed on each remaining concrete lane. *Tab 47.*

30. In a letter dated November 23, 2001 (Tab 48), ACE disputed the accuracy of an interim performance evaluation. ACE claimed that their performance had been impacted by alleged "elevation grade at the project, an impracticable testing procedure that the USACOE originally insisted be applied to the constructed concrete lanes..."

31. ACE was advised in a letter dated December 5, 2001, that the USACE questioned the logic on the November 21, 2001 schedule regarding the sequencing of runway work, and ACE was advised that the bar chart was incomplete because the actual and scheduled activity bars did not have percentage scheduled or percentage complete indicated. The USACE also questioned the lane placement schedule as being incomplete, having a problem with lane identification, and the contractor being behind schedule on lane placement. The schedule indicated that lanes 33, 9, 31, 2, 29, and 13 were to be completed by December 4. However, only lanes 33 and 2 were completed by that date. *Tab 49.*

32. A revised schedule was submitted by ACE accompanying a letter dated December 18, 2001. *Tab 49.* This progress chart was disapproved because the scheduling of the work at the runway was not in compliance with the phasing requirements of the contract. *Tab 50.*

33. A request for proposal (RFP) MK005 (Tab 61) was sent to ACE on February 5, 2002, for deleting the profilograph testing. ACE was advised in a letter dated March 14, 2002, that they had not responded to the RFP. *Tab 54.* ACE advised the USACE in a letter dated March 18, 2002 (Tab 55), that since "virtually all of the concrete paving has been poured and tested, ACE is unable to delete this testing." In a letter dated April 4, 2002 (Tab 56), ACE contended that the deletion of the profilograph testing in the pallet storage area was made too late to be of value to the paving subcontractor. ACE asserted that Cambro suspended work on the project due to their inability to meet the specifications causing a negative impact to the project costs and schedule.

34. ACE advised Cambro, in a letter dated April 17, 2001 (Tab 57), to remove nine panels on lane L-11 pursuant to paragraph 2.11.3 and 3.12.2.7 of Section 02753 of the contract Technical Provisions. Cambro was also advised that two panels on the Storage Pad had cracked all the way through and needed to be replaced. Cambro, on April 17,

2001, enclosed a copy of ACE's letter to their concrete supplier. *Tab 58*

35. The USACE advised ACE in a letter dated April 25, 2002, that on August 29, 2001 (the QAR indicates approval was provided on August 23, 2001), that the USACE agreed with ACE's request to use a straight edge in lieu of the profilograph for testing the smoothness at the pallet storage area. Subsequently on October 18, 2001, the Government agreed to the use of a straight edge in lieu of the profilograph for the pallet storage area and the loading apron. The USACE concurred that Cambro was unable to meet the contract specified tolerance for smoothness. It was the opinion of the USACE that Cambro could not meet the smoothness requirements because of the deficient procedures and inability to place concrete in accordance with contract requirements. *Tab 59.*

36. ACE submitted their claim dated August 6, 2003 (Tab 60), under the Disputes Clause of the contract. ACE requested an additional $1,781,318.00 and a 120-calendar-day time extension. ACE claimed that the contract specifications were defective in three related areas. First, ACE alleged that Drawing Sequence Nos. 59 through 62 indicated that the subgrade, drainage layer rock and concrete would be finished at consistent grades ranging from 0.5% to 2.0%. ACE allegedly attempted to grade the subgrade and drainage layer at the slopes specified in the typical sections. Finish grading of these component at the grades shown did not meet the survey elevations shown in the project plans. It was determined that the discreet elevations shown on the plans did not yield the consistent grades shown in the typical sections. ACE allegedly solved the grading problem by employing additional labor and equipment to hand measure and grade the slopes between each of the elevation locations. Since the slopes could not be finished at the grades shown on the typical sections, ACE demobilized the laser system that had been mounted on the motor grader for finish grading.

The second alleged defect in the specifications was the requirement under Technical Provision 02753, paragraph 3.5.5.1.b, to use three-meter long steel forms for the concrete paving. The grade contours resulting from the specified grade elevations points had grade breaks at random locations. The grade breaks alleged made it impossible for the three-meter rigid forms to conform to

the surface of the drainage layer. This problem was allegedly solved by ACE providing Cambro additional labor to perform hand grading for each of the concrete lanes prior to forming and having the surveyor shoot the grades while Cambro set the forms.

The third alleged defect was the requirement under Technical Provision 02753, paragraph 1.3.7, to use profilograph testing as the basis of acceptance of concrete smoothness for runs over 60 meters in length. ACE asserted that the profilograph was not applicable to the subject project due to the short test runs. ACE alleged that Cambro agreed to resume placing concrete on the pallet storage pad after the USACE agreed to eliminate the profilograph requirement for this portion of the work. ACE asserted that their project team continued to struggle with the profilograph requirement hiring a concrete surfacing contractor to finish the concrete so that it would pass the profilograph tests.

The claim contained a narrative prepared by Cambro. The narrative alleged that the project was delayed from September 23, 2001 to November 23, 2001, before the owner determined that the profilograph was not acceptable for measuring the smoothness of concrete.

Cambro alleged that the site was graded in accordance with the specified grade. Cambro claimed that the grading of the site would not produce the discrete elevation points specified and that grading to the discrete points would not produce a 1% slope. The contractor resorted to laborious string lining of the grades and hand grading to match the discrete points. The resulting dirt surface had significant variances over distance of less then 3 meters and would not allow 3-meter settle forms to be set without hand digging of the trenches to accommodate the below grade portions of the forms.

Cambro alleged that forms for four lanes of concrete were set and placed. All four lanes allegedly failed the profilograph test. Cambro alleged that on November 19, 2002 [sic 2001], the owner agreed that the standard method for accepting concrete slabs of this size, the straight edge method would be used. This allegedly caused work to resume under adverse weather conditions. Cambro alleged that the problems with the data points and 3-meter long

forms continued, Cambro overcame these deficiencies through grinding concrete surfaces.

C. Findings of the Contracting Officer:

The Contracting Officer herein determines that the facts in relations to this claim are as set forth in this Findings of Fact.

JOHN H. RODGERS
Contracting Officer

FEB 18 2004