**UNITED STATES COURT OF FEDERAL CLAIMS**

*****************************

**ACE CONSTRUCTORS, INC.,**

**Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS,**

**Defendant.**

*****************************

**No. 04-299 C**

**Judge Charles F. Lettow**

## PLAINTIFF'S MEMORANDUM OF FACTS AND LAW

Pursuant to this Court's scheduling order, as amended, Plaintiff, ACE Constructors, Inc. ("ACE") files this Memorandum of Facts and Law.

## I. GENERAL ALLEGATIONS OF UNDERLYING FACTS

On September 27, 2000, the U.S. Army Corps of Engineers (the "Corps"), Ft. Worth District, awarded Contract No. DACA 63-00-C-0025 (the "Contract") to ACE, for the Ammo Hot-Load Area, Project No. 44921 at Fort Bliss, Texas (the "Project"). The Corps awarded the Contract to ACE based on ACE's unit price bid that totaled $8,616,840.00.

The Contract contained standard clauses governing Disputes (52-233-1), Differing Site Conditions (52-236-2), and Changes (52.243-4). In addition, the Corps had a common law duty to cooperate with ACE in the performance of the Contract, as well as a duty not to unreasonably delay or hinder ACE's performance of Contract obligations. The Corps provided to ACE certain drawings, surveys and

specifications on which ACE relied – and upon which the Corps intended that ACE rely – in submitting ACE's bid on the Project.

**A. The Excavation and Fill Extra Work Claim**

The Project involved large-scale earth-moving and subsequent concrete paving. As provided to ACE by the Corps, the Project plans indicated that as the Project proceeded, ACE's initial and ongoing excavations would yield sufficient excess fill to meet Project fill requirements. However, the plans did not reflect accurately the amount of excess fill that Project excavations would yield, which resulted in a serious shortfall of available fill. Rather than purchasing additional fill off-site and at great expense, ACE – with the Corps's full knowledge and approval – rectified this fill shortfall by undertaking additional and unscheduled grading operations elsewhere on the Project property. This additional grading took fifteen (15) weeks instead of the planned eight (8) weeks, thus constituting additional Project work for ACE.

In accordance with the contract dispute clause and the Contract Disputes Act, ACE submitted to the Corps on November 4, 2002 an extra work claim for $580,485.00 and a 53 calendar day time extension to complete its Contract work. By letter dated March 7, 2003, the contracting officer issued a final decision denying the November 4, 2002 claim. In reaching his conclusion to deny ACE's excavation and fill extra work claim, the contracting officer opined that ACE had not complied with the notice requirements inherent in a differing site condition claim.

**B. The Concrete Extra Work Claim**

The Project specifications and surveys contained certain latent discrepancies and defects that resulted in extra Project work for ACE, in three related aspects:

**1. The Project grading specifications conflicted with the Typical Sections.**

As noted previously, the Corps provided all Project drawings, surveys and specifications. Once ACE reached the point in the Project at which it was ready to begin pouring the concrete for the Ammo Hot-Load Area, ACE discovered that the Project grading specifications contained a latent defect: the grading specifications conflicted with the Project typical sections contained in the Contract documents. Specifically, the typical concrete sections contained in the specifications showed finished grades ranging from 0.5% to 2%. However, the finished grades did not meet the survey elevations shown in the Project plans. ACE was required to hand-grade the Hot-Load Area sections prior to pouring the concrete in order to meet the required survey elevations. This resulted in a three-week delay and extra work on the Project for ACE.

**2. The Project specifications called for the use of concrete forms that were impossible to install as shown in the plans.**

The Project specifications provided to ACE by the Corps mandated the use of steel forms that were at least three (3) meters long for the concrete paving. In following the Project specifications, ACE encountered yet another latent defect in the Project plans. Because the specifications called for grade elevation points with grade breaks at random intervals, the large, rigid concrete forms could not be conformed to the underlying surface of the Ammo Hot-Load Area drainage layer. Again, ACE was required to remediate this latent defect in the plans by hand-grading the concrete sections prior to pouring. Also, ACE was forced to employ full-time surveyors for the sole purpose of shooting the grades while its

subcontractor set the concrete forms. The hand-grading and additional surveying resulted in additional Project work for ACE.

**3. The Project specifications contained inappropriate testing requirements.**

As supplied to ACE by the Corps, the Project specifications contained a requirement that the concrete ACE poured on the Project be tested by a profilograph in order to be accepted by the Corps. ACE's concrete subcontractor could not meet the acceptance criteria using the profilograph testing. However, profilograph testing is not appropriate this Project. Eventually, the Corps agreed to eliminate the profilograph testing requirement for certain areas of the Project; but by that time, ACE already had expended unnecessary time, effort and funds in attempting to comply with this inappropriate testing requirement.

In accordance with the contract dispute clause and the Contract Disputes Act, ACE submitted to the Corps on August 6, 2003, an extra work claim addressing all three aspects outlined above for $1,781,318.00 and a 120 calendar day time extension. By letter dated February 12, 2004, the contracting officer issued a final decision denying the concrete extra work claim.

## II. SPECIFIC ALLEGATIONS OF FACT AND LAW

### A. The Severin Doctrine

Portions of ACE's claims are pass-through claims that are being pursued on behalf of ACE's concrete paving subcontractor, Cambro. ACE is entitled to recover the amounts due its subcontractors as no Severin Doctrine problem exists here. The Severin Doctrine has been summarized as follows:

> As a general rule, subcontractors under government contracts do not have standing to sue the government. [Citation omitted]. This is because such contractors lack privity with the government, and the government has not

> consented to be sued by those with whom it is not in privity. [Citation omitted]. However, if the prime contractor is liable to the subcontractor for damages sustained by the subcontractor, that prime contractor can bring an action against the government for the subcontractor's damages. [Citation omitted]. In this circumstance, the prime contractor itself is injured by the acts of the government and, therefore, has standing to sue the government in a pass-through suit on behalf of its subcontractor. *See E. R. Mitchell Construction Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999). There is privity between the parties because the prime contractor, and not the subcontractor, is suing the government. Finally, if the government seeks dismissal of the prime contractor's pass-through suit, the government bears the burden of proof, and must show that the prime contractor is not responsible for the costs incurred by the subcontractor.

*W.G. Yates & Sons Const. Co., Inc. v. Caldera*, 192 F.3d 987, 990-991 (Fed. Cir. 1999); *see also, Severin v. United States*, 99 Ct. Cl. 435, 442 (1943).

ACE's contracts with its subcontractors on the Project obligate ACE to sponsor pass-through claims against the Corps, and impose conditional liability on ACE for amounts recovered for those pass-through claims "if and when" ACE recovers. ACE's conditional liability to its subcontractors gives ACE standing to maintain a pass-through action on behalf of its subcontractors. *See, e.g., W.G. Yates & Sons Const. Co., Inc. v. Caldera*, 192 F.3d 987, 992 (Fed. Cir. 1999).

### B. The Corps's Notice Defense

The Corps's defense to ACE's Concrete Extra Work Claim rests in large part upon an allegation that ACE did not comply with the notice requirements contained in the Contract.

#### 1. ACE complied with the Contract notice provision.

The Corps's allegations to the contrary, ACE complied with the Contract's notice provision concerning differing site conditions, which reads in pertinent part:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give written notice to the Contracting Officer of
>
>> (1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract, or
>>
>> (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

Contract, 00700-54.

**2. <u>Oral notice to the Corps will satisfy the notice requirements of the Contract, even though the Contract purports to mandate formal, written notice</u>.**

ACE can satisfy the notice requirements contained in the Contract by establishing that it provided oral notice to the Corps of the facts and circumstances underlying ACE's claims, despite the fact that the Contract specifically calls for formal, written notice:

> We find that the combination of written and oral communications to the Government in this case brought Government representatives to the site before the changed conditions to the site and provided them with an ample opportunity to investigate the condition and its extent. The notice given was consistent with the pre-established pattern to which the Government had acquiesced. Under these circumstances, we find that the notice to the government was adequate to the Changed Conditions Clause.

*Piracci Construction Co., Inc. v. United States,* GSBCA No. 2793, 1970 WL 861 (G.S.B.C.A.).

**3. <u>Notice need not be detailed and actual, only reasonable and constructive</u>.**

Even if this Court finds that ACE failed to give the Corps notice – written or otherwise – of ACE's claims, "actual knowledge ordinarily excuses a failure to give written notice." *J&J Paving, Inc.* 1985 WL 16386 at *71.

If a government contractor proves that the government possessed enough information concerning a potential claim to put the government on notice in general terms that a claim potentially has arisen, and to allow the government to conduct a reasonable and thorough investigation, notice will be imputed to the government:

> [The government's] position is that this notice was inadequate because not enough detail was given. Since the contracting officer and the Board both considered the claim on its merits, it may well be that the latter part of the Changed Conditions Clause . . . precludes the [government] from relying on lack of proper notice. In any event, we hold that the notice was sufficient. Under this Changed Conditions article, the [government] has the duty, once notice is given, to investigate the existence, nature, extent and validity of the contractor's claim. It is not necessary that the allegedly new condition be set forth specifically and in detail. It is enough if the Government knows that the contractor is claiming such a condition in a certain area; no formal or technical requirements have been imposed.

*Farnsworth & Chambers Co., Inc. v. United States*, 346 F.2d 577, 581. (Fed. Ct. Cl. 1965).

**2. The Corps bears the burden of proof of showing prejudice resulting from lack of notice.**

In the absence of prejudice to the government, courts are rightly disinclined to bar a contractor's claim for compensation for a failure to comply with the technical notice requirements of government contracts. As a threshold matter, the government cannot assert lack of formal notice as a defense to a contractor's claim in the absence of prejudice to the government.

> As a general defense to [contractor's] differing site conditions claim, [the government] asserts that a lack of appropriate notice of a differing site condition by the contractor to the Government prejudiced the Government's efforts in investigating and in defending against the allegation of the encountering of the conditions… though the record indicates a lack of definitiveness in the notices of a differing site condition by [the contractor], the Board finds no prejudice to the [government] and no validity in the defense of notice.

*Appeal of Great Lakes Dredge & Dock Co.*, Eng. B.C.A. No. 5606, 1990 WL 212040 (Eng. B.C.A. 1990).

Furthermore, the government bears the burden of proving prejudice arising out of the absence of formal, written notice. *Delphcon Builders, Inc. v. United States*, 55 PSBCA No. 1455(1988), 1998 WL 93095, *12 (P.S.B.C.A.); *see also, J&J Paving, Inc. v. United States*, DOTCAB. No. 1570, 1985 WL 16386, *71 (D.O.T.C.A.B.).

Also, lack of notice that merely obstructs the government's ability to investigate and defend against an alleged claim, without actually preventing the government from doing so, does not rise to the level of "prejudice" for purposes of asserting a notice defense:

> The Court of Claims, in recent years, has been reluctant to bar claims for failure to give notice, where the notice requirement is for the benefit of the Government. [Citations omitted] . . . [H]ere, the prejudice to the Government from want of timely notice consists of merely increasing the difficulty of, but does not prevent, investigation and defense. The facts do not show this difficulty to be of sufficient magnitude to bar the claim.

*C.H. Leavell & Co. v. United States*, ASBCA No. 16099, 1972 WL 1724, *4 (A.S.B.C.A.); *see also*, *J&J Paving, Inc. v. United States*, DOTCAB. No. 1570, 1985 WL 16386, *71 ("It must also be shown that the Government suffered prejudice by the failure to give timely notice. [Citations omitted]. Prejudice will not be presumed . . . .").

**C. Defective Specifications**

The government warrants to its contractors that compliance with the government's specifications will yield a satisfactory result:

> The government implicitly warrants its design specifications for a

government construction contract:

> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. [Citation omitted]. "[I]f this court finds the cause (of faulty construction) to be a deficiency in a design specification the government would bear the risk, and consequently be liable for reasonable costs incurred by the plaintiff." *Neal & Co. v. United States*, 19 Ct. Cl. 463, 467-68 (1990), *aff'd*, 945 F.2d 385 (Fed. Cir. 1991). Defective design specifications may entitle a contractor to an equitable adjustment of the contract for the reparative work required to build a satisfactory end-product.
>
> But not all contract specifications are design specifications—some are merely performance specifications:
>
> Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987). (citation omitted). The government does not implicitly warrant performance specifications for complete accuracy or adequacy. *Id.* "[T]ypical 'performance' type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969).

*George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 296-97 (2005); *see also*, *Conner Brothers Construction Co., Inc. v. United States.*, 65 Fed. Cl. 657, 685 (2005) ("[I]f the specifications are strictly observed, the government implicitly warrants that satisfactory performance will result.").

The specifications defects alleged by ACE are of the "design" type that will support a defective specifications claim. The concrete paving specifications are design specifications, as the Corps set forth the

equipment, forms, concrete, and acceptance testing that ACE would be permitted to use in performing its Contract work.

> Design specifications "set forth in precise detail the materials to be employed and the manner in which the work… [is] to be performed." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969). By contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for the selection." *Id.*

*Conner Brothers Construction Co., Inc. v. United States*, 65 Fed. Cl. 657, 685 (2005).

### D. Alternate Design Specifications

In this case, the Corps's specifications provided ACE with two alternate methods for paving on the Project. The method ACE did not use would have been much more expensive and substantively commercially impracticable, especially in light of the fact that this project was a small business set-aside. The Corps has asserted that the unused method – while significantly more expensive – probably would have achieved a superior end result. Based on this assertion, the Corps reasons that, because ACE elected to use a particular specified method, ACE then bears the burden for the resulting extra work. The Corps's reasoning improperly places the burden on ACE in the context of design specifications.

As noted previously, government design specifications contain an implied warranty that the contractor will produce a satisfactory result if he complies with the specifications. Taking this rationale one step further, if the government's design specifications allow a contractor to elect to perform its obligations by multiple, alternate means or methods, the government warrants that all such means or methods will produce a satisfactory result. "[W]hen the government provides alternate methods by which a project may

be completed there is an implied warranty that either method will achieve the desired result." *Neal & Co., Inc. v. United States*, 19 Ct. Cl. 463, 469 (1990), *superseded in part on other grounds, Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221 (10th Cir. 1999); *see also*, *Fru-Con Construction Corp. v. United States*, 42 Fed. Cl. 94, 99 (1998) (reaffirming the holding of *Neal*, *supra*, and observing that "the Government warrants a prescribed method of performance against impossibility or commercial impracticability resulting from a defective design specification.").

**E. Contractor's Duty of Care: Reasonableness**

As previously noted, ACE was entitled to and did rely on the Project specifications in submitting its bid and performing its Contract work. The Corps contends that ACE did not examine the Project specifications with sufficient zeal, and that the Corps is therefore relieved of its obligation to provide plans free from design defects. Specifically, the Corps alleges that ACE improperly relied on the two existing models of Project drawings, and should have generated a third model of the drawings to determine whether inconsistencies existed between the typical concrete sections and the survey elevations. The Corps attempts to place an impermissibly high burden on ACE.

A government construction contractor is not under any heightened duty of care to ascertain defects in the government's specifications, or other government-provided documents. The contractor need only exercise reasonable care in preparing his bid:

> "[A] contractor is held accountable to discover and pursue indications which would put a reasonable and prudent contractor on notice of conditions differing than those indicated in contract drawings.

*Conner Brothers Construction Co., Inc. v. United States*, 65 Fed. Cl. 657, 673-74 (2005). *see also*

*Hardwick Brothers Co., II v. United States*, 36 Fed. Cl. 347 (1996).

The theoretical "reasonable contractor" is presumed to have examined the plans and specifications, and to have investigated the construction site. *See Al Johnson Construction Co. v. United States*, 854 F.2d 467, 470 (Fed. Cir. 1998). Exercising reasonable care, ACE examined the Project plans and specifications, including the two existing models of the Project drawings, and investigated the construction site. The design defect in the Corps's specifications on this project was latent, and the Corps cannot shift responsibility for the defective plans to ACE.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail and Facsimile transmission to Timothy Paul McIlmail, U. S. Department of Justice, Civil Division--Commercial Litigation Branch, 1100 L Street, NW, 8th Floor, Washington, DC 20005 and Rex Crosswhite, Office of Counsel, Army Corps of Engineers, Fort Worth, Texas, this 24th day of August, 2005.

/s/Bradley S. Copenhaver
W. Robert Vezina, III
Florida Bar No. 329401
Bradley S. Copenhaver
Florida Bar No. 162558
Vezina, Lawrence & Piscitelli, P.A.
318 North Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Telefacsimile: (850) 224-1353