IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ACE CONSTRUCTORS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-299C (Judge Lettow) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

INTRODUCTION

Biggs Army Airfield, Fort Bliss, in El Paso, Texas, is the site of roads, a taxiway, and an ammunition loading area consisting of a "pallet storage pad" and a "loading apron," that plaintiff, ACE Constructors, Inc., constructed pursuant to a contract with the United States Army Corps of Engineers. The Government awarded ACE the contract on September 27, 2000, in the amount of $8,616,840. The contract required completion of the work within 360 days. ACE completed construction on June 4, 2002, and the Army Corps of Engineers withheld $254,380 in liquidated damages. ACE's subcontractor for concrete work was Cambro Construction, Inc.

ACE seeks $2,321,803, plus interest. It asserts differing site condition and defective specification claims, including defective specifications claims passed through from Cambro, and requests an equitable adjustment to the contract and time extensions that would result in the return of liquidated damages.

The evidence at trial will not support ACE's more than $2 million claim.

STATEMENT OF FACTS

I. Differing Site Condition

ACE contends that it encountered a differing site condition, in that it learned that grading the work site to the elevations specified in the contract would require more dirt fill than it estimated. The contract, however, did not expressly indicate the amount of fill that would be required. Rather, ACE subcontracted with an estimator to determine how much fill would be needed.

We expect that ACE will assert that its estimator reasonably relied upon an aerial survey provided as part of the solicitation package, and that the aerial survey was inaccurate. The contract, however, included Federal Acquisition Regulation ("FAR") 52.236-2, Differing Site Conditions, which provided that "[t]he Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of . . . latent physical conditions at the site which differ materially from those indicated in [the] contract . . . ." ACE did not notify the Government that site elevations differed from those indicated on contract plans until after the site had already been cleared, grubbed, and excavated. ACE also did not meet the contract requirement to verify to the contracting officer, in writing, "the basic survey data provided on the

contract drawings" before disturbing existing conditions. Rather, ACE surveyed and cleared and grubbed the site simultaneously.

II. Hand Grading Prior To Pouring Concrete

ACE contends that hand grading of the work site was required prior to pouring concrete to meet the elevations specified in the contract because "the grading specifications conflicted with the typical sections." We also expect that ACE will contend that it was unaware, until its surveyors had staked the site, that the contract called for the pallet storage pad and loading apron to be dome-shaped. The evidence, however, will demonstrate that the contract drawings indicated the shape of the pallet storage pad and the loading apron, and that hand grading of the site prior to pouring concrete was required because ACE failed to grade the site properly before concrete forms were set.

III. Three-Meter Forms

ACE also contends that hand grading of concrete sections prior to pouring concrete and additional surveying was required to meet the elevations specified in the contract because the specifications mandated the use of steel concrete forms of at least three meters in length. The evidence, however, will demonstrate that any such additional work was required because of ACE's performance methods and because (1) Cambro chose an exclusively "rigid form" method of concrete paving, even though

the contract also allowed a "slip-form" method, (2) Cambro chose to use exclusively three-meter long steel forms instead of longer forms that the contract also allowed, and (3) Cambro's workmanship was poor. Indeed, Cambro's concrete work was so poor that ACE terminated Cambro for default.

IV. Profilograph Testing

ACE contends that it expended additional work attempting to meet the "profilograph" test required by the contract for concrete smoothness testing for purposes of determining payment for concrete. The evidence will show that although profilograph testing is not normally used for some of the types of concrete work that the contract required, ACE's concrete work passed the profilograph test when Cambro performed that work properly. For example, Cambro would pile so much concrete in front of the rigid form paving machine that the machine would ride up on the pile, leaving bumps on the surface of the concrete that would be detected as a flaw by the profilograph.

In addition, the Government waived the profilograph testing requirement for concrete at the pallet storage pad on August 29, 2001. Cambro abandoned the work site and ACE terminated Cambro for default in late September 2001. Although ACE contends that Cambro's abandonment of the work site and its termination of Cambro for default were caused by the requirement to test concrete by profilograph, when Cambro abandoned the work site and

ACE terminated Cambro for default there was still concrete to be poured at the pallet storage pad.

Cambro did not return to the work site until October 9, 2001, but, on October 11, 2001, ACE suspended all concrete placement. On October 18, 2001, the Government changed the profilograph requirement (except for the taxiway) to require the test to determine only which areas required grinding; no longer would the profilograph be used to determine payment for concrete placed at the loading apron. Nevertheless, concrete paving did not resume, even at the pallet storage pad, until November 12, 2001.

V. Delay To Contract Completion

ACE contends that the Government delayed contract completion. The evidence will demonstrate that contract completion was delayed by (1) ACE waiting weeks from the issuance of the notice to proceed to begin work at the site, (2) mistakes and slow progress at the work site made by ACE and its subcontractors, (3) decisions by ACE and Cambro regarding how to schedule the work, (4) Cambro's concrete supplier refusing to supply concrete, and (5) Cambro's suspension of work and ACE's termination of Cambro by default.

Moreover, the contract includes the "Suspension of Work" clause, FAR 52.242-14 (Apr. 1984), which provides for an adjustment of the contract price for increases in the cost of

performance from unreasonable delay caused by the Government, "excluding profit." Despite the inclusion of that clause in the contract, ACE seeks profit upon delay and other suspension costs. In addition, even though the Government withheld only $254,280 in liquidated damages for delay to completion of the contract, ACE seeks $580,280 in liquidated damages, including $326,000 in liquidated damages that it assessed against Cambro.

VI. Cambro's Pass-Through Claims

Some of ACE's claims in this actions are passed through from Cambro. On October 7, 2001, however, Cambro released ACE from any claim accrued by that date relating to the pallet storage pad and two light pole piers. Paragraph 7 of ACE and Cambro's October 7, 2001 "Limited Work Agreement" provides:

> The Contractor and Subcontractor hereby waive, release and hold each other harmless from any claim, demand, cost, attorneys' fee, expense, loss or charge, known or unknown, which has been asserted or which could have been asserted against the other as of the date of this Agreement relating to the Pallet Pad and the Piers . . . .

Despite that provision, ACE passes through, in this action, claims related to the pallet pad that had accrued by October 7, 2001.

DISCUSSION OF APPLICABLE LEGAL PRINCIPLES

To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove, by preponderant evidence, that: the conditions indicated in the

contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). FAR 52.236-2(a), however, requires that a contractor, "promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer" of a differing site condition. 48 C.F.R. § 52.236-2(a). Although the courts have relaxed that requirement to allow oral notice even to the contracting officer's representative and waiver of the requirement if the Government had actual or constructive notice of the conditions encountered, the Government may defeat recovery by proving that it was prejudiced or disadvantaged by the contractor's failure to give notice. Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 650 (2005).

The Government may prove that it was prejudiced or disadvantaged by the contractor's failure to give notice by establishing that the passage of time obscured the elements of proof. Id. Indeed, a lack of a timely notice is prejudicial to the Government if it effectively prevents any verification of the

contractor's claim. Id.; John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 533 (3d ed. 1995).

With respect to ACE's defective specifications claims, whenever the Government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors. Robins Maintenance, Inc. v. United States, 265 F.3d 1254, 1257 (Fed. Cir. 2001). The test for recovery based on inaccurate specifications is whether the contractor was misled by the alleged errors in the specifications. Id. A contractor must show that the defective specifications were the cause of its injury. Fru-Con Const. Corp. v. United States, 42 Fed. Cl. 94, 96 (1998), aff'd, 250 F.3d 762 (Fed. Cir. 2000) (table).

"[W]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." United States v Spearin, 248 U.S. 132, 136 (1918). The underlying question is whether the specifications supplied were suitable for their intended purpose. Servidone Const. Corp. v. United States, 19 Cl. Ct. 346, 377 (1990), aff'd, 931 F.2d 860 (Fed. Cir. 1991). A contractor has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct. Id. Even extensive,

unanticipated difficulties do not establish that specifications were unsuitable. Id.

With respect to whether the grading specifications conflicted with typical sections, a patent ambiguity in a Government contract is one that is obvious, gross, or glaring. NVT Techns., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004). A patent ambiguity requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Triax Pacific, Inc. v. West, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). Absent such inquiry, the ambiguity will be resolved against the contractor. Id.

With respect to the contract requirement to test the smoothness of concrete by profilograph, the Government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor. J.L. Malone & Assoc., Inc. v. United States, 879 F.2d 841, 845 (Fed. Cir. 1989). Neither a contractor's belief nor contrary customary practice can justify a departure from the terms of an unambiguous contract provision. R.B. Wright Constr. Co. v. United States, 919 F.2d 1569, 1572 (Fed. Cir. 1990); see WRB Corp. v. United States, 183 Ct. Cl. 409, 436 (1968). The Government is entitled to receive what it has contracted for, even if that exceeds what is absolutely needed for a satisfactory result. R.B. Wright, 919 F.2d at 1573. Such compliance is important in order to insure that a contractor

does not gain an advantage in the bidding process. See Farwell Co. v. United States, 137 Ct. Cl. 832, 836-37 (1957).

With respect to delays to contract completion, a contractor generally cannot recover for "concurrent delays" to contract completion, because a Government act that delays part of the work does not delay the general progress of the work when the work as a whole would have been delayed regardless of the Government's act. Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000). Moreover, where a contract includes the "Suspension of Work" clause, FAR 52.242-14 (Apr. 1984), the contractor may not recover profit upon increases in the cost of performance from unreasonable delay caused by the Government, including inefficiency costs. See Wilner v. United States, 23 Cl. Ct. 241, 244, 262-63 (1991); Holloway Const. Co. v. United States, 4 Cl. Ct. 779, 789 (1984). Indeed, the rationale that a contractor should earn profit does not apply in instances of delay or inefficiency, because the Government has not received anything "extra" from the contractor. See Administration of Government Contracts at 750-51.

With respect to Cambro's pass-through claims, pursuant to ordinary Government prime contracts, subcontractors do not have standing to sue the Government. E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir. 1999). That rule, however, is tempered to permit a prime contractor in certain

circumstances to sue the Government upon behalf of its subcontractor, in the nature of a pass-through suit, for costs incurred by the subcontractor. Id. The Severin doctrine limits the Government's exposure to such pass-through suits to the situations in which the prime contractor is liable for the subcontractor's costs. Id. Where the subcontractor has released the prime contractor from liability for claims, the prime contractor may not sue the Government upon behalf of the subcontractor upon those claims. See J. L. Simmons Co. v. United States, 158 Ct. Cl. 393, 397-98, 304 F.2d 886, 888-89 (1962); cf. George Hyman Constr. Co. v. United States, 30 Fed. Cl. 170, 172, 174-75 (1993) (holding that release of prime contractor liability on reverse of check to subcontractor for final payment brought case within the Severin doctrine), aff'd, 39 F.3d 1197 (Fed. Cir. 1994) (table).

OBJECTIONS TO EXHIBITS

We note that although they appear on the exhibit list that plaintiff provided to us on June 29, 2005, Plaintiff's Exhibits Nos. 108-17 or 170-78 do not appear on the exhibit list that plaintiff filed with the Court on August 29, 2005.

We object to ACE listing "All Exhibits Necessary for Rebuttal" without identifying those exhibits. Appendix A ¶ 15 to the Rules of the United States Court of Federal Claims requires

that a party identify on its exhibit list all exhibits to be used for rebuttal purposes.

We object to Plaintiff's Exhibits Nos. 3 and 4 pursuant to Rule 402 of the Federal Rules of Evidence because they are irrelevant.

We object to the following pursuant to Rule 802 of the Federal Rules of Evidence because they are or include hearsay: Plaintiff's Exhibits Nos. 1, 3, 4, 17, 53 (pages 3-24), 58, 59, 60, 64, 69 (pages 2-6), 91, 101, 102, 103, 104, 106, 107 (page 1), 109, 114, 117, 131, 132, 137, 142, 146, 148, 149, 151, 152, 155, 174, and 175.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 307-0361
Facsimile: (202) 514-7965

OF COUNSEL:
REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

September 21, 2005

Attorneys for Defendant

Certificate of Filing

I hereby certify that on September 21, 2005, a copy of the foregoing Defendant's Memorandum Of Contentions Of Fact And Law was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail