Paragraphs 11.7, 11.8, and 11.9.

11.4 If an application for payment is received by the Contractor after the Application dated fixed above, the Subcontractor's Work covered by it shall be included by the Contractor in the next application for payment submitted to the Owner.

11.5 Each application for payment shall be based upon the most recent schedule of values submitted by the Subcontractor in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the Subcontractor's Work and be prepared in such form and supported by such data to substantiate its accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the Subcontractor's applications for payment.

11.6 Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment.

11.7 Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as follows:

11.7.1 Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Subcontractor's Work by the share of the total Subcontract Sum allocated to that portion of the Subcontractor's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the Subcontractor. Pending final determination of cost to the Contractor of changes in the Work which have been properly authorized by the Contractor, amounts not in dispute shall be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

11.7.2 Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's application for payment;

11.7.3 Subtract the aggregate of previous payments made by the Contractor; and

11.7.4 Subtract amounts, if any, calculated under Subparagraph 11.7.1 or 11.7.2 which are related to Work of the Subcontractor for which the Owner has withheld or nullified, in whole or in part, a certificate of payment for a cause which is the fault of the Subcontractor.

11.7.5 The subcontractor's monthly requisition for progress payments must contain the following statement signed by the licensed qualifier of Subcontractor: "All of the work for which payment is sought has been performed in accordance with the contract documents and all applicable building codes." By submitting a requisition, Subcontractor represents the foregoing statement to be true, and understands that Contractor relies on that statement in processing payment.

11.8 Upon the partial or entire disapproval by the Contractor of the Subcontractor's application for payment, the Contractor shall provide written notice to the Subcontractor. When the basis for the disapproval has been remedied, the Subcontractor shall be paid the amounts withheld.

11.9 Subcontractor shall, in turn and in the same manner, make partial payments to its laborers, suppliers and subcontractors for work performed and materials furnished and to the extent of their respective interests therein. Subcontractor shall earmark all payments made to its subcontractors and suppliers by identifying the Project referenced in this Agreement and include language on its remittances which limits the application of its payments to any outstanding balance on the Project referenced in this Agreement.

11.10 Subcontractor covenants that all sums paid by Contractor to it shall be, and hereby are, impressed with a trust in favor of laborers, sub-subcontractors and materialmen furnishing labor and material to Subcontractor in connection with the work, as well as in favor of any taxes, insurance premiums, or governmental fees owed in connection with the work. Subcontractor will apply the payments received from Contractor for these purposes before using any part thereof for any other purpose. Subcontractor shall, as often as requested by Contractor, furnish an Affidavit showing the names and addresses of all persons who have furnished labor, equipment, services or materials in connection with the Work, as well as the amount due, or to become due to each such person, and the amounts paid to each such person by Subcontractor.

11.11 Contractor shall have the express right of setoff against sums due Subcontractor under this Agreement for sums owed or claimed by Contractor to be owed Contractor (or an affiliate) by Subcontractor (or an affiliate) under or by virtue of this Agreement or an other agreement by and between Contractor (or an affiliate) and Subcontractor (or an affiliate) or by operation of law.

11.12 SUBSTANTIAL COMPLETION

11.12.1 When the Subcontractor's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the Subcontractor, make prompt application for payment for such Work. Within 30 days following issuance by the Owner of the certificate for payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the Subcontractor, deducting any portion of the funds for the Subcontractor's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the Subcontractor. Such payment to the Subcontractor shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the Subcontractor's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the Subcontractor, will reduce the retainage of the Subcontractor's substantially completed Work to the same percentage of retainage as that of the Contractor's work covered by the certificate.

ARTICLE 12 FINAL PAYMENT

12.1 Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Owner has issued a certificate for payment covering the Subcontractor's completed Work and the Contractor has received payment from the Owner. If, for any cause which is not the fault of the Subcontractor, a certificate for payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within three working days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.

12.2 Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for

materials and equipment, and all known indebtedness connected with the Subcontractor's Work have been satisfied.

ARTICLE 13 INSURANCE AND BONDS

13.1 The Subcontractor shall purchase and maintain insurance of the following types of coverage and limits of liability:

Workers' compensation and employers' liability insurance in compliance with applicable state statutes, with a minimum employers' liability coverage of $100,000 for bodily injury by accident, $500,000 policy limit for bodily injury by disease and $100,000 per employee for bodily injury by disease.

Comprehensive general liability insurance for bodily injury and property damage with minimum limits of $500,000 per occurrence. Contractor shall be named as Additional Insured.

Comprehensive automobile liability insurance covering the operation of all automobiles used in connection with the performance of the contract in the minimum limits of $500,000 per occurrence for bodily injury and property damage. Contractor shall be named as Additional Insured.

13.2 Liability policies must be written on an "occurrence" basis, policies written on a "claims made" basis will not be accepted.

13.3 Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the polices will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Subcontractor with reasonable promptness.

13.4 The Contractor shall furnish to the Subcontractor satisfactory evidence of insurance required of the Contractor under the Prime Contract.

13.5 The Contractor shall promptly, upon request of the Subcontractor, furnish a copy of any bond covering payment of obligations arising under the Subcontract.

13.6 Performance Bond and Payment Bond:

Subcontractor shall furnish performance and payment bonds in the penal sum of 100% of the Subcontract amount. The bonds shall be delivered to Contractor within ten days of execution of this agreement and shall be on a form acceptable to Contractor. Surety must be acceptable to Contractor. Without limitation, surety must be (1) licensed to transact business in the State of Texas, (2) listed in the Department of Treasury's Federal Register and (3) have a Best Rating of "A-" or better.

13.7 WAIVERS OF SUBROGATION

13.7.1 The Contractor and Subcontractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Owner, the Owner's consultants, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The Subcontractor shall require of the Subcontractor's Sub-contractors, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

13.8 FAILURE TO FURNISH

If Subcontractor fails to procure and maintain required insurance, Contractor shall have the right, but not the obligation, to procure and maintain the said insurance for and in the name of Subcontractor and Subcontractor shall pay the cost thereof and shall furnish all necessary information to make effective and maintain such insurance.

ARTICLE 14 TEMPORARY FACILITIES AND WORKING CONDITIONS

14.1 The Contractor shall furnish and make available to the Subcontractor the following temporary facilities, equipment and services; these shall be furnished at no cost to the Subcontractor unless otherwise indicated below:

None.

14.2 Specific working conditions:

All hourly wages shall be paid at the hourly wage rates listed in the applicable Davis-Bacon Act Wage Decision. The Wage Decisions applicable to this Project are included in Section 00710 of the Contract Documents and attached herein as Appendix A.

This Subcontract shall be subject to the Prime Contract requirement for affirmative action to ensure equal employment opportunity for construction. The goals for minority and female participation applicable to this project are included in Section 00720 of the Contract Documents and attached herein as Appendix B.

ARTICLE 15 MISCELLANEOUS PROVISIONS

15.1 Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

15.2 Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. The interest rate to be used for payments due and unpaid under this Subcontract will be 8%.

15.3 Retainage and any reduction thereto is as follows:

Contractor, at its sole discretion and at its sole option, may withhold retainage. Retainage will be withheld from payments due to Subcontractor to the same extent that retainage is withheld from payments due to Contractor.

15.4 The Contractor and Subcontractor waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7.

ARTICLE 16 ENUMERATION OF SUBCONTRACT DOCUMENTS

16.1 The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated as follows:

16.1.1 The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement;

16.1.2 The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:

None;

16.1.3 Other Documents, if any, forming part of the Subcontract Document are as follows:

None.

This Agreement entered into as of the day and year first written above.

| | |
|---|---|
| | [signature] |
| CONTRACTOR *(Signature)* | SUBCONTRACTOR *(Signature)* |
| | D.M. Camicci V.P. |
| *(Printed name and title)* | *(Printed name and title)* |

CONTRACTOR'S QUALITY CONTROL REPORT (QCR) (ER 1180-1-6)

DATE: 9-25-01

REPORT No 320

CONTRACT NUMBER AND NAME OF CONTRACTOR (DAC -17-97-C- )

DACA63-00-C-0025
ACE Constructors, Inc.

DESCRIPTION AND LOCATION OF THE WORK:

Ammo Hot Load Project
Fort Bliss, Tx.
El Paso, Tx.

WEATHER CLASSIFICATION:

CLASS A No interruptions of any kind from weather conditions occurring this or previous shifts.
CLASS B Weather occurred during this shift that caused a complete stoppage of all work.
CLASS C Weather occurred during this shift that caused a partial stoppage of work.
CLASS D Weather overhead excellent or suitable during shift. Work stopped due to results of previous adverse weather.
CLASS E Weather overhead excellent or suitable during shift but work partially stopped due to previous adverse manner.
OTHER Explain

CLASSIFICATION:
CLASS A
Sunny
TEMPERATURE:
MAX 88° MIN 58°
Sunny
PRECIPITATION:
INCHES None

CONTRACTOR/SUBCONTRACTORS AND AREA OF RESPONSIBILITY FOR WORK PERFORMED TODAY: (*Attach list of items of equipment either idle or working as appropriate*)

a. ACE Constructors - Prime
b. Land Mark Surveying - Sub.
c. Fank and Company - Sub.
d. Cambro Construction - Sub.
e.
f.
g.

1. WORK PERFORMED TODAY: (*Indicate location and description of work performed refer to work by prime and/or subcontractors by letter in table above*)

A) Graded access road and ditches, prepare for base
B) Set Blue Tops on Access road, checked Blue Tops on Road ditch.
C) Worked on MH # C8, E8, C9, E9, C10, & E10.
D) Hauled off Equipment (Abandon sub.)

2. TYPE AND RESULTS OF INSPECTION: (*Indicate whether: P- Preparatory, I - Initial, or F - Follow-up and include satisfactory work completed or deficiencies with action to be taken.*):

checked Equipment being hauled off.
checked and measured concrete paving
checked grades on access road

3. TESTS REQUIRED BY PLANS AND/OR SPECIFICATIONS PERFORMED AND RESULTS OF TESTS:

None required.

RECEIVED
OCT 0 1 2001
CORPS OF ENGINEERS

4. VERBAL INSTRUCTIONS RECEIVED: *(List any instructions given by Government personnel on construction deficiencies, retesting required, etc., with action to be taken.)*

No contact

5. REMARKS: *(Cover any conflicts in plans, specifications or instructions; acceptability of incoming materials ; offsite surveillance activities; progress of work, delays, causes and extent thereof; days of no work with reasons for same. Note if a Preparatory or Initial Phase Meeting was held, and attach a copy of the checklist.)*

Removal of sub contractor due to non compliance to his contract – behind, no over time to catch up, not enough men to complete work on time, poor workmanship.

5. a. REQUESTS FOR INFORMATION: *(Note that there is an RFI attached to this daily report, assign a control number and attach a sheet to this report which fully describes the RFI , and recommends a solution if applicable.)*

☐ RFI Attached ; Control Number =

5. b. ENVIRONMENTAL QUALITY CONTROL
Environmental Quality Control Requirements are in place and have been checked? ☒ Yes; ☐ Not Applicable
Have any endangered species been encountered? ☐ Yes; ☒ No
(If Yes, attach required reports in accordance with Section ENVIRONMENTAL PROTECTION)

5. c. VISITORS TO THE SITE *(List the name of all official visitors to the site and who they represent i.e. State DEP, OSHA)*

6. SAFETY: *(Include all infractions of the accident prevention plan; COE Safety and Health Requirements Manual, EM 385-1-1; or instructions from Government QA personnel. Describe corrective actions taken.)*

Driver of sub contractor hit gate.

Safety meeting held today? ☐ Yes, ☒ No (If Yes, state the subject and report number of personnel in attendance )

Safety meeting subject: ______

Number of Contractor personnel attending = ______ Number of subcontractor personnel attending = ______

Name of Reporting QC Inspector/s:

Signature & Date: [signature] 9-26-01

CONTRACTOR's CERTIFICATION: I certify that the above report is complete and correct and that all material and equipment used, work performed and tests conducted during this reporting period were in compliance with the contract except as noted above.

[signature]
Contractor's QC System Manager/ Authorized Representative

UNITED STATES COURT OF FEDERAL CLAIMS

************************

ACE CONSTRUCTORS, INC.,

Plaintiff,

v.

NO. 04-299 C
Judge Charles F. Lettow

UNITED STATES ARMY
CORPS OF ENGINEERS,

Defendant.

************************

********************************************

ORAL DEPOSITION OF

JOHN FULKERSON

MARCH 31, 2005

********************************************

The Oral Deposition of JOHN FULKERSON, taken at the request of the Defendant, at 8:55 a.m., Thursday, March 31, 2005, at the offices of Brannon Rasberry & Associates, 300 E. Main, Suite 1024, El Paso, Texas, before Marisol Rocha Pitzer, a Certified Shorthand Reporter of the State of Texas (State Certificate #4937).

Copy Prepared for:
Mr. Timothy McDaniel

08:55:12 JOHN FULKERSON,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. McILMAIL:
08:55:14 Q. What's your name, please?
A. John Randall Fulkerson.
Q. And you're president of ACE; is that right?
A. Yes.
Q. How long have you been president of ACE?
08:55:25 A. Since 1998.
Q. What did you do before '98?
A. I was president of Anderson Columbia Environmental.
Q. What did that company do?
08:55:38 A. That company did heavy construction and environmental remediation.
Q. What does ACE do?
A. Heavy construction and environmental remediation.
(Mr. Crosswhite entered the room)
08:55:50 Q. How is it that you went from -- I'm sorry, I already forgot what the other name of the company was, to ACE in 1998?
A. In 1998 I started ACE. I was working for other people. I was a part owner of Anderson Columbia
08:56:07 Environmental, but started my own business.

10:10:50 took a lot more time to do.

Q. In the second sentence of that paragraph you say, "We have taken steps to rectify this situation" -- you're referring apparently to the minor delays and some quality problems -- "and wish to clarify ACE's steps with regard to Cambro." What steps did you take to rectify the situation of minor delays and quality problems by Cambro?

10:11:01

A. We terminated them according to the letter.

Q. Did you take any other steps to rectify the situation?

10:11:22

A. I think what I am talking about right here was their termination.

MR. McILMAIL: Okay. If you'd like, we can take a break.

10:11:34 (Recess from 10:11 a.m. to 10:21 a.m.)

Q. (BY MR. McILMAIL) Does the claim that ACE has passed from Cambro through to the United States include any money for the pallet pad or the piers?

A. Yes.

10:21:46 Q. Which does it include? The pallet pad?

A. Yes.

Q. Does it include any money for the piers?

A. No.

Q. Does it include any money for the pallet pad that were -- that was spent before ACE vacated the project?

10:21:55

10:22:05 MR. COPENHAVER: Object to the form.

MR. CROSSWHITE: Cambro. Cambro. You said ACE.

MR. McILMAIL: Sorry. Yeah.

10:22:10 Q. (BY MR. McILMAIL) Does it include any money for the pallet pad that Cambro spent before it left the project -- before it left the project in --

MR. CROSSWHITE: September.

Q. -- September?

10:22:30 A. I can't say for sure, because I -- and I don't remember that much about their claim. I reviewed it, but -- you know, I didn't prepare it, so I'm not as familiar with it, but I think it would probably would because they had profilograph problems before they left

10:22:44 the project.

Q. Did ACE and Cambro enter into an agreement that allowed Cambro to come back to the job?

A. Yes.

Q. Did that agreement include a release of any

10:22:59 liability to ACE for costs that Cambro incurred on the pallet pad prior to it vacating the job in September?

MR. COPENHAVER: Object to the form to the extent it calls for a legal conclusion.

A. I -- I'm not sure whether that release did that

10:23:24 or not.

CERTIFICATE

I, Marisol Rocha Pitzer, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that this transcript is a true record of the testimony given in said proceedings, and that said transcription is done to the best of my ability.

Given under my hand and seal of office on this 17th day of April, 2005.

Marisol Rocha Pitzer, Texas CSR 4937
Firm Registration No. 384
300 East Main, Suite 1024
El Paso, Texas 79901
My Commission Expires: 12/31/05

ACE CONSTRUCTORS, INC.

*Your Challenge is our Challenge.*

October 7, 2001

Cambro Construction, Inc.
74424 Second Street N.W.
Albuquerque, NM 87107

Attention: Jerry Camilli, President

Re: Limited Work Authorization Agreement

Dear Mr. Camilli:

This letter sets forth the terms and conditions of a Limited Work Authorization Agreement ("Agreement") between ACE Constructors, Inc. (the "Contractor"), and Cambro Construction, Inc. (the "Subcontractor") for the referenced project.

**Background**

By letter dated September 25, 2001, the Contractor formally notified the Subcontractor (and its surety) that the Standard Form of Agreement Between Contractor and Subcontractor (the "Subcontract") was terminated for cause in accordance with subarticle 7.2.1 of the Subcontract. The Subcontractor contests the declaration of default and Subcontract termination, and the parties have entered good faith discussions to amicably resolve their differences.

In the meantime, in an effort to mitigate potential damages and adverse impacts to the project, the parties have reached this Agreement, the terms and conditions of which are as follows.

**Terms and Conditions of Agreement**

1. The Subcontractor shall return to the project site on Monday, October 8, 2001, to recommence and complete construction of the Pallet Storage Pad (the "Pallet Pad") and the two (2) 1,220 mm light pole piers (the "Piers") as more fully described in the Subcontract Documents.

P.O. Box 357490 • Gainesville, Florida 32635-7490 • (352) 384-0272 • (352) 384-0282 FAX

MER - 0097

2. The Subcontractor shall construct the Pallet Pad and the Piers in accordance with the plans and specifications made a part of the Subcontract Documents.

3. The Subcontractor shall complete the Pallet Pad and the Piers no later than October 31, 2001.

4. The Subcontractor shall be provided a period of 72 hours from written notice by the Contractor to commence and continue correction any default or neglect identified by the Contractor with regard to the construction of the Pallet Pad and the Piers. If the Subcontractor fails to propose a plan of correction or to commence and continue correction of any such default or neglect with diligence and promptness within 48 hours of notice, the Contractor may terminate this Agreement at the expiration of 72 hours of when notice was given.

5. The Contractor shall pay the Subcontractor for the work within the scope of this Agreement in accordance with the payment provisions of the Subcontract.

6. The Subcontract terms and conditions and Subcontract Documents are expressly incorporated herein. In the case of conflict between the Subcontract and the Agreement, the terms and conditions of the latter control.

7. The Contractor and the Subcontractor hereby waive, release and hold each other harmless from any claim, demand, cost, attorneys' fee, expense, loss or charge, known or unknown, which has been asserted or which could have been asserted against the other as of the date of this Agreement relating to the Pallet Pad and the Piers, but this release shall not operate to excuse the Subcontractors obligation to complete Pallet Pad and Piers in accordance with the Subcontract Documents or the Contractor's obligation to pay for said work in accordance with the Subcontract Documents.

8. Time is of the essence in the performance of this Agreement.

9. The performance and payment bonds furnished by the Subcontractor shall apply to this Agreement, and the Subcontractor shall supply the Contractor with written consent thereto by the surety as a condition of the effectiveness of this Agreement.

## Conclusion

We ask that you sign where indicated below and look forward to the successful completion of the work within the scope of this Agreement.

MER - 0098

Sincerely,

ACE CONSTRUCTORS, INC.

John R. Fulkerson
President

Agreed to and Acknowledged this 7th day of October, 2001

Cambro Construction, Inc.
By: Jerry Camilli
President

MER - 0099

ACE
CONSTRUCTORS, INC.

*Your Challenge is our Challenge*

August 6, 2003

U.S. Army Corps of Engineers
8380 Morgan Avenue, Suite B
Fort Bliss, Texas 79906

**Attn.:** **David L. Wise, P.E.**

**Re:** **ACE Constructors, Inc. Request for Equitable Adjustment on the Ammo Hot-Load Area, Project No. 44921, Contract DACA63-00-C-0025**

Dear Mr. Wise:

ACE Constructors, Inc. ("ACE") hereby submits a Request for Equitable Adjustment ("the Request") on the Ammo Hot-Load Area, Project No. 44921 ("the Project"), Contract DACA63-00-C-0025 ("the Contract") for the sum certain of $1,781,318 along with a 120 calendar-day extension to the contract time. ACE continues to be willing to resolve this matter by meeting with the U.S. Army Corps of Engineers ("COE") at a mutually agreeable time and place, or by submitting to a mutually agreeable dispute resolution procedure.

In accordance with FAR 33.207(c), I certify the Request as follows:

> I certify that the Request is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the request on behalf of the contractor.

ACE initiates this Request through section 52.233-1, "Disputes," of the Contract, as well as the Contract Disputes Act of 1978, as amended.

**Basis of Request**

The Request is based upon ACE's and Cambro's belief that the Contract Documents were defective in three different but related areas. The first defect consisted of conflicting plans that were incorporated into the Contract Documents. Typical sections shown on drawing sequences 59 through 62 showed the subgrade, drainage layer rock and concrete being finished at consistent grades ranging from 0.5% to 2%. ACE bid the Project accordingly. During construction, ACE attempted to grade the subgrade and drainage layer at the slopes specified in the typical sections. Finish grading of these components at the grades shown in the typical sections did not meet the survey elevations shown in the project plans. After investigation and analysis by ACE and our surveyors, it was determined that the discrete elevations shown on the plans did not yield the consistent grades shown on the typical sections.

EXHIBIT
36
2

The second defect in the Specifications was the requirement included in Section 02753 Part 3.5.5.1.b to use three-meter long steel forms for the concrete paving. As described in Cambro's Request, the grade contours resulting from the specified grade elevation points had grade breaks at random locations. These grade breaks made it impossible for three-meter long rigid forms to conform to the surface of the drainage layer. This defect is more fully described in Cambro's narrative.

The third defect was the requirement included in Specification Section 02753 Part 1.3.7 that profilograph testing to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length. As described in Cambro's Request, the profilograph machine is designed to test roadway sections much longer than the sixty-meter minimum employed on this project. The machine design was not applicable to the subject project due to the short test runs and the test results were statistically inaccurate. This defect is more fully described in Cambro's narrative.

## Notice to COR

ACE and Cambro complained vigorously to COE on numerous occasions about these issues starting in September 2001. The COE formally agreed in November 2001 to eliminate the profilograph testing requirement for areas of the project.

## The Solution

To mitigate potential adverse impact to cost and schedule, ACE and Cambro took a proactive approach in an attempt to mitigate adverse impacts to the Contract and schedule, and worked cooperatively with COE to determine and implement the most expedient and cost effective fix available.

ACE solved the grading problems caused by the first defect described above by employing additional labor and equipment to hand measure and grade the slopes between each of the elevation locations identified on the project plans. Since the slopes could not be finished at the grades shown on the typical sections, ACE demobilized the laser system that had been purchased and mounted on the motor grader specifically for the purpose of this finish grading. The hand grading allowed ACE to conform to the distinct grade points specified in the plans.

In response to the problems created by the second defect described above, ACE provided Cambro with additional labor to perform hand grading of each of the concrete lanes prior to forming and with surveyors to shoot grades full-time while Cambro set the forms. Cambro performed hand grading under the three-meter forms to attempt to achieve a level surface upon which to set the forms.

ACE and Cambro agreed to resume pouring concrete on the pallet storage pad after COE agreed to eliminate the profilograph requirement for this portion of the work. Our project team continued to struggle with this requirement throughout the remainder of the project and eventually hired a concrete surfacing contractor to finish the concrete so that it would pass the profilograph tests.

There should be no dispute that the "fix" employed was the best and least expensive approach to remedy the conflicts and defects in the plans and specifications. Construction was not halted after COE modified the profilograph testing requirements and the integrity of other key aspects of project design (e.g. drainage, utilities, etc.) was maintained.

After careful analyses, ACE and Cambro determined and implemented the best way to do the work at the least cost to the Government.

**Cost Impact**

The grading of the subgrade took ACE an additional three weeks of work because of the failure of the laser system on the motor grader and the additional complexity created by the irregular geometry of the surface. The irregular surface caused ACE to string line the subgrade in order to meet the grades shown on the plans.

ACE incurred additional costs to finish the drainage layer rock due to same irregular surface geometry. As with the subgrade, ACE was forced to string line the entire surface of the drainage layer to meet the plan grades. This additional work added two weeks to the time required finishing the drainage layer rock.

ACE incurred delay costs during the period of time from September 24, 2001 through October 6, 2001 when Cambro was forced by the Government's adherence to the defective profilograph specification to stop work on the project. During this delay period, drainage layer rock that had been ready to pave became covered with sand. When the Government agreed to abandon the profilograph specification for work on the pallet storage pad and Cambro returned to work on the project on October 6, ACE spent the next two weeks removing and refinishing the rock that had been ready to pave on September 24.

The irregular surface forced ACE to provide full time support in the form of labor and surveying services to Cambro while the forms were set. ACE directed our surveying subcontractor to shoot the elevation of each end of every form prior to and after setting in order to ensure that the top of the concrete met the elevations specified in the plans. In order to place the concrete at the specified thickness, ACE was forced to string line every paving lane at close intervals and hand finished inside the forms after they had been installed and prior to paving.

The total cost for the Claim is $1,781,318 along with a 120 calendar-day extension to the contract time.

**Miscellaneous Items**

Under the Equal Access to Justice Act, 5 U.S.C.A. s.504, ACE seeks recovery from the Government for fees and other expenses incurred by it in connection with the prosecution of this claim.

ACE makes this submission with the express reservation of its rights to submit a claim for itself and on behalf of its subcontractor, Cambro Construction, Inc., under the referenced contract for separate and distinct items from those presented herein.

Sincerely,

ACE CONSTRUCTORS, INC.

John R. Fulkerson
President

(Executed as Required by FAR 33.207(e))

**REQUEST FOR EQUITABLE ADJUSTMENT**
**COST SUMMARY**

| | | | TOTAL DIRECT COST |
|---|---|---|---|
| Additional grading: | | | |
| Subgrade | | | $67,217 |
| Drainage layer | | | $34,884 |
| Concrete forming support | | | $199,616 |
| Profilograph | | | $85,613 |
| Cambro cost | | | $935,131 |
| TOTAL DIRECT COST | | | $1,322,461 |
| Field Overhead | Direct cost | 10% | $132,246 |
| TOTAL FIELD COST | | | $1,454,707 |
| Home office overhead | Field cost | 10% | $145,471 |
| TOTAL COST | | | $1,600,178 |
| Profit | Total cost | 10% | $160,018 |
| SUB-TOTAL | | | $1,760,196 |
| Bond cost | Sub-total | 1.2% | $21,122 |
| TOTAL REQUEST FOR EQUITABLE ADJUSTMENT | | | $1,781,318 |