**UNITED STATES COURT OF FEDERAL CLAIMS**

******************************

**ACE CONSTRUCTORS, INC.,**

**Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS,**

**Defendant.**

******************************

**No. 04-299 C**

**Judge Charles F. Lettow**

# ACE'S POST TRIAL BRIEF

Plaintiff ACE Constructors, Inc. ("ACE") files this Post Trial Brief in accordance with the Court's pretrial order and states as follows.

The trial was held before Judge Charles F. Lettow in El Paso, Texas, on October 17 through 21, 2005. ACE called four witnesses in its case-in-chief: Jerry Fletcher, John Fulkerson, David D. Camilli, and Louis Wenick, P.E. ACE called no rebuttal witnesses. ACE's trial exhibits admitted into evidence are listed in Exhibit A.

Defendant U.S. Army Corps of Engineers ("COE") called six witnesses in its case-in-chief: Stanley Herrin, Danny Menchaca, David Wise, Eleuterio Fuentes, Will Sanford and Lawrence D. Story. COE's trial exhibits admitted into evidence are listed in Exhibit B.

The trial transcript was filed on November 4, 2005.

**Proposed Findings and Conclusions**[1]

ACE is a heavy civil contractor with is principal place of business located in Gainesville, Florida (T 198-99). John Fulkerson, ACE's President, was primarily responsible for the preparation of ACE's bid for the Project (T 220). On September 27, 2000, the COE, Ft. Worth District, awarded Contract No. DACA 63-00-C-0025 (the "Contract") to ACE, for the Ammo Hot-Load Area, Project No. 44921 at Fort Bliss, Texas (the "Project") (ST ¶ 1). The award to ACE was based on ACE's unit price bid in the total sum of $8,616,840.00 (ST ¶1).

The COE designer for the Project was Crawford, Murphy and Tilly, Inc. ("CMT") located in Springfield, Illinois, and performed its work under direct contract with the COE (T 437-38).

**I. ACE "Dirt Claim"**

**A. The Project Cuts Should Have Produced Enough Fill**

A balanced project is one where the amount of cut generated from on site excavation is equivalent to the amount of fill needed to construct the project to the lines and grades depicted on the plans. No importation of fill is needed to complete earthwork on a balanced project (T 453).

During the design process CMT requested and obtained COE approval to use the cuts from the Project site to generate the fill needed to construct the Project so to avoid the expense of importing fill material (T 469-70). After receiving COE approval to balance the earthwork, CMT oversized the ditches on the Project adjacent to the loading pad to provide the necessary fill material (T 472)(PX 18). More specifically, CMT established a ditch bottom width of 8.61 meters in the final plans because that dimension was needed to achieve a balance between cut and fill using a material shrinkage factor of 10 percent (T

[1] For ease of reference, the following abbreviations are used: "ST" means "Stipulation of Facts"; "T" means "Transcript";

472-73)(PX 18). CMT informed the COE, pre-contract, that imported fill would not be needed on the Project, representing a pre-bid cost savings to the COE of $2,603,692.00 (T 469)(PX 15).

Before accounting for shrinkage, CMT calculated that its design would yield 53,308 cubic meters of excess fill (T 465)(PX 122). When the 10 percent shrinkage factor is applied to the excess fill quantity as represented in PX 122, the Project still should have generated excess fill (T 466-467). At the least, CMT's final design for the earthwork portion of the Project reflected a balanced job (T463).

ACE reached a similar pre-bid conclusion regarding the cuts and fills on the Project. Mr. Fulkerson visited the Project site prior to the submission of ACE's bid to the COE (T 220). ACE planed to self-perform the earthwork on the Project with scrapers and planned to use the fill generated from the cuts to construct the Project embankments (T 221). Contract drawings (PX 178) sequence numbers 66 through 87 contain cross sections at every 20 meters from south to north (T 226). At each cross section a number is given for the area for both the cut and the fill for from which a volume can be calculated (T 227-28). Relying on the accuracy of those cut and fill numbers reflected on the plans, ACE determined pre-bid that the cuts would produce approximately 40,000 to 50,000 cubic meters of fill material in excess of what was needed to construct the Project to the final lines and grades of the plans (T 230, 234).[2]

**B. ACE Actually Performed Additional Work**

ACE contends that a differing site condition existed because the actual elevation of the Project was, on average, approximately two feet lower than indicated on the plans. As a result of this condition, excavating to the depths and widths allowed by Contract, did not yield enough fill to construct the Project.

---

"PX" means "Plaintiff's Exhibit"; "DX" means "Defendant's Exhibit."

[2] ACE also received proposals from would-be subcontractors, Camino Construction and Ortega Construction, wherein they proposed to perform the cut and fill operations on the Project at a reduced amount in return for being allowed to export the expected excess fill for use on other projects (T 269-273).

ACE performed additional work by approximately doubling the limits of the trench and pond excavations and importing fill from another COE project. This additional work was done with COE authorization (T 1184, 1190).

Through February 2001 and most of March 2001, ACE performed earthwork operations (cut and fill) within the limits of excavation shown in the plans. Jerry Fletcher, ACE's Project Superintendent, testified that as of March 26, 2001 ACE had exhausted the supply of fill that could be generated by cutting within the original plan limits of excavation and had started importing additional fill on that date (T 117). From March 26 through April 21, 2001 ACE imported fill material from the Dan Williams project (DX 79 098-99, 102-03, 107-108. 111-12,115-16, 119-20, 123-24; DX 80-012-13, 016-17, 020-21, 024-25, 028-29, 036-37, 041-42, 049-50, 075-76, 079-80, 083-84). On April 2, 2001 the COE authorized ACE to widen the limits of the excavation of the ditches and detention ponds in the direction away from the loading pad (DX 80 005-06). On April 11, 2001 Eleuterio Fuentes, the COE Project engineer, provided further instruction that the ditch bottoms were to be widened from 8.61 meters (or 28.24 feet) to 30.48 meters (or 100 feet) (DX 80 045-46). Mr. Fuentes also instructed ACE to enlarge the east pond by 200 feet and the west pond by 100 feet (DX 80 045-46) in order to generate needed fill material. ACE's additional work to extend the dimensions of these excavations continued until at least May 12, 2001 (DX 81 044-45).

More than doubling the limits of excavation shown in the original contract drawings is additional work. In denying payment for this additional work, the COE relies primarily on notice defense.

## C. COE's Reliance On the Notice Defense is Misplaced

### 1. <u>ACE Complied With the Contract Notice Provision</u>

The Contract's notice provision concerning differing site conditions reads in pertinent part:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give written notice to the Contracting Officer of
>
> > (1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract . . .

PX 180, Contract, 00700-54. The trial testimony demonstrates that ACE satisfied this notice requirement.

ACE's subcontract surveyor, SLI Engineering, Inc. ("SLI"), began work at the site on December 5, 2000 (DX 191-024). ACE did not mobilize to the site until the first week of January 2001 (T 57) (DX 77-003). By January 9, 2001, SLI had completed the control survey, and ACE commenced clearing and grubbing operations on that date (ST ¶5) (DX 191-024). Also on January 9, 2001 ACE was informed by SLI that the existing elevations were running much lower than the elevations shown on the plans (T 88-89). Mr. Fletcher testified that he informed Danny Menchaca, the COE Quality Assurance Representative for the Project, of the elevation discrepancy and that Mr. Menchaca instructed that ACE was to complete the topographic survey so to record the extent of the problem (T 88-90). This verbal notice was given by ACE before the existing conditions were disturbed and satisfies the contractual notice requirements.[3]

On January 10, 2001 a preparatory meeting for clearing and grubbing was held between ACE and the COE. Mr. Fletcher was in attendance on behalf of ACE. Mr. Menchaca attended for the COE

[3] Notice requirements can be satisfied by establishing that oral notice of the facts and circumstances underlying a claim was given to the COE, despite the fact that the Contract may call for formal, written notice. *Piracci Construction Co., Inc. v. United States*, GSBCA No. 2793, 1970 WL 861 (G.S.B.C.A.).

(PX37) (T 70-71 & 1119). At this meeting, Mr. Menchaca authorized the clearing and grubbing to commence despite the fact that he had been advised of an elevation discrepancy the day before (T 75).

Additionally, ACE provided the COE with additional actual notice of the differing site condition <u>before</u> it commenced its cut and fill operations. SLI had performed its survey work ahead of ACE's clearing and grubbing operations and from a north to south direction (T 76 & T 297-98). By January 26, 2001 the field work for the topographical survey was 95% complete and clearing and grubbing was 90% complete (ST ¶6) (DX 77-074). Mr. Fletcher testified that on January 29, 2001 he met on site with Mr. Fuentes, the COE Project Engineer, wherein Mr. Fuentes asked why SLI was surveying outside of the Project limits. Mr. Fletcher told Mr. Fuentes that SLI's topographic survey reflected elevations that were significantly lower than the elevations shown on the plans. As such, Mr. Fletcher explained that he had instructed SLI to survey outside of the Project limits to see if the elevations were different outside of the Project as well (T 91). Mr. Fuentes directed that ACE address the elevation discrepancy through Mr. Menchaca (T 91). ACE did not actually commence its cut and fill activities on the Project until February 9, 2001 (ST ¶7) (DX 78-015).

ACE provided verbal notice of the elevation discrepancy – the differing site condition – before disturbing the existing conditions. Before commencement of clearing and grubbing, and before commencement of cut and fill operations, Mr. Fletcher notified COE representatives of the preliminary findings of ACE's surveyor regarding the existing conditions. In both instances, ACE was instructed to continue with the work.

**2. <u>The Written Notice Given on March 2, 2001 Was Sufficient</u>**

Cut and fill operations continued throughout February 2001 but in early March 2001 it became apparent that the cut was not going to produce enough fill to construct the Project (T 96). ACE notified the COE in writing on March 2, 2001 that it was in need of more dirt (T 97-98) (PX 45). ACE attached a request for information ("RFI") to its March 2, 2001 Quality Control Report ("QCR") which provided:

> Subject: Dirt – we are going to be out of dirt by Wed. 3-07-01. The amount of fill to go on the taxiway, loading pad, and pallet shed will require about 125,000 cu yds of dirt. We will need another place to get dirt from. As a suggestion we could widen the ditches. Thanks.

(T 100-01) (PX 44).

COE indisputably was aware of the dirt shortage issue on March 5, 2001 as Mr. Menchaca discussed the issue with Del Hyland of ACE. More specifically, Mr. Menchaca's Quality Assurance Report ("QAR") for that date provides: "The amount of cut does no [sic] balance with the amount of fill needed to finish the job. Ideas talked about today was [sic] lessening the slope on road & lowering job [and]… widening trenches." (DX 79 013-16). On March 8, 2001, Mr. Menchaca, Mr. Fuentes and Roland Ray from the COE's Fort Worth office participated in a teleconference with the principal designer from CMT, Stanley Herrin (T 1133) (DX 79 026-27). Mr. Herrin was asked whether he was instructed by the COE design a balanced job, to which he replied that he was not (T 1134, 1255) (DX 79 026-27). Herrin was not asked whether CMT had, in fact, designed a balanced job, and failed to tell the COE that CMT has specifically undertaken to balance the cut to fill so that no imported material would be required to compute the earthwork for the Project (T 1134).

ACE's March 2, 2001 QCR and RFI provided the COE with enough information concerning the existence of a differing condition to be on notice of a potential claim. The written notice, coupled with the

verbal exchanges in January 2001, were sufficient to allow the COE to conduct a reasonable and thorough investigation. As this Court has provided:

> [The government's] position is that this notice was inadequate because not enough detail was given. . . .Under this Changed Conditions article, the [government] has the duty, once notice is given, to investigate the existence, nature, extent and validity of the contractor's claim. It is not necessary that the allegedly new condition be set forth specifically and in detail. It is enough if the Government knows that the contractor is claiming such a condition in a certain area; no formal or technical requirements have been imposed.

*Farnsworth & Chambers Co., Inc. v. United States*, 346 F.2d 577, 581. (Fed. Ct. Cl. 1965). As of March 2, 2001, the COE had been told that there was a discrepancy between the existing conditions and the elevations shown on the contract plans and that ACE was not going to have enough fill to complete the Project. COE possessed sufficient information by that date to allow it "to investigate the existence, nature, extent and validity of the contractor's claim."

Yet other than limited internal discussions, the COE did little or nothing to investigate the existing conditions to verify if the differing site condition actually existed or to assist ACE in resolving the issue. As of March 8, 2001, ACE was still waiting on a decision as to where to get more dirt (PX 49). On March 9, 2001 ACE informed the COE that it would be out of dirt by Wednesday, March 14 if a decision was not made soon (PX 51). On March 13, 2001 ACE's notifications became even more specific in informing the COE that the topographical survey was two feet lower than shown on the original plans (PX 52).[4]

Despite ACE's written suggestion in RFI 4 dated March 2, 2001, that it could obtain more dirt by widening the ditches, and despite ACE's warnings that it was running out of dirt, on March 14, 2001, the

[4] The March 13, 2001 QCR authored by Mr. Hyland of ACE actually uses the term "topole" and not "topo" or "topographic survey." Although Mr. Menchaca professed at trial that he failed to understand that the "topole" term was

COE responded to RFI 4 by instructing ACE to "submit any suggestions in writing to Govt. for review" (PX 044). On March 21, 2001, ACE amended its RFI 4 related to the dirt issue:

> We are able to get dirt from Dan Williams job and start to haul on Monday, March 26, 01. We need to have a haul route through the desert from Williams's job to ours. We suggest the power line road to blacktop and follow the blacktop to Williams's job and back. If this O.K. we will start to haul on Monday. Thanks.

(PX 54). Instead of assisting ACE by approving either of the solutions proposed in the amended RFI, the COE waited until May 18, 2001 to respond to RFI 4-01 and then only directed ACE's attention to its response to RFI 4 (PX 54).

On March 22, 2001, Mr. Fulkerson, Mr. Fletcher and Mr. Hyland met with David Wise, the COE Resident Engineer at Fort Bliss, regarding the dirt issue. (T 108-09, 313 & 1143-47) (PX 56). At that meeting, Mr. Fulkerson showed Mr. Wise the results of a comparison that he had performed between the original contract survey reflected in the plans and the survey performed by SLI (T 313-15 & 1148). Mr. Fulkerson calculated that ACE would need an additional 143,900 cubic yards of dirt to complete the Project as designed (T 311). Both Mr. Fletcher and Mr. Fulkerson testified that Mr. Wise's response to the information was that it looked like "we have an oh shit here" and to keep the job going, and to not stop the Project (T 109 & 315).

In order to generate the additional fill, on April 2, 2001 the COE finally authorized ACE to import fill from the Dan Williams project and widen the trenches, all as suggested by ACE in the original RFI 4 dated March 2, 2001 (ST ¶9).

---

meant to describe the topographic survey, this testimony is not credible and Menchaca conceded that Mr. Hyland had

### 3. **The COE Cannot Meet its Burden of Proof of Showing Prejudice Resulting from the Alleged Lack of Notice**

In the absence of prejudice to the government, courts are disinclined to bar a contractor's claim for compensation for a failure to comply with the technical notice requirements of government contracts. Here, the COE is unable to meet its burden of proof[5] to establish prejudice as a result of the timing of the written notice.

> As a general defense to [contractor's] differing site conditions claim, [the government] asserts that a lack of appropriate notice of a differing site condition by the contractor to the Government prejudiced the Government's efforts in investigating and in defending against the allegation of the encountering of the conditions… though the record indicates a lack of definitiveness in the notices of a differing site condition by [the contractor], the Board finds no prejudice to the [government] and no validity in the defense of notice.

*Appeal of Great Lakes Dredge & Dock Co.*, Eng. B.C.A. No. 5606, 1990 WL 212040 (Eng. B.C.A. 1990).

Furthermore, a lack of notice that merely obstructs the government's ability to investigate and defend against an alleged claim, without actually preventing the government from doing so, does not rise to the level of prejudice necessary to sustain a notice defense:

> The Court of Claims, in recent years, has been reluctant to bar claims for failure to give notice, where the notice requirement is for the benefit of the Government. [Citations omitted] . . . [H]ere, the prejudice to the Government from want of timely notice consists of merely increasing the difficulty of, but does not prevent, investigation and defense. The facts do not show this difficulty to be of sufficient magnitude to bar the claim.

---

used the term before under circumstances where it could have meant nothing else (T 1136-37).

[5] The government bears the burden of proving prejudice arising out of the absence of formal, written notice. *Delphcon Builders, Inc. v. United States*, 55 PSBCA No. 1455(1988), 1998 WL 93095, *12 (P.S.B.C.A.); *see also*, *J&J Paving, Inc. v. United States*, DOTCAB. No. 1570, 1985 WL 16386, *71 (D.O.T.C.A.B.).

*C.H. Leavell & Co. v. United States*, ASBCA No. 16099, 1972 WL 1724, *4 (A.S.B.C.A.); *see also*, *J&J Paving, Inc. v. United States*, DOTCAB. No. 1570, 1985 WL 16386, *71 ("It must also be shown that the Government suffered prejudice by the failure to give timely notice. [Citations omitted]. Prejudice will not be presumed . . . .").

On the issue of prejudice the testimony of the COE's own witnesses is compelling. In its attempt to establish prejudice as a result of the timing of the written notice, it was argued that the COE was prevented from lowering the elevation of the Project as a means of mitigation. However, Mr. Menchaca testified that there was nothing about the site of the construction on March 5, 2001 that would have prevented the COE from lowering the elevation of the Project (T 1130-31). Although Mr. Wise testified on direct examination that he believed as of March 2001 the fill operations had passed the point for the COE to consider lowering the Project elevation, he later conceded this view was based on his "sense at the time." Mr. Wise conceded that he "did not do any engineering study or any quantitative takeoffs to verify that [position]" (T 1185). According to Mr. Wise, there was nothing physically about the condition of the site as late as April 2001 that would have prohibited the COE from lowering the Project elevations (T 1189). ACE's expert witness, Mr. Wenick, a licensed professional engineer and general contractor, also testified that there was nothing about the existing conditions at the Project site tied to ACE's work that would have prohibited the COE from redesigning the Project and lowering the elevation (T 987-98) during March and April 2001.

It was important to Mr. Wise that the Project not be stopped (T 1190). He conveyed that concern to Mr. Fletcher and Mr. Fulkerson when they met with him about the fill issue on March 22, 2001 (T 109 & 315). Yet, Mr. Wise testified that he estimated the overall delay to the Project if the COE had decided to lower the elevation would span four to six weeks (T 1188). In light of the corresponding delay to the

Project associated with a redesign (i.e., lowering of the site), the differing site condition was mitigated in the most beneficial manner to the Project (T 988-89).

Of course, it is highly questionable whether the Project could have been lowered on any date in an effort to mitigate the costs of the differing site condition. Mr. Fulkerson testified to his belief that it was not possible from an engineering standpoint because of the need to match the existing elevations at the runway at the south end of the Project (T. 317-19). No COE witness testified that lowering the site was truly feasible. Even the principal CMT designer, Mr. Herrin, testified that he did not know whether or not it could be done (T 503). Finally the Court had the benefit of a site visit on October 18, 2001, wherein the Court took notice of the flow of water from the east to the west across the Project (T 482). The need to control the surface runoff from the adjoining 240 acres was a factor considered in the original design of the ditches (T 481-84) and would have hampered the ability to lower the designed elevation of the Project.

The COE also has argued that the timing of the written notice prevented it from verifying that a differing site condition actually existed. The COE has likewise failed to meet its burden regarding this issue of prejudice. ACE's expert witness, Mr. Wenick and Mr. Fulkerson both noted that the COE could have conducted its own survey, even spot checked certain elevations, in March 2001, to determine the status of the excavation of the ditches (T 987, 328). This survey could have been used to verify that ACE was at the original limits of excavation and that the site was still in need of more fill. This information alone would have verified the existence of a differing site condition.

If the COE was prevented from fully investigating the differing site condition it was not due to the timing of ACE's notice, but by its own lack of understanding concerning the nature of CMT's design. COE representatives in El Paso – Mr. Menchaca and Mr. Fuentes – had no understanding prior to March 5,

2001 as to whether the Project, as designed, should have produced enough fill to complete construction of the subgrade (T 1133, 1255). Notably, when they questioned CMT about the issue on March 8, 2001, they apparently did not ask Mr. Herrin whether the design was balanced, but only whether he was asked to design a balanced job (T 1134, 1255) (DX 79 026-27). As a result of the COE's lack of appreciation for the cut and fill balance in CMT's original design, it took the mistaken position that obtaining fill was ACE's responsibility and did not fully investigate the alleged differing site condition (T 1255-56). Notably, it appears that the first time the COE representatives in El Paso learned that the cuts should have supplied enough fill was in January 2002 – some eight months after ACE had completed the additional work (PX 123).

Nevertheless, the COE was in possession of all of the necessary information in March 2001 to conduct its own takeoff and reach its own conclusion. It chose not do so. Finally, there is no credible evidence that directly shows or even infers that as of March 24, 2001 ACE had excavated beyond the lines and shades shown on the plans. Mr. Fletcher and Mr. Fulkerson both testified that ACE had not gone outside of the Project limits (T 87-88, 117, 318-319). Mr. Wise even conceded that he was unaware of whether ACE had gone outside the lines and grades as of that time, nor did he believe that ACE had done so (T 1184).

**D. Disputes Over the Amount of ACE's Damages Are Minor**

The cost of the additional work performed by ACE was initially calculated internally by Mr. Fulkerson based upon ACE's cost accounting records maintained contemporaneously with completing the Project work. That initial calculation totaled $590,416.00 (T 344) (PX 176). After review by ACE's expert witness, Mr. Wenick, ACE's request was adjusted downward to a revised total of $528,185.63

(PX 175a). ACE seeks the recovery of all of its costs incurred between March 23 and May 15, 2001, costs for constructive acceleration, and reduced productivity related to the differing site condition and the resulting additional work.

The COE requested that CMT review ACE's "Dirt Claim" and CMT memorialized its conclusions in a memorandum dated February 18, 2003 (PX 140). In that document prepared by Mr. Herrin, CMT confirmed that the amount of additional fill required to complete the Project to the lines and grades on the plans was in the magnitude of 125,000 cubic yards, just as estimated by ACE. This CMT analysis was based on CMT's comparison of the original plans and elevations and the SLI Survey (T 474, 477) (PX 140). CMT also concluded that if the actual elevations on the Project were two feet lower than shown on the plans, then ACE had performed additional work and should be paid for that work (T 478) (PX 140). Finally, CMT concluded that, based upon the quantity of 125,000 cubic yards of additional fill, ACE's request for $590,485 was reasonable for the amount of work performed (T 478) (PX 140).

The COE also utilized the services of Hughs "Will" Sanford, who is employed in the engineering and construction division support section of the Fort Worth District as a civil engineering technician (T1269-60). Mr. Sanford was tasked to review ACE's claims and prepare his own estimate of the costs incurred (T 1262, 1264-65). Stated differently, Mr. Sanford's assignment was to review the claims and determine whether what was claimed was reasonable, fair and supported (T 1289). He concluded that $409,213.43 is the fair and reasonable value of the "Dirt Claim" (T 1297) (DX 237).

The difference between ACE's claim amount and Mr. Sanford's analysis is approximately $120,000, and is largely derived from three factors: (1) Sanford's analysis did not include a review of ACE's constructive acceleration component ($16,292); (2) Sanford's analysis did not include a review of

ACE's reduced productivity component ($35,747); and Sanford utilized the COE "Construction Equipment Ownership and Operating Expense Schedule" ("COE Manual") to recalculate ACE's equipment costs ($37,198).

**1. <u>Constructive Acceleration</u>**

Mr. Fulkerson testified that because the COE would not grant ACE a time extension in the face of the additional work ACE was performing, ACE was constructively accelerated throughout the life of the Project in an effort to minimize its liquidated damages exposure (T 356). Mr. Fulkerson reviewed ACE's certified payrolls and captured overtime hours worked on Saturdays, or in excess of 50 hours per work week (T 355-56). Mr. Fulkerson treated the captured overtime as acceleration (T 356). Mr. Wenick reviewed Fulkerson's analysis using ACE's certified payrolls and found evidence of acceleration, concluding that the total cost of the constructive acceleration to be $16,292.00 (T 947-50) (PX 175a). Mr. Sanford did not review ACE's constructive acceleration claim.

**2. <u>Reduced Productivity</u>**

Mr. Fulkerson utilized a productivity study of the effects of overtime on productivity conducted by the Business Roundtable to calculate ACE's reduced productivity claim (T 357). That study was used by Mr. Fulkerson because it specifically addressed the effect of long-term scheduled overtime on construction efficiency (T 357). Using the Business Roundtable study, Mr. Fulkerson reviewed ACE's certified payrolls and calculated the productivity impact (T 358-59). Mr. Wenick reviewed ACE's analysis and reached the conclusion that the Business Roundtable study was appropriate for this Project, was properly utilized by ACE in calculating its claim, and that the reasonable value of the reduced productivity claim is $35,492 (T 952-954) (PX 175a). Mr. Sanford did not review ACE's reduced productivity claim.

### 3. Valuation of ACE's Equipment Operating Rate

ACE valued its operating rates for the equipment used in connection with its cut and fill operations by the Caterpillar Handbook (T 926). The Caterpillar Handbook is a manual prepared by the Caterpillar equipment company as a guide in valuing the operating costs associated with the use of heavy equipment (T 926). Mr. Wenick testified that the Caterpillar Handbook is generally used in connection with construction claims preparation and analysis and is generally accepted by experts in the field of equipment valuation (T 926).

Mr. Wenick verified that ACE had properly utilized the Caterpillar Handbook in calculating its equipment operating costs, but he also went a step further by using another industry standard guide – the "Blue Book" – which also is used to calculate the operating costs associated with the use of construction equipment (T 927). The Blue Book is recognized by almost every state's department of transportation (including Texas) as well as the Federal Highway Administration as a means of calculating an operating rate for rental equipment (T 927). Both the Blue Book and Caterpillar Handbook are specifically adapted to allow the calculation of the operating costs associated with both owned and rented equipment (T 350).

Mr. Sanford used the COE Manual to calculate ACE's operating rates based upon his understanding of section 00700-43 of the Contract Documents. That section is entitled equipment "Ownership and Operating Expense Schedule Mar 1995" and provides in part b for the use of the COE Manual as a means of determining allowable costs for construction equipment only when that equipment is "owned or controlled and furnished by a contractor." The equipment used by ACE was not owned or controlled by ACE, but rented from third party vendors (T 349, 928). Mr. Sanford recognized the inherent difficulty of applying the COE Manual to rented equipment because the major category for repairs in the

COE Manual lumps all repairs into one category and makes no attempt to allocate repair expenses based on the realities of the circumstances of rental equipment (T 1296-97). Likely in recognition that the COE Manual does not fairly value the contractor's true operating expense when the equipment in question is rented from third party vendors, the COE Manual states in section 1.1: "The use of this pamphlet . . . relates only to equipment that is contractor owned" (T 1296).

Mr. Wenick opined that use of the COE Manual is inappropriate to value the operating cost of rental equipment because (a) the specifications only require use of the COE Manual for owned or controlled equipment, (b) the COE Manual itself provides that it is to be used for owned equipment, and (c) the five operating expense categories contained in the COE Manual do not relate to the true expenses incurred by the contractor with rented equipment (T 928-30). Stated differently, while an owner of a piece of equipment is responsible for all maintenance and repair, a contractor renting equipment is not responsible for 100% of those items. Mr. Fulkerson testified that the equipment rental agreements for the Project required ACE to be responsible for some, but not all, of the repairs and maintenance of the equipment used on this Project (T 350). Mr. Wenick opined that using <u>all</u> of the operating expense categories in the COE Manual would overvalue the operating costs incurred by ACE, but that excluding all of the categories as done by Sanford would undervalue those same operating costs. It is for this reason that the COE Manual is not an appropriate measure of the operating cost of rental equipment (T 928-930).

## II. The "Cambro Claim"

### A. Typical Sections Conflicted with Staking Information Provided Post-Bid

CMT prepared the contract drawings dated June 13, 2000 that were made available to prospective bidders (including ACE and its concrete paving subcontractor, Cambro) prior to bid (PX 178). Included in those design drawings were typical sections (drawing sequences 59-62) (PX 178). These typical sections were critical to ACE in the formulation of its bid for not only concrete paving, but for the subgrade and drainage layers (T 278). These typical sections informed the bidders as to how the Project was to be constructed and, when coupled with the grading plan located on sequence numbers 24 through 29, indicated that the Project would be constructed as a gradual dome to shed water off of the concrete surfaces (T 278-79, 282, 766). The contract drawings did not inform the bidders of the specific grade breaks at each panel point that would cause ACE and Cambro to incur additional costs and inefficiencies in their operations (T 279).

The Contract drawings also included staking plans (drawing sequences 49 through 52) that contained spot elevations for the concrete paving. The spot elevations do not show all of the information needed to determine the final elevation of each 5.75 meter panel of the loading apron (T 484-85) (PX 178). Prior to bid, interested contractors had requested that the COE provide the elevations at all of the grid lines, but the COE decided that furnishing the required information would delay the bid (T 485-86) (PX 24). The information was withheld even though CMT had the data available and estimated it would only take two weeks to issue revised staking plans with the complete information included (T 485-86) (PX 24).

Instead of the providing the complete set of elevations pre-bid, the COE issued an addendum to the bid package which included revised plans dated July 31, 2000. The revised plans included the following note:

> The plan elevations of the joint pattern grid line intersections will be provided by the government as supplemental information after award.

> These spot elevations will be reflective of the finished contours and profiles of the concrete pavement structure.

(PX 179). The withheld additional information would have enabled the bidders to determine that the pavement slab of the loading apron was not just a gradual dome, but included elevation changes at each and every corner of the 5.75 meter panels. Such information would have allowed ACE and Cambro to consider the effect of that design in planning their means and methods of construction and putting together their cost estimates.

Ultimately, it was ACE's surveyors who discovered the complete elevations provided by the COE after award and the slopes provided in the typical plan sections were in conflict (T 288). However, the conflict was not discovered until ACE unsuccessfully attempted to fine grade the subgrade to the "blue top" elevations (T 288). ACE rented laser equipped motor graders specifically for the Project, but still was not able grade the subgrade to the elevations required (T 289). ACE's motor grader dug in too deep behind the blue tops at one moment and then would completely miss the blue tops the next (T 289). It was then that ACE's surveyors recognized that the staking elevations provided after award included elevations that changed between each of the 5.75 meter panels, making the laser equipped motor grader ineffective (T 290).

As a result of the constantly changing elevations, ACE was required to re-survey areas previously surveyed, to re-work subgrade and drainage layers previously graded, and to hand grade subgrade and drainage layers to meet the exacting elevations that were not disclosed prior to bid and that conflicted with the 1% slope shown on the typical sections at the time of bid (T 290, 362-365).

**B. Elevation Breaks and CMT Design Assumptions Impacted Cambro's Concrete Paving Operations and ACE's Support Thereof**

### 1. CMT Designed the Project for a Slipform Paver

Slipform paving is the industry term that describes a method of concrete paving where a paver follows a stringline and a low slump concrete is used so that the paver will leave the concrete standing up on its own as it passes (T 439). Conversely, rigid form paving is when wooden or steel forms are used for a paver to ride upon and the forms are removed after the concrete has set (T 440).

CMT designed the Project for a slip form paver (T 448). Mr. Herrin assumed that the concrete paving would be accomplished using a slipform paver and did not envision that rigid form paving would have been used on the Project (except for some small areas) because of its size and curvature (T 448). CMT specified a maximum two inch slump concrete mix, which is required for a slipform paver and designed the direction of the longitudinal joints for a slipform paver (T 443-44). Nevertheless, the Contract specifications gave the contractor the option of using either slipform paving or rigid form paving to construct the Project. Mr. Herrin suggested during trial that if a contractor was going to construct the Project using a rigid form paver, the contractor should have paved the project from east to west instead of north to south as designed by CMT (T 443-44),[6] but he conceded that nothing in the Contract documents otherwise informed the contractor that the Project should be constructed as designed (i.e., in the north to south direction) (T 462).

The specifications stated no preference for a slipform paver and did not disclose that the design was premised on use of a slipform paver for almost all of the paving work. Consequently, ACE nor Cambro

[6] The idea of paving the Project from east to west was one not considered by either ACE or Cambro (T 772-73). Mr. Fulkerson testified that the first time he had even heard it suggested was during Stanley Herrin's testimony at trial (T 733). Mr. Fuentes testified that "it would have seemed ridiculous to" him had the contractor proposed paving in that direction as it would not have made any "financial sense to do it that way" (T 1257). Mr. Camilli testified that paving across the longitudinal joint would have required a complex and time consuming method of "checkerboard" paving (T 772-73).

considered the use of the more expensive slipform paving machine at the time of bid (T 726-30, 769). The rigid form paver was the least expensive means of constructing the Project[7] and a means that ACE and Cambro understandably assumed had been accommodated in the design of the Project by way of its inclusion in the specifications as an acceptable method of construction.

### 2. **<u>The COE Warranted that the Use of 3 Meter Forms and a Form Riding Paver Would Produce a Satisfactory Result</u>**

COE warrants to its contractors that compliance with its specifications will yield a satisfactory result:

> The government implicitly warrants its design specifications for a government construction contract:
>
> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. [Citation omitted]. "[I]f this court finds the cause (of faulty construction) to be a deficiency in a design specification the government would bear the risk, and consequently be liable for reasonable costs incurred by the plaintiff." *Neal & Co. v. United States*, 19 Ct. Cl. 463, 467-68 (1990), *aff'd*, 945 F.2d 385 (Fed. Cir. 1991). Defective design specifications may entitle a contractor to an equitable adjustment of the contract for the reparative work required to build a satisfactory end-product.
>
> But not all contract specifications are design specifications—some are merely performance specifications:
>
> Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987). (citation omitted). The government does not implicitly warrant performance specifications for complete accuracy or adequacy. *Id.* "[T]ypical 'performance' type

[7] Mr. Camilli estimated the cost of a slipform paver to be in excess of $1,000,000 compared to the $166,000 for the rigid form paver Cambro purchased for the Project (T 769, 786).

> specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969).

*George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 296-97 (2005); *see also*, *Conner Brothers Construction Co., Inc. v. United States.*, 65 Fed. Cl. 657, 685 (2005) ("[I]f the specifications are strictly observed, the government implicitly warrants that satisfactory performance will result.").

The concrete paving specifications are design specifications, as the COE set forth the equipment, forms, concrete, and acceptance testing that ACE would be permitted to use in performing its Contract work.

> Design specifications "set forth in precise detail the materials to be employed and the manner in which the work… [is] to be performed." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969). By contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for the selection." *Id.*

*Conner Brothers Construction Co., Inc. v. United States*, 65 Fed. Cl. 657, 685 (2005). When the COE specified the use of a slipform paver or a rigid form paver (including the minimum weight and horsepower of the power itself) with 3 meter length forms, and no other option, the COE provided ACE with a design specification for which liability attaches if defective (T 441, 280-81, 784). CMT concealed until trial that it did not engineer the construction of the Project for the use of the rigid form paver, leaving

ACE and Cambro to deal with the consequences of the COE's design failure.[8]

### 3. Three Meter Forms were Not Compatible with the Elevation Breaks Provided to ACE Post-Bid

Cambro used the shortest form allowed by the specifications due to concern over worker safety and the inability to move any form that was larger (T 774, 778). The forms Cambro purchased were 3 meters (or approximately 10 feet) long and varied dimensions depending on the thickness of the concrete (T 776). ACE and Cambro were aware that the panels depicted on the plans for the loading apron at time of bid would be 5.75 meters square, but they could not reasonably have anticipated that each of those panels would be at different elevations (T 778). Those elevations, not provided by the COE until construction was underway, directly impacted Cambro's concrete paving operations.

Cambro anticipated at the time that it quoted the Project to ACE that the forms would follow a gradually sloping subgrade and drainage layer to create a crown to shed water off of the loading pad (T 778-79). The actual elevations made Cambro's concrete paving operations more complex than had been anticipated, and rendered its operations inefficient. The root of the problem was that when two 3 meter forms were joined together they created a rigid form that would cross the grade break occurring at 5.75 meters (T 779). At some locations the form would dig into the ground because the grade was rising and ACE and Cambro would have to dig out drainage layer by hand to get the form to lay flat (T 779). At other locations the form would not touch the ground because the grade was falling which would necessitate

[8] The COE cannot take shelter by the fact that the other alternative provided for the concrete paving, slipform paving, might have yielded a better result. It is well established that when design specifications allow a contractor to elect to perform its obligations by multiple, alternate means or methods, the government warrants that all such means or methods will produce a satisfactory result. "[W]hen the government provides alternate methods by which a project may be completed there is an implied warranty that either method will achieve the desired result." *Neal & Co., Inc. v. United States*, 19 Ct. Cl. 463, 469 (1990), *superseded in part on other grounds, Morrison Knudsen COE. v. Fireman's Fund Ins. Co*., 175 F.3d 1221 (10th Cir. 1999); *see also*, *Fru-Con Construction COE. v. United States*, 42 Fed. Cl. 94, 99 (1998)

that the drainage layer be filled in under the form by hand (T 779).

The effect of the grade breaks rippled throughout Cambro's paving operations and made it extremely difficult to meet the intent of the grading plans (T 450). Where the grade was falling between panels the paver would teeter on the top creating a bump in the pavement (T 780). Another problem caused by the grade breaks was that the paver – which was specified by the COE to be heavy enough to construct the Project – would pull itself off the forms at panel intersections (T 780). Compounding the difficulties being experienced by Cambro, and further evidence that the Project was designed for a slipform paver, was the extremely low slump concrete specified in the contract documents. The COE required that the concrete slump not exceed two inches. The testimony was consistent that such a low slump would be required for a slipform paver so that they concrete could stand up on its own after the paver had passed (T 392, 749). The testimony was equally consistent that such a low slump would not be needed for a form riding paver and, in fact, would be detrimental to paving operations using a rigid form paver (T 392). Mr. Herrin testified that he would expect to see a slump of two to four inches if a rigid riding paver were used (T 459-60). The lower the slump the stiffer the concrete and the more difficult it is to manipulate (T 784). In October 2001 ACE and Cambro requested permission to increase the slump to three inches to help alleviate some of the problems being encountered meeting the COE's smoothness requirements (T 395-96, 401-03, 790). Although this change would not have affected the strength of the finished concrete, the COE rejected the request two months later (T 403, 792).

As a result of these events Cambro's concrete paving operations took significantly longer to complete and were much less efficient than anticipated at the time of bid. Cambro was forced to hand finish

---

(reaffirming the holding of *Neal*, *supra*, and observing that "the Government warrants a prescribed method of

almost the entire Project in order to produce a finished product that met the specification requirements for smoothness (T 792-93). This hand finishing was largely accomplished through the use of bump cutters, straightedges, and bull floats (T 793-96). It also precipitated the need to bring in a concrete grinding firm to grind down portions of the concrete that were not brought within tolerance during the paving operation on the taxiway (T 807).

### C. The COE Employed Optional and Inappropriate Testing Requirements to the Concrete Paving Operations

In preparing its bid for the Project ACE understood that the specifications gave the contractor the option of using either a straightedge or a profilograph to test the smoothness of the concrete paving (T 408). ACE opted to use the straightedge method and did not include any sum in its bid price to the COE for performing profilograph testing (T 408). After concrete paving had started, the COE informed ACE that it wanted the profilograph test performed on the Project and ACE entered into a contract with Jobe Concrete Products to perform that test (T 408). Ultimately the COE determined that the profilograph was not an appropriate test for smoothness for either the pallet storage pad or the loading apron due to the particular design characteristics (ST 21, 30). Although the COE waived the test for surface smoothness, it still required ACE to perform the test to determine what the COE called "must grind" areas (PX 111).

The Project specifications support ACE's understanding that the profilograph was an optional smoothness test. Section 1.3.7 provides that the contractor is required (i.e., "shall") to use either the straightedge or profilograph to test surface smoothness. Section 1.11.9 requires (i.e., "shall") the contractor to furnish and maintain a straightedge on the Project and section 1.11.10 gives the contractor the option (i.e, "may") to furnish a 7.6 meter profilograph. The reason that a straightedge is mandatory is that a

performance against impossibility or commercial impracticability resulting from a defective design specification.").

profilograph cannot be used on runs that are less than 60 meters. Thus, if a contractor opted to use a profilograph, it would still need to provide a straightedge for those shorter runs.

The Project's designer recognized the merit of ACE's position when questioned by the Court on the issue:

> THE COURT: All right, Do you see the first line of Section 1.11.10, it says the contractor may furnish a 7.6 meter profilograph for testing the finished pavement surface?
> THE WITNESS: Yes.
>
> THE COURT: Well, what if the contractor decides not to do that?
> THE WITNESS: I guess it's the way you interpret the word may.
>
> THE COURT: Well, that's ordinarily a job for the Court, but it – could you go back up to Section 1.11.9?
> THE WITNESS: There it says it shall furnish.
>
> THE COURT: That's right. The contractor shall furnish and maintain at the job, in good condition one 4 meter straight edge for each paving train for testing. Does that difference signify anything to you as an engineer?
> THE WITNESS: Yes. Shall is always a requirement.
>
> THE COURT: All right. Does that affect your judgment on whether profilograph is required or not?
> THE WITNESS: Well, I have sat through meetings where there's been long discussions on what the definition of shall, may, must, and all these requirements are. And we even prepared a document one time where we defined all of the different terms and said that shall is mandatory and must implies that there is some requirement and **may in that document we reply did imply a choice**.

(T 490-91).

Nevertheless, the COE viewed the profilograph test as a mandatory test for the smoothness of the concrete paving and, although the COE ultimately determined that the profilograph was inapplicable to both the pallet storage pad and loading apron, the COE did not announce its decision until Cambro had stopped

pouring concrete because of its inability to pass the test (T 1218-19) (ST 25-30) (PX 111). By the date the COE deleted the profilograph – October 18, 2001 – ACE and Cambro already had expended unnecessary time, effort and funds in attempting to comply with this inappropriate testing requirement (ST 30).

### D. Damages Claimed by ACE and Cambro are Reasonable and Only Isolated Items Remain in Dispute

In accordance with the contract dispute clause and the Contract Disputes Act, ACE submitted to the COE on August 6, 2003, an extra work claim addressing the difficulties experienced by ACE and Cambro as discussed above seeking to recover $1,781,318.00 and a 120 calendar day time extension.

#### 1. ACE's Request for Additional Compensation

Mr. Wenick concluded that the reasonable value of the additional work ACE had performed was $469,617.57 (PX 175a). To perform an "apples to apples" comparison to the claim analysis of Mr. Sanford (DX 237) the applicable markups must be applied only to the amounts claimed by ACE. When those markups are separately applied in the Sanford analysis, his valuation of this portion of the claim is $285,735.51 (T 964).

The major difference between the competing reports is in the method of evaluating the cost of operating rented equipment (T 964).[9] In addition, Mr. Sanford also made an adjustment in his analysis to utilize a five versus a six day work week (T 965). Mr. Sanford deduced that ACE was actually working six days a week and not five days as originally planned by ACE. Mr. Sanford then pro-rated the rental invoiced expense for the six day week instead of the five day week used by Mr. Wenick (T 965). This adjustment resulted in a lower hourly rate which Mr. Sanford then applied to the corresponding number of

[9] This is the same difference of opinion addressed above at I.D.3 regarding the "dirt" claim.

hours claimed by ACE during the periods of time that it was performing additional work (DX 273). This adjustment is not appropriate because it undervalues ACE's equipment (T 395). ACE anticipated working only five day weeks during the Project, but was forced to constructively accelerate its efforts by working six day weeks on many occasions (T 395). Mr. Sanford has reduced the hourly rental rate by taking advantage of ACE's acceleration efforts and allowing the COE to benefit from its own wrongdoing in the approximate amount of $40,000.00.

**2. Cambro's Request for Additional Compensation**

Cambro has accepted the adjustments of the DCAA auditor which accounts for the majority of the difference between the original claim submitted by Cambro and the one presented at trial (T 799). During trial Cambro sought recovery of $477,160.00 (PX 175a).[10] This amount compares to the $305,758 which was found by Mr. Sanford to be the fair and reasonable cost to Cambro if entitlement were established (T 1297) (DX 237). Mr. Sanford's analysis improperly excludes two categories of Cambro's claim entirely – Steel Forms and Penhall Milling.

The Penhall Milling charge of $41, 465.00 is for hiring a milling specialist to grid areas of concrete that failed to pass the profilograph test (T 806). The areas in question were on the taxiway and passed the contractually mandated straightedge test, but not the optional profilograph test which the COE imposed as the acceptance test for the taxiway throughout the entire Project (T 807). Additionally, Mr. Sanford's exclusion of the $41,465 from Cambro's claim was done at the direction of the COE's attorneys and was not an independent conclusion reached by Mr. Sanford himself (T 1298).

[10] When ACE's approved markups are applied to Cambro's claim it adds $92,903 to the $477,160, for a total of $570,063.

Mr. Sanford also inexplicably excluded the $17,825.00 rental charge for the steel forms used by Cambro in its paving operations (DX 237). Compensation was allowed by Mr. Sanford for the additional usage of the form riding paver, and the steel forms conceptually are no different. Compensation is due for both items of equipment in recognition of the additional time that the equipment was devoted to this Project. The COE has stated no logical reason for treating the forms differently from the paver, and no such reason exists. Cambro calculated daily rate for both pieces of equipment based on typical rental rates charged by local equipment suppliers and this claim item represents a reasonable estimation of the ownership rates (T 806).[11]

**SUMMARY OF REQUESTED RELIEF**

In this action ACE and Cambro seek the recovery of $1,822,146.39 in total compensation and the return of liquidated damages withheld by the COE, together with the recovery of interest under the Contracts Disputes Act and attorney's fees and costs under the Equal Access to Justice Act. ACE and Cambro claims as presented at trial are summarized as follows:

| | | | |
|---|---|---|---|
| **Dirt Claim Total:** | | | **$528,185.63** |
| Additional Grading | | $476,401.63 | |
| Constructive Acceleration | | $16,292.00 | |
| Reduced Productivity | | $35,492.00 | |
| **Cambro Claim Total:** | | | **$1,039,897.50** |
| ACE Direct Costs | | $469,617.57 | |
| Subgrade | $62,224.00 | | |
| Drainage Layer | $35,638.00 | | |
| Concrete Preform | $86,824.00 | | |

[11] There does not appear to be a corresponding piece of equipment to the steel forms in the COE Manual to use as a basis of comparison.

| | | |
|---|---|---|
| Concrete Postform | $115,715.00 | |
| Profilograph | $92,683.00 | |
| Cambro's Claim | | $570,063.19 |
| Cambro Direct Claim | $477,160.00 | |
| ACE Markup | $92,903.00 | |
| **Return of Liquidated Damages** | | **$254,280.00** |

## CONCLUSION

For the reasons set forth above, and considering all evidence presented at trial, ACE requests judgment against the COE in the amounts set forth in the Summary of Requested Relief.

### Certificate of Filing

I hereby certify that on December 5, 2005, a copy of ACE's Post-Trial Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Bradley S. Copenhaver____________
W. Robert Vezina, III
Florida Bar No. 329401
Bradley S. Copenhaver
Florida Bar No. 162558
Vezina, Lawrence & Piscitelli, P.A.
318 North Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Telefacsimile: (850) 224-1353