IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ACE CONSTRUCTORS, INC., Plaintiff, | No. 04-299C |
| v. | (Judge Lettow) |
| THE UNITED STATES, Defendant. | |

# DEFENDANT'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

OF COUNSEL:
REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

December 5, 2005

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE QUESTIONS INVOLVED . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 2

I. Background . . . . . . . . . . . . . . . . . . . . . . 2

II. Dirt Fill Claim . . . . . . . . . . . . . . . . . . . . 2

III. Site Grading Claim . . . . . . . . . . . . . . . . . . 9

IV. Steel Form Claim . . . . . . . . . . . . . . . . . . 11

V. Profilograph Testing Claim . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. ACE Is Not Entitled To An Equitable Adjustment For The Cost Of Producing Dirt Fill . . . . . . . . 13

A. ACE Failed To Verify The Survey Data Provided On The Contract Drawings Prior To Construction . . . . . . . . . . . . . . . . . . . 13

B. By Failing To Give The Government Timely Notice Of Its Claim That Site Elevations Were Lower Than The Contract Indicated, ACE Prejudiced The Government . . . . . . . . . . . 14

C. ACE Did Not Prove That It Incurred Unexpected Fill Costs . . . . . . . . . . . . . 19

D. ACE Did Not Prove That The Conditions Indicated In The Contract Differ Materially From Those Actually Encountered During Performance . . . 22

II. ACE Is Not Entitled To An Equitable Adjustment Based Upon Its Defective Specifications Claims . . . . . . 24

A. ACE Did Not Reasonably Interpret The Contract Regarding How To Grade The Subgrade And Drainage Layer . . . . . . . . . . . . . . . . 26

B. ACE Did Not Prove That It Was Misled By The Specification Governing The Length Of Steel Forms . . . . . . . . . . . . . . . . . . . . 27

C. ACE Was Not Misled By Specification § 02753 ¶ 3.5.5.1.b, Regarding Profilograph Testing . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

CASES

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . 19, 22, 25

Day & Zimmermann Services v. United States,
38 Fed. Cl. 591 (1997) . . . . . . . . . . . . . . . . . . . . . 19-20

Fruin-Colnon Corp. v. United States,
912 F.2d 1426 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . 19

George Sollitt Constr. Co. v. United States,
64 Fed. Cl. 229 (2005) . . . . . . . . . . . . . . . . . . . . 16

International Union (UAW) v. NLRB,
459 F.2d 1329 (D.C. Cir. 1972) . . . . . . . . . . . . . . . 19-20

Mingus Constructors, Inc. v. United States,
10 Cl. Ct. 173 (1986), aff'd,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . 16

NVT Technologies, Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . 29

Pacific Alaska Contractors v. United States,
193 Ct. Cl. 850, 436 F.2d 461 (1971) . . . . . . . . . . . . 22-23

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005) . . . . . . . . . . . . . . . . . . 16, 25

Robins Maintenance, Inc. v. United States,
265 F.3d 1254 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . 25

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . 28

Schnip Bldg. Co. v. United States,
227 Ct. Cl. 148, 645 F.2d 95 (1981) . . . . . . . . . . . . . 16

Triax Pacific, Inc. v. West,
130 F.3d 1469 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . 29

Whiteside v. United States,
26 Cl. Ct. 564 (1992) . . . . . . . . . . . . . . . . . . . . 20

W.M. Schlosser, Inc. v. United States,
50 Fed. Cl. 147 (2001) . . . . . . . . . . . . . . . . . . . . 25

W.M. Schlosser Co. v. United States,
767 F.2d 870 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . 14

TREATISES

John Cibinic, Jr. & Ralph C. Nash, Jr.,
Administration of Government Contracts 533 (3d ed. 1995) . . 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACE CONSTRUCTORS, INC., Plaintiff, | ) | No. 04-299C |
| v. | ) | (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

STATEMENT OF THE QUESTIONS INVOLVED

1. Whether plaintiff, ACE Constructors, Inc. ("ACE"), is entitled to an equitable adjustment for the cost of producing dirt fill on the Ammo Hot-Load Project, Fort Bliss, Texas.

2. Whether ACE is entitled to an equitable adjustment based upon its claim that finish grading of the subgrade and drainage layer at the slopes provided in Drawing Sequences 59 through 62 of the Ammo Hot-Load contract did not produce the survey elevations shown in the project plans.

3. Whether ACE is entitled to an equitable adjustment based upon its claim that specification section 02753 ¶ 3.5.5.1.b of the contract was defective in that it required the use of three-meter long steel forms for concrete paving.

4. Whether ACE is entitled to an equitable adjustment based upon its claim to the contracting officer that specification section 02753 ¶ 1.3.7 of the contract was defective in that it required profilograph testing of concrete smoothness.

STATEMENT OF THE CASE

I. Background

Biggs Army Airfield, Fort Bliss, in El Paso, Texas, is the site of the Ammo Hot-Load Project. Plaintiff's Exhibit ("PX") 177 at vol. (a) Standard Form 1442. The project consists of roads, a taxiway, and an ammunition loading area consisting of a "pallet storage pad" and a "loading apron," that ACE constructed pursuant to a contract with the United States Army Corps of Engineers. Transcript ("Tr.") 68, 147. ACE brought four claims to the attention of the contracting officer: one claim for the cost of producing dirt fill, and three claims that contract specifications relating to site grading and concrete work were defective. PX 174 at p.174001 to 174002, PX 176 at 175001. The Court conducted trial in this case on October 17-21, 2005, in El Paso, Texas. Tr. 5, 1307-08.

II. Dirt Fill Claim

At trial, ACE's president, John Fulkerson, testified that, prior to bid, he used the cut and fill numbers shown on Drawing Sequences 66 through 87 to calculate ACE's bid for the dirt fill portion of the work. Tr. 234 at 1-5. Mr. Fulkerson claimed that ACE required more fill than it anticipated because site elevations were lower than those indicated on Drawing Sequences 66 through 87. Tr. 310 at 9-15. In order to generate the additional fill, the Government authorized ACE to increase

the width of trench and retention pond excavations and to import fill from another Government construction project in proximity to the project. Stipulations of Fact ("Stip.") ¶ 9.

Specification section 01720 of the contract provided that, during initial site layout and before disturbing existing conditions, the contractor verify the basic survey data provided on the contract drawings, including benchmark elevations, horizontal control points, and sufficient spot checks of critical elevations to ensure that the survey data adequately reflected existing conditions. PX 177 at vol. (a) § 01720 p.1. The section further provided that the contractor not proceed with construction until providing survey verification to the contracting officer's authorized representative. PX 177 at vol. (a) § 01720 p.1.

The contract also included General Clause 52.236-2, Differing Site Conditions. PX 177 at vol. (a) § 00700. That clause provided that, before disturbing existing conditions, the contractor provide notice to the contracting officer of latent physical conditions that materially differ from those indicated in the contract. PX 177 at vol. (a) § 00700.

The sequence of construction of the project included clearing and grubbing the site. Tr. 69 at 3-6. Clearing and grubbing involved using a bulldozer to dig up to six inches into the site to root up cactus. Tr. 60 at 24-25, 61 at 1-12. ACE

fired one bulldozer operator early in the clearing and grubbing process for digging too deep into the ground. Tr. 302 at 19-25.

ACE commenced clearing and grubbing on January 9, 2001 (Stip. ¶ 5), without providing any survey verification to the contracting officer's authorized representative (Tr. 519 at 7-15, 1164 at 7-16) and before it had even completed the field work necessary for a topographical survey of the work site. Tr. 70 at 12-17, 12-17. ACE's surveyor commenced work on the topographical survey on January 16, 2001. Defendant's Exhibit ("DX") 77 at p.37. ACE's surveyor set clearing limits and grade limits before January 16, 2001 (DX 77 at p.23, 32), but that task was different than working on the topographical survey. Tr. 140 at 5-6, 142-43.

By January 26, 2001, 75 percent of the site had been leveled. DX 77 at p.74; Tr. 144-45. Excavation and fill activities at the site started on February 5, 2001. Stip. ¶ 7. On February 5, 2001, ACE began leveling the loading pad. DX 78-15. By February 7, 2001, ACE had completed clearing and grubbing the entire site. DX 78-23.

By early March 2001, the "footprint" of the job not only could already be seen, but ACE had begun building up the roads and pads. Tr. 1071-72. By March 2, 2001, ACE had begun hauling dirt to the loading pad to bring the loading pad to finished grade. PX 45. By March 5, 2001, ACE had begun hauling dirt to

the taxiway (DX 79-15) and, by March 9, 2001, had begun hauling dirt to the pallet pad. PX 51.

By late March 2001, because of the amount of fill that ACE had brought onto the site, the opportunity to lower the site had already passed. Tr. 1169-70. By March 26, 1001, ACE had leveled and set "blue tops" (that is, stakes installed after a grade is brought to finish elevation for that grade) at the pallet pad, indicating that at least part of the dirt grade at the pallet pad had been brought to finished elevations. Tr. 146 at 19-25, 147 at 1-19, 149 at 14-25, 150 at 1-11; DX 79-102. By March 27, 2001, ACE had begun hauling dirt to the access road. DX 79-107.

By April 2, 2001, ACE had begun setting grades on the loading pad. DX 80-7. ACE did not notify the Government of its claim that site elevations were different than those indicated in the contract until April 2, 2001, at a meeting with David Wise, then Resident Engineer for the Army Corps of Engineer. Tr. 1159, 1161-62. At that meeting, ACE orally informed the Government that it believed that site elevations were lower than those indicated on contract drawings. Tr. 1162 at 6-12.

Had the Government received notice of ACE's claim before ACE proceeded with construction, and had the Government verified ACE's claim, the Government could have explored the possibility of lowering portions of the project to eliminate or mitigate the effect of the elevation discrepancy. Tr. 1164-65. Instead of

authorizing ACE to increase the width of trench and retention pond excavations and to import fill from another Government construction project to generate all the additional fill that ACE found it required (Stip. ¶ 9), the Government might have lowered the planned elevations for the pallet pad and loading pad, as well as the planned elevations for portions of the access road and taxiway (Tr. 1166-67), eliminating or reducing the need for fill.

On October 19, 2005, Mr. Fulkerson testified that ACE's bid dirt takeoffs and bid estimate sheets are probably in ACE's project files. Tr. 526 at 22-25, 527 at 1-2. Even though two days of trial remained, ACE made no apparent attempt to locate those documents and offer them into evidence. ACE did, however, present Mr. Fulkerson's post-award dirt takeoff comparing Drawing Sequences 66 through 87 with ACE's 2001 site survey. Tr. 303-09; PX 176 at oversized drawings.

On August 15, 2001, Mr. Fulkerson wrote in a letter to the Government that ACE's pre-bid takeoffs indicated that there would be approximately 20,000 cubic yards of excess dirt at the site. PX 76 at p.1-2. However, on October 17, 2005, he testified that he determined prior to bidding that the site would produce 40,000 to 50,000 cubic meters or cubic yards of excess fill. Tr. 230 at 22-23. Mr. Fulkerson testified on October 19, 2005, that ACE's bid estimate sheets might show that ACE estimated that it

would cost $20,000 to remove 5,000 cubic yards of excess fill from the site. Tr. 528.

Drawing Sequences 66 through 87 show cross-sections of the site at 20-meter intervals, and provided cut and fill numbers at those intervals. PX 178 at p.66-87. Those drawings, however, do not indicate any swell or shrinkage factor to apply. ACE presented no evidence of what, if any, swellage or shrinkage factor it applied to its or Dirt-Tek's cut and fill calculations. ACE's bidding schedule, the only contemporaneous evidence reflecting ACE's assumptions during the bidding period, does not indicate a specific amount for earthwork - the bidding schedule provides a lump sum for that and several other non-concrete activities. PX 177 at vol. (a) p.00010-3.

Mr. Fulkerson also testified that ACE, in preparing its bid, relied in part upon an August 21, 2000 takeoff performed by Dirt-Tek, Inc. Tr. 234 at 12-18, 241 at 5-10. According to Mr. Fulkerson, the Dirt-Tek takeoff indicates that the site was a "balanced job" in terms of cut and fill. Tr. 527 at 5-12. Dirt-Tek, however, warned ACE that its earthwork volume did not include factors for shrinkage or swellage. PX 176 at p. 175037. Dirt-Tek's August 21, 2000 report does not indicate what documents Dirt-Tek relied upon, or what its report signifies regarding a need for fill at the site. PX 176 at 175037.

Mr. Fulkerson did not assist Dirt-Tek in preparing the Dirt-Tek takeoff and, therefore, possessed no first-hand knowledge of how Dirt-Tek performed its takeoff. Tr. 527 at 21-23. Although ACE listed a Dirt-Tek representative on its witness list, ACE called no Dirt-Tek representative to testify regarding what contract documents, if any, were used to perform Dirt-Tek's takeoff or what that takeoff concluded. On the first day of trial, ACE's counsel stated that Dirt-Tek's principal, Carl Bice, was available to testify (Tr. 14 at 12-25) and counsel for the Government stated that, if Mr. Bice testified, he was expected to testify that Dirt-Tek's report did not reflect a balanced job. Tr. 39 at 24-25.

ACE presented no evidence regarding what constitutes a material difference in elevations found between different surveys of the same site. A comparison of the cross-sections provided in the contract and those developed by ACE's surveyor reflected that at the extreme edges of the work site the elevations on those cross-sections matched, but in the center ACE's surveyor's cross-sections reflected lower elevations. Tr. 476 at 16-25, 494-95. In addition, an examination of the as-built drawings of the finished project also revealed that where disturbed earth met undisturbed earth, elevations were the same. Tr. 1238-39. Although the Government's survey for the Ammo Hot-Load project and another Fort Bliss project were performed at the same time by

the same aircraft, only the Ammo Hot-Load project was the subject of any complaint of a discrepancy between site elevations and elevations indicated in the contract. Tr. 496, 507-08, 1171-72.

III. Site Grading Claim

ACE brought to the attention of the contracting officer the claim that the typical sections shown on Drawing Sequences 59 through 62 of the Ammo Hot-Load contract showed the subgrade, drainage layer rock, and concrete being finished at consistent grades ranging from 0.5 percent to 2 percent, and that ACE bid accordingly, but that finish grading of the subgrade and drainage layer did not meet the survey elevations shown in the project plans. PX 174 at p.174001. Mr. Fulkerson testified that ACE relied upon Drawing Sequences 60 and 61 in preparing the subgrade portion of its bid (Tr. 276-78); he did not testify that ACE also relied upon Drawing Sequences 59 and 62.

Drawing Sequences 49 through 52, the staking plans, provided a partial set of spot elevations for the final grade of the concrete pavement structures. PX 178 at p.49-52. An amended Drawing Sequence 49, issued prior to award, included a note stating that additional elevations would be provided after award. PX 179 at p.49. ACE received a complete set of spot elevations after award. Tr. 288 at 2-7.

Mr. Fulkerson testified that the complete set of spot elevations included constantly changing grades that made it

difficult to achieve those elevations with a laser-equipped motor grader. Tr. 288-90. He also testified that the problems that ACE encountered with the fine-grading of the subgrade "were attributable to the geometry of the final grade and the elevations that were called out for in the drawings that were provided after contract award on the staking plans." Tr. 362 at 25, 262 at 1-6. He testified that the problems that ACE encountered in fine-grading the subgrade and the drainage layer were compensable because "[t]he documents conflicted between the typical sections and the grading plan and then the staking plans that actually were provided after contract award as well, so we didn't have all of the information when we bid the job or when we were awarded the job." Tr. 365 at 13-24.

Mr. Fulkerson testified that although he saw Amended Drawing Sequence 49 prior to bid (Tr. 286 at 16-24), Drawing Sequences 49 through 52 were only to be provided to surveyors and were not drawings that a contractor would use in bid preparation. Tr. 286, 287 at 1-7. Although Drawing Sequences 49 through 52 provided only a partial set of finish elevations (PX 178 at p.49-52), the remaining elevations were calculated from the partial set by simple mathematical interpolation. Tr. 1179-80. ACE did not initially make use of all the spot elevations during performance of the work: David Camilli, vice-president of Cambro Construction Co., ACE's concrete subcontractor (Tr. 753 at 7-8),

testified that, initially, ACE would provide a hub at a panel point "or they'd skip one." Tr. 822 at 20-25, 823 at 1-6.

IV. Steel Form Claim

ACE brought to the attention of the contracting officer the claim that specification section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long steel forms for concrete paving. PX 174 at p.174002. Specification section 02753 ¶ 3.5.5.1.b provides that (except on some curves) "[s]teel forms shall be furnished in sections not less than 3 m in length." PX 177 at vol. (a) § 02753 p.46 ¶ b. Mr. Fulkerson testified that ACE relied upon the quote of FSH, a concrete subcontractor, to bid the concrete part of the job. Tr. 223-24, 610. ACE presented no evidence that it or FSH, during the bidding period, planned to use only three-meter forms.

V. Profilograph Testing Claim

ACE brought to the attention of the contracting officer the claim that "the requirement included in Specification Section 02753 [¶] 1.3.7 that profilograph testing [was] to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length" is defective. PX 174 at p.174002, 174025-26. Mr. Fulkerson testified, however, that he interpreted the contract as allowing either profilograph testing or straight-edge testing, and that ACE "opted to use the straight edge" and was directed to use the profilograph. Tr. 408 at 1-8, 414-16, 678.

Mr. Fulkerson testified that ACE's bid did not include any cost for profilograph testing. Tr. 408 at 9-11. He also testified that ACE "didn't see anything on this project that would indicate that a profilograph was appropriate or should be used." Tr. 416 at 11-13.

Specification section 02753 ¶ 1.3.7, entitled "Surface Smoothness," provides that "[t]he Contractor shall use one of the following methods to test and evaluate surface smoothness of the pavement." PX 177 at vol. (a) § 02753 p.7. Specification section 02753 ¶¶ 1.3.7.1, 1.3.7.2, and 1.3.7.3 refer to straightedge testing and profilograph testing. PX 177 at vol. (a) § 02753 p.8-9. Specification section 02753 ¶ 1.11.9 further provides that "[t]he Contractor shall furnish and maintain at the job site . . . one 4 m straightedge for each paving train for testing the hardened portland cement concrete surfaces." PX 177 at vol. (a) § 02753 p.27. Specification section 02753 ¶ 1.3.7, however, provides that "[t]he profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 m in length and at the ends where the straightedge shall be used." PX 177 at vol. (a) § 02753 p.8.

In addition, specification section 02753 ¶ 1.3.7.1(b) provides that, in the case of profilograph testing, "all pavement shall have a Profile Index of not greater than specified in

Table 2 when tested with an approved California-type profilograph." PX 177 at vol. (a) § 02753 p.8. Finally, specification section 02753 ¶ 1.11.10 provides that

> The Contractor may furnish a 7.6 m profilograph for testing the finished pavement surfaces. The profilograph shall produce a record on tape of the results of testing the pavement surface and shall automatically mark the Profile Index of each section tested as well as indicate and measure each "must grind" point, all in accordance with CDT Test 526 and as required by paragraph Surface Smoothness.

PX 177 at vol. (a) § 02753 p. 27. CDT Test 526 is not part of the record.

## ARGUMENT

### I. ACE Is Not Entitled To An Equitable Adjustment For The Cost Of Producing Dirt Fill

#### A. ACE Failed To Verify The Survey Data Provided On The Contract Drawings Prior To Construction

ACE is not entitled to an equitable adjustment for the cost of producing dirt fill because it proceeded with construction without verifying the basic survey data provided in the contract documents. ACE failed to comply with its contractual obligation, pursuant to specification section 01720 of the contract (PX 177 at vol. (a) § 01720 p.1), to verify site elevations before proceeding with construction. The sequence of construction of the project included clearing and grubbing the site. Tr. 69 at 3-6. ACE commenced clearing and grubbing on January 9, 2001 (Stip. ¶ 5), without providing any survey verification to the

contracting officer's authorized representative (Tr. 519 at 7-15, 1164 at 7-16) and before it had even completed the field work necessary for a topographical survey of the work site. Tr. 70 at 12-17, 12-17. Because ACE proceeded with construction without verifying the accuracy of the site elevations depicted on Drawing Sequences 66 through 87, ACE assumed the risk that those site elevations were not accurate. Cf. W.M. Schlosser Co. v. United States, 767 F.2d 870, 873-74 & n.2 (Fed. Cir. 1985) (including dicta suggesting that Government was not obliged to reimburse contractor for costs incurred prior to contractor's performance of contract obligation to verify dimensions before performing affected work). ACE, therefore, may not recover the cost of producing additional fill that it may have required due to any discrepancies between Drawing Sequences 66 through 87 and actual conditions.

### B. By Failing To Give The Government Timely Notice Of Its Claim That Site Elevations Were Lower Than The Contract Indicated, ACE Prejudiced The Government

Even if ACE did not assume the risk of inaccuracies in Drawing Sequences 66 through 87, to the extent that its dirt fill claim is predicated upon the claim that site elevations were lower than those indicated on those drawings, the Court should deny that claim because ACE prejudiced the Government by failing to provide timely notice. ACE failed to comply with its obligation, pursuant to the contract's differing site conditions

clause (PX 177 at vol. (a) § 00700 p.54), to notify the contracting officer of latent physical conditions at the site that differed materially from those indicated in the contract before conditions were disturbed. ACE did not notify the Government of its claim that site elevations were different than those indicated in the contract until April 2, 2001. Tr. 1159, 1161-62. By then, ACE had already disturbed existing conditions. By early February 2001, ACE had completed clearing and grubbing the entire site (DX 78-23) had leveled 75 percent of the site (DX 77 at p.74; Tr. 144-45), and had begun leveling the loading pad. DX 78-15.

By early March 2001, ACE had begun hauling dirt to the loading pad to bring the loading pad to finished grade (PX 45), had and had begun hauling dirt to the taxiway (DX 79-15) and the pallet pad. PX 51. By late March 2001, ACE had brought at least part of the dirt grade at the pallet pad to finished elevations. (Tr. 146 at 19-25, 147 at 1-19, 149 at 14-25, 150 at 1-11; DX 79-102) and had begun hauling dirt to the access road. DX 79-107. And by April 2, 2001, ACE had begun setting grades on the loading pad. DX 80-7.

In order to prevail in a case a differing site condition case in which the contractor has not provided timely notice of the alleged differing site condition, the Government has the burden of proving that the untimeliness caused prejudice to its

case. George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 291 (2005). The Government may satisfy that burden by establishing that the passage of time obscured the elements of proof or that the Government could have minimized the extra work and attendant costs had notice been given. Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 650 (2005); John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 533 (3d ed. 1995). Where the Government shows that, with timely notice, a contractor's solution for overcoming a differing site condition may have been entirely unnecessary or a lower cost solution might have been preferred, the Government demonstrates prejudice. See George Sollitt, 64 Fed. Cl. at 291 (citing Schnip Bldg. Co. v. United States, 227 Ct. Cl. 148, 645 F.2d 95 (1981)).

A differing site conditions claim fails for lack of timely notice where, by the time notice was received, the physical aspects of the area in question had been altered. See Mingus Constructors, Inc. v. United States, 10 Cl. Ct. 173, 178 (1986), aff'd, 812 F.2d 1387 (Fed. Cir. 1987). Where original site conditions have been altered by construction, the validity of a contractor's claim cannot be determined with the degree of accuracy or certainty that prompt notice would engender. Id.

In addition, specification section 01720 required that ACE, prior to proceeding with construction, provide verification to the contracting officer's authorized representative that site

elevations on contract drawings reflected existing conditions. PX 177 at vol. (a) § 01720 p.1. By requiring that verification, the contract required that ACE notify the Government of discrepancies between elevations indicated on contract drawings and existing site elevations before proceeding with construction. See PX 177 at vol. (a) § 01720 p.1. Section 01720 is designed to ensure that the Government will have the opportunity to confirm the existence and extent of a discrepancy between the basic survey data provided in the contract drawings and existing conditions - and document the extent of Government liability arising from any discrepancy - before the discrepancy can be exacerbated by a contractor's construction practices and techniques. See PX 177 at vol. (a) § 01720 p.1. It also provides the Government the opportunity to remediate the effect of a discrepancy upon a project and mitigate the Government's liability before a contractor's actions have limited or precluded that opportunity. See PX 177 at vol. (a) § 01720 p.1.

By proceeding with construction and disturbing site conditions before verifying existing site elevations, ACE prejudiced the Government's presentation of its case. Once ACE disturbed existing site elevations, the Government was unable to conduct its own survey to document the extent to which, if at all, site elevations were materially different from those indicated in the contract. And because ACE proceeded with

construction before verifying the basic site elevation data on the contract drawings, it was also impossible to quantify to what extent ACE caused the discrepancy between the contract elevations and the elevations that ACE's surveyor found.

The Government also lost the opportunity to redesign the project to remediate the effect of any discrepancy between the contract indications of site elevations and the existing site elevations. With timely notice and the ability to verify ACE's claim, the Government could have explored the possibility of lowering portions of the project to eliminate or mitigate the effect of the elevation discrepancy. Tr. 1164-65. Instead of authorizing ACE to increase the width of trench and retention pond excavations and to import fill from another Government construction project to generate all the additional fill that ACE found it required (Stip. ¶ 9), the Government might have eliminated or reduced the need for fill by lowering the planned elevations for the pallet pad and loading pad, as well as the planned elevations for portions of the access road and taxiway. Tr. 1166-67.

In addition, by the time that ACE notified the Government of its claim that site elevations were lower than the contract indicated, ACE had added to the work that would have been required to lower the planned elevations. By early March 2001, the ACE had already begun building up the roads and pads

(Tr. 1071-72), and, by late March 2001, because of the amount of fill that ACE had brought onto the site, the opportunity to lower the site had already passed. Tr. 1169-70. ACE's failure to comply with the contract's notice requirements, therefore, prejudiced and disadvantaged the Government, both by obscuring the elements of proof in this case and because the Government could have eliminated or minimized the extra work and attendant costs of a need for fill had timely notice been given.

### C. ACE Did Not Prove That It Incurred Unexpected Fill Costs

ACE did not prove that it incurred unexpected fill costs. To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove that it reasonably relied upon its interpretation of the contract and contract-related documents and was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). Evidence at the time of bidding is crucial to proving reliance. See Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1432 (Fed. Cir. 1990). When a party has relevant evidence within its control, the failure to produce that evidence raises the presumption that if in fact produced, it would be unfavorable to its cause. Day & Zimmermann Servs. v. United States, 38 Fed. Cl. 591, 602 n.13 (1997) (citing Int'l Union (UAW) v. NLRB,

459 F.2d 1329, 1335 (D.C. Cir. 1972)). Failure to produce evidence can create an inference that, had the evidence been presented, the evidence would establish a case for the opposing party. Whiteside v. United States, 26 Cl. Ct. 564, 575 n.3 (1992).

Although ACE's bid dirt takeoffs and bid estimate sheets are probably in ACE's project files (Tr. 526 at 22-25, 527 at 1-2), ACE did not offer those documents into evidence. The Court should draw the adverse inference that those documents would establish that ACE did not incur any costs producing fill that were not reflected in its bid. An adverse inference is particularly appropriate because, although ACE failed to present its original dirt takeoff, it presented a dirt takeoff comparing Drawing Sequences 66 through 87 with its 2001 topographical survey of the site. Tr. 303-09; PX 176 at oversized drawings.

In preparing its bid, ACE relied in part upon an August 21, 2000 takeoff performed by Dirt-Tek, Inc. Tr. 234 at 12-18, 241 at 5-10. That takeoff (PX 176 at 175037) does not indicate what documents Dirt-Tek relied upon, or what its report signifies regarding a need for fill at the site, and ACE presented no first-hand knowledge of how Dirt-Tek performed its takeoff. Tr. 527 at 21-23. ACE did not cal any Dirt-Tek representative to testify regarding what contract documents, if any, were used to perform Dirt-Tek's takeoff or what that takeoff concluded.

Because ACE did not call Dirt-Tek's principal as a witness after representing that he was available to testify (Tr. 14 at 12-25), the Court should either disregard Dirt-Tek's report or infer that ACE did not reasonably rely upon Dirt-Tek's takeoff.

Even if the Court does not draw any adverse inferences, it should conclude that ACE did not establish that it reasonably relied upon Drawing Sequences 66 though 87 or that it was damaged as a result of any material variation between the amount of dirt fill it expected to encounter on site and the amount it actually encountered. Without ACE's pre-bid takeoffs and bid estimate sheets the Court lacks sufficient credible evidence to determine how much fill ACE anticipated it would encounter at the site and what fill-related costs it anticipated it would incur. ACE's bidding schedule, the only contemporaneous evidence reflecting ACE's assumptions during the bidding period, does not indicate a specific amount for earthwork - the bidding schedule provides a lump sum for that and several other non-concrete activities. PX 177 at vol. (a) p.00010-3.

And Mr. Fulkerson's statements regarding how much fill ACE anticipated it would encounter are contradictory. On August 15, 2001, Mr. Fulkerson wrote that ACE's pre-bid takeoffs indicated that there would be approximately 20,000 cubic yards of excess dirt at the site. PX 76 at p.1-2. However, he testified that he determined prior to bidding that the site would produce 40,000 to

50,000 cubic meters or cubic yards of excess fill (Tr. 230 at 22-23), then testified that ACE's bid estimate sheets might show that ACE estimated that it would cost $20,000 to remove 5,000 cubic yards of excess fill from the site. Tr. 528.

Moreover, ACE presented no evidence of what, if any, swellage or shrinkage factor it applied to its or Dirt-Tek's cut and fill calculations. Notably, Dirt-Tek warned ACE that its earthwork volume did not include factors for shrinkage or swellage. PX 176 at p. 175037.

D. ACE Did Not Prove That The Conditions Indicated In The Contract Differ Materially From Those Actually Encountered During Performance

ACE did not prove that the conditions indicated in the contract differ materially from those actually encountered during performance. To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove that the conditions indicated in the contract differ materially from those actually encountered during performance. Comtrol, 294 F.3d at 1362. Drawing Sequences 66 through 87 do not indicate that the site would produce enough fill to perform the work. Those drawings show cross-sections of the site at 20-meter intervals, and provide cut and fill numbers at those intervals, but do not indicate any swell or shrinkage factor to apply. PX 178 at p.66-87. In a very similar case, Pacific Alaska Contractors v. United States, 193 Ct. Cl. 850, 864-65, 436 F.2d

461, 469-70 (1971), the United States Court of Claims held that a contract that provided estimated cut and fill numbers but no swell factor did not indicate that cut and fill would balance.

In addition, ACE did not prove that site elevations were materially different from those that it actually encountered during performance. ACE presented no evidence regarding what constitutes a material difference in elevations found between different surveys of the same site. Moreover, ACE disturbed the site elevations before performing its topographical survey. Although its surveyor began work on the topographical survey on January 16, 2001 (DX 77 at p.23, 32, 37), ACE had been clearing and grubbing since January 9, 2001. Stip. ¶ 5. Indeed, a comparison of the cross-sections provided in the contract and those developed by ACE's surveyor reflected that at the extreme edges of the work site the elevations on those cross-sections matched, but in the center ACE's surveyor's cross-sections reflected lower elevations, indicating that ACE had stripped the topsoil in the center of the work site prior to surveying. Tr. 476 at 16-25, 494-95.

Moreover, an examination of the as-built drawings of the finished project also revealed that where disturbed earth met undisturbed earth, elevations were the same (Tr. 1238-39), indicating that the elevation discrepancies between contract elevations and the elevations determined by ACE's surveyor

existed only where ACE had disturbed the site. In fact, ACE fired one bulldozer operator early in the project for digging too deep into the ground during clearing and grubbing. Tr. 302 at 19-25. Finally, although the Government's survey for the Ammo Hot-Load project and another Fort Bliss project were performed at the same time by the same aircraft, only the Ammo Hot-Load project was the subject of any complaint of a discrepancy between site elevations and elevations indicated in the contract. Tr. 496, 507-08, 1171-72.

## II. ACE Is Not Entitled To An Equitable Adjustment Based Upon Its Defective Specifications Claims

ACE is not entitled to an equitable adjustment based upon its defective specifications claims. ACE brought to the attention of the contracting officer three claims that contract specifications were defective. First, ACE claimed that the typical sections shown on Drawing Sequences 59 through 62 showed the subgrade, drainage layer rock, and concrete being finished at consistent grades ranging from 0.5 percent to 2 percent, and that it bid accordingly, but that finish grading of the subgrade and drainage layer did not meet the survey elevations shown in the project plans. PX 174 at p.174001. Second, ACE claimed that specification section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long steel forms for concrete paving. PX 174 at p.174002. Third, ACE claimed that "the

requirement included in Specification Section 02753 [¶] 1.3.7 that profilograph testing [was] to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length" is defective. PX 174 at p.174002.

Whenever the Government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors. Robins Maintenance, Inc. v. United States, 265 F.3d 1254, 1257 (Fed. Cir. 2001). The test for recovery based on inaccurate specifications is whether the contractor was misled by the errors in the specifications. Id. There can be no recovery upon a defective specifications claim if there was no reliance upon the defective specification in preparation of the bid. See Comtrol, 294 F.3d at 1364. A contractor must prove that it relied on its interpretation of the contract documents when calculating its bid. Renda Marine, 66 Fed. Cl. at 655. A contractor cannot base a claim for equitable adjustment upon documents and information that it did not review prior to bid. Comtrol, 294 F.3d at 1364. Furthermore, a contract interpretation is unreasonable if it is based on some contract indications to the exclusion of others. W.M. Schlosser, Inc. v. United States, 50 Fed. Cl. 147, 154 (2001).

A. ACE Did Not Reasonably Interpret The Contract Regarding How To Grade The Subgrade And Drainage Layer

For three reasons, ACE is not entitled to an equitable adjustment based upon its claim that finish grading of the subgrade and drainage layer at the slopes provided in Drawing Sequences 59 through 62 did not produce the survey elevations shown in the project plans. First, ACE did not establish that it relied upon Drawing Sequences 59 and 62 in preparing its bid; Mr. Fulkerson's testimony reflects only that ACE relied upon Drawing Sequences 60 and 61 in preparing the subgrade portion of its bid. Tr. 276-78.

Second, ACE did not establish that it relied upon the survey elevations shown in the project plans in preparing its bid. ACE did not receive the complete set of spot elevations until after award. Tr. 288 at 2-7. In addition, Mr. Fulkerson's testimony that Drawing Sequences 49 through 52 were not drawings that a contractor would use in bid preparation (Tr. 286-87) establishes that ACE did not rely upon the elevations provided on Drawing Sequences 49 through 52 in preparing its bid. (Indeed, ACE did not initially make use of all the spot elevations even during performance. Tr. 822-23.) Because ACE did not rely upon Drawing Sequences 49 through 52 or the complete set of spot elevations in preparing its bid, it cannot rely upon those drawings and spot elevations to establish a defective specifications claim.

Third, ACE's pre-bid reliance upon Drawing Sequences 60 and 61 to the exclusion of Drawing Sequences 49 through 52 was not reasonable. Although Drawing Sequences 49 through 52 provided only a partial set of finish elevations (PX 178 at p. 49-52), the remaining elevations - the same elevations that were provided after award - were calculated from the partial set by simple mathematical interpolation. Tr. 1179-80. Therefore, Drawing Sequences 49 through 52 contained information from which ACE could have determined how to grade to achieve finished elevations. Moreover, ACE's decision to rely upon the typical sections knowing that additional elevations would be provided after award (Tr. 286, PX 179 at p.49) unreasonably assumed that those additional elevations would not effect its pre-bid assumptions.

B. ACE Did Not Prove That It Was Misled By The Specification Governing The Length Of Steel Forms

For two reasons, ACE is not entitled to an equitable adjustment based upon its claim that specification section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long steel forms for concrete paving. First, specification section 02753 ¶ 3.5.5.1.b does not require the use of three-meter long steel forms; the section provides that (except on some curves) "[s]teel forms shall be furnished in sections <u>not less than</u> 3 m in length" (emphasis added). PX 177 at vol. (a) § 02753

p.46 ¶ b. Second, there is no evidence that ACE was misled by ¶ 3.5.5.1.b prior to bid. Mr. Fulkerson testified that ACE relied upon the quote of FSH, a concrete subcontractor, to bid the concrete part of the job. Tr. 223-24, 610. ACE presented no evidence that it or FSH, during the bidding period, planned to use only three-meter forms.

C. ACE Was Not Misled By Specification § 02753 ¶ 3.5.5.1.b, Regarding Profilograph Testing

ACE is not entitled to an equitable adjustment based upon its claim to the contracting officer that specification section 02753 ¶ 1.3.7 was defective in that it required profilograph testing of concrete smoothness. ACE abandoned that claim at trial in favor of a claim that although the contract did not require profilograph testing, the Government directed the use of profilograph testing. Tr. 408 at 1-8, 414-16, 678. That latter claim, however, is not one that the Court possesses jurisdiction to entertain. The Court does not possess jurisdiction to entertain a claim that was not brought to the attention of the contracting officer. See Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987). In the request for equitable adjustment that ACE submitted to the contracting officer, both ACE and Cambro claimed that specification section 02753 ¶ 1.3.7 required profilograph testing. PX 174 at p.174002, 174025-26.

The contract, however, did require profilograph testing. Specification sections 02753 ¶¶ 1.3.7, 1.3.7.1, 1.3.7.2, 1.3.7.3, 1.11.9, and 1.11.10, when read together, (1) require that the profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 meters in length and at the ends where the straightedge shall be used, (2) allow the contractor to use straightedge or profilograph testing in all other cases, (3) require that all straightedge testing be performed with a four-meter straightedge, (4) require that all profilograph testing be performed with a California-type profilograph, and (5) allow the contractor to use a 7.6 m profilograph. To the extent that those provisions require profilograph testing and allow the choice of only straightedge testing, that ambiguity or conflict is patent. A patent ambiguity in a Government contract is one that is obvious, gross, or glaring. NVT Techns., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004). A patent ambiguity requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Triax Pacific, Inc. v. West, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). Absent such inquiry, the ambiguity will be resolved against the contractor. Id.

Even if ACE did not abandon its claim that specification section 02753 ¶ 1.3.7 is defective, ACE did not establish that it

was misled by that specification. Indeed, Mr. Fulkerson's testimony that ACE opted to use the straightedge testing method and included no cost for profilograph testing in its bid (Tr. 408, 416 at 11-13) establishes that ACE was not misled by ¶ 1.3.7 during bid preparation. That testimony is fatal to ACE's claim that specification ¶ 1.3.7 is defective.

CONCLUSION

For these reasons, the Court should dismiss the complaint, with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

OF COUNSEL:
REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

December 5, 2005 Attorneys for Defendant

Certificate of Filing

I hereby certify that on December 5, 2005, a copy of the foregoing Defendant's Post-Trial Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail