IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACE CONSTRUCTORS, INC., | ) | |
| Plaintiff, | ) | No. 04-299C |
| v. | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

OF COUNSEL:
REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

December 19, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Dirt Fill Claim . . . . . . . . . . . . . . . . . . . . . 1

II. Defective Specifications Claims . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

Contract Cleaning Maintenance, Inc. v. United States,
811 F.2d 586 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . 14

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . 14-15

Delco Electronics Corp. v. United States,
17 Cl. Ct. 302 (1989), aff'd, 909 F.2d 1495
(Fed. Cir. Jul 18, 1990) (Table) . . . . . . . . . . . . . . . . 11

Doninger Metal Products, Corp. v. United States,
50 Fed. Cl. 110 (2001) . . . . . . . . . . . . . . . . . . . . 10-11

Farnsworth & Chambers Co., Inc. v. United States,
171 Ct. Cl. 30, 346 F.2d 577 (1965) . . . . . . . . . . . . . . 3

Fru-Con Construction Corp. v. United States,
43 Fed. Cl. 306 (1999) . . . . . . . . . . . . . . . . . . . . . 9

George Sollitt Construction Co. v. United States,
64 Fed. Cl. 229 (2005) . . . . . . . . . . . . . . . . . . . . . 8

Gulf & Western Industries v. United States,
6 Cl. Ct. 742 (1984) . . . . . . . . . . . . . . . . . . . . . . 9

Jackson Construction Co., Inc. v. United States,
62 Fed. Cl. 84 (2004) . . . . . . . . . . . . . . . . . . . . . 9

Luria Bros. & Co. v. United States,
177 Ct. Cl. 676, 369 F.2d 701 (1966) . . . . . . . . . . . . . 19

L.W. Foster Sportswear Co. v. United States,
186 Ct. Cl. 499, 405 F.2d 1285 (1969) . . . . . . . . . . . . 15

Mega Construction Co., Inc. v. United States,
29 Fed. Cl. 396 (1993) . . . . . . . . . . . . . . . . . . . . 17

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . 20

Orlosky Inc. v. United States,
64 Fed. Cl. 63 (2005) . . . . . . . . . . . . . . . . . . . . 17

Pacific Alaska Contractors v. United States,
193 Ct. Cl. 850, 436 F.2d 461 (1971) . . . . . . . . . . . . . . 1

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005) . . . . . . . . . . . . . . . . . . . . 13

SAB Construction, Inc. v. United States,
66 Fed. Cl. 77 (2005) . . . . . . . . . . . . . . . . . . . . 11

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . 14

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . 2

Youngdale & Sons Construction Co., Inc. v. United States,
27 Fed. Cl. 516 (1993) . . . . . . . . . . . . . . . . . . . . 17

TREATISES

John Cibinic, Jr. & Ralph C. Nash, Jr.,
Administration of Government Contracts (3d ed. 1995) . . . 8-10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACE CONSTRUCTORS, INC., Plaintiff, | ) | No. 04-299C |
| v. | ) | (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF

ARGUMENT

I. Dirt Fill Claim

Plaintiff, ACE Constructor's, Inc. ("ACE"), may not rely upon any intent of the Government's design firm that cut and fill on the Ammo Hot-Load Project would balance if a ten percent shrinkage factor were applied. A contractor may not rely upon the Government's or its agents' intentions, calculations, or assumptions unless the contract overtly reflects them. See Pacific Alaska Contractors v. United States, 193 Ct. Cl. 850, 865, 436 F.2d 461, 470 (1971). The contract did not expressly state that cut and fill would balance or that ditches and trenches would provide all the fill necessary for embankments, and did not include the design firm's balance calculations or indicate that a ten percent shrinkage factor should be applied.

ACE did not perform any "additional work" obtaining fill, because the contract did not indicate how much fill the site would produce; it only estimated cut and fill numbers at 20-meter

cross-sections (Plaintiff's Exhibit ("PX") 178 at p.66-87), without indicating any shrinkage or swell factor. Cf. Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987) ("Government estimates are not warranties."). The Government did not order ACE to widen the ditches and ponds; it authorized ACE to proceed with it proposal to do that to obtain fill. Trial Transcript ("Tr.") 315-16; Stipulations of Fact ("Stip.") ¶ 9.

ACE did not prove that it notified the Government of a differing site condition before April 2, 2001. No documentary evidence supports the claim that on January 9, 2001, ACE's former project superintendent, Jerry Fletcher, notified the Government's construction representative, Danny Menchaca, that site elevations were lower than those indicated in the contract. Indeed, that claim does not appear in any of ACE's correspondence to the Government regarding its differing site condition claim. Although Mr. Fletcher claimed that he recorded the conversation in a construction diary and provided that diary to ACE (Tr. 134), ACE did not offer that diary into evidence. In fact, Mr Fletcher did not testify that he notified Mr. Menchaca on January 9; he testified that on the same day that clearing and grubbing began, he was told by SLI Engineering, Inc. ("SLI") that site elevations were lower than those indicated on the plans, and that he told Mr. Menchaca that "[t]he next time Danny was on the job."

Tr. 88. However, ACE never notified Mr. Menchaca that elevations in the contract conflicted with SLI's findings. Tr. 1073 at 2-6.

No documentary evidence reflects that on January 29, 2001, Mr. Fletcher advised the Government's project engineer, Eleuterio Fuentes, that site elevations were lower than those indicated in the contract. Again, ACE presented no documentary evidence recording such a conversation, even though Mr. Fletcher testified that the conversation was recorded in his diary. Tr. 134. In addition, Mr. Fletcher testified in a June 2005 deposition that the only Army Corps of Engineers personnel he told of a problem with site elevations was Mr. Menchaca. Tr. 133-34. In fact, the first time that Mr. Fuentes learned that ACE was claiming that site elevations were lower than those indicated in the contract was when Mr. Fletcher sent a letter to the Government making that claim in April 2001. Tr. 1235.

ACE's March 2, 2001 Request for Information ("RFI") is not notice of a differing site condition. That RFI, which was not received by the Government until March 13, 2001, indicates only that ACE was predicting that it would soon be out of dirt - it does not state that the need for dirt was the result of a discrepancy between site conditions and conditions indicated in the contract. PX 44. And Farnsworth & Chambers Co., Inc. v. United States, 171 Ct. Cl. 30, 346 F.2d 577 (1965), is distinguishable. There, a contractor wrote to the Government

"making a claim under the contract for a changed condition in general terms." Id. at 36, 581. The court held that the claim constituted sufficient notice of a differing site condition even though it did not present the details of the claim. Id. at 36-37, 581. ACE's RFI, however, makes no claim pursuant to the contract's Differing Site Conditions clause.

ACE fails to support with citation to the record its claim (ACE's Post-Trial Brief ("Pl. Br.") at 7), that on March 5, 2001, its then-employee Del Hyland notified Mr. Menchaca of a differing site condition. The Government's March 5, 2001 Quality Assurance Report ("QAR") states only that "the amount of cut does no [sic] balance with the amount of fill." Defendant's Exhibit ("DX") 79-13. ACE's March 9, 2001 QCR, which the Government did not receive until March 12, 2001, also refers only to a need for dirt. PX 51 at p.2. However, even if, in early March 2001, the Government understood that ACE was claiming that the site was not producing the fill that the contract indicated it would, it reasonably investigated that issue. On March 8, 2001, the Government asked its design firm whether the firm had been instructed to design a balanced job. Tr. 1255. The firm responded that the Government had not instructed it to design a balanced job. Tr. 1255. The Government understood from that response that the design firm did not know whether the job was balanced. Tr. 1255. The Government was also aware at the time

that the contract did not state that the job was balanced, and concluded that the contract did not represent that the job was balanced. Tr. 1256. The Government therefore reasonably concluded that any additional fill was ACE's responsibility, and informed ACE of that conclusion on March 14, 2001. PX 44. Because ACE had not yet informed the Government of its claim that site elevations were different from contract indications, the Government was under no obligation to investigate whether site elevations differed from those indicated in the contract.

ACE's March 13, 2001 QCR does not constitute notice of its claim that site elevations were lower than the contract indicated. That QCR, written by Mr. Hyland, states "To pole is 2' lower than original & plans say." PX 52 at p.2. ACE did not call Mr. Hyland as a witness to explain what that sentence meant, and Mr. Menchaca, who reviewed ACE's QCRs (Tr. 1074) did not review that QCR until April 16, 2001. PX 79-48. Moreover, Mr. Menchaca did not understand that QCR as a claim that site elevations were lower than those indicated in the contract (Tr. 1134); he understood it to be referring to a light pole on the site, and recorded in the Government's March 13, 2001 QAR that he "disagree[d] with Dels [sic] comment on pole being 2' lower." Tr. 1075-76; PX 79-48. Although ACE claims that Mr. Hyland used the term "topole" to refer to "topographical survey" in a January 26, 2001 QCR (Pl. Br. at 8-10 n.4),

Mr. Hyland used the phrase "to pole" in the March 13, 2001 QCR (PX 52 at p.2); not the term "topole."

ACE did not notify the Government that site elevations differed from contract elevations during a March 22, 2001 meeting. Although there was discussion of ACE's need for fill at that meeting, there was no discussion of any discrepancy between elevations at the site and those indicated in the contract. Tr. 1077-78, 1137-38. Indeed, Mr. Fletcher testified only that "the problem [ACE] had" was explained to the Government at that meeting. Tr. 108. Discussion between ACE and the Government of a discrepancy between site elevations and contract indications did not occur until an April 2, 2001 meeting. Tr. 1161-62.

Even if ACE notified the Government by March 22, 2001, that site elevations were different than contract elevations, ACE had already disturbed the site and prejudiced the Government by then. By the end of January 2001, ACE had leveled 75 percent of the site (DX 77-74) and by February 7, 2001, it had cleared and grubbed the entire site. DX 78-23. ACE began excavating the site in early February 2001 (Stip. ¶ 7), and worked on leveling the loading pad throughout that month. Tr. 146. By early March 2001, the "footprint" of the job could already be seen and ACE had begun building up the road, taxiway, and pads. Tr. 149 at 4-

13,[1] 1071-72; PX 45, PX 51, PX 52. On March 22, 2001, ACE was already checking grades on the loading pad. PX 56.

ACE relies upon the testimony of its expert, Louis Wenick, and ACE's president, John Fulkerson, to argue that the Government could have checked spot elevations in March 2001 to verify ACE's claim. Pl. Br. at 12. Mr. Wenick, however, testified only that the Government could have surveyed the status of the excavation of the ditches (Tr. 987), and Mr. Fulkerson testified that the Government could have verified that ACE was at the limits of the excavations (Tr. 328); neither testified that the Government could have conducted a survey of the pads, road, and taxiway in March 2001, to determine whether and to what extent there were discrepancies between contract and site elevations. In fact, by March 2001, it was not possible for the Government to collect the survey data that would have enabled it to conduct a comparative analysis of the type that Mr. Fulkerson described (Tr. 305-10) having performed of the contract drawings and SLI's survey. And considering that ACE had built up the site, lowering the site would have required removing fill already placed. Tr. 1189-90.

---

[1] In Defendant's Post-Trial Brief at page 5 we cite to DX 79-15 in support of our contention that ACE had begun hauling dirt to the taxiway by March 5, 2001. At trial we identified that exhibit (Tr. 148-49), but did not offer it into evidence. We regret having cited to an exhibit that was not admitted into evidence; however, Mr. Fletcher's testimony (Tr. 149 at 4-13) regarding DX 79-15 establishes that ACE had begun hauling dirt to the taxiway by March 5, 2001.

The Government is not required to prove that the site could have been lowered to prove prejudice. The Government can show prejudice by showing that late notice obscured the alleged differing site condition. John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 533 (3d ed. 1995). It can also prove prejudice by showing that a lower cost alternative might have been preferred. See George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 291 (2005). The Government proved that with timely notice it would have pursued lowering portions of the site. Tr. 1164-67. Even if the entire site could not have been lowered, portions of the site might have been lowered. Tr. 1166-67. Although the project designer testified that one of the considerations for the design elevations was to control water runoff (Tr. 480 at 9-11), he did not testify that the need to control water runoff would have precluded lowering portions of the site.

In addition, ACE failed to comply with specification section 01720 of the contract (PX 177 at vol. (a) § 01720 p.1) by failing to verify site elevations before proceeding with construction. Tr. 1164. That section is designed to avoid the verification and remediation problems that arise after construction has begun where the contractor claims that site conditions are different than those indicated in the contract's survey data but gives notice of that claim late; that is, after

construction has begun. See PX 177 at vol. (a) § 01720 p.1. ACE's notice to the Government that site elevations were lower than the contract indicated was late because it was not provided before construction began. Tr. 1164. Because late notice of a differing site condition increases the burden a contractor bears in proving a differing site condition claim, see Gulf & Western Industs. v. United States, 6 Cl. Ct. 742, 756 (1984); Administration of Government Contracts 533, ACE bears an increased burden of proving that claim.

ACE did not prove its constructive acceleration claim. To prove such a claim, the contractor must prove that it notified the Government that the Government had ordered acceleration. See Fru-Con Constr. Corp. v. United States, 43 Fed. Cl. 306, 328 (1999). Even if ACE proved that the Government constructively ordered acceleration, it did not prove that it notified the Government that the Government had ordered acceleration.

ACE failed to establish that the work it performed obtaining additional fill reduced its productivity. A contractor claiming that the Government has reduced its productivity must present specific evidence of how its work was disrupted or performed inefficiently as a result of the Government's actions. See Jackson Constr. Co., Inc. v. United States, 62 Fed. Cl. 84, 104 (2004). For example, a contractor may compare a period of work that was unaffected by the Government's actions with an affected

period to isolate the reduction in productivity caused by the Government's actions. See Administration of Government Contracts 746. ACE failed to compare the period during which it obtained allegedly additional fill to the period before it performed that work, and failed to present specific evidence of how its work was disrupted or performed inefficiently as a result of the additional fill work. And ACE's lost productivity and constructive accelerations claims are based in part upon Mr. Wenick's assumption that the 53 days that ACE claims to have worked obtaining additional fill from March 23 through May 15, 2001, was responsible for all the overtime that ACE worked through to June 2002. Tr. 998. That assumption is unreasonable because delays to later concrete work substantially delayed completion of the job. Tr. 999 at 22-25.

Of the $476,401.63 that ACE claims in its dirt fill claim for "additional grading," $70,839.32 is attributable to the alleged costs of operating rental equipment. PX 175A at p.3. Although we agree that use of the Corps of Engineers Construction Equipment Ownership and Operating Expense Schedule is not appropriate to estimate the operating costs of rental equipment, the Court should in no case award those operating costs. The preferred method for proving the amount of an equitable adjustment is through the submission of actual cost data. Doninger Metal Prods., Corp. v. United States, 50 Fed. Cl. 110,

125 (2001). To prove damages through the actual cost method, a plaintiff must present specific documentation of the expenses caused by the Government's change. Id. A contractor should segregate costs associated with a Government change where it is feasible to do so, and especially where the contractor can anticipate submitting a large claim. Delco Elec. Corp. v. United States, 17 Cl. Ct. 302, 321 (1989), aff'd, 909 F.2d 1495 (Fed. Cir. Jul 18, 1990) (Table). ACE failed to prove that it was not feasible to segregate the cost of operating the rental equipment it used to produce fill from March 23 through May 15, 2001, and should have segregated those costs beginning on March 23, 2001; particularly because it claims that it advised the Government on March 22, 2001, that the project would require 143,900 additional cubic yards of fill. Pl. Br. at 9. Subtracting $70,839.32 and associated markups from $476,401.63 leaves $324,315.08 for additional grading.

In no case, however, should the Court award $324,315.08 for additional grading. The measure of an equitable adjustment is the difference between what it cost to do the work and what it would have cost it if the unforeseen conditions had not been encountered. SAB Constr., Inc. v. United States, 66 Fed. Cl. 77, 85 (2005). ACE did not foresee that cut and fill would balance; it claims that it foresaw that the site would produce 40,000 to 50,000 cubic meters or cubic yards of excess fill. Tr. 230

at 19-23. In its certified claim to the contracting officer, ACE claimed that an additional 125,000 cubic yards of fill were required to overcome that condition. PX 176 at p.175002. If the Court finds that ACE is entitled to an equitable adjustment upon that claim, it should use 125,000 cubic yards as a basis and subtract a proportionate estimate of what it would have cost to grade off and truck off 50,000 cubic yards from the site. (Although ACE claims that would-be subcontractors proposed to perform at a reduced price in exchange for access to excess fill (Pl. Br. at 3 n.2), ACE did not receive those proposals until after bidding (Tr. 269-70) and, therefore, those proposals are irrelevant.) Because 50,000 is 40 percent of 125,000, the Court should in no case award for the dirt fill claim more than 60 percent of $324,315.08: $194,589.05.

The Court should not award the return of liquidated damages for any additional grading. The contract provided for liquidated damages in the event of late completion. PX 177 at vol. (a) § 01000 ¶ 1.1. The contract completion date was December 31, 2001. Stip. ¶ 3. ACE claims that additional grading delayed project completion by 53 days. PX 176 at p.175002. ACE, however, also claims to have learned on January 9, 2001, that site elevations were different than contract indications. Pl. Br. at 5. On February 20, 2001, ACE submitted to the Government a Construction Progress Chart projecting that it would complete

work by November 5, 2001. PX 47 at p.2-4. Even if ACE could show that additional grading delayed project completion beyond November 5, 2001, it cannot show that additional grading delayed project completion beyond the contract completion date because 53 days after November 5, 2001, was only December 28, 2001.

II. Defective Specifications Claims

Because there is no evidence that ACE relied upon the internal assumptions of the Government's design firm or upon the assumptions of Cambro Construction, Inc. ("Cambro"), in preparing its bid, ACE cannot rely upon those assumptions to prove the defective specifications claims raised in this case. See Renda Marine v. United States, 66 Fed. Cl. 639, 655 (2005).

ACE claims that conflicts between the typical sections and the plan elevations prevented it from grading the subgrade to the "blue top" elevations without unanticipated work, and appears to claim that it always planned to use a laser-equipped motor grader to subgrade but even that machine was unable to subgrade properly. Pl. Br. 19. Contradicting that claim, ACE stated on July 19, 2001, that it was "able to achieve specified grade tolerance with the equipment that [it] already had on site" but was mobilizing a laser-equipped motor grader to "provide even greater grade control." PX 72. In addition, on August 15, 2001, ACE stated that "the problems with the concrete to-date have been finishing problems and not thickness or subgrade elevation

problems" (PX 74 at p.2), and, on September 26, 2001, stated that "[t]here has been only one instance where the subgrade was out of tolerance." PX 99 at p.1.

The Court does not possess jurisdiction to entertain a claim that the specifications were defective in that they did not state a preference for slipform paving over rigid form paving. In a Contract Disputes Act case such as this, a contractor may not raise claims that were not presented to the contracting officer. See Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987). The contractor must submit to the contracting officer a clear and unequivocal statement that gives adequate notice of the basis of the claim. Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). The only concrete paving claims that ACE raised to the contracting officer were that specification section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long forms and that specification section 02753 ¶ 1.3.7 was defective in that it required profilograph testing. PX 174 at p.2.

Even if the Court possesses jurisdiction to entertain a claim regarding the applicability of rigid form paving to the project, the Court should deny that claim. A contractor cannot establish a defective specifications claim where it cannot establish that it acted as a reasonably prudent contractor in interpreting the contract documents. Comtrol, Inc. v. United

States, 294 F.3d 1357, 1365 (Fed. Cl. 2002). An experienced contractor is not misled by a Government-prepared specification where it had reason to know that the specification was defective. See L.W. Foster Sportswear Co. v. United States, 186 Ct. Cl. 499, 508, 405 F.2d 1285, 1290 (1969). If the contract specifications are defective in that they do not state a preference for slipform paving, ACE had reason to know of that defect when it bid. The contract allowed slipform paving and rigid form paving. PX 177 at vol (a) § 02753 p.25. Mr. Fulkerson testified that the contract required the use of concrete with no more than a two-inch slump. Tr. 390-91. He also testified, based upon his experience, that a rigid form paving system was incompatible with a two-inch slump. Tr. 392 at 15-19. He testified that any experienced concrete contractor would know that. Tr. 749. He also testified that a two-inch slump is not incompatible with slipform paving. Tr. 750. Because ACE chose rigid form paving despite having reason to know that slipform paving was more suitable, it was not misled into bidding based upon an assumption that rigid form paving would work as well as slipform paving.

ACE did not prove that Cambro could not have used forms that were over three meters long. In fact, ACE advised Cambro to use different length forms so that when the subgrade slope changed, the form could change slope. PX 99 at p.1. ACE also terminated Cambro for default, in part because Cambro failed to provide the

correct length of forms to match break points in the grade. PX 98 at p.1 ¶ 2. ACE is an experienced paving contractor (Tr. 199 at 1-6); it would not have advised Cambro to acquire forms of different lengths or have terminated Cambro in part for failure to use forms that matched break points unless forms longer than three meters could have been used. In fact, forms longer than three meters could have been purchased. Tr. 821. Had Cambro used forms that spanned panel points, it would have had no problems setting forms. Tr. 779-80, 887. The remaining form problems that Cambro alleges - the rocking and cradling of the paving machine (Tr. 887) - were insignificant because, given the distance between panel points, the elevation differences between panel points were minor. Tr. 1247-48.

ACE confirms that it claims that the Government directed it to use a profilograph test that, prior to bid, it did not plan to use. Pl. Br. at 25. It presented no first-hand evidence, however, that the Government directed it to use the profilograph test. Furthermore, Cambro's concrete, on occasion, passed the profilograph test. Tr. 417, 1091, 1250-51. ACE also claims $41,465 for concrete grinding (Pl. Br. at 28), but a facsimile from ACE to Cambro proves that the grinding was necessary because the concrete failed the straightedge test. DX 221.

The Court should award no damages for delays to subgrade or concrete paving activities. To recover delay damages, a

contractor must present a critical path analysis that indicates the interrelationships between preceding and succeeding activities, Mega Construction Co., Inc. v. United States, 29 Fed. Cl. 396, 434 (1993), and identifies the time that each critical path activity remained on the critical path. See Youngdale & Sons Constr. Co., Inc. v. United States, 27 Fed. Cl. 516, 550 (1993). Periods of alleged delay are non-recoverable where the contractor caused a concurrent delay. Orlosky Inc. v. United States, 64 Fed. Cl. 63, 70 (2005). A contractor must, therefore, disentangle its delays from those that the Government allegedly caused. See Mega Constr., 29 Fed. Cl. at 424.

Concrete paving, not grading of the subgrade, delayed the work that followed earthwork activities. PX 99. Either through its own or Cambro's actions, ACE delayed concrete paving. Cambro failed to perform in a timely or good and workmanlike manner, and delivered defective goods and materials. DX 232 at p.4 ¶ 27; DX 233 at p.3 ¶¶ 19, 20. As early as July 2001, Cambro had adversely affected ACE's schedule: its submittals were late and its forms required modification prior to beginning work. PX 72. During the period July 12 through July 17, 2001, Cambro removed its forms, refused to set forms, and left the site. DX 83-46, DX 83-52, DX 83-56, DX 83-64, DX 83-69.

In addition, Cambro was unable to pour concrete from August 15 through August 17, 2001, and from September 11 through

17, 2001, because its concrete placer was not on site. PX 99 at p.1, PX 95. Machinery problems delayed Cambro's work (Tr. 872-73), and, at least for a time, Cambro performed inefficiently by performing small concrete pours. PX 74 at p.2. Cambro operated its screed improperly, failed to finish concrete properly, drilled holes in incorrect locations, failed to provide the correct length forms or enough forms to pour concrete every day, and poured concrete in large piles in front of its paving machine, causing the machine to come off the forms. PX 98 at p.1; PX 99. Cambro's concrete supplier suspended concrete deliveries because of non-payment. PX 98 at p.1.

Cambro also abandoned the project in September 2001. PX 98 at p.1. On September 24, 2001, Cambro stopped work (Stip. ¶ 25), and ACE terminated it for default the next day for failure to prosecute the work diligently. Stip. ¶ 26; PX 98. Cambro employees returned to the jobsite on October 8, 2001 (Stip. ¶ 29), but between September 24 and October 8, 2001, ACE failed to ensure that concrete paving operations continued, even though in the weeks leading up to Cambro's leaving the job, ACE had looked into hiring a contractor with a slipform paver. Tr. 612 at 14-17; PX 100 at p.3. Indeed, one slipform contractor had informed ACE that it could complete the concrete work within six weeks (Tr. 612 at 18-25), and ACE informed the Government that it had received a verbal commitment from a slipform

contractor that could begin work on the project within a week of receiving a notice to proceed. PX 100 at p.3. Instead of immediately replacing Cambro with another concrete subcontractor when Cambro stopped working, ACE allowed the drainage layer that it had placed in preparation for concrete pavement to fill with sand during Cambro's absence, requiring rework before Cambro could resume paving; delaying the resumption of concrete paving operations until well into November 2001. Tr. 410-11; DX 88-35, DX 88-71.

Furthermore, the delay analysis offered by Mr. Wenick (PX 175 at Tab 25) does not identify the interrelationships between critical path activities or the time that activities remained on the critical path, and does not account for delays to project completion caused by events such as Cambro's abandonment of the job, ACE's failure to prosecute paving activities during Cambro's absence, and ACE's failure to maintain the jobsite ready for immediate resumption of paving operations upon Cambro's return.

In addition, the defective specification damages that ACE and Cambro claim are based upon estimates rather than contemporaneous tracking of actual costs. Tr. 372-73, 873-74. Such estimates are insufficient proof of damages. See Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 698, 369 F.2d 701, 714 (1966).

Finally, Cambro claims Eichleay damages. Tr. 882; PX 144 at p.9-10. To be eligible for Eichleay damages, however, a contractor must prove that it was on standby during a Government-caused delay of uncertain duration. Nicon, Inc. v. United States, 331 F.3d 878, 883 (Fed. Cir. 2003). The Government did not cause ACE's forces to be on standby for an uncertain duration; rather, ACE failed to ensure that concrete paving continued when Cambro stopped work. Stip. ¶ 25; Tr. 410.

## CONCLUSION

For these reasons and those set forth in our post-trial brief, the Court should dismiss the complaint, with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-4325
Facsimile: (202) 514-7965
Attorneys for Defendant

OF COUNSEL:
REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

December 19, 2005

Certificate of Filing

I hereby certify that on December 19, 2005, a copy of the foregoing Defendant's Reply To Plaintiff's Post-Trial Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail