**UNITED STATES COURT OF FEDERAL CLAIMS**

*****************************

**ACE CONSTRUCTORS, INC.,**

**Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS,**

**Defendant.**

*****************************

**No. 04-299 C**

**Judge Charles F. Lettow**

**ACE'S REPLY BRIEF**

Plaintiff ACE Constructors, Inc. ("ACE") files this Reply Brief in accordance with the Court's pretrial order and provides as follows.

## I. AS DESIGNED THE PROJECT SHOULD NOT HAVE REQUIRED IMPORTED FILL MATERIAL

The viability of ACE's "Dirt Claim" does not depend on whether the bid documents represented that the site would yield 50,000 cubic yards of excess material, 20,000 cubic yards of excess material, or even 1 cubic yard of excess material. Rather, the Dirt Claim is founded on two undisputed facts. First, the bid documents indicated there would be enough fill generated from on-site "cuts," i.e., plan excavations, to construct the Project as designed. Second, by mid March 2001, ACE had excavated to the depths and widths shown on the bid documents, yet approximately 125,000 cubic yards of additional fill material was still needed to construct the Project as designed. ACE seeks payment for the extra work performed to generate, place and finish the additional dirt work to construct the Project.

### A. ACE's Calculations are in Agreement with Those of CMT

CMT acknowledged that it designed the ditches and ponds specifically for the purpose of generating enough fill material to construct the Project, and thus obviate any need for imported fill.

ACE, in turn, concluded from the bid documents that fill material generated from the excavation of the ditches and ponds would suffice to construct the Project without any imported fill.

The COE attempts to muddy this simple issue by arguing that an inconsistency exists in John Fulkerson's trial testimony on the quantity of anticipated excess fill. No inconsistency exists. By letter dated August 15, 2001, Mr. Fulkerson informed the COE that "the topo documents [sic] provided by the Corps that was[sic] utilized for bid takeoffs indicated that there was approximately 20,000 cubic yards of excess dirt on-site" (PX 76). Mr. Fulkerson acknowledged at trial that the 20,000 cubic yard figure was in error. He explained that *based on the Dirt-Tek analysis* of the bid documents the site was essentially balanced (see below), and ACE included $20,000 (and not 20,000 cy) in his bid price for the cost of removing approximately 5,000 cubic yards of excess material (T 527-28). By contract, on direct examination Mr. Fulkerson was asked about the takeoff *he had performed* pre-bid based on the cut and fill numbers provided by the COE in the bid documents (T 229-230). Mr. Fulkerson testified that his takeoff indicated that the cut and fill operations should generate an estimated 40,000 to 50,000 cubic yards of excess fill (T 230).[1] Thus, Mr. Fulkerson addressed two different pre-bid estimates that, although varying in magnitude, confirmed the central fact that no imported fill would be needed to construct this Project. As a prudent contractor, ACE included an amount in its bid price to defray the cost of disposing of the anticipated excess fill in case it was not able to either sell the fill or get someone to remove the excess fill free of charge.

Nevertheless, both numbers demonstrate that "the topographical representation that the Corps provided for this project indicated that there was more than an adequate amount of dirt on-site to complete this project in accordance with the specifications" (PX 76). Mr. Fulkerson testified in detail as to how ACE performed its pre-bid takeoff:

[1] Mr. Fulkerson's testimony that the cut and fill sections contained in the contract documents resulted in an excess of "40 to 50,000 cubes" is fully supported by CTM's own takeoff dated January 8, 2002 (PX 122). Mr. Fulkerson noted as much when he testified that the "cut-and-fill areas [used by CMT] are the same areas that are shown on the drawings. So those are the same areas we used. And the end result is roughly order-of-magnitude the same result we got. I don't know that we got exactly the identical numbers at each station, because I don't have our calculations to compare. But we came up with the same result" (T 232).

> Q What use, if any, did you or others at Ace make of these cut-to-fill sections in your bid?
> A We did the same calculation to see what the -- that was one of the ways that we looked at what the balance condition would be on the job. Would it be an import job, or would be an excess job, or would it be a balanced job?
>
> Q All right. Did you convert these cut-to-fill numbers into volume?
> A Yes, we did.
>
> Q And what did the computation tell you, as to whether the project would be an excess job, a borrow job or a balanced job?
> A It told us that it would have excess fill material, because the cut volumes were greater than the fill volumes.
>
> Q And do you recall, pardon me. Do you recall how much excess fill these cross-section sheets reflected the job would generate?
> A As I recall, between 40 and 50,000 cubes. And I can't remember whether it was cubic meters or cubic yards.

(T 230).

Every estimate or takeoff presented in this case is in agreement as to the central underlying fact – no imported fill would be needed to construct this Project. The magnitude of the expected excess is of no relevance as ACE is not seeking to recover the loss of revenue that it might have earned from the sale of the excess fill, nor does the magnitude of the *anticipated* excess fill otherwise factor into the damages sought by ACE in this action.

It is undisputed that ACE had to double the size of the planned excavations and had to import fill from the Dan Williams project. It is undisputed that these actions were not anticipated at the time of bid by anyone connected with the Project. It is thus undisputed that ACE performed additional work, for which the COE has refused to pay.

**B. Dirt-Tek's Analysis**

**1. Dirt-Tek's Analysis is in Agreement with Those of CMT and ACE**

ACE used the services of a company called Dirt-Tek, Inc. in preparing its bid on the Project (T 234). Mr. Fulkerson testified that the Dirt-Tek analysis (PX 176 – 175037) indicated the site was balanced in terms of cut and fill. More specifically, Mr. Fulkerson testified that the Dirt-Tek analysis

reflected the Project would *require* 151,408 cubic yards of fill and would *generate* 151,628 cubic yards of fill (T 527) (PX 176-175037). Thus, the Dirt-Tek analysis indicates that the site would produce an excess quantity of fill in the magnitude of 220 cubic yards – or essentially a balanced job.[2]

The COE is correct that Dirt-Tek's analysis did not account for the effects of shrinkage or swelling but, as testified to by Mr. Fulkerson upon inquiry by the Court, taking both into consideration would largely cancel out their effect and result in the actual numbers presented by Dirt-Tek as being close to correct:

> THE COURT: As a construction engineer, what does a shrinkage factor for soil in this context mean?
> THE WITNESS: It means measurement -- if you bring loose fill into an area in a truck, dump it out and then you compact that fill into embankment, it will shrink 22 to 24 percent, this particular soil.
>
> THE COURT: That's with appropriate treatment we talked about, moisture and other factors, yesterday. Is that correct?
> THE WITNESS: That's correct. That's to get it within the acceptable moisture range and acceptable density.
>
> THE COURT: Do you know what the swelling is of the soil that was removed from the ditches and ponds at the site?
> THE WITNESS: It is going to be very similar, 20 to 25 percent. You can generally compact the soil a couple percent more than it will swell. When you put it in, compact it in place, it's going to probably be a couple percent more dense than in natural conditions.
>
> THE COURT: Thank you. That's really what I was driving at.

(T 339-40).

Further, it is clear from the face of the Dirt-Tek report itself that the Dirt-Tek analysis is of only a portion of the Project as it does not take the entire length of the cut and fill activities into account. A note on the report provides: "Access road sta. 1+350 to end. No earthwork calculations

---

[2] The COE notes in its brief that its trial counsel represented to the Court that Mr. Bice of Dirt-Tek was expected to testify that Dirt-Tek's report did not reflect a balanced job (Defendant's Initial Brief, p. 8). However, this reference to counsel's statement should be stricken as: (1) Mr. Bice did not testify, (2) Mr. Bice was not deposed, (3) COE counsel did not purport to make a formal proffer, (4) argument of counsel is not evidence, (5) the statement is hearsay not subject to any exception, and, as explained further herein, (6) the statement is incorrect.

due to unreadable existing grade contours" (PX 176 – 175037).[3] However, if the volume calculations performed by CMT in its analysis of January 9, 2002 (PX 122) for the stations greater than 1+350[4] are totaled, another 16,600 cubic meters (21,712 cubic yards) of excess fill would need to be added to what Dirt-Tek already indicated to be a balanced site. In short, Dirt-Tek's conclusions are completely consistent with those of CMT and ACE – no imported fill would be needed to construct this Project.

**2. Testimony Regarding Dirt-Tek's Analysis Would Have Been Cumulative**

Based only on a review of the COE's Post-Trial Brief one would conclude the COE had not called its chief designer to testify at trial.[5] A review of Mr. Herrin's testimony and documentary evidence generated by him during the design and construction phases of the Project reveals why the COE seeks to ignore Mr. Herrin's testimony altogether – Mr. Herrin was an exceptional witness for ACE.

On February 23, 2000, CMT provided the COE with the benefit of its review of the cost estimate prepared from CMT's 35% design documents (PX 15). The cost estimate of $14,562,179 was approximately $5,000,000 over the COE's $9,749,065 budget. CMT offered several comments designed to lower the estimated costs of construction; none more significant than its recommendation that imported fill would not be needed on the Project (T 469)(PX 15). CMT's recommendation that imported fill would not be required and should be eliminated from the cost estimate represented a pre-bid cost savings to the COE of $2,603,692 (T 469)(PX 15).

[3] The COE argues that the Dirt-Tek report "does not indicate what documents Dirt-Tek relied upon" (Defendant's Post-Trial Brief, p. 7). However, it is readily apparent that Dirt-Tek used the elevations contained in the grading plans contained in the contract drawings, sequence numbers 24-29, as: (1) Mr. Fulkerson testified this was the information he provided to Dirt-Tek (T 244); (2) Mr. Fulkerson testified as to how Dirt-Tek performed its quantity takeoffs from the information provided to it (T 244-45); (3) in fact, the elevations become very difficult to read at around station 1+350 (PX 180); and (4) the ponds are located at station 2+000.

[4] This analysis excludes stations 2+000 through 2+080 which include the pond quantities that were already included in Dirt-Tek's analysis. Note that Dirt-Tek calculated that the pond excavations would yield 20,666 cubic yards of fill while the CMT analysis indicates that the excavations for the relevant stations would yield approximately 27,000 cubic yards of fill – or roughly the same magnitude.

[5] In over 30 pages of argument, the COE makes no reference whatsoever to Mr. Herrin's testimony.

CMT then obtained COE approval to use the cuts from the Project site to generate the fill needed to construct the Project so to avoid the expense of importing fill material (T 469-70). In its 90% Design Narrative, CMT discussed several important considerations that influenced the profile design of the Project:

> The profile design was based largely around several important parameters to achieve an acceptable profile and pavement structure:
>
> - The high points along the profile are the middle of the two apron pavements to insure proper drainage. . . .
>
> - Ditches will be cut on both sides of the proposed taxiway and apron to a location just north of the pallet storage apron. The ditches will be required for two reasons: First, sheet flow from the proposed pavement will collect in the new ditch, as will overland flow form the east that his now being trapped. Second, fill is needed for the raised profile of the new taxiway and apron. The ditches will be oversized to satisfy the amount of earth needed for the taxiway and apron profiles.
>
> - The surface drainage of the site via the ditches dictated the overall profile of the taxiway, apron, and pallet storage area.
>
> - The ditch width was determined based upon achieving a balance between cut and fill using a shrinkage factor of 10%.

(PX 18, p. 34). Mr. Herrin testified that based upon COE approval to balance the earthwork, CMT purposefully oversized the ditches on the Project adjacent to the loading pad to provide the necessary fill material (T 472). More specifically, CMT established a ditch bottom width of 8.61 meters in the final plans because that dimension was needed to achieve a balance between cut and fill using a material shrinkage factor of 10 percent (T 472-73)(PX 18).

Mr. Herrin testified that in January 2002 CMT calculated that its design should have yielded 53,308 cubic meters of excess fill (T 465)(PX 122). Likewise, in February 2003, CMT reviewed ACE's Dirt Claim and verified that "ACE's original earthwork calculation[s] were in the same magnitude as CMT's" (PX 140, p. 3). CMT had calculated, pre-bid, that the Project cuts should have yielded 127,391 cubic yards of fill, while ACE had calculated, pre-bid, 130,962 cubic yards (PX 140). CMT also confirmed the volume of additional fill that would be needed based on the

comparison of the two surveys was of the same magnitude as the 125,000 cubic yards estimated by ACE. Finally, CMT concluded that the amount then claimed by ACE for performing the additional work ($580,485) was a reasonable cost (PX 140).

Mr. Herrin confirmed the accuracy of ACE pre-bid assumptions that the cuts would produce approximately 130,000 cubic yards of fill and that no imported fill would be required to construct the Project. After Mr. Herrin's testimony, testimony from Mr. Bice of Dirt-Tek would have been entirely cumulative and a waste of trial time.

### 3. No Inference Can be Drawn Because the Dirt-Tek Representative Did Not Testify

In support of its argument that ACE has not proven its entitlement to an equitable adjustment, the COE requests that this Court to draw an adverse inference from the fact that ACE did not call a Mr. Bice to testify at trial (Defendant's Post Trial Brief, pp. 20-21). The COE's request on this point fails as a matter of law.

#### a. Mr. Bice was Equally Available, or Unavailable to Both Parties

"[I]f a party has peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41 (1893) (emphasis added). "'The general rule is that no such inference may be drawn by a jury because a party fails to call as a witness one who is in a legal sense a stranger to him and is equally available to the other side.'" *Brown v. United States*, 414 F.2d 1165, 1167 (D.C. Cir. 1969) (quoting *Egan v. U.S.*, 52 App. D.C. 384, 396, 287 F. 958, 970 (1923)); *see also Dent v. United States*, 404 A.2d 165, 169-70 (U.S. App. D.C. 1979) (emphasis added) (citing federal authority); *A.B. Dick Company v. Burroughs Corporation*, 798 F.2d 1392, 1400, n. 9 (Fed. Cir. 1986) ("An unfavorable inference may not be drawn from the lack of testimony by one who is equally available to be called by either party.") (emphasis added); *and United States v. Johnson*, 467 F.2d 804, 808 (1st Cir. 1973) ("No inference is permissible, however, . . . where the evidence is equally available to either party.").

The COE has failed to meet its burden of demonstrating that Mr. Bice was within ACE's peculiar physical or constructive control, and therefore is without basis to obtain any adverse inference against ACE. The Federal Circuit Court of Appeals has observed:

> When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable. [Citation omitted]. Generally, <u>the opposing party must establish that the missing witness was peculiarly within the adversary's power to produce</u> by showing that the witnesses were unavailable to be called. . . . [Citation omitted]. This generalization is not applicable, however, where the likelihood of bias of the potential witnesses is great, and in such a case the witnesses are not considered "equally available" to both parties. For instance, employees are usually not considered to be "equally available." [Citation omitted].

*A.B. Dick Company*, 798 F.2d at 1400, n. 9 (emphasis added); *see also U.S. v. Simpson*, 974 F.2d 845, 848 (7th Cir. 1992) ("[W]hen the witness is equally available to both sides, the preferred practice is to preclude the argument rather than to leave [the finder of fact] free to speculate about a lot of non-evidence.")

No inference can be drawn as the testimony of Mr. Bice was equally available – or, rather, equally unavailable – to both ACE and the COE. In this case, the record is devoid of any evidence tending to establish that Mr. Bice is anything but a stranger to this case. He is not an ACE employee, nor is he an expert witness retained by ACE for purposes of testifying in this action. Absent a showing of substantial hardship by a party, a witness cannot be compelled to testify at a location more than 100 miles from a place where the witness resides or regularly transacts business. *See* RCFC 45(b)(2) and (c)(3)(B)(iii). In this case, the COE knew that Mr. Bice resides in South Florida, well outside the 100 mile limit for ordinary subpoena power (T 14). Because of an unforeseeable health condition, Mr. Bice could not travel to testify at the trial of this case (T 13). However, the parties engaged in off-record discussions indicating Mr. Bice would voluntarily make himself available to testify by telephone (T 13-16).

Counsel for COE represented that he had spoken with Mr. Bice by telephone prior to trial and could have contacted Mr. Bice to secure his testimony.[6] In fact, to the knowledge of ACE there was no impediment to the COE calling Mr. Bice (via telephone) as a witness in the government's case-in chief. Therefore, because Mr. Bice was equally available (or unavailable as the case may be) to both ACE and the COE, drawing an inference from Mr. Bice's absence would be improper.

b. Mr. Bice's Testimony Would Have Been Cumulative

In addition to failing to satisfy the first "peculiarly available" prong of the test for applying the missing witness doctrine, the COE has not fulfilled the second prong:

> Before the [finder of fact] is allowed to draw an inference to a party from the absence of a witness, the opposing party must also establish . . . that the missing witness would have given testimony likely to elucidate the transaction. [Citation omitted]. This means that the testimony, if given, would have been "an important part of the party's case, that his testimony would be not cumulative, and that it would be superior to other testimony already given on the matter." [Citation omitted].

*Dent*, 404 A.2d at 170 (emphasis added); *see also Johnson*, 467 F.2d at 808 ("No inference is permissible, however, where the unpresented evidence would be merely cumulative . . . ."). As noted previously, after Mr. Herrin testified Mr. Bice's testimony proved unnecessary and cumulative. For this reason alone, an adverse inference against ACE for his absence at trial would be improper.

**C. A Differing Site Condition Existed**

The COE, rather remarkably, contends that ACE failed to prove the actual conditions encountered differed materially from those represented in the contract documents (Defendant's Post Trial Brief, p. 22). To adopt this position, the COE would have this Court ignore the undisputed fact that ACE was required to drastically increase the width of the ditch and pond excavations beyond

[6] The COE's request for a negative inference also fails because there is no record that the COE made any attempt to secure Mr. Bice's testimony. "No showing was made of any effort whatever on the part of appellant's counsel to obtain [the missing witnesses'] testimony. The apparent failure of the appellant to take any steps to procure the testimony of these witnesses justifies the inference that their testimony would have added little, if any, benefit to appellant's case." *Gross v. Williams*, 149 F.2d 84, 86 (8th Cir. 1945); *see also Katkish v. District of Columbia*, 763 A.2d 703, (D.C. Ct. App. 2000) (affirming trial court's refusal to give missing witness doctrine jury instruction when appellant made no effort to subpoena the missing witness for trial or to obtain missing witness' testimony by deposition).

what was required in the contract documents in order to construct the Project to the profile elevations required by the design. As it is undisputed that the Project was designed so that the cuts from those excavations would provide enough fill to build the Project, and it is undisputed that excavating to the depths and widths shown on the contract documents did not produce enough fill to construct the Project as designed, the COE's assertion that no differing site condition existed is not credible.

The COE relies on the analysis of the United States Court of Claims in *Pacific Alaska Contractors, Inc. v. United States*, 436 F. 2d 461 (1971) in support of its position that no differing site condition existed. The facts in *Pacific Alaska* are markedly different than those at-hand. In *Pacific Alaska* the contract at issue was for the improvement of 8.7 miles of roadway of forest roadway in Alaska. Unlike the present case, the contract documents required the use of imported (or borrow) material to construct the project. It was undisputed that the contractor was required to use substantially more imported fill than indicated in the contract documents. Unlike the position taken by the COE here, the government in *Pacific Alaska* did not dispute the contractor was entitled to be paid for the additional work associated with the overrun in imported fill. In fact, the contracting officer paid the contractor in accordance with the contractual force account provisions based on the quantity of work performed. Rather, the issue presented was whether the contractor was entitled to payment for the additional imported fill under the changes clause (because of the existence of a differing site condition) or was limited to the force account payment received.

The *Pacific Alaska* court assumed that the "within-the-government calculations, defendant's agents intended or hoped the job would be balanced" but found that there were not sufficient "indications" of that intention expressed in the contract documents upon which the contractor could rely. *Id.* at 469-70. The information cited to by the contractor in support of its position was the estimated quantity information provided by the government for payment purposes. The court, however, focused on what it termed "frequent reminders" that appeared throughout the specifications that informed the contractor that the estimated figures were to be viewed with great caution in

reaching its conclusion that the information provided by the government was nothing more than "hopes, expectations, guesses or suggestions." *Id*. at 470.

The contract documents on this Project do not contain similar warnings, nor are the cut and fill numbers presented as "hopes, expectations, guesses or suggestions." The cut and fill numbers contained in contract drawing sequence numbers 66 through 88 are precise calculations taken directly from the comparison of specific survey elevation points and the required finish elevations. The cut and fill information[7] clearly indicates to prospective bidders that sufficient fill will be generated to construct the project. This is more than enough to underpin a differing site condition claim.

For a Type I differing site condition to exist the "contract 'indication[s] need not be explicit or specific' so long as they provide sufficient grounds by which the contractor can justify his 'expectation of latent conditions materially different from those encountered'." *Neal & Co. v. United States,* 36 Fed.Cl. 600, 617 (1996) (quoting *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984); *accord Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873, 875 (1970) ("[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract'.").

To determine what is "indicated," a "proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *Randa/Madison Joint Venture III v. Dahlberg,* 239 F.3d 1264, 1274 (Fed.Cir.2001) (quoting *P.J. Maffei,* 732 F.2d at 917). A reasonably prudent contractor would perform the take off of the cut and fill information provided by the COE and reach a conclusion as to whether it needed to include amounts in its bid price for importing additional fill. ACE did that take off based on cut and fill information and also retained the services of an outside consultant to perform an independent take off on the elevation information contained in

[7] Unlike the specifications in *Pacific Alaska*, there is no reference in the Contract Documents to any on-site borrow source or any specification that otherwise addresses how the contractor may obtain approval of an off-site borrow source.

the bid documents. All pre-bid information available to ACE was in accord – no imported fill would be needed. There can be no dispute that a differing site condition existed on this Project.

## II. ACE PROVIDED ADEQUATE NOTICE OF THE DIFFERING SITE CONDITION

### A. COE Mistakenly Asserts that ACE Failed to Identify an Elevation Problem Until April 2, 2001

Ignoring substantial evidence to the contrary, the COE mistakenly asserts that "ACE did not notify the Government of its claim that the site elevations were different than those indicated in the contract until April 2, 2001, at a meeting with David Wise, then Resident Engineer for the Army Corps of Engineer." (Defendant's Post Trial Brief, p. 5). However, the totality of the evidence establishes that the problem regarding the elevation discrepancy was brought to the attention of the COE before that date, and before ACE performed *any* additional work on the Project.

#### 1. The March 22, 2001 Meeting

Although Mr. Wise testified that the first time that he recalls learning that there was a problem with the elevations was at an April 2, 2001 meeting with Mr. Fletcher and Mr. Hyland (both of ACE)[8] in attendance, he is the only witness to testify about an April 2 meeting. While that meeting may, or may not, have occurred, the uncontradicted testimony is that ACE met directly with Mr. Wise on March 22, 2001 in Mr. Wise's office, and specifically for the purpose of discussing the elevation discrepancy. That meeting took place before any additional work had been performed by ACE on the Project.

Mr. Fulkerson, Mr. Fletcher and Mr. Hyland met with Mr. Wise on March 22 in Wise's office at Fort Bliss. (T 108-09, 313) (PX 56). Mr. Fulkerson testified that "the purpose of ACE calling the meeting was to show the Corps the SLI survey and the difference between the elevations on that survey and the elevations on the contract documents as they [the COE] had been requesting

[8] The reliability of Mr. Wise's recollection is called into question by his own trial testimony. Mr. Wise first testified that he recalled discussing the issue with Mr. Fulkerson and Mr. Fletcher, but is not certain that he discussed the elevation issue with Mr. Hyland (T 1161). However, he then testified that the first time that he learned of an elevation issue was at the April 2, 2001 meeting with Mr. Hyland in attendance (T 1162). Further, Mr. Fletcher and Mr. Fulkerson testified that Mr. Hyland was present at a meeting with Mr. Wise on March 22 to discuss the elevations issue (T 108, 314). Mr. Hyland's presence at that meeting is also confirmed by his QC report for that same date (PX 56).

us to do" (T 314). Mr. Fulkerson also testified that he showed Mr. Wise the full size SLI topographic survey that he had marked up and showed Mr. Wise that the differences were running about 18 to 22 inches (T 314-15). Both Mr. Fletcher and Mr. Fulkerson testified that Mr. Wise's response to the information was that it looked like "we have an 'Oh Shit' here" and to keep the job going, and to not stop the Project (T 109 & 315).

Mr. Menchaca's QA report for March 22 confirms that a meeting with David Wise took place that day (DX 79-084-85). After reviewing his desk calendar for the month of March 2001, Mr. Menchaca confirmed that Mr. Fulkerson was in attendance at the March 22 meeting (T 1145-46). Mr. Menchaca also confirmed that Mr. Fulkerson had brought full size drawings with him to the meeting with Mr. Wise (T 1146-47). In fact, mirroring Mr. Fulkerson's testimony, Mr. Menchaca testified that he recalled Mr. Fulkerson tossing the drawings on David Wise's desk (T 1148).

The COE's assertion that it did not learn of the differing site condition until April 2, 2001 is without merit.

**2. The March 13, 2001 Quality Control Report**

The COE was apprized of the elevation problem before the March 22, 2001 meeting with Mr. Wise. Section 5 of ACE's form QC report is entitled "Remarks" and instructs the QC representative from ACE, Mr. Hyland, to "Cover any conflicts in plans, specifications or instructions . . ." (PX 52). In the QC report for March 13, 2001, Mr. Hyland wrote in that section that the "Topole is 2' lower than original & plans say" (PX 52). "Topole" was the term used by Mr. Hyland as shorthand for topographic survey (T 77-78,).[9] For example, in the QC report for January 24, 2001 Mr. Hyland wrote "Finish Topole & Start Water Line Layout" in his description for the work being performed by ACE's surveyor, SLI (PX 39). On January 26, 2001 Mr. Hyland wrote "Topole Grid 95% Complete" (DX 77 – 074-75).

[9] Although, the COE attempted to say that it meant something else, even Mr. Menchaca had to concede that "topole" could not mean anything else in the context in which it was used (T 1136-37).

The COE was notified by ACE on March 13, 2001 that the SLI survey was two feet lower than shown on the plans. Surely, the COE is not justified in disavowing the design intent and attaching no import to this express notification that the plan profile did not match the existing grades as documented by ACE.

**3. The March 5, 2001 Written Notice**

The COE seeks to draw an artificial distinction between ACE's written notice on March 5, 2001 that it was running out of dirt and the elevation discrepancy. The distinction is one without substance as the issues are one and the same. A differing site condition was presented when ACE was nearing the end of the excavation shown in the contract drawings, yet did not have enough fill to construct the Project. This is because, as set forth at length above, the Project was designed so that the excavations would produce enough fill material. The comparison of the survey data only confirms the existence of the differing site condition and the COE's admitted lack of any understanding concerning the Project's design regarding imported fill was the only reason the COE did not understand the significance of ACE's March 5, 2001 notice.

Had the COE undertaken any investigation on March 5 it could have verified that ACE was nearing completion of the designed excavations and that additional fill was still needed. Had the COE undertaken any investigation on March 5 it could have verified for itself that the actual elevations were lower than shown on the plans. The COE opted to do almost nothing in response to ACE's differing condition notice of March 5.

**4. The January 29, 2001 Verbal Notice**

The COE completely ignores the testimony of Jerry Fletcher regarding his on site conversation with Mr. Fuentes on January 29, 2001. Mr. Fuentes was the COE's project engineer and he testified that he was on the Project on a daily basis (T 1232). Mr. Fletcher testified:

> Q Okay. Did you ever have any conversations with Mr. Fuentes about it?
> A Yes. One time.

> Q Okay. Tell us what you recall about that conversation.
> A Sometimes when Danny [Menchaca] was tied up on other jobs or was off from work, Mr. Fuentes would take Danny's jeep and ride the job. And he came by one day, and SLI was off of the jobsite, like 100 yards, shooting some elevations. And he stopped and asked me why they was out there. And it made me think that he thought we had made a mistake or didn't know where we was at, or what was going on.
>
> And I told him that they was saying that the elevations on their topo compared to the ones on the plan was a lot different. And I asked them to go out and shoot topos out there just to see if it was low all over the area, or just where we were working. And he said that as soon as Danny got back, we needed to get back with Danny about it. And he left.
>
> Q Do you recall the date of that conversation?
> A I think it was like the 29th or 30th of January. Something right there.

(T 91). Mr. Menchaca's desk calendar for the month of January 2001 indicates that he was on leave on January 29 providing confirmation to Mr. Fletcher's testimony (PX 156). Notice of the elevation discrepancy in January is significant as ACE had yet to begin its earthwork activities at the site and was still conducting its clearing and grubbing operations at that date. As of January 29, any disturbance of existing conditions was minimal.

Despite Mr. Fletcher's pointed testimony, Mr. Fuentes was not asked anything about the conversation during his testimony in the trial of this case. Rather, Mr. Fuentes was only asked in general terms when it was that he recalled learning that ACE was claiming that the contract elevations were different than the existing elevations (T 1235). His answer was that it was when he received a letter from Mr. Fletcher sometime in April 2001 (T 1235). Mr. Fuentes did not deny having the conversation with Mr. Fletcher. Nevertheless, the unrebutted evidence in this case is that Mr. Fletcher told the COE, before commencing with excavation, that the actual elevations were not matching with those contained in the contract documents.

**5. The January 9, 2001 Verbal Notice**

The COE also ignores the conversation Mr. Fletcher had with the COE's Mr. Menchaca on January 9, 2001. Mr. Fletcher testified that he first learned that their might be a problem with the elevations before ACE had started clearing and grubbing the site:

> Q And when did you first learn that there might have been a problem with the elevation of the project site?
> A About a week into the job, in January, I was out talking to the surveyor, and he said that his topo was running a lot lower than the topo that was on the plans.
>
> Q You say about a week into the job. Is that a week after your arrival?
> A Yes.
>
> Q Okay. And had you started clearing and grub[b]ing?
> A No. I think we started that day.

(T 88). Mr. Fletcher testified that he then spoke directly with Mr. Menchaca about the information that SLI had provided regarding the issue:

> Q Okay. What did you do after being told that information?
> A The next time Danny was on the job, I asked him about it. And he said that until we got the topo done, that we didn't know if we was going to be short or not. So there wasn't no need to get into it.
>
> Q He didn't -- and what specifically did you tell Danny as to what your understanding was?
> A I just told him that SLI said that the topo they were shooting was not close to the grades that was on the plans.
>
> ****
>
> Q Okay. And in that conversation did Danny tell you not to start clearing and grub[b]ing?
> A No.
>
> Q Did he give you any direction?
> A No. Like I said, all he said was get the topo done.

(T 88, 89). ACE started its clearing and grubbing operations on January 9, 2001 (ST 5). On March 6 Mr. Menchaca completed his QA report for the date of January 10, 2001 (DX 77 013-14). Mr.

Menchaca apparently did not recall that he was on site that day[10] or that the preparatory meeting for clearing and grubbing had taken place on January 10, 2001 (PX 37) (DX 77 013-14). According to Mr. Fletcher, he had discussed the elevation issue with Mr. Menchaca before the preparatory meeting took place. Nevertheless, Mr. Menchaca, knowing that there was at least an issue with the elevations instructed ACE to commence with clearing and grubbing (T 70-72, 75).

Mr. Menchaca likewise did not directly contradict Mr. Fletcher's testimony concerning the January 9, 2001 conversation. Rather, Mr. Menchaca testified that, in general, nobody from ACE ever told him that the elevations conflicted (T 1073). Mr. Menchaca admitted that he did not record every conversation that he had on the job in his QA reports (T 1113). In fact, Mr. Menchaca's practice was to complete his QA reports more than a month, often two months, after the date in question (T 1113-14). Thus, it is not surprising that there is no reference to the conversation with Mr. Fletcher in the QA reports, just like there was no mention of the clearing and grubbing preparatory meeting having occurred on January 10, or Mr. Fulkerson having been in attendance at the meeting with Mr. Wise on March 22.

Mr. Menchaca's trial testimony reflects that his memory of Project events is not wholly reliable. In addition to his confusion surrounding the preparatory meeting for clearing and grubbing and Mr. Fulkerson's attendance at the March 22, 2001 meeting with Mr. Wise, Mr. Menchaca testified that that SLI was not on site surveying before ACE mobilized to the site in January 2001 (T 1119). Mr. Menchaca is clearly mistaken on this point as is evidenced by COE exhibit 191 023-24. This exhibit reflects that SLI personnel on site as early as December 11, 2000.

ACE's evidence on this point is credible and compelling. The COE knew well in advance of April 2001 that ACE has encountered a differing condition. ACE provided repeated notices (verbal

[10] At trial, Mr. Menchaca first recalled attending the clearing and grubbing preparatory meeting on January 10, 2001 then testified that he was not on the Project site on that date based upon his QA report (T 1120-22). However, he conceded that his desk calendar was not consistent with the QA report because it indicates he was on leave the next two days, but not on January 10 (T 1124-25).

and written) and took no action to proceed beyond the lines and grades depicted in the original plans until the COE directed the nature and the extent of the additional work.

**B. Survey Verification Requirement was Satisfied, Waived or is of No Effect**

ACE did, in fact, verify the basic survey data provided in the contract drawings before disturbing the existing conditions. ACE's surveyors were working at the Project site about a month before ACE mobilized to the Project and surveyed in front of ACE's clearing and grubbing operations. ACE complied with all aspects of section 01720 with the exception that ACE started construction before it provided the results of the verification to the COE in writing. ACE provided the COE with verbal notice that the actual elevations were not matching the contract elevations both before clearing and grubbing and excavation activities were started. In both instances, ACE was directed by the COE representative to not delay the work, to proceed with the work (and thus disturbing the existing conditions), and to finish the topographic survey while earthmoving operations were underway. The COE thus waived any ability to rely upon section 01720 when it authorized ACE to commence with actual work on the site with the full knowledge that ACE had not yet fully completed verification of the basic survey data.

Furthermore, the COE attempts to elevate section 01720 to a status not afforded by the contract documents or judicial decisions. Verification of the contract survey information is not a condition precedent to recovery for a differing site condition; in fact, the contract documents do not provide for any consequence for the contractor's failure to comply with this requirement. The case cited by the COE is illustrative of the point. In *W.M. Schlosser Co., Inc. v. United States*, 767 F. 2d 870 (Fed. Cir. 1985) the court applied a similar verification requirement to deny a contractor's request for additional compensation *for the cost of performing the verification survey itself*. The contractor had ordered dampers of differing sizes based on the dimensions shown on the contract drawings and had not verified those dimensions before ordering the dampers. Significantly, and in stark contrast to the position taken by the COE in this case, the government did not dispute that it

was liable for the additional work that the contractor had to perform because the contract drawings were in error:

> So our AE firms take the best information they have [, such] as bills from previous contractors, and they put them on a set of contract drawings. That's the basis that everybody bids on. When you're the successful bidder, then you go in and do your field measuring. And if there's any difference between what we represented and what actually is there, it is brought to the government's attention and any major differences are handled by added or deducted change orders.

*Id*. at 873. The issue confronting the court in *Schlosser* was only whether the contractor was entitled to be compensated for the cost of actually verifying the existing conditions, an expense not claimed by ACE in this action.

The court in *Schlosser* did, however, comment in a footnote that the government might have been too generous in that it had paid for work that was performed before the existing conditions were verified. Rather than finding that the contractor's failure to satisfy the requirements of the verification clause to be a condition precedent or a waiver of any claim by the contractor, the court merely noted that had the contractor verified the existing conditions before it purchased the dampers it would not have been necessary to replace the incorrectly sized dampers.

The factual circumstances here are materially different. ACE is not seeking, and has never sought, payment for the work that it performed before it submitted its verification of the existing conditions. Rather, ACE seeks compensation only for the work that it performed at the COE's express direction after ACE had provided the COE with the results of its topographic survey.

**C. The COE Has Not Met its Burden of Showing Prejudice**

The COE concedes that it bears the "burden of proving that the untimeliness [of ACE's notice] caused prejudice to its case" (Defendant's Post Trial Brief, p. 15). Yet, the only evidence presented by the COE is Mr. Wise's supposition that the Project's profile (elevation) could have been lowered and that lowering the elevation was not possible in March 2001 because the work had progressed too far (Defendant's Post Trial Brief, p. 15).

The COE brought forth no competent evidence to satisfy its burden of proving that the site could have been lowered. Mr. Herrin, the principal designer for the Project, refused to even speculate whether the site could be lower and still function as required (T 503). Moreover, Mr. Herrin's design narrative indicates that the Project was designed to the specific plan elevations for an important reason: "The surface drainage of the site via the ditches *dictated* the overall profile of the taxiway, apron, and pallet storage area." (PX 18, p. 34)(emphasis added). In sum, ACE's witnesses doubted that the Project's profile could be lowered, the designer refused to speculate, and no COE witness testified that lowering the site was, in fact, even possible. The speculation offered by Mr. Wise during his direct testimony is the COE's sole evidence to support its argument and it falls well short of satisfying the government's burden of proof.

Notably, no witness other than Mr. Wise even testified that in March 2001 the fill operations had passed the point for the COE to consider lowering the Project elevation. Mr. Menchaca actually testified that there was nothing about the site of the construction on March 5, 2001 that would have prevented the COE from lowering the elevation of the Project (T 1130-31). Even Mr. Wise testified that his belief was based only on his "sense at the time." Mr. Wise conceded that he "did not do any engineering study or any quantitative takeoffs to verify that [position]" (T 1185). According to Mr. Wise, there was nothing physically about the condition of the site as late as April 2001 that would have prohibited the COE from lowering the Project elevations (T 1189).

The COE has completely failed to present any competent evidence to support its burden relative to the issue of prejudice. For this reason alone, the COE's notice defense must fail.

## III. COE MISCONSTRUES THE PROBLEM CAUSED BY CONFLICTS WITHIN THE CONTRACT DRAWINGS

Mr. Fulkerson testified at length as to how ACE put together its bid for the Project based upon the information provided by the COE. Mr. Fulkerson testified that ACE relied heavily on the typical sections (sequence numbers 59 through 62) "to plan the work which involved completing the subgrade work . . . installing your drainage layer rock, and then eventually setting your forms on top

of the drainage layer rock and installing your concrete paving" (T 278). Mr. Fulkerson also testified that he consulted the grading plan (sequence numbers 24 through 29) to confirm the information provided by the typical sections regarding the anticipated slope of the loading apron and pallet storage pad (T 279-83).

The information contained in those contract drawings conflicted with the information not provided by the COE until *after award* of the contract to ACE. The spot elevations set forth on the staking plans (sequence numbers 49 through 52), although perhaps reflective of the finished contours, did not provide prospective bidders with enough information for them to have discovered the conflict that existed between the actual elevation points of the 5.75 meter panels and the typical sections. This is because the staking plans include only "one of the points at the corner of each of the squares on every other lane" (T 284).

Mr. Herrin testified that interested bidders were requesting that they be provided with all of the elevations at each of the intersections before the Project was let (T 485-86) (PX 24). The COE decided that it did not want to delay the bid and put a note on the amended contract drawings to assure the prospective bidders that the elevations already provided were, in fact, reflective of the final finished contours (PX 179 & 24). At the time that the COE decided to withhold the requested information, Mr. Wise expressed his concern over the COE's liability if the information provided after award was in error, but conceded that the COE would be liable for a plan error whether the information was provided before or after award (PX 24).

With respect, Mr. Wise's conclusion was not correct. The information provided after award changed ACE's pre-bid assumptions as to how the Project was to be constructed because the new information conflicted with the information contained in the typical sections and the grading plan in the bidding documents. Had the COE provided the information, and ACE had ignored the revised and complete staking information when it put together its bid, the COE may have been shielded from liability as argued by the COE in its Post Trial Brief. However, the COE chose to withhold that vital

information, depriving ACE of any opportunity to discover the conflict pre-bid. It is pure speculation at this point for the COE to argue that ACE would not have relied upon the additional information had the COE listened to the interested contractors and provided new staking plans with elevations at each panel intersection as a pre-bid amendment to the bid documents. In light of Mr. Fulkerson's testimony that including staking plans in the bidding documents is not routine (T 287), it is fair to say that it would have been noteworthy had the COE issued revised bidding documents with different elevations at each of the panel intersections prior to bid. The COE consciously withheld that information prior to the bid and exposed the government to liability in the process.

The COE argues that, alternatively, any interested contractor could have determined all of the various intersection elevations by a process called interpolation (Defendant's Post Trial Brief, p. 27). It is generally true that where a contractor "knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract." *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 95 (1989) (quoting *Vann v. United States*, 190 Ct.Cl. 546, 420 F.2d 968, 982 (1970)). However, contractors are not expected to know that which only an expert could derive from those materials. *See Kaiser Indus. Corp. v. United States*, 169 Ct.Cl. 310, 340 F.2d 322, 330 (1965). It is unreasonable to expect a prospective bidder to undertake to interpolate, pre-bid, elevations at hundreds of intersections, using some undefined mathematical or modeling formula. This is especially the case when the COE readily concedes that its designer used computer software to perform that work and admits that it had the information available to it prior to bid (T 1180) (PX 24).

The COE prevented ACE from determining the true nature of the complex design prepared by CMT. The pre-bid investigation by ACE was thorough and its design assumptions were reasonable. It was not until after award that the conflicting information was provided to ACE and it was not until construction was underway that the conflict in the supplemental information was discovered.

## CONCLUSION

For the reasons set forth above, and considering all evidence presented at trial, ACE requests judgment against the COE in the amounts set forth in the Summary of Requested Relief.

**Certificate of Filing**

I hereby certify that on December 19, 2005, a copy of ACE's Reply Brief was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Bradley S. Copenhaver
W. Robert Vezina, III
Florida Bar No. 329401
Bradley S. Copenhaver
Florida Bar No. 162558
Vezina, Lawrence & Piscitelli, P.A.
318 North Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Telefacsimile: (850) 224-1353