# United States Court of Appeals for the Federal Circuit

RECEIVED
OVER THE COUNTER
NOV 13 2006
THE OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

2006-5093

ACE CONSTRUCTORS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

FILED
NOV 13 2007
U.S. COURT OF FEDERAL CLAIMS

## Judgment

ON APPEAL from the United States Court of Federal Claims

in CASE NO(S). 04-CV-299

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED: AFFIRMED

ENTERED BY ORDER OF THE COURT

DATED SEP 18 2007

Jan Horbaly, Clerk

ISSUED AS A MANDATE: NOV 13 2007

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Date: 11/13/07

# United States Court of Appeals for the Federal Circuit

2006-5093

ACE CONSTRUCTORS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

W. Robert Vezina, III, Vezina, Lawrence & Piscitelli, P.A., of Tallahassee, Florida, argued for plaintiff-appellee.

Timothy P.McIlmail, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director. Of counsel was Lloyd Rex Crosswhite, Office of Counsel, United States Army Corps of Engineers, of Fort Worth, Texas.

Appealed from: United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

2006-5093

ACE CONSTRUCTORS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: September 19, 2007

---

Before MICHEL, Chief Judge, NEWMAN and DYK, Circuit Judges.

NEWMAN, Circuit Judge.

ACE Constructors, Inc. entered into a contract with the United States Army Corps of Engineers to build a structure designated the Ammo Hot-Load Facility, at Biggs Army Airfield at Fort Bliss in El Paso, Texas. Several disputes arose and, after a five-day trial, the Court of Federal Claims decided several issues in favor of ACE, awarded an equitable adjustment to ACE in the amount of $1,383,009 with statutory interest, and ordered the

return of liquidated delay damages in the amount of $246,130.[1] On this appeal by the United States, we affirm the judgment of the Court of Federal Claims.

## BACKGROUND

The facts are fully set forth in the trial court's opinion. In brief, the project included construction of a loading area for cargo planes, various roadways, buildings, a storage pad, a loading apron, and a taxiway for airplanes. The site contained hills and other terrain that needed to be excavated, leveled, and filled. The bid solicitation materials included architectural drawings and engineering specifications prepared for the government by the engineering firm of Crawford, Murphy & Tilly, Inc., which plans were incorporated into the contract. The Court of Federal Claims found, and the government does not dispute, that certain drawings and specifications were incomplete and defective.

During performance ACE encountered numerous difficulties. ACE was required by the Corps of Engineers or by the actual conditions encountered to alter its construction procedures, and experienced significant additional costs. There were various contract modifications, delays, and changes to ACE's roster of subcontractors. The project was ultimately completed to the government's satisfaction, and ACE filed several claims for its additional costs based on the unforeseen conditions and defective specifications. The contracting officer granted some of ACE's claims and denied others. ACE appealed to the Court of Federal Claims, as provided by the Contract Disputes Act, 41 U.S.C. §605. That court provided additional relief. The government argues that ACE is not entitled to any

---

1 Ace Constructors, Inc., v. United States, 70 Fed. Cl. 253 (2006).

additional recovery, and requests reversal of all of the relief granted by the Court of Federal Claims.

***Standard of Review***

Decisions of the Court of Federal Claims receive plenary review as to issues of law, and the court's factual findings are reviewed for clear error. E.g., Adams v. United States, 350 F.3d 1216, 1221 (Fed. Cir. 2003). The issues herein relate to contract interpretation, the role of the defective specifications, and the foreseeability of the problems encountered. In general the same contract law is applied when the government is party to a contract as applies to contracts between private parties. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08 (2000) ("'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'") (quoting United States v. Winstar Corp., 518 U.S. 839, 895 (1996)).

I

THE PROFILOGRAPH CLAIM

The contract set forth two methods of measuring the smoothness of the concrete paving, viz. straightedge testing and profilograph testing, the latter being the more expensive method. ACE testified to its belief that the use of profilographic testing was optional under the contract, and therefore that it used the straightedge method in calculating its bid. However, during contract performance the Corps required profilographic testing, which ACE performed under protest, until the Corps eventually agreed with ACE that the straightedge method was better suited to this project. The Court of Federal Claims

awarded ACE its additional costs arising from use of the profilographic test method. The government presented three arguments as to why these costs should not be awarded: first, that the Court of Federal Claims lacked jurisdiction to review the contracting officer's decision of this issue; second, that the contract required profilographic testing; and third, that ACE had not shown that it based its bid on straightedge testing. The government renews these arguments on this appeal.

A

With respect to jurisdiction of this issue, the government argues that ACE did not exhaust its administrative remedies before the contracting officer, and thus could not proceed in the Court of Federal Claims. The Contract Disputes Act, 41 U.S.C. §605(a), requires that the contractor must have submitted the claim to a contracting officer, and that the contracting officer issued a final decision concerning that claim. See, e.g., England v. Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1578 (Fed. Cir. 1994). The government argues that the claim as presented to the Court of Federal Claims was not identical to that before the contracting officer.

In Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003) this court explained that the same claim must be presented to the Court of Federal Claims as was decided by the contracting officer, but that this standard "does not require rigid adherence to the exact language or structure of the original administrative CDA claim [when] they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." Id. at 1365. The Court of Federal Claims found, and we agree, that the claims before the contracting officer and the court did not differ

significantly, for the claim concerning the use of profilograph testing was presented to the contracting officer based on the same contract provisions, the same requirements made by the Army Corps of Engineers, the same costs, the same requested relief, and the same legal theories. This claim was properly before the court.

**B**

As to the question of what the contract required, the Court of Federal Claims analyzed this issue in terms of "constructive change"; that is, whether the Army constructively altered the contract, either expressly or implicitly, by requiring performance at variance with that set forth in the contract. In contract interpretation, the plain meaning of the contract's text controls unless it is apparent that some other meaning was intended and mutually understood. See Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (in interpreting a solicitation, "[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation. . . . If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.")

Some portions of the contract treat profilographic testing as optional, and other portions can be read as making this test obligatory. The contract specification with respect to test method is either ambiguous or, when read as the government initially insisted, defective. The contract refers to various testing procedures at various points in the document, including both straightedge and profilographic testing. Contract ¶1.3.7 states:

> The Contractor shall use one of the following methods to test and evaluate surface smoothness of the pavement . . . . The profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 m in length and at the end where the straightedge shall be used.

¶1.3.7.1(b) discusses the concrete's smoothness requirements and states:

> Profilographic testing: The finished surfaces of the pavements shall have no abrupt change of 3 mm or more, . . . when tested with an approved California-type profilograph . . . .

¶1.11.9 states:

> The Contractor shall furnish and maintain at the job site, in good condition, one 4 m straightedge for each paving train for testing the hardened portland cement concrete surfaces . . . .

¶1.11.10 provides:

> The Contractor may furnish a 7.6 m profilograph for testing the finished pavement surface . . . .

The government argued that these provisions show that the contract unambiguously required profilographic testing. The government acknowledged that this specification, if viewed as mandatory, was defective, because the straightedge method was better suited to the required measurements, and during performance the Corps authorized use of the straightedge method alone. At the trial Mr. Herrin, the Army's project manager who drafted the relevant portions of the Solicitation, acknowledged the distinction between "shall" and "may." He testified that profilographic testing was not suitable for this project, and that the "requirement" was eventually dropped in favor of straightedge testing. In construing the meaning of "shall" in ¶1.11.9 and "may" in ¶1.11.10, the Court of Federal Claims explained the need to "honor[] the distinction" between "may" and "shall" in a contract, and concluded that profilographic testing was permissive under the contract.

The Court of Federal Claims found that ACE reasonably concluded that profilographic testing was not required by the contract, and that the Army's insistence on this requirement, until it was found to be inappropriate, warranted compensation for the

additional costs incurred. We need not reach the question of whether the contract was ambiguous, because we conclude that the contractor is entitled to recover on the defective specification ground.

C

The government argues that even if the specification were defective, ACE has not shown that it was misled by a defective specification, for contract ¶1.3.7 provided that "[t]he Contractor shall use one of the following methods [profilograph or straightedge] to test . . . surface smoothness of the pavement." The government refers to the testimony of ACE's president, Mr. Fulkerson:

> This test was not specified in the contract documents. It gave the contractor the option of using this test or using a straight edge. We opted to use the straight edge, and we were told we had to use the profilograph. So that, we believe, is an additional cost . . . there was not [any cost in our bid for a profilograph].

The government argued at trial, and in its brief on this appeal, that ACE recognized the possibility of being required to use the profilograph, and therefore that the specification was not defective. At oral argument of this appeal the government pressed the theory that the specifications were indeed defective with respect to the profilograph testing requirement, but that ACE did not assert and prove that it relied on the defective specification. However, ACE's claim to the contracting officer stated that "[t]he third defect was the requirement included in Specification Section 02753 Part 1.3.7 that profilograph testing [] be used." The specifications were read by the government as requiring profilograph testing and they were acknowledged as defective, for during performance the government, seeing its error, changed to straightedge testing.

The Court of Federal Claims found that ACE acted reasonably in basing its bid on the less expensive straight-edge testing technique. The government conceded that the specification was defective, and required ACE to use the defective method for a period of time. The court treated the requirement for profilographic testing as a compensable constructive change in a defective specification, and held that ACE was entitled to recover the additional cost thereof. Reversible error has not been shown in that ruling.

The government does not dispute quantum. The ruling as to this issue is affirmed.

II

THE CONCRETE PAVING CLAIM

On appeal the government again argues that the Court of Federal Claims did not have jurisdiction to entertain this claim, and that ACE did not rely on the permissive or defective specification in its bid.

A

As to jurisdiction, the government argues that the claim as raised in the Court of Federal Claims differs from the claim as raised with the contracting officer. The Court of Federal Claims found that the claims were the same, arising from the same operative facts and raising the same issues and arguments. In its written claim to the contracting officer, ACE incorporated the paving subcontractor's (Cambro Construction Company) claim:

> [The specifications] required that the Contractor use rigid 3-meter steel forms to form the concrete, but the contours resulting from the specified grade elevation points could not be used constructed within the specified tolerances from rigid 3-meter forms. Cambro submits that the tolerances specified in the Contract cannot, as a matter of mathematical certainty, be maintained with rigid 3-meter steel forms.

A letter from ACE President Fulkerson to the Corps of Engineers (Aug. 6, 2003) recites this defect in the specification and the alterations needed in the performance of the contract. The government argues that the claim did not discuss how rigid-form paving in general was not suitable to the project; this argument is belied by the claim itself. The Court of Federal Claims did not err in finding that the jurisdictional requirements as to this claim were met.

**B**

At the trial it was explained that there are several types of concrete paving techniques, including rigid or fixed-form paving and slip-form paving. Fixed-form paving entails pouring wet concrete into pre-set metal or wooden forms, whereas slip-form paving relies on temporary forms and relatively dry concrete. Slip-form paving is the more complex and more expensive method. Again, the primary question underlying this issue is which paving technique was required by the contract. The joint Stipulation of Facts presented to the Court of Federal Claims stated that: "Section 02753 of the contract Technical Provisions allowed the placement of concrete pavement using either fixed form paving (¶ 3.5.5) or slip form paving (¶ 3.5.6)." ACE states that although the less expensive fixed-form paving was authorized in the contract, and was the basis of ACE's bid, it was required to use the more expensive slip-form paving. The court found that the fact that the Corps designed the project for a slip-form paver while simultaneously approving the project for a fixed-form paver constituted a defective design specification, and awarded ACE the additional costs incurred.

The government argues that the trial court erred in awarding the additional costs of using slip-form paving. The question focused on whether ACE should reasonably have known at the time of the bid that the specification's requirement to use three-meter rigid

forms was defective in light of the grade and contour conditions of the site. The government contends that ACE should have known that the fixed-form paving technique was inappropriate for the job, and unreasonably relied on the defective contract specification §02753 ¶3.5.5 in its bid. This specification states:

> Fixed Form Paving
>
> Paving equipment for fixed-form paving and the operation thereof shall conform to the requirements of paragraph EQUIPMENT, all requirements specified above under paragraph PAVING and as specified herein.

The subsequent subparagraphs describe the guidelines for fixed-form paving, including the types of materials, necessary procedures, etc.

It is not disputed that the plans provided by the government and incorporated into the contract were incomplete and defective. The government's position is that since its specifications were defective, ACE should not have relied on them. The Court of Federal Claims rejected this theory, and applied precedent that "[w]hen the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach." Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000) (citing United States v. Spearin, 248 U.S. 132, 136 (1918)).

Concerning the omissions in the specification and the contract's defects, the government's Project Engineer testified that the three-meter forms would not work with the pavement design and that the project was not designed for rigid forms. The trial court "accept[ed] that an engineer or experienced surveyor could have interpolated the panel points . . . to derive a vertical curve or constantly changing gradient, [however,] a contractor

that is making a bid on a project typically is not expected to make such calculations." The court found that ACE's reliance on the specifications in making its bid was reasonable, and that the Corps "may not avoid liability for its own omissions and errors."

Impracticability of performance is "treated as a type of constructive change to the contract; because a commercially impracticable contract imposes substantial unforeseen costs on the contractor, the contractor is entitled to an equitable adjustment." Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts §261 cmt. d (1981)). No error has been shown in the trial court's analysis, or in its finding that ACE reasonably relied on the government's defective specification, experienced additional costs due to the paving technique, and is entitled to compensation therefor.

III

THE DIFFERING SITE CONDITION EARTHWORK CLAIM

The Court of Federal Claims found that ACE encountered a Type I differing site condition in that "[r]ather than being a balanced project as indicated by the cut-and-fill schematics, the site required approximately 129,000 additional cubic yards of soil." A "balanced project" is one where the amount of dirt excavated from a site is roughly equivalent to what is needed for fill-ins and to meet embankment requirements. The government does not dispute that this discrepancy was the result of a defective specification, and that 129,000 additional cubic yards of fill were required.

The trial court found that these conditions were reasonably unforeseeable by ACE, and awarded ACE a total of $501,012.49, calculated as $462,745.76 for direct costs on the differing site condition and additional costs due to the constructive acceleration. The

government does not now contest its liability, but disputes the quantum of compensation, arguing that despite the defective specifications provided by the government, there was evidence that ACE "knew better" concerning the conditions of the site. On appeal the government contends that ACE should have foreseen this error in the specifications, and bid accordingly. However, the record shows that before ACE bid on this project it retained an expert consultant, Dirt-Tek, Inc., who analyzed the project based on the plans provided by the Corps and concluded, based on these plans, that the project would be relatively balanced, in that an approximately equal amount of dirt would be excavated as needed for fill. On the totality of the evidence, the trial court found that ACE acted reasonably in concluding that it would not need a significant amount of additional fill, and calculated its bid accordingly.

The government also argues that the court should have taken into account that ACE expected to achieve savings through excess fill or a "balanced project" -- although it turned out to have been seriously unbalanced -- and that the government should be credited with ACE's expected albeit unrealized savings. This argument was not presented to the contracting officer, was not discussed in the decision of the Court of Federal Claims, and is devoid of merit. Reversal is appropriate only when we are "left with the definite and firm conviction that a mistake has been committed." United States v. U. S. Gypsum Co., 333 U.S. 364, 395 (1948). This burden has not been met.

The amount of fill used, and the costs incurred, are not disputed. The recovery for this claim is affirmed. Other aspects of the judgment of the Court of Federal Claims were not appealed, and remain in effect.

AFFIRMED

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: [signature] Date: 11/13/07