IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACE CONSTRUCTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-299C |
| v. | ) | |
| | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S EAJA APPLICATION

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

OF COUNSEL:
LLOYD REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

Attorneys for Defendant

January 14, 2008

# TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S RESPONSE TO PLAINTIFF'S EAJA APPLICATION. . . . . . . 1

I. The Court Should Deny ACE's Application Because ACE Does Not Establish Its Eligibility For An EAJA Award. . . . . . . 1

II. The Court Should Deny ACE's Application Because The Government's Position Was Substantially Justified. . . . . . 3

A. Introduction. . . . . . . . . . . . . . . . . . . . . . . 3

B. The Government's Overall Position In This Case Had A Reasonable Basis In Both Law And Fact.. . . . . . . . . 4

1. ACE Recovered Significantly Less Than It Sought From The Contracting Officer And The Court . 4

2. The Government's Resistance To ACE's Differing Site Condition Claim Had A Reasonable Basis In Law And Fact.. . . . . . . . . . . . . . . . . . . . . . 6

3. The Government's Resistance To ACE's Defective Specifications Claims Had A Reasonable Basis In Law And Fact.. . . . . . . . . . . . . . . . . . . 10

a. Introduction. . . . . . . . . . . . . . . . . 10

b. The Government Had Reasonable Bases Upon Which To Resist The Claim That Drawing Sequences 59 Through 62 Were Defective. . 12

c. The Government Had Reasonable Bases Upon Which To Resist ACE's Claim Regarding Concrete Forms. . . . . . . . . . . . . . . 13

d. The Government Had Reasonable Bases Upon Which To Resist ACE's Profilograph Claim.. . . . . . . . . . . . . . . . . . . 16

III. The Court Should In No Case Award ACE All The Fees And Expenses That It Requests. . . . . . . . . . . . . . . . . 19

CERTIFICATE OF FILING

ATTACHMENTS

TABLE OF AUTHORITIES

FEDERAL CASES

ACE Constructors, Inc. v. United States,
70 Fed. Cl. 253 (2006),
aff'd, 499 F.3d 1357 (Fed. Cir. 2007). . . . . . . . . . . . 5, 6

Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,
67 Fed. Cl. 494 (2005). . . . . . . . . . . . . . . . . . . . . . 2

Chiu v. United States,
948 F.2d 711 (Fed. Cir. 1991). . . . . . . . . . . . . . . . . . 4

Commissioner, Immigration & Nauralization Service v. Jean,
496 U.S. 154, 160 (1990). . . . . . . . . . . . . . . . . . . . 4

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002). . . . . . . . 8, 9, 11, 12, 14, 17

Contract Cleaning Maint., Inc. v. United States,
811 F.2d 586 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . 15

Doe v. United States,
54 Fed. Cl. 337 (2002). . . . . . . . . . . . . . . . . . . . . . 2

Doty v. United States,
71 F.3d 384 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . 3

Fields v. United States,
29 Fed. Cl. 376 (1993),
aff'd, 64 F.3d 676 (Fed. Cir. 1995) (table). . . . . . . . . . . 2

Gargoyles, Inc. v. United States,
45 Fed. Cl. 1398 (1999). . . . . . . . . . . . . . . . . . . . . . 3

KMS Fusion, Inc. v. United States,
39 Fed. Cl. 593 (1997). . . . . . . . . . . . . . . . . . . . . . 21

L.W. Foster Sportswear Co. v. United States,
405 F.2d 1285 (Ct. Cl. 1969). . . . . . . . . . . . . . . . . . . 14

Manno v. United States,
48 Fed. Cl. 587 (2001). . . . . . . . . . . . . . . . . . . . . . 4

Mingus Constructors, Inc. v. United States,
10 Cl. Ct. 173 (1986),
aff'd, 812 F.2d 1387 (Fed. Cir. 1987). . . . . . . . . . . . . . 7-8

NVT Technologies, Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004).. . . . . . . . . . . . . . . . 18

Pacific Alaska Contractors v. United States,
436 F.2d 461 (Ct. Cl. 1971). . . . . . . . . . . . . . . . . . 9

Pierce v. Underwood,
487 U.S. 552 (1988). . . . . . . . . . . . . . . . . . . . 19

Prowest Diversified, Inc. v. United States,
40 Fed. Cl. 879 (1998).. . . . . . . . . . . . . . . . . . 19

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005).. . . . . . . . . . . . . . . . . . 11

Richlin Security Service Co. v. Chertoff,
472 F.3d 1370, 1381 (Fed. Cir. 2006).. . . . . . . . . . . . 20

Robins Maintenance, Inc. v. United States,
265 F.3d 1254 (Fed. Cir. 2001).. . . . . . . . . . . . . . . 11

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987). . . . . . . . . . . . . . 15, 18

Scherr Construction Co. v. United States,
26 Cl. Ct. 248 (1992). . . . . . . . . . . . . . . . . . . . 2

TGS International, Inc. v. United States,
983 F.2d 229 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . 3

Triax Pacific, Inc. v. West,
130 F.3d 1469 (Fed. Cir. 1997).. . . . . . . . . . . . . . . 18

W.M. Schlosser Co. v. United States,
767 F.2d 870 (Fed. Cir. 1985). . . . . . . . . . . . . . . . . 6

W.M. Schlosser, Inc. v. United States,
50 Fed. Cl. 147 (2001).. . . . . . . . . . . . . . . . . . 12

STATUTES

28 U.S.C. § 2412(d).. . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2412(d)(1)(A).. . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2412(d)(2)(A)(i). . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 2412(d)(2)(A)(ii).. . . . . . . . . . . . . . . . . 19

28 U.S.C. § 2412(d)(2)(B)(ii).. . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACE CONSTRUCTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-299C |
| v. | ) | |
| | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S EAJA APPLICATION

Defendant, the United States, respectfully responds to the Motion And Application For Attorneys' Fees And Related Nontaxable Expenses filed by plaintiff, ACE Constructors, Inc. ("ACE").

I. The Court Should Deny ACE's Application Because ACE Does Not Establish Its Eligibility For An EAJA Award

The Court should deny ACE's application because ACE does not establish its eligibility for an Equal Access to Justice ("EAJA") award. ACE requests fees and expenses pursuant to 28 U.S.C. § 2412(d). ACE's Motion And Application For Attorneys' Fees And Related Nontaxable Expenses ("Pl. Mot.") at 1. The Court should deny that request because ACE fails to establish that it is an eligible "party" pursuant to § 2412(d).

Pursuant to § 2412(d)(1)(A), a court shall award to a prevailing party fees and other expenses incurred by that party in any civil action (other than cases sounding in tort) brought against the United States, unless the court finds that the position of the United States was substantially justified. A corporate "party" means a corporation, which at the time the

action was filed, had a net worth not exceeding $7,000,000 and had no more than 500 employees. 28 U.S.C. § 2412(d)(2)(B)(ii).

The applicant bears the burden of establishing that it meets those limitations. See Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 67 Fed. Cl. 494, 498 (2005); Fields v. United States, 29 Fed. Cl. 376, 382 (1993), aff'd, 64 F.3d 676 (Fed. Cir. 1995) (table). Failure to submit documentation of a plaintiff's net worth, for the purpose of determining whether the plaintiff qualifies for an award under EAJA, renders an application deficient. Al Ghanim, 67 Fed. Cl. at 496.

A conclusory affidavit without supporting documentary evidence is inadequate to establish "party" status. Fields, 29 Fed. Cl. at 382; accord Doe v. United States, 54 Fed. Cl. 337, 343 (2002). Even an unaudited balance sheet would not enable the Court to ascertain a plaintiff's net worth. See Scherr Constr. Co. v. United States, 26 Cl. Ct. 248, 250-51 (1992). Indeed, a failure to submit information consistent with generally accepted accounting principles is fatal to an EAJA application. Fields, 29 Fed. Cl. at 383; accord Scherr Constr., 26 Cl. Ct. at 251.

ACE does not establish that it meets EAJA's employee and net worth limitations. It relies upon the affidavit of ACE President John Fulkerson (Pl. Mot. at 2), but provides no supporting documentary evidence, much less information consistent with

generally accepted accounting principles. Because it fails to sufficiently document its claim to meet the employee and net worth limitations of EAJA, it fails to establish that it is a "party" pursuant to EAJA. The Court should, therefore, deny ACE's EAJA application.

## II. The Court Should Deny ACE's Application Because The Government's Position Was Substantially Justified

### A. Introduction

The Court should also deny the application because the Government's position was substantially justified. An award pursuant to § 2412(d) is precluded if the Government's position is "'justified in substance or in the main' – that is, justified to a degree that could satisfy the reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Court does not examine a party's stance upon every individual issue addressed in the case, Gargoyles, Inc. v. United States, 45 Fed. Cl. 139, 148 (1999); rather, the question is whether the Government's position was substantially justified overall, Doty v. United States, 71 F.3d 384, 386 (Fed. Cir. 1995) (parenthetically explaining TGS Int'l, Inc. v. United States, 983 F.2d 229, 229-30 (Fed. Cir. 1993)). The term "position of the United States" refers to the Government's position throughout the dispute, including the agency's administrative position. Id.

To determine whether the overall position of the United States is substantially justified, a trial court looks at the

entirety of the Government's conduct and makes a judgment call whether the Government's overall position had a reasonable basis in both law and fact. Chiu v. United States, 948 F.2d 711, 715 (Fed. Cir. 1991). A position "can be justified even though it is incorrect, and it can be substantially justified if a reasonable person could think it correct." Manno v. United States, 48 Fed. Cl. 587, 589 (2001). Whether the Government's position was substantially justified is a single finding that operates as a one-time threshold for fee eligibility. See id. (citing Comm'r, Immigrat. & Nat. Serv. v. Jean, 496 U.S. 154, 160 (1990)).

B. The Government's Overall Position In This Case Had A Reasonable Basis In Both Law And Fact

The Government's overall position in this case had a reasonable basis in both law and fact, for the following reasons.

1. ACE Recovered Significantly Less Than It Sought From The Contracting Officer And The Court

ACE recovered significantly less than it sought from the contracting officer and the Court. In its July 2004 initial disclosures, ACE indicated that the damages it was seeking were the same amounts that it sought from the contracting officer. Initial Rule 26(a)(1) Disclosures at 4 ¶ 3 (attached). ACE sought from the contracting officer two claims for monetary amounts, before interest: $580,485 and $1,781,318, for a total of $2,361,803. Complaint ("Compl."), Exhibit ("Exh.") 1 at 1; Compl., Exh. 2 at 1. At trial, ACE reduced those claims to

$528,185.63 and $1,039,897.50, respectively. ACE's Post-Trial Brief ("Pl. Post-Trial Br.") at 29-30.[1] It also requested the return of $254,280 in liquidated damages, for a total of $1,822,146.39. From the Court, however, ACE obtained a judgment upon those claims in the principal amounts of $501,012.49 and $1,128,127.48, and for the return of only $246,130 in liquidated damages, for a total of $1,629,139.97. That amount is $193,006.42 less than the amount requested from the Court, and (interpreting ACE's claims to the contracting officer as including a request of the return of $254,280 in liquidated damages), $986,943.03 less than the amount requested from the contracting officer.

Specifically, upon the issue of damages on ACE's differing site condition claim, the Court credited the Government's arguments in favor of reduction of ACE's claimed labor costs, surveying costs, and additional soils testing. Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 276-78 (2006), aff'd, 499 F.3d 1357 (Fed. Cir. 2007). Upon ACE's defective specifications and profilograph claims, the Court credited the Government's arguments in favor of reduction of ACE's claimed labor costs with respect to these claims, id. at 290, and that

[1] In its post-trial brief, ACE stated that it sought only $1,822,146.39, but the sum of the amounts that it sought equal $1,822,363.13 ($528,185.63 plus $1,039,897.50 plus $254,280.00 equals $1,822,363.13). Pl. Post-Trial Br. at 29-30.

the "Eichelay" formula should not be applied to this case. Id. at 293.

2. The Government's Resistance To ACE's Differing Site Condition Claim Had A Reasonable Basis In Law And Fact

There was a reasonable basis for the agency, and the Government at trial, to resist ACE's differing site condition claim. First, ACE failed to comply with its contractual obligation, pursuant to contract specification § 01720 (Plaintiff's Exhibit ("PX") 177 at vol. (a) § 01720 p.1), to verify site elevations before proceeding with construction.

The sequence of construction of the project included clearing and grubbing the site (Transcript ("Tr.") 69 at 3-6), but ACE commenced clearing and grubbing on January 9, 2001 (Stipulations of Fact ("Stip.") ¶ 5), without providing any survey verification to the contracting officer's authorized representative (Tr. 519 at 7-15, 1164 at 7-16) and before it had even completed the field work necessary for a topographical survey of the work site, (Tr. 70 at 12-17). Because ACE proceeded with construction without verifying the accuracy of the site elevations, the Government reasonably took the position that ACE assumed the risk that those site elevations were not accurate. Cf. W.M. Schlosser Co. v. United States, 767 F.2d 870, 873-74 & n.2 (Fed. Cir. 1985) (including dicta suggesting that Government was not obliged to reimburse contractor for costs

incurred prior to contractor's performance of contract obligation to verify dimensions before performing affected work).

Second, ACE did not notify the Government of its claim that the site elevations were different than those indicated in the contract until after it had already disturbed the existing conditions. Tr. 1159, 1161-62. By the time ACE provided that notice, ACE had completed clearing and grubbing the entire site (Defendant's Exhibit ("DX") 78-23), leveled seventy-five percent of the site (DX 77 at p.74; Tr. 144-45), and had begun leveling the loading pad (DX 78-15). It had also begun hauling dirt to the loading pad to bring the loading pad to finished grade (PX 45), begun hauling dirt to the taxiway (DX 79-15) and the pallet pad (PX 51), and brought at least part of the dirt grade at the pallet pad to finished elevations (Tr. 146 at 19-25, 147 at 1-19, 149 at 14-25, 150 at 1-11; DX 79-102).

In addition, by the time ACE provided that notice, it had begun hauling dirt to the access road (DX 79-107) and begun setting grades on the loading pad (DX 80-7). Based upon those facts, the Government reasonably took the position that ACE's late notice of the differing site condition prejudiced the Government, because a "differing site conditions" claim fails for lack of timely notice where, by the time notice was received, the physical aspects of the area in question had been altered. _See_ _Mingus Constructors, Inc. v. United States_, 10 Cl. Ct. 173, 178

(1986), aff'd, 812 F.2d 1387 (Fed. Cir. 1987). That is because, where original site conditions have been altered by construction, the validity of a contractor's claim cannot be determined with the degree of accuracy or certainty that prompt notice would have engendered. Id.

Third, to establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove that it was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). The evidence regarding how much fill ACE anticipated it would encounter on the site was contradictory, and indicated that ACE expected to have to export fill from the site, and therefore expected to have to perform at least some of the same earthwork that it performed overcoming the differing site condition through importation of fill.

On the one hand, ACE wrote to the Government that ACE's pre-bid takeoffs indicated that there would be approximately 20,000 cubic yards of excess dirt at the site. PX 76 at p.1-2. ACE's President testified at trial, however, that he determined prior to bidding that the site would produce 40,000 to 50,000 cubic meters or cubic yards of excess fill. Tr. 230 at 22-23. Later, he testified that ACE's bid estimate sheets, which were not submitted into evidence, might show that ACE estimated that it

would cost $20,000 to remove 5,000 cubic yards of excess fill from the site. Tr. 528.

Fourth, there was evidence that ACE did not prove that the conditions indicated in the contract differed materially from those actually encountered during performance. To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove that the conditions indicated in the contract differ materially from those actually encountered during performance. Comtrol, 294 F.3d at 1362. Drawing Sequences 66 through 87 did not indicate that the site would produce enough fill to perform the work; rather, those drawings showed cross-sections of the site at 20-meter intervals, and provide cut and fill numbers at those intervals, but did not indicate any swell or shrinkage factor to apply. PX 178 at p.66-87. In a very similar case, Pacific Alaska Contractors v. United States, 436 F.2d 461, 469-70 (Ct. Cl. 1971), the United States Court of Claims held that a contract that provided estimated cut and fill numbers but no swell factor did not indicate that cut and fill would balance.

In addition, a comparison of the cross-sections provided in the contract and those developed by ACE's surveyor reflected that at the extreme edges of the work site the elevations on those cross-sections matched, but in the center ACE's surveyor's cross-sections reflected lower elevations, indicating that ACE had

stripped the topsoil in the center of the work site prior to surveying. Tr. 476 at 16-25, 494-95. Furthermore, an examination of the as-built drawings of the finished project also revealed that where disturbed earth met undisturbed earth, elevations were the same (Tr. 1238-39), indicating that the elevation discrepancies between contract elevations and the elevations determined by ACE's surveyor existed only where ACE had disturbed the site. Finally, although the Government's survey for the Ammo Hot-Load project and another Fort Bliss project were performed at the same time by the same aircraft, only the Ammo Hot-Load project was the subject of any complaint of a discrepancy between site elevations and elevations indicated in the contract. Tr. 496, 507-08, 1171-72.

### 3. <u>The Government's Resistance To ACE's Defective Specifications Claims Had A Reasonable Basis In Law And Fact</u>

#### a. <u>Introduction</u>

The agency and the Government had reasonable bases upon which to resist ACE's defective specifications claims. ACE brought to the attention of the contracting officer three claims that contract specifications were defective. First, ACE claimed that the typical sections shown on Drawing Sequences 59 through 62 showed the subgrade, drainage layer rock, and concrete being finished at consistent grades ranging from 0.5 percent to two percent, and that it bid accordingly, but that finish grading

of the subgrade and drainage layer did not meet the survey elevations shown in the project plans. PX 174 at p.174001. Second, ACE claimed that Specification Section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long steel forms for concrete paving. PX 174 at p.174002. Third, ACE claimed that "the requirement included in Specification Section 02753 [¶] 1.3.7 that profilograph testing [was] to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length" is defective. PX 174 at p.174002.

Whenever the Government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors. Robins Maint., Inc. v. United States, 265 F.3d 1254, 1257 (Fed. Cir. 2001). However, the United States Court of Appeals for the Federal Circuit has held that the test for recovery based on inaccurate specifications is whether the contractor was misled by the errors in the specifications, id., and that there can be no recovery upon a defective specifications claim if there was no reliance upon the defective specification in preparation of the bid. See Comtrol, 294 F.3d at 1364.

This Court has also held that a contractor must prove that it relied on its interpretation of the contract documents when calculating its bid, Renda Marine v. United States, 66 Fed. Cl. 639, 655 (2005), and the Federal Circuit held that a contractor

cannot base a claim for equitable adjustment upon documents and information that it did not review prior to bid. Comtrol, 294 F.3d at 1364. Furthermore, this Court has held that a contract interpretation is unreasonable if it is based on some contract indications to the exclusion of others. W.M. Schlosser, Inc. v. United States, 50 Fed. Cl. 147, 154 (2001).

b. The Government Had Reasonable Bases Upon Which To Resist The Claim That Drawing Sequences 59 Through 62 Were Defective

The Government reasonably resisted, upon the bases discussed below, the claim that Drawing Sequences 59 through 62 were defective. First, although ACE claimed that Drawing Sequences 59 through 62 were defective, the testimony of John Fulkerson, ACE's president, reflects only that ACE relied upon Drawing Sequences 60 and 61 in preparing the subgrade portion of its bid. Tr. 276-78.

Second, to the extent that ACE relied upon Drawing Sequences 59 through 62, it did not rely upon other relevant information regarding finish gradings that was in the contract. Drawing Sequences 49 through 52 provided a partial set of finish elevations (PX 178 at p. 49-52), but ACE's President's testimony that Drawing Sequences 49 through 52 were not drawings that a contractor would use in bid preparation (Tr. 286-87) established that ACE did not rely upon the elevations provided on Drawing Sequences 49 through 52 in preparing its bid. Moreover, the

remaining elevations - the same elevations that were provided after award - were calculated from the partial set by mathematical interpolation. Tr. 1179-80. Therefore, there was evidence that Drawing Sequences 49 through 52 contained information from which ACE could have determined how to grade to achieve finished elevations. Moreover, ACE's decision to rely upon the typical sections knowing that additional elevations would be provided after award (Tr. 286, PX 179 at p.49) was evidence that ACE unreasonably assumed that those additional elevations would not affect its pre-bid assumptions.

c. <u>The Government Had Reasonable Bases Upon Which To Resist ACE's Claim Regarding Concrete Forms</u>

The Government had reasonable bases upon which to resist ACE's claim regarding concrete forms. In essence, ACE presented two versions of concrete forms claim. To the contracting officer, ACE claimed that Specification Section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long forms. PX 174 at p.174002. To the Court, ACE claimed that the specifications were defective because they did not state a preference for slipform paving over rigid form paving. Pl. Post-Trial Br. at 20. The Government's resistance to those claims upon the bases discussed below was reasonable.

First, Specification Section 02753 ¶ 3.5.5.1.b did not require the use of three-meter long steel forms at all; rather,

it provided that (except on some curves) "[s]teel forms shall be furnished in sections not less than 3 m in length" (emphasis added). PX 177 at vol. (a) § 02753 p.46 ¶ b.

Second, ACE had told its subcontractor to use forms of different lengths. PX 99 at p.1.

Third, the United States Court of Appeals for the Federal Circuit has held that a contractor cannot establish a defective specifications claim where it cannot establish that it acted as a reasonably prudent contractor in interpreting the contract documents. Comtrol, 294 F.3d at 1365. Its predecessor, the United States Court of Claims, held that an experienced contractor cannot, for example, rely on Government-prepared specifications where he should have known that the specification is defective. See L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 1290 (Ct. Cl. 1969). If the contractor should have known that the specification is defective, the contractor has a duty to inquire about the defect prior to bidding. See Comtrol, 294 F.3d at 1365. Failure to inquire is fatal to a claim for recovery. See id.

There was substantial evidence that ACE had reason to know of the defect it complained of when it bid for the contract upon the assumption that it would use rigid form paving. The contract allowed for slipform paving and rigid form paving. PX 177 at vol (a) § 02753 p.25. ACE's President testified that the contract

required the use of concrete with no more than a two-inch slump. Tr. 390 at 25, 391 at 1-6. He also testified, based upon his experience, that a rigid form paving system was incompatible with a two-inch slump. Tr. 392 at 15-19. He testified that any experienced concrete contractor would know that. Tr. 749 at p.7-19. He further testified that a two-inch slump is not incompatible with slipform paving. Tr. 750 at 1-2. That testimony was substantial evidence that ACE was not misled into bidding based upon an assumption that rigid form paving would work as well as slipform paving because ACE chose rigid form paving despite having reason to know that slipform paving was the only suitable method.

Fourth, there was substantial evidence that ACE did not present that claim to the contracting officer. In a Contract Disputes Act case such as this, a contractor may not raise claims that were not presented to the contracting officer. See Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987). The contractor must submit to the contracting officer a clear and unequivocal statement that gives adequate notice of the basis of the claim. Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). There was substantial evidence that the only concrete paving form claim that ACE raised to the contracting officer was that Specification

Section 02753 ¶ 3.5.5.1.b was defective in that it required the use of three-meter long forms. PX 174 at p.174002.

d. The Government Had Reasonable Bases Upon Which To Resist ACE's Profilograph Claim

The Government had reasonable bases upon which to resist ACE's profilograph claim. Here, too, in essence, ACE presented two versions of its profilograph claim. To the contracting officer, ACE presented Cambro's claim that "the requirement included in Specification Section 02753 [¶] 1.3.7 that profilograph testing [was] to be used as the basis of acceptance of concrete smoothness for runs over sixty-meters in length" was defective. PX 174 at p.174002, 174025-26. To the Court, ACE also presented the claim that the contract did not require profilograph testing, but the Government nevertheless directed the use of profilograph testing. Tr. 408 at 1-8, 414-16, 678. The Government's resistance to those claims upon the bases discussed below was reasonable.

First, ACE had terminated Cambro for default, advising Cambro that Cambro's construction techniques were the cause of the concrete finishing problems that were encountered during contract performance (PX 99 at p.1), and Mr. Fulkerson effectively admitted that some of Cambro's work had, on some places on the loading pad, passed the profilograph test. Tr. 417 at 18-21.

Second, the Federal Circuit has held that there can be no recovery upon a defective specifications claim if there was no reliance upon the defective specification in preparation of the bid. See Comtrol, 294 F.3d at 1364. ACE's President, however, testified that, in bidding for the contract, ACE opted to use the straightedge testing method and included no cost for profilograph testing in its bid (Tr. 408, 416 at 11-13), providing substantial evidence that ACE was not misled by the profilograph specification during bid preparation and, therefore, could not recover upon a claim that a specification requiring profilograph testing was defective.

Third, it was reasonable to interpret the contract to require profilograph testing. Specification Sections 02753 ¶¶ 1.3.7, 1.3.7.1, 1.3.7.2, 1.3.7.3, 1.11.9, and 1.11.10, when read together, (1) require that the profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 meters in length and at the ends where the straightedge shall be used; (2) allow the contractor to use straightedge or profilograph testing in all other cases; (3) require that all straightedge testing be performed with a four-meter straightedge; (4) require that all profilograph testing be performed with a California-type profilograph; and (5) allow the contractor to use a 7.6 m profilograph. Indeed, Specification Section 02753 ¶ 1.3.7 provides that "[t]he

profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 60 m in length and at the ends where the straightedge shall be used." PX 177 at vol. (a) § 02753 p.8 (emphasis added).

It was also reasonable for the Government to take the position that, to the extent that those provisions require profilograph testing and allow the choice of only straightedge testing, that the ambiguity or conflict was patent. A patent ambiguity in a Government contract is one that is obvious, gross, or glaring, NVT Techns., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004), and requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Triax Pac., Inc. v. West, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). Absent such inquiry, the ambiguity will be resolved against the contractor. Id. ACE presented no evidence that it raised any such inquiry.

Moreover, there was substantial evidence that ACE had not presented that constructive change claim to the contracting officer. A contractor may not raise CDA claims to this Court that were not presented to the contracting officer. See Santa Fe Eng'rs, 818 F.2d at 858. There was substantial evidence that the only profilograph claim ACE presented to the contracting officer was that the contract was defective because Specification

Section 02753 ¶ 1.3.7 required profilograph testing. PX 174 at p.2.

III. The Court Should In No Case Award ACE All The Fees And Expenses That It Requests

If the Court does award fees and expenses, the Court should not award all of the $259,346.66 requested in the application, for two reasons. First, ACE requests fees in excess of $125 per hour limitation set forth at 28 U.S.C. § 2412(d)(2)(A)(ii) (in some cases, more than twice that amount), arguing that there were a limited number of attorneys available to it, that its attorneys "are dedicated to the specialized practice of construction litigation," including Government contracts, and that "the issue of fact and law before the Court were numerous and complex." Pl. Mot. at 3. "Expertise" with construction matters and government contracts cases, however, is an insufficient basis for an enhanced fee award. Prowest Diversified, Inc. v. United States, 40 Fed. Cl. 879, 889 (1998). Indeed, the exception for "limited availability of qualified attorneys for the proceedings involved" refers to attorneys having some distinctive knowledge or specialized skill such as an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Pierce, 487 U.S. at 572. A construction or Government contract case does not require any specialized knowledge or skill of that kind. See Prowest Diversified, 40 Fed. Cl. at 889.

This is a Government contract construction case; there is, therefore, no justification in this case for an hourly fee enhancement above the statutorily prescribed rate. Whereas ACE's fee request amounts to a request for $222.72 per hour ($193,722.50/869.8 hours) (Summary of Fees And Expenses at 4), in no case should the Court award more than $125 per attorney (ACE has requested no other adjustment).[2]

Second, ACE requests expert fees at rates of $120 to $200 per hour. Summary of Fees And Expenses at 4. However, no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States. 28 U.S.C. § 2412(d)(2)(A)(i).

The only experts whom the United States compensated in this case, as employees, were Will Sanford and Doran Storey. The weighted compensation of Mr. Sanford, an employee of the Army Corps of Engineers, amounted at the time to $81.80 per hour. Declaration of Will Sanford ¶ 3 (attached). The weighted

---

[2] Of the hours for which ACE requests "Attorney Fees," 60.6 are billed at $85 per hour, rather than the $175 to $290 per hour charge that is more prevalent among the charges listed on ACE's Detail Fee Transaction File List. That suggests that ACE combines its paralegal hours with its attorney hours to arrive at the 869.80 hours referenced at page 4 of its Summary of Fees And Expenses. However, paralegal services are not recoverable as fees, but are only recoverable as expenses at the cost to the attorney. Richlin Sec. Serv. Co. v. Chertoff, 472 F.3d 1370, 1381 (Fed. Cir. 2006). Therefore, in no case could ACE recover more than $10,302 for the cost to its attorneys of paralegal services (60.6 hours times $85 per hour), or $101,150 for attorneys fees ((869.8 hours minus 60.6 hours) times $125 per hour).

compensation of Mr. Storey, an employee of the Defense Contract Audit Agency, amounted at the time to $44.70 per hour. Declaration of Doran Storey ¶ 3 (attached). Therefore, in no case should the Court award expert witness fees in excess of Mr. Sanford's rate. Specifically, ACE's request for expert witness fees amounts to $161.76 per hour ($37,650.80 divided by 232.75 hours), but in no case should the Court award more than $19,038.95 for expert fees; that is, 232.75 hours at $81.80 per hour.

Finally, although the quantum and method of proof of each allowable expense is discretionary with the trial court, the Court should not allow claims for expenses that are not supported with invoices. See KMS Fusion, Inc. v. United States, 39 Fed. Cl. 593, 606 (1997). ACE supports with invoices (as opposed to the "Detail Fee Transaction File List") only $5,131.70 of the $9,502.20 in reprographic services it seeks, only $665.28 of the $13,790.24 in travel expenses it seeks, and none of the $2,630.41 in postage and courier charges, $133.06 in long distance and facsimile charges, or $1,917.45 in legal research services that it seeks. The Court should accordingly disallow that $22,176.38 in charges which are not supported by invoices.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Donald E. Kinner
by s/Brian M. Simkin
DONALD E. KINNER
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

\ OF COUNSEL:
LLOYD REX CROSSWHITE
Office of Counsel
Army Corps of Engineers
Fort Worth, Texas

Attorneys for Defendant

January 14, 2008

Certificate of Filing

I hereby certify that on January 14, 2008, a copy of the foregoing Defendant's Response To Plaintiff's EAJA Application was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail