**UNITED STATES COURT OF FEDERAL CLAIMS**

******************************

**ACE CONSTRUCTORS, INC.,**

**Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS,**

**Defendant.**

**No. 04-299 C**

**Judge Charles F. Lettow**

******************************

**ACE'S SUPPLEMENT TO APPLICATION FOR EAJA RELIEF AND REPLY TO DEFENDANT'S RESPONSE TO ACE'S APPLICATION**

Plaintiff ACE Constructors, Inc. ("ACE") supplements its April 28, 2006 motion and application for fees and nontaxable expenses (the "Application"), submitted pursuant to the Equal Access to Justice Act (the "EAJA"), 28 U.S.C. 2412 *et seq.*, and replies to Defendant United States Army Corps of Engineers' (the "COE") response to the Application, as follows:

## I. ACE Qualifies for EAJA Relief

The COE first argues that the Application should be denied for ACE's alleged failure to "establish its eligibility for an [EAJA] award," asserting that ACE's original supporting submittals were insufficient. (Def.'s Resp. 1-3.) The COE ignores controlling case law.

In *Bazalo v. West*, 150 F.3d 1380 (Fed. Cir. 1998), the plaintiff submitted a timely EAJA application, but failed within the 30-day time limit to demonstrate his eligibility for relief – that his net worth did not exceed the EAJA threshold. *Id.* at 1381-82. The plaintiff's original application contained only the conclusory allegation that he was a "prevailing party" and failed

to set forth the specific facts establishing eligibility. *Id.* The Federal Circuit reversed the lower court's dismissal of the application, reasoning as follows:

> We agree . . . that while the time limitation should be strictly met, the content of the EAJA application should be accorded some flexibility. . . .
>
> . . . [B]y making the statement that he was a "prevailing party" entitled to an award [the plaintiff] met the jurisdictional eligibility requirement. Because he met the jurisdictional requirements of the EAJA statute, [the plaintiff] could supplement his filing after the thirty-day time limitation to set forth a more explicit statement about his net worth.

*Id.* at 1383-84; *see also, e.g.*, *Scarborough v. Principi*, 541 U.S. 401, 416-23 (2004) (holding that the "relation back" principle permits an EAJA applicant to supplement or amend a timely but incomplete application). Thus, a bare allegation of eligibility qualifies a "prevailing party" for relief, so long as the application is timely. *Bazalo*, 150 F.3d at 1383-84.

Here, ACE met and exceeded EAJA jurisdictional requirements by submitting the timely Application and submitting supporting evidence, including an affidavit of ACE's President, John Fulkerson. To the extent ACE's evidence is insufficient, " '[w]hat remains is the fleshing out of the details,' " and the Application cannot be denied without the opportunity to provide additional information. *Bazalo*, 150 F.3d at 1383 (quoting *Dunn v. United States*, 775 F.2d 99, 103 (3d Cir. 1985)).

Supplemental evidence provided with this submittal conclusively establishes ACE's status as a "prevailing party" entitled to EAJA relief. ACE has attached the affidavit from its Certified Public Accountant, accompanied by a copy of its 2003 audited financial statements, which established that on the date this action was filed ACE's net worth was only $384,162. (Forehand Aff. ¶¶ 2-3, Ex. 1 – attached hereto as Exhibit "A."; *see also* Pl.'s Initial App. Ex. A

(Fulkerson Aff.) ¶ 2). This same evidence also confirms that ACE employed fewer than 500 workers.

ACE has established that it qualifies under the EAJA and its application should not be denied on jurisdictional grounds. *See* 28 U.S.C. § 2412(d)(2)(B).

## II. The COE's Substantially Unjustified Position Warrants EAJA Relief

### A. As the "Prevailing Party" ACE's Entitlement Is Presumed, and the COE Bears the Burden of Proof

The COE correctly concedes that ACE prevailed in this case, a significant statutory threshold to EAJA entitlement. (*See generally* Def.'s Resp., Jan. 14, 2008; *see also* 28 U.S.C. § 2412(b).) A "prevailing part[y] for attorneys fees purposes . . . succeeds on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (emphasis added); *see also Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 1025 (Fed. Cir. 2005) ("prevailing" includes obtaining an enforceable judgment on the merits).

ACE obtained an enforceable judgment against the COE on every significant issue. *See Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 295 (2006). Accordingly, ACE is the "prevailing party" entitled to relief under the EAJA, and the COE, not ACE, bears the burden of establishing that its position was substantially justified. *See Rice Servs.*, 405 F.3d at 1025; *see also, e.g.*, *Davidson v. Veneman*, 317 F.3d 503, 506 (5th Cir. 2003) ("The burden of proving substantial justification falls to the Government."); *Clark v. Busey*, 959 F.2d 808, 810 (9th Cir. 1992) ("[T]he prevailing party's entitlement to an award under the EAJA is presumed, unless the government's position in the challenged conduct and in the litigation itself is 'substantially justified.' " (emphasis added)).

### B. The "Substantially Justified" Standard

To avoid EAJA liability, the COE must establish that its position is "substantially justified," defined as "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person." *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). The COE also acknowledges a crucial point when it states that " 'the position of the United States' refers to [the COE's] position throughout the dispute, including the agency's administrative position." (Def.'s Resp. 3 (emphasis added) (quoting *Doty v. United States*, 71 F.3d 384, 386 (Fed. Cir. 1995)).) The COE's catalogue of its very minor successes and its restatement of positions that have been rejected repeatedly throughout this dispute are a most unpersuasive effort to meet this standard.

### C. ACE's Recovery Demonstrates the COE's Unjustified Position Throughout this Dispute

#### 1. In its results-based analysis, the COE distorts the "substantially justified" standard.

The COE first attempts to reframe the "substantially justified" determination by focusing on the amount of ACE's recovery (Def.'s Resp. 4-6), when the proper touchstone for the Court's inquiry is the COE's position. *Doty*, 71 F.3d at 386. When the monetary results of the litigation are considered, however, the unjustified position of the COE is apparent. From the very

inception of this dispute the COE adopted and maintained an unequivocal position that ACE was not entitled to any compensation on any of its claims whatsoever.[1]

The COE's untenable position is essentially that it was substantially justified simply because ACE did not recover every dollar sought in the underlying administrative process and at trial. (Def.'s Resp. 4-6) Under the COE's interpretation, EAJA relief is appropriate only if the plaintiff recovers at trial all amounts sought at every stage of the dispute. The actual EAJA threshold is far less rigorous, and the COE's narrow and unsupported interpretation is belied by the inherent nature of the "substantially (un)justified" standard.

In asserting this position, the COE seeks to divert attention from the fact that the COE's consistent position throughout the proceedings was that ACE should recover nothing. (Def.'s Resp. 4-6.) When ACE's recovery is viewed in this proper context, the simple fact is that ACE recovered over $1.6 million more than the COE contended ACE was entitled to throughout and minor differences do support a finding of substantial justification for the COE's position. *Ace Constructors*, 70 Fed. Cl. at 294-95.

**2. ACE recovered on all claims and substantially all amounts requested.**

At trial the COE maintained its position that ACE had no entitlement on any claim (*e.g.*, Trial Tr. 37-52), yet ACE recovered 89.4% of the damages sought.

[1] *See, e.g.*, Pl.'s Compl. Ex. 3 at 5 ("This letter constitutes the final decision of the Contracting Officer denying your claim for additional compensation."); Pl.'s Compl. Ex. 4 at 6 ("I have determined that your claim is without merit and therefore, is denied. This letter constitutes the final decision of the Contracting Officer denying your claim for additional compensation."); Def.'s Post-Trial Br. 13-30 ("ACE is not entitled to an equitable adjustment for the cost of producing dirt fill . . . . ACE is not entitled to an equitable adjustment based upon its defective specifications claims. . . . For these reasons, the Court should dismiss the complaint, with prejudice.").

| Claim Description | Damage Component | Court's Award | ACE Trial Claim | Difference |
|---|---|---|---|---|
| **Dirt Claim** | | | | |
| | Additional Grading | $462,745.76 | $476,401.63 | (13,655.87) |
| | Constructive Acceleration | $17,283.76 | $16,292.00 | 991.76 |
| | Reduced Productivity | $20,982.97 | $35,492.00 | (14,509.03) |
| | *Subtotal* | *$501,012.49* | *$528,185.63* | (27,173.14) |
| **Cambro Claim** | | | | |
| | ACE Direct Costs | $461,936.95 | $469,617.57 | (7,680.62) |
| | Cambro's Claim | $420,060.53 | $570,063.19 | (150,002.66) |
| **Liquidated Damages** | | $246,130.00 | $254,280.00 | (8,150.00) |
| | | ***$1,629,139.97*** | ***$1,822,146.39*** | ***(193,006.42)*** |

Excluding the Cambro pass-through claims,[2] ACE recovered 96.5% of its direct claims before this Court. Based on the results attained at trial, Mr. Wenick's analysis and the totality of the evidence, the COE's position that none of ACE's claim had merit was patently unjustified.

**3. ACE recovered significantly more than the COE's valuation at trial.**

While maintaining its position that ACE had no entitlement on any claim, the COE tasked Mr. Sanford with analyzing the quantum to determine what, if anything, was reasonable, fair and supported. (Trial Tr. 1262, 1264-65, 1289.) Mr. Sanford prepared his own estimate of the costs ACE incurred and calculated the fair and reasonable value of ACE's claims as $1,000,706.94:

[2] The amounts claimed by Cambro were calculated initially by Mr. Camili of Cambro and were based upon Cambro's internal cost accounting records maintained contemporaneously with completion of the Project work. Like the technical issues underlying this Court's entitlement determinations, these claims became more refined through attorney involvement and the review by the DCAA auditors. Mr. Wenick, however, did not undertake a substantive analysis of the amounts claimed by Cambro prior to trial, yet the only area where the COE made any significant inroads regarding the amounts claimed in this action relate to the Cambro claim – more specifically, the exclusion of the Penhall Milling amounts and the proper equipment rate for Cambro's form riding paving machine.

| Claim Description | Damage Component | ACE Trial Claim | Sanford's Position | Difference |
|---|---|---|---|---|
| **Dirt Claim** | | | | |
| | Additional Grading | $476,401.63 | $409,213.43 | $67,188.20 |
| | Constructive Acceleration | $16,292.00 | $0.00 | $16,292.00 |
| | Reduced Productivity | $35,492.00 | $0.00 | $35,492.00 |
| | *Subtotal* | *$528,185.63* | *$409,213.43* | *$118,972.20* |
| **Cambro Claim** | | | | |
| | ACE Direct Costs | $469,617.57 | $285,735.51 | $183,882.06 |
| | Cambro's Claim | $570,063.19 | $305,758.00 | $264,305.19 |
| **Liquidated Damages** | | $254,280.00 | $0.00 | $254,280.00 |
| | | ***$1,822,146.39*** | ***$1,000,706.94*** | ***$821,439.45*** |

(Def.'s Trial Ex. 237.)

The approximately $820,000 difference between ACE's trial claims and Mr. Sanford's conclusions resulted largely from the following factors: (a) the COE denied ACE's entitlement for, and did not ask Mr. Sanford to review, ACE's claims for constructive acceleration ($16,292), reduced productivity ($35,492) and liquidated damages ($254,280), and (b) Mr. Sanford utilized the COE "Construction Equipment Ownership and Operating Expense Schedule" (the "COE Manual") to reduce the equipment cost component of ACE's claims. ACE prevailed on its claims for constructive acceleration, reduced productivity and liquidated damages, and the COE ultimately capitulated in its post-trial rebuttal brief that the COE Manual was an improper basis for valuating ACE's equipment costs. (Def.'s Reply to Pl.'s Post-Trial Br. 10.)

In the end ACE recovered 163% of what Mr. Sanford determined to be reasonable, fair and supported and $1.6 million more than what the COE contended to be ACE's actual entitlement:

| Claim Description | Damage Component | Court's Award | Sanford's Position | Difference |
|---|---|---|---|---|
| **Dirt Claim** | | | | |
| | Additional Grading | $462,745.76 | $409,213.43 | $53,532.33 |
| | Constructive Acceleration | $17,283.76 | $0.00 | $17,283.76 |
| | Reduced Productivity | $20,982.97 | $0.00 | $20,982.97 |
| | *Subtotal* | *$501,012.49* | *$409,213.43* | $91,799.06 |
| **Cambro Claim** | | | | |
| | ACE Direct Costs | $461,936.95 | $285,735.51 | $176,201.44 |
| | Cambro's Claim | $420,060.53 | $305,758.00 | $114,302.53 |
| **Liquidated Damages** | | $246,130.00 | $0.00 | $246,130.00 |
| | | ***$1,629,139.97*** | ***$1,000,706.94*** | ***$628,433.03*** |

Any minor difference in the amount ACE claimed and what this Court awarded does not support the position that the COE was substantially justified in the whole. Even after this Court found in ACE's favor on every significant issue, the COE adhered to the indefensible position that ACE was not entitled to any additional compensation, took an appeal and lost again. *Ace Constructors, Inc. v. United States,* 499 F.3d 1357, 1361, 1365 (Fed. Cir. 2007) ("The government argues that ACE is not entitled to any additional recovery, and requests reversal of all of the relief granted by the Court of Federal Claims."). Thus, the ultimate outcome of this action, far from bolstering COE's claim of substantial justification, weighs heavily in ACE's favor.

### D. Record Evidence Demonstrates the COE's Unjustified Position Throughout the Dispute

The subject of the "substantially justified" determination is the COE's overall position throughout this dispute, not the COE's position as to each and every discrete issue. *E.g., Doty*, 71 F.3d at 386. The COE's overall position (that ACE had no entitlement whatsoever) nevertheless is necessarily the aggregate of various discrete "subpositions" taken with respect to ACE's individual claims. The COE cannot carry its evidentiary burden of establishing that its

position was substantially justified as to any of ACE's claims, and ACE is entitled to EAJA relief.

### 1. The <u>COE's unjustified resistance to the differing site condition Dirt Claim</u>.

#### a. The COE failed to conduct an adequate investigation.

The COE's failure to conduct a reasonable and thorough investigation of the Dirt Claim is perhaps the strongest indication of the COE's unjustified position and led to four years of litigation.[3] By early March 2001, the COE was aware of the claim. *Ace Constructors*, 70 Fed. Cl. at 272-73. During a March 8, 2001, teleconference between COE employees (Messrs. Menchaca, Ray and Fuentes) and the Project's principal designer, Mr. Herrin, the COE posed a very specific and carefully worded question – adopting a position of willful ignorance in the process:

> Q Okay. What question was asked of Mr. Herrin?
>
> A The main question was asked was this supposed to be a balanced job.
>
> Q Okay. And what did he say?
>
> A He answered that he was not asked to design a balanced job. He was never asked by Fort Bliss to design a balanced job. Those words I remember.
>
> Q And did he – did you ask him whether, whether he was asked to or not, whether he had in fact designed a balanced job?
>
> A No.
>
> Q Did anybody on that call ask that question of him?

[3] Unlike the COE in this instance, this Court recognized that "the [government] has the duty, once notice is given, to investigate the existence, nature, extent, and validity of the contractor's claim." *Ace Constructors*, 70 Fed. Cl. at 273 n.24 (*quoting Farnsworth & Chambers Co. v. United States*, 346 F.2d 577, 581 (Ct. Cl. 1965)).

A Not to my recollection.

(Trial Tr. 1134.) The Court recognized the COE's contrived handling of ACE's claim: "[O]nce the Corps was on notice of the differing site condition, [the COE] failed to adequately review the 'nature' and 'extent' of ACE's claim. . . . T]he teleconference was oriented toward assigning responsibility for the extra costs rather than determining the possible mitigating steps that might be taken." *Ace Constructors,* 70 Fed.Cl. at 273 n.24.

Beyond this bit of sleight-of-hand with the designer, the COE denied the Dirt Claim even though the COE possessed ample pre-bid evidence that the Project in fact was designed to be balanced. Although the COE may not have requested that Crawford, Murphy and Tilly, Inc. ("CMT") design a balanced project, CMT early on advised the COE that its original design would require imported fill at a cost of $2.5 million. (Trial Tr. 462-63; 468-69.) So, "[CMT] redesigned the project to eliminate the need for importation of fill, thus eliding the cost of importing fill from the cost estimate." *Ace Constructors*, 70 Fed. Cl. at 271. Well before the COE solicited bids, CMT submitted a February 23, 2000, proposal that the imported fill material be eliminated, indicating that "[w]e believe this [imported fill] is not required." (Pl.'s Tr. Ex. 15.) CMT ultimately designed the project so that planned excavations would provide sufficient fill material to meet the elevations indicated in the Contract Documents. (Trial Tr. 467-70.) Had the COE simply reviewed its own design records as part of an investigation of this claim, it could have determined that ACE was entitled to recover for having to import additional fill.

Furthermore, in early 2003 the COE requested that CMT review ACE's Dirt Claim, and CMT memorialized its conclusions in a memorandum dated February 18, 2003. (Pl.'s Trial Ex. 140.) In that document, prepared by Mr. Herrin, CMT confirmed that the amount of additional fill required to complete the Project to the lines and grades on the plans was in the magnitude of 125,000 cubic yards, just as estimated by ACE. This CMT analysis was based on CMT's comparison of the original plans and elevations and the SLI Survey. (Trial Tr. 474, 477; Pl.'s

Trial Ex. 140.) CMT also concluded that if the actual elevations on the Project were two feet lower than shown on the plans, then ACE had performed additional work and should be paid for that work. (Trial Tr. 478; Pl.'s Trial Ex. 140.) Finally, CMT concluded that, based upon the quantity of 125,000 cubic yards of additional fill, ACE's request for $590,485 was reasonable for the amount of work performed. (Trial Tr. 478; Pl's Trial Ex. 140.)

The evidence was overwhelmingly in ACE's favor on both the entitlement and quantum. Had the COE undertaken any investigation at all – or followed the advice of its designer after the fact – ACE would not have had to incur significant attorneys' fees and costs to secure payment of this claim. The COE was wholly unjustified in denying the existence of the differing site condition in the face of its inexplicable failure to conduct a reasonable investigation of ACE's contentions, or to acknowledge the evidence sitting in its files.

**b. The COE's unjustified technical defenses – notice and survey verification.**

Beginning with its initial responses to the Dirt Claim, continuing with the contracting officer's decision and throughout the trial of this matter, the COE consistently denied Dirt Claim entitlement, in part, on a notice defense. This Court squarely rejected this defense and methodically tracked the evidence concerning notice in its decision. *Ace Constructors*, 70 Fed. Cl. 266. The COE now resurrects this rejected defense in an attempt to avoid EAJA liability.

The COE asserts, once again, that "ACE did not notify the Government of its claim that the site elevations were different than those indicated in the contract until after it had already disturbed the existing conditions." (Def.'s Resp. 7). The COE again attempts to draw an artificial distinction between ACE's written notice on March 5, 2001, that it was running out of dirt and an elevation discrepancy. As this Court found: "The government argues a distinction

that has no real meaning; a shortage of dirt and a low elevation are two sides of the same coin." *Ace Constructors*, 70 Fed. Cl. at. 273 n.24.

A differing site condition was presented when ACE was nearing the end of the excavation shown in the contract drawings, yet did not have enough fill to construct the Project. A simple comparison of the survey data confirmed the existence of the differing site condition, and the COE's admitted lack of any understanding concerning the Project's design regarding imported fill, coupled with its own failure to conduct any meaningful investigation, was the reason the COE did not understand the significance of ACE's March 5 notice.

Had the COE undertaken any investigation on March 5, 2001 it could have verified that ACE was nearing completion of the designed excavations and that additional fill was still needed. Had the COE undertaken any investigation on March 5 it could have verified for itself that the actual elevations were lower than shown on the plans. The COE opted to do almost nothing in response to ACE's notice of the differing site condition on March 5. The COE's assertion that it did not learn of the differing site condition until April 2, 2001 is without merit, and its defense on this basis was, and is, without substantial justification.

Likewise, this same evidence demonstrates that the COE's claim of prejudice from the alleged lack of notice fails the "substantially justified" test. The COE brought forth no competent evidence to satisfy its burden of proving that the site could have been lowered. Mr. Herrin refused even to speculate at trial whether or not it could be done (Trial Tr. 503), and his pre-bid design narrative indicated that the Project was designed with that specific elevation for an important reason: "The surface drainage of the site via the ditches dictated the overall profile of the taxiway, apron, and pallet storage area." (Pl.'s Trial Ex. 18, at 34.) ACE's witnesses doubted that the Project's profile could be lowered, the designer refused to speculate and no

COE witness testified that it was even possible. A lawyer's trial theory – without record support – is of no help to the COE.

No witness other than Mr. Wise testified that in March 2001 the fill operations had passed the point for the COE to consider lowering the Project elevation. Mr. Menchaca even testified that there was nothing about the site of the construction on March 5, 2001, that would have prevented the COE from lowering the elevation of the Project. (Trial Tr. 1130-31.) Even Mr. Wise testified that his belief was based only on his "sense at the time." (Trial Tr. 1185.) Mr. Wise conceded that he "did not do any engineering study or any quantitative takeoffs to verify that [position]." (Trial Tr. 1185.) In short, the COE did no investigation into the possibility of lowering the site and, according to Mr. Wise, there was nothing physical about the condition of the site as late as April 2001 that would have prohibited the COE from lowering the Project elevations. (Trial Tr. 1189.)

The COE falls well short of satisfying the burden of proof for showing substantial justification.

**c. The COE's irrelevant argument concerning ACE's damages.**

The COE addresses purported contradictions in the evidence surrounding ACE's claimed damages in an attempt to justify its overall position in rejecting the Dirt Claim. (Def.'s Resp. 8.) Such contradictions (if any existed) are irrelevant, as the record is devoid of any indication that the COE – at any point – based its denial of the Dirt Claim on equivocal evidence concerning damages. On the contrary, the COE disputed entitlement at every opportunity and, except as a precaution at trial, never engaged in analysis of ACE's damages. As such, the COE cannot retroactively justify its position by disputing the evidentiary foundations of ACE's damages.

Furthermore, the origin of ACE's Dirt Claim was not in whether the bid documents represented that the site would yield 50,000 cubic yards of excess dirt, 20,000 cubic yards of excess dirt or even 1 cubic yard of excess dirt. Rather, the Dirt Claim had its genesis in the fact that it was essentially undisputed that the bid documents represented to ACE, and other potential bidders, that there would be enough fill generated from the cuts to construct the Project. There can be no dispute that CMT designed the ditches and ponds specifically for the purpose of generating enough fill to construct the Project. Nor can there be any dispute that ACE reached the pre-bid conclusion that, because of the fill that would be generated from the excavation of the ditches and ponds, imported fill would not be needed to construct the Project.

The COE attempted at trial, on appeal and here to muddy this simple issue by arguing that an inconsistency existed in Mr. Fulkerson's trial testimony on the quantity of anticipated fill. A closer examination reveals that no inconsistency exists. While Mr. Fulkerson did write in a letter that "the topo documents provided by the Corps that [were] utilized for bid takeoffs indicated that there [were] approximately 20,000 cubic yards of excess dirt on-site" (Pl.'s Trial Ex. 76), Mr. Fulkerson explained clearly at trial that the writing was in error. Rather, Mr. Fulkerson testified that, based on the Dirt-Tek analysis that the site would essentially be balanced, he included $20,000 (not 20,000 cubic yards) in his bid for the cost of removing approximately 5,000 cubic yards of excess material. (Trial Tr. 527-28.) Conversely, on direct examination Mr. Fulkerson was asked about the takeoff he had performed pre-bid based on the cut and fill numbers provided by the COE in the contract documents. (Trial Tr. 229-30.) Mr. Fulkerson testified that his takeoff indicated that the cut and fill operations should generate an

estimated 40,000 to 50,000 cubic yards of excess fill. (Trial Tr. 230.)[4] Thus, ACE was presented with two different pre-bid estimates that, although varying in magnitude, confirmed the central fact that no imported fill would be needed to construct this Project. As a prudent contractor, ACE included an amount in its bid price to defray the cost of disposing of the anticipated excess fill in case it was not able either to sell the fill or to get someone to remove the excess fill free of charge.

Nevertheless, both numbers demonstrate that "the topographical representation that the COE provided for this project indicated that there was more than an adequate amount of dirt on-site to complete this project in accordance with the specifications." (Pl.'s Trial Ex. 76.) Mr. Fulkerson testified in detail as to how ACE performed its pre-bid takeoff:

> Q What use, if any, did you or others at Ace make of these cut-to-fill sections in your bid?
>
> A We did the same calculation to see what the – that was one of the ways that we looked at what the balance condition would be on the job. Would it be an import job, or would be an excess job, or would it be a balanced job?
>
> Q All right. Did you convert these cut-to-fill numbers into volume?
>
> A Yes, we did.
>
> Q And what did the computation tell you, as to whether the project would be an excess job, a borrow job or a balanced job?
>
> A It told us that it would have excess fill material, because the cut volumes were greater than the fill volumes.

[4] Mr. Fulkerson's testimony that the cut and fill sections contained in the Contract Documents resulted in an excess of "40 to 50,000 cubes" was fully supported by CTM's own takeoff dated January 8, 2002. (Pl.'s Trial Ex. 122.) Mr. Fulkerson noted as much when he testified that the "cut-and-fill areas [used by CMT] are the same areas that are shown on the drawings. So those are the same areas we used. And the end result is roughly order-of-magnitude the same result we got. I don't know that we got exactly the identical numbers at each station, because I don't have our calculations to compare. But we came up with the same result." (Trial Tr. 232.)

> Q And do you recall, pardon me. Do you recall how much excess fill these cross-section sheets reflected the job would generate?
>
> A As I recall, between 40 and 50,000 cubes. And I can't remember whether it was cubic meters or cubic yards.

(Trial Tr. 230.) Every estimate or takeoff presented in this case was in agreement as to the central underlying fact: no imported fill would be needed to construct this Project. The magnitude of the expected excess was of no relevance as ACE was not seeking to recover the loss of revenue that it might have earned from the sale of the excess fill, nor did the magnitude of the anticipated excess fill otherwise factor into the damages sought by ACE in this action. In short, the alleged discrepancies in the pre-bid takeoffs do not give rise to substantial justification for the COE's position in this case in light of the entirety of the evidence.

**d. The COE unjustifiably maintains that a differing site condition never existed.**

After an affirmed judgment in ACE's favor on the Dirt Claim, the COE suggests that "ACE did not prove that conditions indicated in the contract differed materially from those actually encountered during performance." (Def.'s Resp. 9-10.) This Court has rejected the COE's argument on this point, distinguishing *Pacific Alaska Contractors v. United States*, 436 F.2d 461 (Ct. Cl. 1971), and finding that ACE reasonably relied on the elevations set forth in the contract documents. *Ace Constructors*, 70 Fed. Cl. at 269-70. As before, the evidence is clear: the contract documents contained inaccurate and misleading survey elevations, and ACE reasonably relied on the information contained in the Contract Documents in formulating its bid.

In this post-appellate stage the COE also attempts to bolster its untenable denial of the Dirt Claim by (a) inferring from as-built drawings that ACE caused the differing site condition (without acknowledging that any such condition existed), and (b) alluding to the alleged absence

of similar complaints concerning the inaccurate survey data. (Def.'s Resp. 10.) Given the overwhelming weight of evidence to the contrary, the COE's position in denying the Dirt Claim cannot be considered "substantially justified."

**2. The COE's unjustified resistance to the defective specifications claims and constructive change claim.**

**a. ACE presented all claims to the contracting officers.**

With respect to the two-part defective specifications Concrete Paving Claim and the constructive change Profilograph Claim, the COE attempts to justify its position by reiterating its rejected argument that this Court lacks jurisdiction. (Def.'s Resp. 15-16, 18-19.) The COE's argument is untenable.

Before seeking relief in the Court of Federal Claims pursuant to the Contracts Disputes Act of 1978 (the "CDA"), a contractor must present written claims for additional compensation to the contracting officer. *See* 41 U.S.C. § 605(a). Once a claim is presented a contractor need not adhere rigidly "to the exact language or structure of the original administrative CDA claim [when] they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003). "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Id.*

ACE submitted clear and unequivocal statements requesting additional compensation for these claims, and the COE was and is unjustified in arguing that this Court lacks jurisdiction. As to the Concrete Paving Claim,

> [t]he Court of Federal Claims found that the claims were the same, arising from the same operative facts and raising the same issues and arguments. . . . The government argues that the claim did not

> discuss how rigid-form paving in general was not suitable to the project; this argument is belied by the claim itself.

*Ace Constructors*, 499 F.3d at 1363 (emphasis added); *see also Ace Constructors*, 70 Fed. Cl. at 266. As to the Profilograph Claim, the Federal Circuit stated:

> [t]he Court of Federal Claims found, and we agree, that the claims before the contracting officer and the court did not differ significantly, for the claim concerning the use of profilograph testing was presented to the contracting officer based on the same contract provisions, the same requirements made by the Army Corps of Engineers, the same costs, the same requested relief, and the same legal theories.

*Ace Constructors*, 499 F.3d at 1361 (emphasis added); *see also Ace Constructors*, 70 Fed. Cl. at 266.

The COE was unjustified in its attempted application of a narrow jurisdictional standard at the trial court and appellate level.

**b. ACE reasonably based its bid on concrete paving information and drawings the COE provided.**

The COE attempts to justify rejecting ACE's Concrete Paving Claim by alleging that ACE and Cambro did not rely on certain staking plans (Drawing Sequences 49 through 52) included in the contract drawings and arguing that ACE could have derived the correct elevations through mathematical interpolation. (Def.'s Reply 12-13.) These arguments are nonsensical.

The COE took the Project to bid without issuing a complete set of staking plans, that is, without providing the final elevations for each 5.75-meter concrete panel. (Trial Tr. 484-85; Pl.'s Trial Ex. 178.) Instead, the COE issued an addendum to the bid package, including revised plans, which provided in pertinent part:

> The plan elevations of the joint pattern grid line intersections will be provided by the government as supplemental information after award. These spot elevations will be reflective of the finished contours and profiles of the concrete pavement structure.

(Pl.'s Trial Ex. 179 n.3.)

In other words, the COE essentially directed ACE and all other bidders not to rely on the incomplete staking plans in formulating their bids for constructing the Project. Now, the COE argues that ACE should have (a) ignored the COE's directive, (b) relied on the staking plans and (c) performed an onerous and unreasonable set of mathematical interpolations, after the COE's revised plans advised that those same interpolations would be forthcoming post-award.

The information contained in the contract drawings conflicted with the information not provided by the COE until *after award* of the contract to ACE. The spot elevations set forth on the staking plans (Drawing Sequences 49 through 52), although perhaps reflective of the finished contours, did not provide prospective bidders with enough information for them to have discovered the conflict that existed between the actual elevation points of the 5.75-meter panels and the typical sections. This is because the staking plans included only "one of the points at the corner of each of the squares on every other lane." (Trial Tr. 284.)

Mr. Herrin testified that interested bidders were requesting that they be provided with all of the elevations at each of the intersections before the Project was let. (Trial Tr. 485-86; Pl.'s Trial Ex. 24.) The COE decided that it did not want to delay the bid and put a note on the amended contract drawings to assure the prospective bidders that the elevations already provided were, in fact, reflective of the final finished contours. (Pl.'s Trial Ex. 24, 179.) At the time that the COE decided to withhold the requested information, Mr. Wise expressed his concern over the COE's liability if the information provided after award was in error. (Pl.'s Trial Ex. 24.)

The information provided after award changed ACE's pre-bid assumptions as to how the Project was to be constructed, as the new information conflicted with the information contained in the typical sections and the grading plan in the bidding documents. Had the COE provided the

information, and had ACE had ignored the revised and complete staking information when it put together its bid, the COE may have been shielded from liability as argued by the COE in its Post-Trial Brief. However, the COE chose to withhold that vital information, depriving ACE of any opportunity to discover the conflict pre-bid.

The COE cannot establish substantial justification in rejecting ACE's claim based on such an unsound argument, and ACE is entitled to recover attorneys' fees and costs under the EAJA.

**c. The COE failed to investigate ACE's concerns over concrete paving methods.**

It appears that here too the COE failed to conduct a reasonable investigation of ACE's claim when it was presented. The COE first rejected ACE's request for an increased concrete slump even though the request was backed by the form riding paver manufacturer. *Ace Constructors*, 70 Fed. Cl. at 266. The COE then consistently denied any liability for the Cambro Claim at every turn. However, based on Mr. Herrin's trial testimony, it is evident that had the COE had a discussion with its designer, the COE would have learned that the use of rigid form paving system would not work with the underlying CMT design, and the resulting litigation might not have been necessary.

Mr. Herrin testified at trial that CMT designed the Project for a slipform paver. (Trial Tr. 448.) Mr. Herrin assumed that the concrete paving would be accomplished using a slipform paver and did not envision that rigid form paving would have been used on the Project (except for some small areas) because of its size and curvature. (Trial Tr. 448.) CMT specified a maximum two-inch slump concrete mix, which is required for a slipform paver, and designed the direction of the longitudinal joints for a slipform paver. (Trial Tr. 443-44.) Nevertheless, the Contract specifications gave the contractor the option of using either slipform paving or rigid

form paving to construct the Project. Mr. Herrin suggested during trial that if a contractor was going to construct the Project using a rigid form paver, the contractor should have paved the project from east to west instead of north to south as designed by CMT (Trial Tr. 443-44), but he conceded that nothing in the Contract Documents otherwise informed the contractor that the Project should be constructed other than as designed (that is, in the north-south direction) (Trial Tr. 462).

The COE apparently never fully investigated ACE's assertions concerning the existence of a defect in the Contract Documents with respect to the application of the form-riding paver to this design. Had the COE made such an inquiry with CMT during construction, CMT might have directed the COE to instruct the paving to be done in an east-west direction that, at least according to CMT had the potential to alleviate the construction problems experienced by ACE and Cambro. This conversation obviously did not occur as the COE never even raised the possibility with ACE or Cambro and Mr. Fuentes, testified that "it would have seemed ridiculous to" him and would not have made any "financial sense to do it that way" (Trial Tr. 1257).

Having not fully investigated ACE's allegations as it was obligated to do, the COE was uninformed as to the basis of the design and adopted the wholly unjustified position that the problems encountered in the concrete paving operations were entirely due to the fault of ACE and/or Cambro. At no stage of this dispute did the COE ever entertain even the possibility that a defect in the Contract Documents caused the difficulties ACE and Cambro complained:

> The evidence, however, will demonstrate that any such additional work was required because of ACE's performance methods and because (1) Cambro chose an exclusively 'rigid form' method of concrete paving, even though the contract allowed for a 'slip form' method, (2) Cambro chose to use exclusively three-meter long steel forms instead of longer form that the contract also allowed, and (3) Cambro's workmanship was poor.

(Defendant's Memorandum of Contentions of Fact and Law, 3-4.) If the COE had consulted with Mr. Herrin at any time before trial, perhaps the COE could have adopted a reasonable position on this claim. The COE failed to perform a thorough investigation of the Concrete Paving Claim, and it cannot avoid liability for defects by characterizing as unreasonable ACE's reliance on the defective Contract Documents. ACE is entitled to EAJA relief as a result.

**d. The COE's unjustified denial of the Profilograph Claim.**

Unlike with ACE's dirt and concrete paving claims, the COE actually undertook to investigate ACE's contention that the profilograph was not an appropriate test for this Project, and its decision to delete the test mitigated the damages ACE ultimately sought in this action. Despite this investigation, the COE still managed to adopt an unreasonable position at practically every opportunity.

After concrete paving operations began, the COE informed ACE that profilograph testing would be required. (Trial Tr. 408.) In September 2001, ACE and Cambro complained of the inappropriate nature of the optional profilograph test and objected to the COE requiring that all nonconforming concrete be removed. (Compl. Ex. 4) The COE initially maintained that profilograph testing was appropriate and mandatory in all areas, but later contacted the USACE Transportation Center in October 2001 and was advised, "The profilograph was not recommended for the pallet storage area because the area was meant for vehicular traffic. The profilograph did not apply to the apron because of the dome shape." (*Id.* at "Findings of Fact" ¶ C.26; *see also* Pl.'s Trial Ex. 125.) Although the COE ultimately waived profilograph testing for surface smoothness, the COE still required ACE to perform the test in certain areas. (Pl.'s Trial Ex. 111.)

The COE forced ACE to struggle to satisfy the profilograph until at least February 2002, when the COE finally acknowledged the inappropriate nature of profilograph testing on this Project and issued a request for proposal (RFP No. 5) for deleting the requirement as a precondition to payment in certain areas. (Compl. Ex. 4; Pl.'s Tr. Ex. 126) By that time, however, ACE had placed most of the concrete, and providing a proposal for deleting the profilograph testing would have constituted a useless act. (*See id.*)

Although the COE's investigation of ACE's claim was more reasonable, the COE's ultimate position was quite the opposite. The contracting officer rejected the Profilograph Claim on the grounds that some of the concrete passed the mandatory profilograph test and that as such ACE's and Cambro's "lack of quality control procedures" caused other failures. (*Id.* at 4, 5 ("The problem with obtaining the specified smoothness resulted not from the requirement to use the profilograph test, but rather the lack of quality control procedures followed by ACE and Cambro." (emphasis added).) At trial the COE maintained that profilograph testing was both mandatory and appropriate even though its own investigation had concluded that it was, in fact, not appropriate. (*See*, *e.g.*, Def.'s Post-Trial Br. 29 ("The contract, however, did require profilograph testing.").)

The COE now seeks to avoid EAJA liability for denying the Profilograph Claim by (a) adhering to a patently unreasonable interpretation of the contract language and (b) arguing that ACE was not misled by those specifications, as ACE included no amounts for profilograph testing in its bid. (Def.'s Post-Trial Br. 29; Def.'s Resp. 16-18; *see also Ace Constructors*, 70 Fed. Cl. at 288 n.40.)

The COE's argument concerning ACE's bid underscores the unreasonable nature of the COE defense in this action and supports ACE's entitlement under the EAJA. The fact that

ACE's bid did not include amounts for profilograph testing is the very essence of ACE's claim. (Trial Tr. 408.) Prior to bid, ACE reasonably interpreted the solicitation language to mean that profilograph testing was optional. *Ace Constructors*, 70 Fed. Cl. at 288. When the COE wrought a constructive change by mandating profilograph testing, ACE was damaged. *Id.* at 288-89. In other words, if ACE had based its bid on the assumption that profilograph testing was mandatory, there would have been no constructive change, no claim, no lawsuit and no appeal.

Further, no support exists for the COE's consistently maintained position that profilograph testing was mandatory. The profilograph was an optional smoothness test. Contract Section 1.3.7 specifies that the contractor "shall" use either the straightedge or profilograph to test surface smoothness. A straightedge is mandatory (i.e., "shall"), while the contractor has the option (i.e, "may") to furnish a 7.6-meter profilograph. (Pl.'s Trial Ex. 177 §§ 1.11.9, 1.11.10.)

The Project's designer recognized the merit of ACE's position when questioned by the Court on the issue:

> THE COURT: All right, Do you see the first line of Section 1.11.10, it says the contractor may furnish a 7.6 meter profilograph for testing the finished pavement surface?
>
> THE WITNESS: Yes.
>
> THE COURT: Well, what if the contractor decides not to do that?
>
> THE WITNESS: I guess it's the way you interpret the word may.
>
> THE COURT: Well, that's ordinarily a job for the Court, but it – could you go back up to Section 1.11.9?
>
> THE WITNESS: There it says it shall furnish.
>
> THE COURT: That's right. The contractor shall furnish and maintain at the job, in good condition one 4 meter straight edge for

> each paving train for testing. Does that difference signify anything to you as an engineer?
>
> THE WITNESS: Yes. Shall is always a requirement.
>
> THE COURT: All right. Does that affect your judgment on whether profilograph is required or not?
>
> THE WITNESS: Well, I have sat through meetings where there's been long discussions on what the definition of shall, may, must, and all these requirements are. And we even prepared a document one time where we defined all of the different terms and said that shall is mandatory and must implies that there is some requirement and <u>may in that document we reply did imply a choice</u>.

(Trial Tr. 490-91 (emphasis added).)

The COE also cannot justify its position that ACE was responsible for the alleged patent ambiguity in the Project testing specifications. As discussed, the contract was clear, and as such no ambiguity existed. Even if that were not the case, "[a] patent ambiguity is one that is obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." *Ace Constructors*, 70 Fed. Cl. at 288 n.40 (citations and internal quotation marks omitted). As this Court found, ACE could not have anticipated that the COE would take the unjustified position that profilograph testing was mandatory. Accordingly, ACE is entitled to EAJA recovery.

**III. ACE Should Recover the Actual Attorneys' Fees Incurred**

The COE contends that the Court should award only the standard EAJA hourly rate, and not the actual amount of attorneys' fees ACE incurred, arguing that no EAJA "special factors" exist to warrant an enhanced award. (Def.'s Resp. 19-20.) The COE cites to *Prowest Diversified, Inc. v. United States*, 40 Fed. Cl. 879 (1998), for the proposition that "a construction or Government contract case does not require any specialized knowledge or skill." (Def.'s Resp. at 19-20.) Thankfully for counsel who have devoted their entire careers to litigating complex construction disputes, the *Prowest* decision is not so dismissive as the COE contends.

The *Prowest* court denied enhancement, finding that the plaintiff's results were not exceptional and that the case "required only a level of general lawyerly knowledge and ability useful in all litigation." *Id.* *Prowest* involved "construction law" or "government contract law" only to the extent that the basic contract law principles (anticipatory repudiation) at issue arose from a public construction contract. *See id.* at 880-81. As the court found, any attorney could have litigated after reasonable familiarization with governing legal principles. *Id.* at 888-89.

It is the "nature of the case," rather than the specific area of law, that determines whether the standard EAJA rate should be increased. *Cox Constr. Co. v. United States*, 17 Cl. Ct. 29, 36 (1989). While some courts have been reluctant to award rates above the EAJA standard rate, most recognize that the "identifiable practice specialty" recognized by the Supreme Court in *Pierce v. Underwood*, 487 U.S. 552 (1988), is not limited to the areas of patent law or law requiring knowledge of foreign law or language. *See Atlantic Fish Spotters Ass'n v. Daley*, 205 F.3d 488, 491 (1st Cir. 2000) ("[W]e do not read the Supreme Court or most of the circuit cases as adopting a mechanical rule that automatically excludes a specialist from extra compensation merely because no separate credential exists for his field and because no foreign law or language is required. Such a reading is neither compelled by the statutory language or the examples in *Pierce*, nor consistent with what appears to be the underlying purpose of the exception."); *see also Muhur v. Ashcroft*, 382 F.3d 653, 656 (7th Cir. 2004) (allowing enhancement where "relevant expertise" was required to give the plaintiff a "fair shot at prevailing" in an immigration case); *Breaux v. U.S. Sec'y of Dep't of Health & Human Servs.*, No. 94-40582, 1995 WL 29223, at *2 (5th Cir. Jan. 11, 1995) (acknowledging that some social security disability cases may involve particularly complex issues that warrant an enhanced award); *Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir. 1991) (prior experience in environmental litigation constituted

distinctive knowledge sufficient to justify enhancement); *Pirus v. Bowen*, 869 F.2d 536, 541 (9th Cir. 1989) ("[T]here is no reason to believe the Court intended the universe of such specialties to be limited to patent law alone."); *Jean v. Nelson*, 863 F.2d 759, 774 (11th Cir. 1988) (a narrow legal specialty may justify enhancement where market rates for services exceed the statutory rate); *Harriott v. Ashcroft*, 277 F. Supp. 2d 538, 546-47 (E.D. Penn. 2003) (allowing enhancement where attorneys had specialized knowledge of immigration law).

The present case was infinitely more complex than the anticipatory repudiation case presented in *Prowest* and required attorneys with specialized knowledge in design, engineering, survey, concrete, concrete paving and earthwork means and methods, as well as the specialized understanding of intricate construction law principles and construction claims.

ACE posits that one cannot read this Court's comprehensive Opinion and Order and take away that this is the stuff of "general lawyerly knowledge and ability." Moreover, the results of this case qualify under the "excellent results" and "exceptional success" criteria the plaintiff relied upon in *Prowest.* This result would not likely have been achieved, however, if ACE's attorneys possessed only general knowledge and ability useful in all litigation. The self-evidently complex issues litigated before this Court necessitated representation by attorneys with exactly the kind of "distinctive knowledge or specialized skill" contemplated by Supreme Court in *Pierce*. 487 U.S. at 572. ACE's litigation counsel specialize in exactly this type of complex construction/design case and possess the distinctive knowledge and specialized skill not generally possessed other members of the legal profession. As such, ACE should receive an enhanced fee award reflective of the limited number of attorneys possessing its counsel's necessary and distinctive knowledge and specialized skill.

## IV. Alternatively, ACE Requests a Cost-of-Living ("COLA") Adjustment to the EAJA Standard Rates

Although ACE is entitled to an enhanced attorneys' fee recovery based on actual amounts incurred, in the alternative ACE requests a COLA adjustment to the EAJA maximum rate pursuant to 28 U.S.C. § 2412(d)(2)(A)(ii).

The cost of living has increased, " as measured by the Department of Labor's Consumer Price Index ("CPI")," since the March 1996 enactment of the EAJA. *Geo-Seis Helicopters, Inc. v. United States*, 79 Fed. Cl. 74, 79 (2007); *see also Baker v. Bowen*, 839 F.2d 1075, 1084 (5th Cir. 1988) (absent "unusual circumstances," COLA should be granted in EAJA attorneys' fee awards); *Payne v. Sullivan*, 977 F.2d 900, 903 n.2 (4th Cir. 1992) (acknowledging that many circuits "regard the cost of living adjustment as 'essentially perfunctory or even mandatory' " (citation omitted)); *Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor*, No. 04-00229, 2007 WL 2994605, *53 (Ct. Int'l Trade Oct. 15, 2007) ("[T]he great weight of authority today recognizes that '[i]t "would undermine the purpose of EAJA to remove the financial disincentive to challenge wrongful government action" if . . . courts could simply "withhold an inflation adjustment without reason." ' " (citations omitted)).

"The Federal Circuit has endorsed using 'a single mid-point inflation adjustment factor applicable to services performed before and after that mid-point.' " *Geo-Seis*, 79 Fed. Cl. at 79 (quoting *Chiu v. United States*, 948 F.2d 711, 722 n.10 (Fed. Cir. 1991)). "A base date of March 1996 constitutes the starting point to calculate the COLA." *Id.*; *see also* Pub. L. No. 104-121, Title II, §§ 232(b)(2), 233, 110 Stat. 847, 863-64 (1996) (codified at 28 U.S.C. § 2412(d)(2)(A)(ii)) (increasing the EAJA statutory rate from $75 per hour to $125 per hour in all actions filed after March 1996); *Ca. Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724,

733-34 (1999); *cf. Chiu*, 948 F.2d at 718-19; *Doty v. United States*, 71 F.3d 384, 387 (Fed. Cir. 1995).

ACE's attorneys' rates ranged from $175 to $325 per hour, for an average rate of $232.96 per hour. (*See* Pl.'s Initial App. Ex. B (Vezina Aff.))[5] The market rate for ACE's attorneys' services exceeded the rates ACE actually paid, and a COLA-adjusted rate is even lower. (*Id.* at ¶ 5.) ACE's attorneys rendered legal services between February 25, 2004 and the present. (*See id.* at Exs. 1 through 3.) The bulk of those services, however, were rendered between February 25, 2004 and April 10, 2006, resulting in a midpoint of March 2005. (*Id.*)

As calculated by the Bureau of Labor Statistics, United States Department of Labor, the CPI's for March 1996 (the base date) and March 2005 (the midpoint date) measured 155.7 and 193.3, respectively. *Compare* Bureau of Labor Statistics, U.S. Dep't of Labor, Consumer Price Index: March 1996 at Table 1, (ftp://ftp.bls.gov/pub/news.release/History/cpi.041296.news), *with* Bureau of Labor Statistics, U.S. Dep't of Labor, Consumer Price Index: March 2005 at Table 1, (http://www.bls.gov/cpi/cpid0503.pdf). The resulting COLA-adjusted midpoint rate for ACE's attorneys is $155.19,[6] for an alternative attorneys' fee award totaling $130,730.75.[7]

Per the previously submitted affidavit of John Fulkerson (Pl.'s Initial App. Ex. A), the supplemental affidavit of W. Robert Vezina, III (attached as Exhibit "B"), which includes a

---

[5] Dividing the gross amount of attorneys' fees ACE paid by the number of hours performed ($188,513.50/809.2 = $232.96). By way of comparison, Mr. Vezina's standard hourly rate over the pendency of this litigation has ranged from $375 to $425.

[6] Multiplying the statutory rate of $125 per hour by the March 2005 CPI, then dividing by the March 1996 CPI ($125 x 193.3/155.7 = $155.19).

[7] Multiplying the midpoint rate by the number of hours performed and adding the paralegal fees to the total ($155.19 x 809.2 = $125,579.75 + $5,151.00 in paralegal fees = $130,730.75).

revised Summary of Fees and Expenses and supporting invoices and documentation, ACE claims attorneys' fees and expenses in the amount of $259,288.66 (at the requested enhanced rate), or alternatively, $196,354.91 (at the COLA-adjusted rate). The breakdown of the impact of the COLA adjustment on the total recovery is as follows:

| ATTORNEYS' FEES RATE COMPARISON | | | | |
|---|---|---|---|---|
| | | TOTALS | | |
| Attorney | Hours Worked | Actual Hourly Rate | COLA ($155.19/hour) | EAJA standard rate ($125.00/hour) |
| | 809.20 | $188,513.50 | $125,579.75 | $101,150.00 |
| | | | | |
| Paralegal | 60.60 | $5,151.00 | $5,151.00 | $5,151.00 |
| | | | | |
| TOTAL | 869.80 | $193,664.50 | $130,730.75 | $106,301.00 |

## V. ACE Should Recover Actual Expert Witness Fees and Expenses

COE argues that the Court should not award the expert fees ACE requests, claiming that ACE cannot recover at a rate above the highest weighted compensation COE paid an expert in this particular case, or $81.80 per hour. (Def.'s Resp. 20-21.) COE had the luxury of using its own employees to analyze the costs claims, an option unavailable to ACE. If COE had utilized outside experts, however, perhaps no EAJA dispute would exist as COE would have adopted more realistic positions and avoided protracted litigation.

ACE's expert witness, Mr. Wenick, earned an undergraduate engineering degree from the U.S. Military Academy and a master's degree in civil engineering from the Massachusetts Institute of Technology. Mr. Wenick further supplemented his engineering education and expertise with an MBA from the University of Miami. Mr. Wenick is both a respected Professional Engineer and licensed General Contractor. The Court drew extensively on Mr. Wenick's testimony in its opinion, expressly noting Mr. Wenick's credibility as an expert witness regarding the cost of dirt hauling. *See, e.g.*, *Ace Constructors*, 70 Fed. Cl. at 278. Given Mr. Wenick's education, experience, background and credibility, the requested average hourly rate for his services ($161.76) is more than reasonable.

Courts routinely award EAJA expert fees far exceeding the $161.76 hourly average ACE requests, and in fact the United States routinely compensates its own expert witnesses at rates far above that amount. *See, e.g., Info. Scis. Corp. v. United States*, 78 Fed. Cl. 673, 683 (2007) (awarding expert fees of $327 per hour); *Am. Fed. Bank, FSB v. United States*, 74 Fed. Cl. 208, 221 (2006) (government's experts charged up to $600 per hour). While COE in this instance elected to reduce its costs by utilizing its own employees as witnesses, to penalize ACE for this choice would undermine the EAJA's purpose of eliminating the "financial disincentive to challenge unreasonable government actions." *Comm'r, INS v. Jean*, 496 U.S. 154, 164 (1990).

ACE therefore requests recovery of its actual expert witness fees incurred with respect to this case: $37,650.80.

**Conclusion**

ACE qualifies under the EAJA and the COE's position in this matter, taken as a whole, was substantially unjustified. ACE is entitled to an award pursuant to the EAJA of attorneys' fees and expenses in the amount of **$**259,288.66 (at the actual hourly rate it was charged), or alternatively, $196,354.91 (at the COLA-adjusted rate).

**CERTIFICATE OF FILING**

I hereby certify that on February 6, 2008, a copy of ACE's Supplement to Application for EAJA Relief and Reply to Defendant's Response to ACE's Application was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Bradley S. Copenhaver____________
W. Robert Vezina, III
Florida Bar No. 329401
Bradley S. Copenhaver
Florida Bar No. 162558
Vezina, Lawrence & Piscitelli, P.A.
413 East Park Avenue
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Facsimile: (850) 224-1353