# In the United States Court of Federal Claims

No. 04-299C

(Filed: March 20, 2008)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * | |
| **ACE CONSTRUCTORS, INC.,** Plaintiff, v. **UNITED STATES,** Defendant. | Post-trial request for attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); prevailing plaintiff; lack of substantial justification for the government's posture in the case; cost-of-living adjusted rate for attorneys' fees; statutory limitation on allowable hourly rate for plaintiff's expert witness; 28 U.S.C. § 2412(d)(2)(A)(i); costs |
| * * * * * * * * * * * * * * * * * * * * * | |

W. Robert Vezina, III, Vezina, Lawrence & Piscitelli, P.A., Tallahassee, FL, for plaintiff. With him on the briefs was Bradley S. Copenhaver, Vezina, Lawrence & Piscitelli, P.A., Tallahassee, FL.

Timothy P. McIlmail, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

A post-trial judgment was issued in plaintiff's favor in this contract case, and that judgment has been affirmed on appeal. *See ACE Constructors, Inc. v. United States*, 70 Fed. Cl. 253 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007). The only matters that remain unresolved are plaintiff's motion for an award of attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), and plaintiff's Bill of Costs. ACE Constructors, Inc. ("ACE") initially claimed that it was entitled to an award of $259,346.66 for attorneys' fees and expenses

and $20,978.73 in taxable costs under EAJA, but it subsequently reduced the amount sought to $257,103.60 in attorneys' fees and $19,616.05 in costs. The government resists such an award, maintaining that its position in the underlying litigation was substantially justified and also questioning elements of ACE's costs.

**BACKGROUND**

ACE contracted with the U.S. Army Corps of Engineers ("the Corps") to construct the Ammo Hot-Load Facility at Biggs Army Airfield, Fort Bliss, El Paso, Texas. *ACE Constructors*, 70 Fed. Cl. at 257. The Facility consists of a roadway, a sizable pallet storage pad, a large loading apron, and a taxiway that is connected with the main runway at the Airfield. *Id*. It is used to transfer missiles and other munitions to cargo aircraft for transport. *Id*. ACE completed the Facility to the Corps' satisfaction and it is being used successfully, but ACE sought equitable adjustments from the Contracting Officer for extra work caused by unexpected site conditions, defective specifications, and constructive changes to the contract. The Contracting Officer largely denied ACE's claims, and ACE then filed its complaint in this court on March 5, 2004, seeking recompense.

On March 31, 2006, after a five-day trial, this court held the government liable for differing site conditions, defective specifications, and a constructive change to the contract, and also found that the government wrongly assessed liquidated damages against ACE. *ACE Constructors*, 70 Fed. Cl. at 257. The court additionally "conclude[d] that ACE may be entitled to costs and attorney[s'] fees under the [EAJA], but reserve[d] a final determination in that regard pending completion of further proceedings under . . . Rules 54(d) and 58(c) [of the Rules of the Court of Federal Claims ("RCFC")]." *Id*. The court also awarded ACE the costs of suit. *Id*. at 295.

ACE filed a motion for attorneys' fees and costs under EAJA and its Bill of Costs on April 28, 2006. Proceedings on the motion and the Bill were deferred pending resolution of the government's appeal from the judgment. Following completion of the appellate process, ACE's motion and Bill of Costs were briefed by the parties, a hearing was held on February 13, 2008, and supplemental submissions were received from the parties. The disputed matters are now ready for disposition.

**ANALYSIS**

**A. Fees and Expenses under the Equal Access to Justice Act**

1. *EAJA requirements*.

EAJA provides a mechanism by which a qualifying party may receive an award of reasonable attorneys' fees. 28 U.S.C. § 2412(d)(1)(A), (B). To be eligible for an such an award, five criteria must be satisfied: (1) the applicant must have been a "prevailing party" in a suit

against the United States; (2) the government's position must not have been "substantially justified;" (3) there cannot be any "special circumstances [that] make an award unjust;" (4) any fee application must be submitted to the court within thirty days of final judgment in the action and also be supported by an itemized statement, and (5) a qualifying party must, if a corporation, have not had more than $7,000,000 in net worth and 500 employees at the time the adversarial adjudication was initiated. *Id.*; *see Commissioner, INS v. Jean*, 496 U.S. 154, 158 (1990); *Geo-Seis Helicopters, Inc. v. United States*, 79 Fed. Cl. 74, 76-79 (2007); *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 612, 614-15 (2007); *Loomis v. United States*, 74 Fed. Cl. 350, 353 (2006); *Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505, 508 (2003). ACE bears the burden of establishing that it meets these requirements, except that the government has the burden to show that its actions were substantially justified. *See White v. Nicholson*, 412 F.3d 1314, 1315 (Fed. Cir. 2005); *Hillensbeck v. United States*, 74 Fed. Cl. 477, 479-80 (2006); *Al Ghanim Combined Group Co. v. United States*, 67 Fed. Cl. 494, 498 (2005).

The government does not contest that ACE is a "prevailing party" or the existence of any "special circumstances" in the case, but it questions ACE's proofs regarding ACE's status as a qualifying party and argues that the government's position was "substantially justified."

a. *Qualifying "party."*

ACE filed its Bill of Costs and its motion for attorneys' fees within the required thirty days of the final judgment entered March 31, 2006. In its application, ACE stated that it was a "party" eligible for relief under EAJA because "[o]n the date this action was filed, ACE's net worth was less than $7,000,000, and it employed fewer than 500 workers." ACE's Motion and Application for Attorneys' Fees and Related Nontaxable Expenses ("Pl.'s Mot.") at 2. As support for this statement, ACE cited the affidavit of John Fulkerson, ACE's President, which made that same general statement without providing more details about the company's net worth or number of employees. *See* Pl.'s Mot., appended Affidavit of John Fulkerson ("Fulkerson Aff.") ¶ 2. Based on this record, the government contends that ACE has "not establish[ed] that it meets EAJA's employee and net worth limitations . . . [because it] . . . provides no supporting documentary evidence" about those two matters. Def.'s Resp. to Pl.'s EAJA Application ("Def.'s Resp.") at 1-3.

Although ACE's original application made only a minimal demonstration of its eligibility for relief, binding precedent establishes that "the content of the EAJA application should be accorded some flexibility." *Bazalo v. West*, 150 F.3d 1380, 1383-84 (Fed. Cir. 1998) ("Because he met the jurisdictional requirements of the EAJA statute, [plaintiff] could supplement his filing after the thirty-day time limitation to set forth a more explicit statement about [his qualification as a 'prevailing party']."); *see also Scarborough v. Principi*, 541 U.S. 401, 416-23 (2004) (holding that the "relation back" principle permits an EAJA applicant to supplement or amend a timely but incomplete application). ACE has invoked these precedents to flesh out the record respecting its net worth and number of employees, and the supplemental documentation provided by ACE establishes its status as a qualifying party for purposes of EAJA.

ACE filed a reply on February 6, 2008, appending an affidavit from its Certified Public Accountant and a copy of its audited financial statements for 2003, which indicate that ACE's net worth was $384,162 on the date this action was filed. *See* Pl.'s Supp. to Application and Reply to Def.'s Resp. ("Pl.'s Reply") at 2 and Attachment A (Affidavit of Whit Forehand) at ¶ 3 and appended financial statements as of Dec. 31, 2003. ACE thus falls well under the $7,000,000 statutory net-worth maximum for a qualifying party. Additionally, in a supplement filed on February 19, 2008, ACE provided a second affidavit of Mr. Fulkerson identifying that ACE had exactly 50 employees on its payroll on the date this action was filed. Pl.'s Supp. Reply Br. Supporting EAJA Application ("ACE's Supp. Br.") at 2 and appended Supplemental Affidavit of John Fulkerson at ¶ 2 and Ex. A. Accordingly, ACE has provided sufficient evidence of its status as a qualifying party.[1]

b. *"Substantially justified."*

The shoe is on the other foot regarding the "substantially justified" element of the requisite showing for an award under EAJA, because the burden of proving that its litigation position was "substantially justified" rests on the government. *See White*, 412 F.3d at 1315; *Hillensbeck*, 74 Fed. Cl. at 479-80; *Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505, 512 (2003). An award pursuant to Section 2412(d) is precluded if the government shows its position to be "'justified in substance or in the main' – that is, 'justified to a degree that could satisfy the reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The court does not examine a party's stance upon every individual issue addressed in the case, *Gargoyles, Inc. v. United States*, 45 Fed. Cl. 139, 148 (1999); rather, the question is "whether the government's overall position [both prior to and during litigation] had a reasonable basis in both law and fact." *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991); *see also Doty v. United States*, 71 F.3d 384, 386 (Fed. Cir. 1995) (defining "position of the United States" in EAJA as "the government's position throughout the dispute, including not only its litigating position but also the agency's administrative position").

The government's position "can be justified even though it is incorrect, and it can be substantially justified if a reasonable person could think it correct." *Manno v. United States*, 48 Fed. Cl. 587, 589 (2001) (internal quotations omitted). The inquiry is "not what the law now is, but what the [g]overnment was substantially justified in believing it to have been." *Loomis*, 74 Fed. Cl. at 355 (quoting *Pierce*, 487 U.S. at 561). "Substantially justified" is not to "'be read to raise a presumption that the [g]overnment position was not substantially justified simply because it lost the case.'" *Scarborough*, 541 U.S. at 415 (quoting H.R. Rep. No. 96-1005, at 10). Rather,

---

[1]This result is not surprising, given that the Corps' solicitation for construction of the Ammo Hot-Load Facility was designated as a "100% Small Business Set-Aside Solicitation," *ACE Constructors*, 70 Fed. Cl. at 258, and ACE was a qualified small business at the time of its bid and the award.

substantial justification occurs somewhere between winning the case and being "merely undeserving of sanctions for frivolousness." *See Pierce*, 487 U.S. at 566.

*i. Differing-site-condition claim ("the dirt claim").*

At trial, this court held that ACE faced a Type I differing site condition[2] because "[r]ather than being a balanced project as indicated by the cut-and-fill schematics, the site required approximately 129,000 additional cubic yards of soil." *ACE Constructors*, 70 Fed. Cl. at 271.[3] The Contracting Officer disallowed ACE's differing-site-condition claim, and the government disputed the claim both at trial and on appeal, arguing that ACE "knew better" concerning the specifications of the site or should have foreseen the error in the specifications and bid accordingly. *ACE Constructors*, 499 F.3d at 1365. However, this court and the Federal Circuit concluded that ACE was entitled to rely on the site elevations shown on a plan that had cross-sections of the site at 20-meter intervals based on an aerial survey, *see ACE Constructors*, 70 Fed. Cl. at 258,[4] and that "ACE acted reasonably in concluding that it would not need a significant amount of additional fill, and calculated its bid accordingly." *ACE Constructors*, 499 F.3d at 1366.

The government now argues that there was a "reasonable basis" for the Corps' Contracting Officer and for the government at trial to resist ACE's differing-site-condition claim. Def.'s Resp. at 6. The government explicitly revisits the merits by now shifting positions and contending that "ACE did not prove that conditions indicated in the contract differed materially from those actually encountered during performance." Def.'s Resp. at 9-10. However, the government's position on this point was not substantially justified. The evidence at trial showed that the engineer who had developed the project for the Corps had redesigned the project specifically to result in a "balanced" job, that ACE had made its own pre-bid assessment of the project drawings to assure itself that no significant import or export of fill would be required, that ACE had hired a consultant to confirm that result, that the project's plan sheets were materially

---

[2]A Type I differing site condition is a "latent physical condition[] at the site which differ[s] materially from th[at] indicated in th[e] contract." 48 C.F.R. § 52.236-2. *See also Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002); *H. B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed. Cir. 1998); *P. J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984).

[3]A "balanced project" is one where the amount of dirt excavated from a site is roughly equivalent to what is needed for fill and to meet embankment requirements. *ACE Constructors*, 499 F.3d at 1365.

[4]Post-award on-ground surveys of the site, which occupied an area several miles in length, showed that cross-sections based on the aerial survey were accurate at each end of the site but were several feet in error (lower than shown) between the ends. A visit to the site confirmed this condition. *ACE Constructors*, 70 Fed. Cl. at 270 n.16.

incorrect insofar as elevations were concerned, and that a significant mid-course correction had to be made by the Corps to provide that ACE would bring in fill dirt when the differing site condition became evident. *See ACE Constructors*, 70 Fed. Cl. at 258-62, 267-71. To be blunt, the Corps' aerially generated contours were in error, that fact was recognized fairly early in the construction of the project, and work on the project had to be revised as a result.

*ii. Defective-specification claim ("the concrete paving claim").*

The concrete paving claim was based on the contract's authorization for either fixed-form paving or slip-form paving for the pallet storage pad, loading apron, and taxiway. *See ACE Constructors*, 70 Fed. Cl. at 284. However, the project had been designed to be paved only by a slip-form paver. *Id*. The pallet storage pad and loading apron each had a dome-shaped profile which could be paved relatively easily with a slip-form paver, but could be paved with a fixed-form paver only with the forms set in a direction opposite to that indicated on the project design sheets. *Id*. at 284-85. Moreover, the dome shape was not apparent from the design sheets provided at the time of bid. Only a portion of the concrete-panel corner elevations for the pallet storage pad and loading apron were shown on the sheets provided as part of the solicitation for bids. *Id*. at 285-86. A note accompanying the sheets indicated that the other corner elevations would be provided at a later time. *Id*. at 286. The government now contends, at it did at trial and on appeal, that the missing elevations on the pertinent drawing sequences could have been derived by "mathematical interpolation" and thus ACE could have determined the finished elevations. Def.'s Resp. at 13. The government suggested that with those elevations, ACE would have become aware of the domed shape of the pallet storage pad and loading apron and could have concluded that a slip-form paver was necessary. *Id*. at 13-15. In addition, the government asserts that the contractual specification for concrete with a two-inch slump was consistent only with slip-form paving and that ACE should have recognized as much. *Id*. at 15.

These contentions by the government were unavailing at trial and on appeal, and they fare no better in supplying substantial justification for the government's faulty specifications. The project was designed only for a slip-form paver and yet a fixed-form paver was both authorized by the contract and then specifically approved by the Corps' supervising engineers for ACE's use on the project. *ACE Constructors*, 70 Fed. Cl. at 284. It also became readily apparent at trial that during the Corps' administration of ACE's performance, the Corps' officials never made pertinent inquiries of the designing engineer notwithstanding the substantial difficulties ACE and its paving subcontractor had in meeting project specifications. The government's actions were not substantially justified respecting ACE's defective-specification claim.

*iii. Profilograph claim.*

Testing of the finished paving also was a disputed issue. After the first concrete was poured, the Corps required that a profilograph be used to measure smoothness, and some of the

concrete failed the profilograph testing. *ACE Constructors*, 70 Fed. Cl. at 287.[5] The contract, however, expressly provided that the contractor "shall" furnish and maintain a straightedge for smoothness testing, but "may" furnish a profilograph. *Id*. Somewhat inconsistently, the contract later provided that "[t]he profilograph method shall be used for all longitudinal and transverse testing, except where the runs could be less than 60 m[eters] in length and at the ends." *Id*. at 288.

Apart from requiring that ACE and its paving subcontractor furnish and use a profilograph, the Corps initially directed ACE to take up and repave areas that failed profilograph testing, and then also refused to pay for work that failed to pass profilograph testing. *ACE Constructors*, 70 Fed. Cl. at 263-4, 287. Subsequently, the Corps suspended profilograph testing as a precondition for payment for areas of concrete on the storage pad and loading apron because of the dome shape, and for areas of the taxiway where the slope changed. *Id*. at 287-88. Nonetheless, the Contracting Officer denied an equitable adjustment on this ground. In litigation, the government's position was inconsistent. At trial, the government contended that the contract required profilograph testing and that it was appropriate for use with the concrete paving on the project. *Id*. at 287. This court concluded that testing with a straightedge, not a profilograph, was required by the contract, that profilograph testing was inappropriate for many aspects of the project, and that the Corps requirement for such testing constituted a constructive change to the contract. *Id*. at 288-89. On appeal, "the government pressed the theory that the specifications were indeed defective with respect to the profilograph testing requirement, but that ACE did not assert and prove that it relied on the defective specification." *ACE Constructors*, 499 F.3d at 1362. The court of appeals rejected that contention and affirmed the award of an equitable adjustment because the Corps had "required ACE to use the defective method for a period of time." *Id*. at 1363. In this instance, the government's position is not substantially justified because the Corps conceded during performance of the contract that profilograph testing was not appropriate but nonetheless refused to allow any adjustment for the time during which it had required use of the test method. Its changing grounds for urging denial of an equitable adjustment further reduce the credibility of its asserted justifications for its position.

*iv. Synopsis.*

Taken as a whole, the government's position in the litigation was not substantially justified on any of the three principal grounds at issue. Perhaps anticipating this finding, the government counters that it prevailed in some respects because "ACE recovered significantly less than it sought from the [C]ontracting [O]fficer and the [c]ourt." Def.'s Resp. at 4. The government points out that ACE requested that the court award $1,822,146.39 in damages but that the actual judgment amounted to $1,629,139.97, or $193,006.42 less than the amount sought. *Id*. at 5. The difference was attributable to the court's findings on several subsidiary

[5]A profilograph is an instrument that looks something like a pair of bicycle wheels with a connecting truss, that was developed and has been used by California highway authorities to evaluate the smoothness of stretches of highways. *See ACE Constructors*, 70 Fed. Cl. at 260.

issues affecting quantum, not entitlement, such as ACE's labor-burden rate, *see ACE Constructors*, 70 Fed. Cl. at 276, an adjustment to equipment rental amounts, *id*. at 276-78, 280, and bond costs. *Id*. at 280. However, even then, ACE prevailed on the majority of those secondary issues. In all events, the adjustments made to ACE's claimed amounts to take account of the secondary issues reflected relatively minor sums. The government cannot generate substantial justification for its overall position by the fact that it prevailed on some secondary issues.

2. *Attorneys' fees.*

A $125 per-hour cap applies to attorneys' fees under EAJA, "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). ACE seeks to recover the actual attorneys' fees incurred, $188,513.50, arguing that "special factors" justify an award in excess of the statutory cap, and that these factors include: (1) a "limited pool of available attorneys admitted to [this court]"; (2) the firm's "specialized practice of construction litigation, with particular emphasis on public construction projects and government contracts," and (3) the "numerous and complex" issues presented by the case. Pl.'s Mot. at 3; Pl.'s Supp. Br., Ex. B at 5.[6] In the alternative, ACE requests that the court apply a cost of living adjustment ("COLA") to the EAJA maximum rate. Pl.'s Reply at 28.

Responding to ACE's first contention, the government asserts that "expertise" with construction matters and government contracts cases is an insufficient basis for an enhanced fee award. Def.'s Resp. at 19 (citing *Prowest Diversified, Inc. v. United States*, 40 Fed. Cl. 879, 889 (1998)). There is merit to this contention. In *Pierce*, 487 U.S. 552, the Supreme Court stated that the exceptions to EAJA's cap on attorneys' fees "are not of broad and general application." *Id*. at 573. Thus, "the 'novelty and difficulty of issues,' . . .[and] 'the work and ability of counsel,'" do not qualify because they "are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are." *Id*. The court explained that the EAJA exception for the "limited availability" factor must refer to attorneys "having some distinctive knowledge or specialized skill needful for the litigation in question – as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* at 572. A construction or government-contract case does not require specialized knowledge or skill of that nature. *See Prowest Diversified*, 40 Fed. Cl. at 889. The EAJA cap would essentially become a dead letter in this court if these types of litigation could be considered to involve "special factors." *See Pierce*, 487 U.S. at 573 ("For the same reason of the need to preserve the intended effectiveness of the [then] $75 cap, we think the other 'special factors' envisioned by the exception must be such as are not of broad and general application."). Although this was admittedly a complex case that raised a great many of

[6]The requested rate amounts to $232.96 per hour ($188,513.50 divided by 809.2 hours). Pl.'s Supp. Br., Ex. B at 5.

the specialized issues that can arise with governmental construction contracts, the law involved was not novel and the court is not convinced that the "nature of the case" falls within the "identifiable practice specialty" contemplated by the Supreme Court in *Pierce*.

Adjustment of the cap on attorneys' fees for increased cost of living is a different matter. To receive an adjusted award, a plaintiff must "allege[] that the cost of living has increased [since the March 1996 enactment of EAJA], as measured by the Department of Labor's Consumer Price Index ('CPI')," *California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 733 (1999), and supply the court with relevant CPI data. *See Lion Raisins*, 57 Fed. Cl. at 519 (citing *Weaver-Bailey Contractors, Inc. v. United States*, 24 Cl. Ct. 576, 580-81 (1991)). Such an adjustment should be freely granted. *See Baker v. Bowen*, 839 F.2d 1075, 1084 (5th Cir. 1988) (stating that absent "unusual circumstances," a cost-of-living adjustment should be granted in an EAJA attorneys' fees award); *see also Payne v. Sullivan*, 977 F.2d 900, 903 n.2 (4th Cir. 1992) (acknowledging that many circuits "regard the cost of living adjustment as 'essentially perfunctory or even mandatory'" (citation omitted)); *Former Employees of BMC Software, Inc. v U.S. Sec'y of Labor*, 519 F.Supp.2d 1291, 1365 (C.I.T. 2007) ("[T]he great weight of authority today recognizes that '[i]t would undermine the purpose of EAJA to remove the financial disincentive to challenge wrongful government action' if . . . courts could simply 'withhold an inflation adjustment without reason.'" (quoting *Payne*, 977 F.2d at 903)).

At the hearing on ACE's application for fees under EAJA, the government did not strongly resist a cost-of-living adjustment, but it did contest ACE's use of the midpoint method for calculating the COLA. *See Chiu*, 948 F.2d at 722 n.10 (endorsing the use of "a single mid-point inflation adjustment factor applicable to services performed before and after that mid-point"); *see also Geo-Seis*, 79 Fed. Cl. at 79 (applying a mid-point adjustment factor for fees in a bid-protest case of short duration). The government argued that under *Hubbard v. United States*, 480 F.3d 1327, 1334 (Fed. Cir. 2007), "the [c]ourt should try to determine the [months] in which different portions of fees were incurred" and use a month-by-month analysis to derive the appropriate COLA. Hr'g Tr. 35:2-6 (Feb. 13, 2008). Detailed daily time had been provided by ACE, and in a supplemental filing ACE has supplied the necessary month-by-month COLA calculation to satisfy the government's position. *See* Pl.'s Reply at 3. The calculation using these data results in an *increase* of $2,089.98 over that obtained using a midpoint analysis for the COLA. *Id*.

In the circumstances, the court adopts the month-by-month method of calculating the applicable COLA and awards adjusted attorneys' fees to ACE totaling $127,669.73.

**B. Costs**

RCFC 54(d)(1) provides that "[c]osts other than attorneys' fees may be awarded to the prevailing party to the extent permitted by [EAJA, 28 U.S.C. § 2412(a)(1)]." The prevailing party has the obligation to provide documentation of the costs it requests to be awarded. *Asphalt Supply & Serv., Inc. v. United States*, 75 Fed. Cl. 598, 602 (2007) (citing *Pan American Grain*

*Mfg. Co. v, Puerto Rico Ports Auth.*, 193 F.R.D. 26, 35 (D.P.R. 2000), *aff'd*, 295 F.3d 108 (1st Cir. 2002)). ACE filed its initial Bill of Costs, followed by a Revised Summary of Fees and Expenses and a Revised Summary of Costs, *see* Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 96-102, and Second Revised Summaries. *See* Pl.'s Supp. Br., Ex. B. The government questions certain of ACE's claimed costs.

1. *Clerk's fees.*

EAJA explicitly allows a judgment for costs "as enumerated in [S]ection 1920 of this title." 28 U.S.C. § 2412(a)(1). Under 28 U.S.C. § 1920(1), a judge or clerk of any court of the United States is allowed to tax as costs the "[f]ees of the clerk and marshal." The amount that the clerk of this court may charge as filing fees is governed by 28 U.S.C. § 1926, which provides that the fees are to be prescribed by the Judicial Conference of the United States. At the time ACE filed its Complaint, filing fees were set at $150.

ACE initially sought $300 in clerk's filing fees, which included a $150 filing fee on March 3, 2004 and a $150 fee on May 17, 2005. *See* Pl.s' Mem. Supporting Taxing of Costs at 3 (citing Fulkerson Aff.) and First Vezina Aff. at 3. The government objected to $150 of these fees because it claims that "[t]he docket sheet in this case . . . reflects that, on March 5, 2004, ACE paid only $150 in filing fees; the docket sheet does not support ACE's contention . . . that it paid a second $150 filing fee on May 17, 2005." Def.'s Objections to Pl.'s Bill of Costs ("Def.'s Objections") at 1. ACE then withdrew its request for the May 5, 2004 fee. *See* Pl.'s Reply to Def.'s Objections at 2; *see also* Pl.'s Reply at 2 and Ex. B (Second Vezina Aff.) at pt. 2, 101. Accordingly, ACE is awarded $150 as the cost of the filing fee paid on March 5, 2004.

2. *Costs of transcripts.*

ACE claims that it incurred $15,419.76 in costs for transcripts of depositions, two hearings, and trial, plus a copying charge. Pl.'s Mem. Supporting Taxing of Costs at 3 (citing Fulkerson Aff.); Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 101. The government contends that ACE is only due compensation of $2,802.80 for transcripts of the depositions. Def.'s Objections at 1-4.[7] In the alternative, the government contends that ACE should not be compensated for the costs of condensed electronic copies of the transcripts and for the transcript of a hearing held on February 2, 2006.

The government's initial objection is that ACE is entitled to no compensation for costs of transcripts of the trial and two hearings. The government argues that "[a] plaintiff . . . must provide an explanation as to the necessity of a transcript; an invoice alone does not satisfy the

[7]Specifically, these costs are $1,828.75 for the depositions of Danny Menchaca, Telo Fuentes, and David L. Wise on April 5, 2005; $329.75 for the depositions of Jerry Fletcher, Allen Nobles, and Louis Wenick on June 10, 2005; and $644.30 for the deposition of Will Sanford on October 20, 2005. Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 101.

requirement to provide sufficient documentation for the [c]ourt to find that the transcript was necessarily obtained for use in the case and a reasonable expense under the circumstances." Def.'s Objections at 2 (citing *Asphalt Supply*, 75 Fed. Cl. at 603).

The court has discretion to tax the costs of transcripts from court proceedings when (1) the transcripts are necessarily obtained for use in the case, and (2) the cost is reasonable. *See Asphalt Supply*, 75 Fed. Cl. at 602-03 (citing 28 U.S.C. § 1920(2)); *see also Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 233-34 (1964); *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1245 (10th Cir. 1988); *Syntex Ophthalmics, Inc. v. Novicky*, 795 F.2d 983, 986 (Fed. Cir. 1986) (citing *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 781-82 (Fed. Cir. 1983)). Because trial in this case was complicated with many disputed issues, the court finds that ACE's costs for transcripts of the trial are taxable. *See Baker v. John Morrell & Co.*, 263 F.Supp.2d. 1161 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004) (holding that plaintiff was entitled to recover the cost of trial transcript; due to the length of the trial and the complexity and sheer number of issues argued and raised by the defendant, the entire trial transcript was necessary for the plaintiff's effective prosecution of her case). Further, the reasonableness of the costs of the transcript is shown by the fact that they equal the amount charged to the government for the same transcripts. *See* Pl.'s Reply to Def.'s Objections at 2; Hr'g Tr. 61:15-16.[8]

The government contests other aspects of ACE's requested transcription costs. Hr'g Tr. 25:4-6. First, ACE's costs of $250.30 for a transcript of a hearing held on October 11, 2005 are disputed because that amount relates to a condensed copy and a disk. The government avers "those things are for the convenience of attorneys [and are] not necessary." Hr'g Tr. 25:18-20. Similarly, the government objects to $1,963.50 of the costs of the trial transcript on the same grounds. Hr'g Tr. 26:3-7. The expense of additional copies of transcripts in electronic or condensed format must be justified on grounds of necessity. If incurred for the convenience of counsel such costs are not taxable. *See Asphalt Supply*, 75 Fed. Cl. at 603; *Fields v. Gen. Motors.*, 171 F.R.D. 234, 236 (N.D. Ill. 1997); *Nugget Distrib. Co-op. of Am. v. Mr. Nugget, Inc.*, 145 F.R.D. 54, 58 (E.D. Pa. 1992). ACE's counsel supported the necessity of electronic copies of the trial transcripts by observing that those transcripts were lengthy and electronic versions were "vital" to their preparation of post-trial briefs in the time allotted. Hr'g Tr. 60:21 to 61:4. The court concurs that, although certainly convenient for ACE's attorneys, the electronic transcripts were not simply for convenience, but rather were necessary to timely post-trial preparation of the case. The use of electronic transcripts also promoted judicial economy by reducing the attorneys' time compensable under EAJA from that which would have been

[8]The government points out that there is a $36 discrepancy between the amount billed to the government and ACE's claimed costs for the trial transcripts. Def.'s Objections at 3. The discrepancy was for Federal Express delivery because ACE's counsel is located in Florida, not Washington, D.C. *See* Hr'g Tr. 61:16-21. ACE's taxable costs appropriately include this amount, as the premium delivery charge reflects necessity, not just the convenience of counsel, given the post-trial briefing schedule, and thus the charges are taxable. *Cf. Asphalt Supply*, 75 Fed. Cl. at 602-03 (premium delivery not shown to be necessary).

required if the attorneys had had to rely only on non-electronic transcripts to prepare their post-trial briefs.

Correlatively, the hearing held on October 11, 2005, constituted the final pre-trial conference in the case and was important to the parties' preparation for the trial set to convene in El Paso, Texas six days later. The government contests the costs of the transcript of that hearing on the ground that "the invoices that ACE's attorneys' issued . . . do not reflect that ACE's attorneys billed ACE for those costs." Def.'s Supp. Br. Concerning Pl.'s Replies Upon Its EAJA Application and Bill of Costs ("Def.'s Supp. Br.") at 7, ¶ 25. ACE responds that the "items . . . were paid directly by ACE" and did not run through [the] law firm's accounting system." Hr'g Tr. 62:4-8. The costs of this transcript accordingly are allowable. ACE's taxable costs thus appropriately include $11,917 for the trial transcripts and $250.30 for the transcript of the hearing held on October 11, 2005.

A third charge for a transcript protested by the government relates to a hearing held on February 2, 2006. ACE claims $306.85 for the cost of that transcript. Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 101. Under RCFC 54(d)(1)(A), "[a]ny vouchers, receipts or invoices supporting the costs being requested [must] be attached [to the bill of costs] as exhibits." ACE failed to include an invoice for this charge and also provided no explanation of why this transcript was necessary. Accordingly, this charge is not taxable.

ACE's allowable costs for transcripts thus total $15,112.91, comprised of $2,802.80 for deposition transcripts, $250.30 for a transcript of the hearing held on October 11, 2005, $142.81 for copies, and $11,917 for trial transcripts.

3. *Expert witness costs.*

ACE seeks $36,225 in expert witness fees for 223 hours of work by its testifying expert, Louis M. Wenick, P.E., at a rate averaging $162.44 per hour. Pl.'s Supp. Br., Ex. B at 5.[9] The government contests this amount based on the mandate of 28 U.S.C. § 2412(d)(2)(A)(i) that "no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States." Def.'s Resp. at 20.

---

[9]ACE initially sought fees for an additional 9.75 hours of work done between October 13 and 31, 2002 at a rate of $120 per hour. Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 99. However, ACE agreed to rescind its request for these costs based upon the government's contention that the time was spent by Mr. Wenick well before the commencement of the case and related to ACE's claims to the Contracting Officer rather than for this action. *See* Pl.'s Supp. Br. at 8; Def.'s Supp. Br. ¶ 23 (citing *Hillensbeck*, 74 Fed. Cl. at 484 ("Plaintiff may not recover for expenses related to administrative proceedings.")).

ACE's request to the court also contained typographical errors in the amounts due for Mr. Wenick's services during March and May 2005. Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 99. The court's calculations correct these errors.

The United States compensated two experts in this case.[10] The compensation paid to Will Sanford, an employee of the Army Corps of Engineers, amounted to $81.80 per hour, as weighted for fringe benefits. Def.'s Resp. at 20 (citing attached Declaration of Will Sanford, ¶ 3). The weighted compensation of Doran Storey, an employee of the Defense Contract Audit Agency, amounted to $44.70 per hour. Def.'s Resp. at 21 (citing attached Declaration of Doran Storey, ¶ 3).[11] The government argues that the provisions of 28 U.S.C. § 2412(d)(2)(A)(i) require that the court cap plaintiff's allowable expert costs at $81.80 per hour.

Mr. Wenick had strong credentials for service as an expert and was a credible witness. Judged by the compensation of other experts who have testified recently in other cases heard by the court, Mr. Wenick's charges of $162.44 per hour are very reasonable, even modest by comparison. *See, e.g.*, *American Fed. Bank, FSB v. United States*, 74 Fed. Cl. 208, 221 (2006) (expert testifying for the government received $600 per hour for his work, and his assisting colleagues each received $400 per hour for their work). Nonetheless, the court must apply the statutory provision as written, and the statute allows no room for adjustment of its plain, mandatory terms. Accordingly, ACE may recover fees for Mr. Wenick's expert work and testimony, but only at the highest rate paid by the government to any of its experts. Therefore, ACE is entitled to fees for Mr. Wenick derived by multiplying his hours of work (223) by Mr. Sanford's weighted hourly rate ($81.80 per hour), resulting in $18,241.40.

4. *Additional disbursements*.

After ACE filed supplemental supporting documentation, Pl.'s Reply; Pl.'s Reply to Def.'s Objections, the government, with leave of the court, filed a supplemental brief outlining its specific objections to certain of ACE's disbursements on February 14, 2008. *See* Def.'s Supp. Br. ACE responded to those objections on February 19, 2008, and included additional supplemental documentation and an updated summary of the requested fees and costs. *See* Pl.'s Supp. Br.; *see also M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1410 (7th Cir. 1991) (holding that district court did not err in allowing party to supplement its petition for costs when petition was timely filed). Only the disbursements contested by the government are addressed here.

---

[10]Messrs. Sanford and Storey testified for the government as experts at trial. Mr. Sanford was qualified as an expert in the evaluation of costs in claims arising from construction contracts, Trial Tr. 1271:7 to 1273:23, and Mr. Storey was qualified as an expert in the auditing of contractor claims presented to the federal government, Trial Tr. 1023:15 to 1024:7.

[11]Messrs. Sanford and Storey received no compensation apart from their salary and benefits received through their employment by the federal government. The weighted compensation amounts for each take into account their employment benefits as well as their direct salaries.

For reprographic services, ACE is awarded $9,492.20.[12] The government contested some of the costs on the grounds that "the invoices that ACE's attorneys issued to it for the periods during which those services were rendered . . . do not reflect that ACE's attorneys billed ACE for those services." Def.'s Supp. Br. at 2, ¶ 1. These costs are appropriately due to ACE, however, because the supporting invoices were either billed at a later date or paid by ACE directly rather than through ACE's attorneys. *See* Pl.'s Reply at 5 ("[S]ome of the costs claimed by ACE do not appear in counsel's monthly invoices. The reason for this is simply that ACE paid those charges directly to the vendors. In each such instance, vendor invoices are or have been submitted to the Court to document the actual cost incurred.").

The government resists some of ACE's claimed travel expenses, citing "failure to identify vendor invoices reflecting the incurrence of those charges." Def.'s Supp. Br. at 3, ¶ 5; Def.'s Objections at 4 (citing RCFC 54(d)(1)(A) (requiring any vouchers, receipt, or invoices supporting the costs to be attached as exhibits)). ACE failed to provide vendor invoices for several requested costs, merely directing the court to the bills sent to ACE by counsel. This documentation is insufficient, and accordingly the court does not award ACE the requested costs that lack underlying vendor invoices as support. With those subtractions, ACE is awarded $3,976.29 for witness fees and costs[13] and $11,974.57 in attorney travel expenses.[14] ACE is also

---

[12]The correct supporting document for ACE's reprographic services is Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 2.

[13]This amount is $70 less than ACE's request because of insufficient supporting documentation for parking and toll costs incurred by Mr. Jerry Fletcher on October 16, 2005. *See* Pl.'s Reply, Ex. B at 1 (directing the court to Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 1, 89-90, which bills the client for this expense but does not provide receipts of the costs).

The government also contested $60.40 for meals for Mr. John Fulkerson, ACE's President, on March 31, 2005. Def.'s Supp. at 8, ¶ 30. ACE is awarded these costs based on its response that ACE "maintains its principal place of business and Mr. Fulkerson resides in Gainesville, Florida. Mr. Fulkerson . . . was deposed in El Paso, Texas." Pl.'s Reply at 8 (citing Fulkerson Dep. 1:18-23; 82:1-20; Trial Tr. 198:21:25).

[14]ACE is not awarded the following costs because it has not provided, or directed the court to, any vendor invoice that underlies attorney travel expenses allegedly incurred on: (1) February 25, 2005, amounting to $579.80 for airfare, $8.61 for meals, and $19.50 for tolls/parking; (2) March 15, 2005, consisting of $10 for meals and $20 for tolls and parking; (3) June 2, 2005, for lodging amounting to $88.09 (which is actually a witness cost incurred for Mr. Fletcher); and (4) October 10, 2005, for Mr. Vezina's tolls and parking totaling $40.

Also, the correct amount for lodging costs on March 15, 2005 is $150.08, as supported by the receipt provided in Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 2, 19-20, not the requested amount of $332.64, which was a lodging cost on April 1, 2005.

Finally, vendor-invoice support for Mr. Copenhaver's hotel expenses of $2,097.92 on October 15, 2005 was located in Pl.'s Reply, Ex. B (Second Vezina Aff.) at pt. 1, 39-42.

awarded $2,507.65 for postage and courier charges, $133.06 for long distance and facsimile charges, $1,902.26 for online legal research charges, and $5,151.00 in paralegal fees, none of which are contested by the government.

**CONCLUSION**

For the reasons set forth, ACE's motion for attorneys' fees and costs under EAJA is GRANTED. ACE is awarded attorneys' fees of $127,669.73 and costs totaling $59,149.14, consisting of $150 in clerk's fees, $15,112.91 in transcript costs, $18,241.40 in expert witness costs, $3,976.29 for witness fees and costs, $11,974.57 in attorney travel expenses, $2,507.65 for postage and courier charges, $133.06 for long distance and facsimile charges, $1,902.26 for online legal research charges, and $5,151.00 in paralegal fees. The clerk shall enter judgment for ACE in the total amount of $186,818.87.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge